## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA,
## NORTHERN DIVISION

| | | |
|---|---|---|
| **LILIAN WOODLEY, as the** | * | |
| **administratrix of the Estate of** | * | |
| **RUFUS WOODLEY,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **CASE No.:  2:07-CV-74-ID** |
| | * | |
| **PFG-LESTER BROADLINE, INC.,** | * | |
| **KENNETH O. LESTER COMPANY,** | * | |
| **INC., et al.,** | * | |
| | * | |
| **Defendants.** | | |

## <u>MOTION TO EXCLUDE</u>

COME NOW the defendants, by and through the undersigned counsel and pursuant to Rule 702, 703, and 403 of the Federal Rules of Evidence, move this Honorable Court to exclude the testimony of James R. Lauridson, M. D.  In support of their motion, defendants rely on the following:

1) Plaintiff's Rule 26 Expert Disclosures, attached hereto as Exhibit A.

2) Deposition of James R. Lauridson, M. D. attached hereto as Exhibit B.

3) Plaintiff's complaint and amendments, defendants' answers, and all other pleadings, exhibits, and documents of record.

4) Defendants' Brief in Support of Motion to Exclude filed contemporaneously herewith.

WHEREFORE, PREMISES CONSIDERED, the defendants request this Honorable Court to grant its motion and exclude the testimony of James L. Lauridson, M. D.

Respectfully submitted,

s/ Matthew W. Robinett
WILLIAM C. WOOD
WOO007 – ASB-2689-DA4W
MATTHEW W. ROBINETT
ROB127 – ASB-3523-172M
*Attorneys for Defendants*
NORMAN, WOOD, KENDRICK & TURNER
Financial Center, Suite 1600
505 20th Street North
Birmingham, AL  35203
Telephone:  (205) 328-6643
Fax:          (205) 251-5479
Email:       wood@nwkt.com
              mrobinett@nwkt.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA,
### NORTHERN DIVISION

| | | |
|---|---|---|
| **LILIAN WOODLEY, as the** | * | |
| **administratrix of the Estate of** | * | |
| **RUFUS WOODLEY,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **CASE No.:  2:07-CV-74-ID** |
| | * | |
| **PFG-LESTER BROADLINE, INC.,** | * | |
| **KENNETH O. LESTER COMPANY,** | * | |
| **INC., et al.,** | * | |
| | * | |
| **Defendants.** | * | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2008, I electronically filed the foregoing with the Clerk of the Court through the CM/ECF system which will send notification of such filing to the following:

Michael J. Crow
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, PC
P.O. Box 4160
Montgomery, AL 36103-4160

Respectfully submitted,

s/ Matthew W. Robinett
WILLIAM C. WOOD
WOO007 – ASB-2689-DA4W
MATTHEW W. ROBINETT
ROB127 – ASB-3523-172M
*Attorneys for Defendants*
NORMAN, WOOD, KENDRICK & TURNER
Financial Center, Suite 1600
505 20th Street North

Birmingham, AL  35203
Telephone:   (205) 328-6643
Fax:            (205) 251-5479
Email:          wood@nwkt.com
                   mrobinett@nwkt.com

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

| | | |
|---|---|---|
| **LILLIAN WOODLEY as the administratrix of the Estate of RUFUS WOODLEY,** | * * * * | |
| **Plaintiffs,** | * * * | **CIV. ACT. NO.: 2:07cv74-ID** |
| **v.** | * * | |
| **PFG-LESTER BROADLINE, INC.; KENNETH O. LESTER COMPANY, INC.,** | * * * * | |
| **Defendants.** | * * | |

## PLAINTIFF'S EXPERT DISCLOSURES

Plaintiff, Lillian Woodley, pursuant to the Court's Order dated March 13, 2007 hereby discloses the identity of the following persons who may be used at the trial of this matter:

1.    Silvo Papapietro;

2.    James Lauridson.

MICHAEL J. CROW (CRO039)
Attorney for Plaintiffs

OF COUNSEL:

BEASLEY, ALLEN, CROW,
  METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
Montgomery, AL 36103-4160
(334) 269-2343

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon all counsel of record listed below via e-file, on this the 22nd day of October, 2007.

_Michael Crow_

OF COUNSEL

Matthew W. Robinett
William C. Wood
Norman, Wood, Kendrick and Turner
Financial Center, Suite 1600
505 Twentieth Street North
Birmingham, Alabama 35203

# Exhibit B

# FREEDOM COURT REPORTING

1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         NORTHERN DIVISION
4
5    CASE NUMBER:  2:07-CV-74-ID
6    LILIAN WOODLEY, AS THE ADMINISTRATRIX
7    OF THE ESTATE OF RUFUS WOODLEY,
8         Plaintiffs,
9         vs.
10   PFG-LESTER BROADLINE, INC., ET AL.,
11        Defendants.
12
13        S T I P U L A T I O N
14        IT IS STIPULATED AND AGREED by and
15   between the parties through their respective
16   counsel, that the deposition of James R.
17   Lauridson may be taken before Sara Mahler,
18   CCR, at the offices of Beasley, Allen, Crow,
19   Methvin, Portis & Miles, at 218 Commerce
20   Street, Montgomery, Alabama 36103, on the
21   27th day of February, 2008.
22
23        DEPOSITION OF JAMES R. LAURIDSON

2

1         IT IS FURTHER STIPULATED AND
2    AGREED that the signature to and the reading
3    of the deposition by the witness is waived,
4    the deposition to have the same force and
5    effect as if full compliance had been had
6    with all laws and rules of Court relating to
7    the taking of depositions.
8         IT IS FURTHER STIPULATED AND
9    AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17        IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21        * * * * * * * * * * * * *
22
23

3

1         * * * * * * * * * * * * *
2              I N D E X
3            EXAMINATION
4                     PAGE
5    By Mr. Wood ......................... 6
6        DEFENDANT'S EXHIBITS
7                     PAGE
8    Exhibit 26 - Notice of Deposition ... 7
9    Exhibit 38 - Dr. Fallahi's
10      records .................. 17
11   Exhibit 39 - CV ................... 18
12   Exhibit 27 - Federal Rule 26
13      excerpt ................. 21
14   Exhibit 28 - Lauridson's report .... 22
15   Exhibit 30 - SEAK document ........ 53
16   Exhibit 31 - Article from Beasley
17      website ................. 70
18   Exhibit 33 - Nibbana Graphics
19      info ................... 73
20   Exhibit 34 - Jere Beasley Report,
21      April 2003 .............. 79
22   Exhibit 35 - Jere Beasley Report
23      dated May, 2004 .......... 82

4

1    Exhibit 36 - Page 24,
2       Dr. Papapietro's
3       deposition.  ........... 91
4    Exhibit 37 - Dr. Arciniegas'
5       record ................ 102
6         * * * * * * * * * * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

5

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3        NORTHERN DIVISION
4    CASE NUMBER: 2:07-CV-74-ID
5    LILIAN WOODLEY, AS THE ADMINISTRATRIX
6    OF THE ESTATE OF RUFUS WOODLEY,
7        Plaintiffs,
8    vs.
9    PFG-LESTER BROADLINE, INC., ET AL.,
10        Defendants.
11   BEFORE:
12        SARA MAHLER, Commissioner.
13   APPEARANCES:
14        MICHAEL J. CROW, ESQUIRE, of
15   BEASLEY, ALLEN, CROW, METHVIN, PORTIS &
16   MILES, 218 Commerce Street, Montgomery,
17   Alabama 36103, appearing on behalf of the
18   Plaintiffs.
19        WILLIAM C. WOOD, ESQUIRE, of
20   NORMAN, WOOD, KENDRICK & TURNER, 505
21   Twentieth Street North, Suite 1600,
22   Birmingham, Alabama 35203, appearing on
23   behalf of the Defendants.

6

1        I, SARA MAHLER, CCR, a Court
2    Reporter of Wetumpka, Alabama, acting as
3    Commissioner, certify that on this date, as
4    provided by the Federal Rules of Civil
5    Procedure and the foregoing stipulation of
6    counsel, there came before me at the offices
7    of Beasley, Allen, Crow, Methvin, Portis &
8    Miles, 218 Commerce Street, Montgomery,
9    Alabama 36103, beginning at 1:00 p.m., and
10   James R. Lauridson, witness in the above
11   cause, for oral examination, whereupon the
12   following proceedings were had:
13        JAMES R. LAURIDSON,
14   being first duly sworn, was examined and
15   testified as follows:
16        COURT REPORTER: Usual
17   stipulations?
18        MR. CROW: Yes.
19        MR. WOOD: That would be fine.
20        EXAMINATION
21   BY MR. WOOD:
22        Q.  Tell us your name, please,
23   sir.

7

1        A.  James R. Lauridson.
2        Q.  All right, sir.  And you live
3    and work here in the Montgomery area; is
4    that right?
5        A.  Yes, sir, that's correct.
6        Q.  Where are you presently
7    employed?
8        A.  I'm self-employed.
9        Q.  Doing what kind of work?
10       A.  I do some clinical medicine, I
11   do autopsies, privately and with a couple of
12   hospitals, and I do case consultations.
13       Q.  What kind of case
14   consultations, please, sir?
15       A.  The majority of them are on
16   the criminal side:  Criminal defense, some
17   criminal prosecution, and then some civil.
18           (Whereupon, Defendant's
19           Exhibit No. 26 was marked
20           for identification.)
21       Q.  Let me show you what's been
22   marked as Exhibit 26, which is a Notice of
23   your deposition.  Have you seen that before,

8

1    please, sir?
2        A.  I have, yes.
3        Q.  Have you brought the items
4    that were requested?
5        A.  Everything that is available,
6    I have brought, yeah.
7        Q.  What is not available?
8        A.  I don't have a complete record
9    of all of my testimonies in the past.  I
10   have testified when I was a medical
11   examiner, I testified a large number of
12   times, and I did not keep a record of those.
13       Q.  All right, sir.  Were those
14   all in criminal cases?
15       A.  For the most part, yes.
16       Q.  Well, were some of them in
17   civil cases?
18       A.  Yes.
19       Q.  How many were in civil cases?
20       A.  Again, it's a minority.  But,
21   in medical examiner's work, we did generate
22   some civil cases.
23       Q.  How many times have you

2  (Pages 5 to 8)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

9

1  testified in civil cases all total?
2          MR. CROW: Are you talking
3  about trial testimony or deposition?
4          MR. WOOD: Deposition or
5  trial.
6      A.    My estimate is probably
7  fifteen times.
8      Q.    And were those all when you
9  were in the medical examiner's office?
10     A.    No. I've testified since.
11     Q.    How many times since in civil
12 cases?
13     A.    In civil cases, probably five.
14     Q.    Have you kept records of
15 those?
16     A.    I have not.
17     Q.    How far back do they go?
18     A.    It would go back two to three
19 years.
20     Q.    Do you have any billing or
21 time records that would allow you to
22 reconstruct that?
23     A.    Yes.

10

1      Q.    But you have not done that?
2      A.    I have not, no.
3      Q.    But you brought everything
4  else?
5      A.    Everything that's available,
6  yes, I brought.
7      Q.    But everything else is
8  available; is that correct?
9      A.    Everything that is available,
10 I have brought. I guess we'd need to go
11 down step by step here.
12     Q.    Take a look at it and tell me
13 what else is not available.
14     A.    Number one is available.
15     Q.    Tell me any of them that are
16 not available.
17     A.    All but seven.
18     Q.    And you have produced to me
19 this morning a CV?
20     A.    Yes.
21     Q.    Resume?
22     A.    Yes.
23     Q.    All right. That's the first

11

1  time we've seen that. But that's our --
2  But, now, I want to be sure everything is
3  available except seven; is that correct?
4      A.    As I read this, yes, sir.
5  It's not available in hard copy, but it's
6  available digitally here.
7      Q.    All right. Well, tell me,
8  then, what's in your file if it's not
9  available in hard copy?
10     A.    Yes, sir. I can tell you that
11 now. I have the report of Dr. -- let me go
12 down to the bottom here and see. Joaquin
13 A-R-C-I-N --
14     Q.    Arciniegas?
15     A.    Arciniegas. I have an invoice
16 of billing that I've given to Mike.
17     Q.    How much is that to date?
18     A.    It is five hundred and
19 twenty-five dollars.
20     Q.    Does that show the dates when
21 you've done work?
22     A.    No. It shows the time and
23 that invoice, it was dated May 4th, 2007.

12

1  And there's not been an invoice since.
2      Q.    All right. Do you have any
3  records of your time spent from that time
4  until now?
5      A.    Not listed, but I don't have
6  it with me. It's going to be in the order
7  of five to ten hours. I don't have that
8  with me.
9      Q.    All right.
10     A.    I have the deposition of
11 Dr. Papapietro; I have a copy of my report;
12 I have medical records from UAB Hospital; I
13 have medical records from Dekalb Hospital or
14 emergency room there; I have records from
15 Dr. Williams; medical records from
16 Dr. Wybenga; and I have a part of a clinical
17 record from Dr. Fallahi.
18     Q.    Tell me about that last one,
19 Dr. Who?
20     A.    F-A-L-L-A-H-I, who is a
21 rheumatologist that Mr. Woodley was seeing.
22 I have just one clinic visit from that.
23     Q.    Is that of any significance in

3 (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

13

1 forming your opinion?
2     A.   It didn't alter my opinion,
3 but it strengthened my opinion.
4     Q.   In what way?
5     A.   This was a clinic visit on
6 August the 15th, 2006, just a few days
7 before the accident. And it's a
8 documentation of the physical activity that
9 Mr. Woodley was capable of performing.
10     Q.   Do you have a hard copy of
11 that there?
12     A.   Yeah.
13     Q.   May I see it, please, sir? Is
14 this all there is, these two pages?
15     A.   That's all I've reviewed. I'm
16 sure there's more medical records than that,
17 but that's all that I've reviewed.
18     Q.   I don't believe we've had this
19 man's name before, Dr. Fallahi.
20     MR. CROW: You haven't got his
21 records?
22     MR. WOOD: No.
23     MR. CROW: There's the rest of

14

1 them (indicating). I thought you had.
2     MR. WOOD: Thank you.
3     Q.   Have you reviewed all of the
4 records from Dr. Fallahi?
5     A.   No. Just this one.
6     Q.   Who selected the one that you
7 did review?
8     A.   Mr. Crow did.
9     Q.   I see. So Mr. Crow pulled
10 that one out from 8/15/06?
11     A.   Yes.
12     Q.   Have you seen the other
13 records to know whether they are of any
14 consequence?
15     A.   No.
16     Q.   What is your understanding of
17 what Dr. Fallahi was seeing Mr. Woodley for?
18     A.   Dr. Fallahi, as I understand
19 it, is a rheumatologist who was taking care
20 of some ankylosing spondylitis that
21 Mr. Woodley had.
22     Q.   What is ankylosing
23 spondylitis?

15

1     A.   Ankylosing spondylitis is a
2 degenerative condition of the spine.
3     Q.   Yes, sir. And does that have
4 some consequence with respect to this --
5 Mr. Woodley and this suit?
6     A.   No. That condition, in
7 itself, does not.
8     Q.   All right. What is of
9 consequence to you about the one report
10 that -- to which you have referred, the one
11 on 8/15, of '07?
12     A.   Right. This was a clinic
13 visit of Mr. Woodley's to this physician on
14 August the 15th, a few days before the
15 accident. And what is significant in my
16 opinion is the fact that there is a good
17 documentation as to the physical activity
18 that Mr. Woodley was able to perform;
19 specifically, he said he's playing golf,
20 cutting grass, he walks two to three miles
21 three times a week.
22     Q.   May I see that?
23     A.   Yes, sir.

16

1     MR. WOOD: Mike, I do not see
2 this 8/15/06.
3     A.   It came out of here
4 (indicating).
5     MR. CROW: It came out of
6 that. That's your copy.
7     MR. WOOD: This is my copy?
8     MR. CROW: The 8/15 visit.
9     MR. WOOD: Well, the whole
10 thing.
11     MR. CROW: Yeah, the whole
12 thing if you want it.
13     MR. WOOD: Well, since I
14 didn't have a copy before and didn't know
15 about this witness, I'll --
16     Q.   So you haven't reviewed any of
17 the other records other than those that were
18 showed to you -- that one showed to you by
19 Mr. Crow?
20     A.   From Dr. Fallahi's record,
21 yes, that's right, just that one visit.
22     MR. WOOD: I will probably ask
23 for you to make a copy of that before we

4 (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

17

1 leave today.
2          (Whereupon, Defendant's
3          Exhibit No. 38 was marked
4          for identification.)
5     Q.    Anything else in your file,
6 please, sir?
7     A.    No, sir.
8     Q.    Is that everything that you
9 have reviewed that's in your file?
10    A.    Yes.
11    Q.    Is there anything that you
12 have asked for in addition to that to
13 review?
14    A.    No, sir.
15    Q.    Now, you have a copy of your
16 report that's been submitted through
17 Mr. Crow's office; is that right?
18    A.    Yes, I do.
19    Q.    Does your file, that we
20 discussed in item one, include all of the
21 data or other information that you've
22 considered in forming any opinion?
23    A.    Yes.

18

1     Q.    Have you prepared any exhibits
2 as a summary or to support -- as a support
3 for your opinions?
4     A.    No.
5     Q.    You really are kind of an
6 exhibit man, though, aren't you?
7     A.    I do that, yes.
8     Q.    But you haven't prepared any
9 in this case?
10    A.    No, sir.
11    Q.    And then your CV is what we
12 saw today for the first time; is that right?
13    A.    Yes, sir.
14          (Whereupon, Defendant's
15          Exhibit No. 39 was marked
16          for identification.)
17    Q.    All right. I'm going to mark
18 that as Exhibit 39.
19          And the records of
20 compensation, do you have any time records
21 of the time that you've spent, other than
22 the statement there? Do you keep up with
23 current records?

19

1     A.    I do. But they're not on this
2 computer.
3     Q.    Where are they?
4     A.    They're at home, in my home
5 office.
6     Q.    How many offices do you have?
7     A.    One.
8     Q.    Is there some reason you
9 didn't bring those with you?
10    A.    I just forgot. I could have
11 brought that.
12    Q.    Would you get those to
13 Mr. Crow. I had asked for them, and I think
14 we're entitled to those.
15    A.    Yes, sir, we can do that.
16    Q.    Can you also produce for me a
17 hard -- Let me go ahead and let you make
18 your note.
19    A.    Okay.
20    Q.    Will you also produce for me a
21 hard copy of what you have on the statement?
22    A.    On the statement, yes, sir.
23          By statement, you mean by

20

1 invoice to Mr. Crow earlier?
2     Q.    Yes, sir. Yes.
3          Can I look at that?
4     A.    Sure. I can pull this around.
5          MR. CROW: Off the Record.
6          (Off the Record.)
7     Q.    (BY MR. WOOD:) Is it coming
8 up?
9     A.    This is it. You wanted to see
10 the invoice?
11    Q.    Yes.
12    A.    Okay.
13    Q.    Your invoice just shows --
14 just reports the number of hours, but not
15 what work was done?
16    A.    Yes. What was done was review
17 of records.
18    Q.    And that was about an hour and
19 a half's time?
20    A.    Hour and three-quarters.
21          (Whereupon, Defendant's
22          Exhibit No. 27 was marked
23          for identification.)

5  (Pages 17 to 20)

# FREEDOM COURT REPORTING

21

1    Q.    Yes, sir. I'll show you what
2    I'll mark as Exhibit 27, it's an excerpt
3    from Federal Rule 26, with regard to expert
4    witness reports.
5          Have you ever seen Federal
6    Rule 26 before or read that?
7    A.    No.
8    Q.    Are you aware of the
9    requirements what's supposed to be included
10   in an expert report in federal court?
11   A.    According to Rule 26?
12   Q.    Yes, sir.
13   A.    I'm unfamiliar with Rule 26.
14   Q.    Well, take a look at that
15   paragraph 2B for a moment, please.
16   A.    Yes, sir.
17   Q.    Does your report in this case
18   meet the requirements of that?
19   A.    As best I was able to do, yes,
20   sir.
21   Q.    What was limiting to you?
22   A.    The fact that I don't have a
23   complete record of my prior testimonies.

22

1          (Whereupon, Defendant's
2          Exhibit No. 28 was marked
3          for identification.)
4    Q.    All right, sir.
5          Well, I will mark as Exhibit
6    28 a copy of your report as we received it.
7    A.    Yes.
8    Q.    Your report was sent to us on
9    December the 18th, it shows the date of
10   Mr. Crow's letter at the top. I want to be
11   certain I understand. Look at the second
12   page, you apparently signed your report,
13   however, on August the 17th, of 2007; is
14   that correct?
15   A.    Yes, sir.
16   Q.    Do you have any understanding
17   for why the essentially two-month delay from
18   the time you signed it until it was
19   forwarded?
20   A.    Are you asking do I have any
21   responsibility for that?
22   Q.    No. Do you understand any
23   reason for the delay?

23

1    A.    No, sir.
2    Q.    I'm not implying any -- when I
3    say, do you know why it was -- I'm not
4    implying anything wrong. That's not where I
5    was going.
6          There's a second page there
7    that apparently was a supplement that you
8    put with the report after?
9    A.    Yes.
10   Q.    What was the reason for
11   putting that supplement with the one-page
12   report?
13   A.    As I remember, Mr. Crow said
14   you need to add, as best you can, the cases
15   and your fees.
16   Q.    Yes, sir. That's what's
17   required in Exhibit 27, the Rule?
18   A.    Yes.
19   Q.    But you never actually saw the
20   Rule, itself; is that right?
21   A.    No.
22   Q.    All right. Tell me, please,
23   sir, what opinion you reported in Exhibit

24

1    28, that's your report. What was your
2    opinion, what was your conclusion that's
3    reported there?
4    A.    What's my conclusion?
5    Q.    Yes, sir.
6    A.    As I wrote it?
7    Q.    Yes, sir.
8    A.    In summary, Mr. Woodley had no
9    known severe coronary disease for several
10   years, but prior to the automobile accident
11   had been well managed and was clinically
12   stable and active. However, following the
13   severe cervical spine injury, and due to the
14   associated cardiovascular complications and
15   stress, he suffered progressive cardiac
16   deterioration, leading to cardiac arrest and
17   eventual death.
18   Q.    Yes, sir. The last sentence
19   is the conclusion, he suffered progressive
20   cardiac deterioration leading to cardiac
21   arrest and eventual death; is that correct?
22   A.    Yes.
23   Q.    And that's your opinion?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

**25**

1    A.    Yes.
2    Q.    And that's the opinion that
3  you reported in this document, Exhibit 28;
4  is that right?
5    A.    Yes.
6    Q.    Dr. Lauridson, have you --
7  you've mentioned in your report on the
8  second page there --
9    A.    Yes.
10    Q.    -- that you've testified on a
11  number of occasions.
12    A.    Yes, sir.
13    Q.    Tell me, please, sir, have you
14  ever been disqualified or disallowed from
15  testifying as an expert?
16    A.    No.
17    Q.    Have you testified in federal
18  court before where you had to prepare and
19  sign and submit a report like this, under
20  the provisions of Federal Rule 26?
21    A.    U.S. versus Seale was in
22  federal court.
23    Q.    Yes, sir. But did you prepare

**26**

1  a report like this?
2    A.    I don't remember.
3    Q.    How long ago was it?
4    A.    That was in the summer of
5  2007.
6    Q.    What was that case about?
7    A.    It was a criminal case. Do
8  you want the details of that case?
9    Q.    No, sir. Maybe I should have
10  been more specific in my question. What I
11  meant to ask you was whether you have
12  testified in a civil case in federal court
13  that would be controlled by Federal Rule of
14  Civil Procedure 26, which required the
15  preparation, signing, and submission of a
16  report like you did in this case?
17    A.    I don't remember. And,
18  generally, I abide by what the requesting
19  attorney asks for me when I provide a
20  report.
21    Q.    Yes, sir.
22    A.    So, I'm trying to think. Was
23  there a civil case? I don't remember.

**27**

1    Q.    Well, I want to be clear on
2  this. You don't remember any other
3  testimony in federal court that required you
4  to prepare and submit a signed affidavit --
5  excuse me, a signed report, like you have in
6  this case, as required by Federal Rule of
7  Civil Procedures?
8    A.    As of this moment, I do not.
9  If you have a case that you know of --
10    Q.    I don't have any records, I'm
11  sorry.
12    A.    As of this moment, I do not.
13  But it may well be that I have and I just
14  simply do not remember.
15    Q.    All right. That would be
16  either -- All right. You didn't do a report
17  like this in that criminal case, I'm sure,
18  did you? U.S. versus Seale?
19    A.    I don't believe there was a
20  report issued in that case.
21    Q.    Yes, sir.
22    A.    Again, I can't remember
23  specifically. I would have to refer to

**28**

1  records.
2    Q.    Yes, sir. How many times have
3  you testified for the Beasley, Allen firm?
4    A.    For Beasley, Allen?
5    Q.    Yes, sir.
6    A.    I testified once about fifteen
7  or twenty years ago when I was a medical
8  examiner.
9    Q.    Was that a criminal or civil
10  case?
11    A.    It started as a medical
12  examiner's case, but it was a civil case as
13  far as Beasley was concerned.
14    Q.    Yes, sir.
15    A.    So it was in civil court. I
16  don't believe I've testified since then.
17    Q.    For the Beasley firm.
18      Well, you've testified in
19  other cases since then apparently. You just
20  told me about --
21    A.    Yes. I thought that you said
22  for the Beasley firm, and that was the
23  context in which I was trying to answer

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

29

1  that.
2      Q.    That's what -- I thought
3  that's what you meant, that's why I was
4  trying to clarify that.
5          Have you ever testified
6  against the Beasley firm?
7      A.    No. Not that I know of.
8      Q.    And you do have billing
9  records that would allow you to go back and
10 reconstruct the cases in which you've
11 testified?
12     A.    Only the last few years. You
13 know, there -- I did not keep medical
14 records -- or billing records when I was a
15 medical examiner.
16     Q.    What is the past few years?
17 Are we talking about ten, twelve years,
18 something like that?
19     A.    No, sir. The last two to
20 three years.
21     Q.    But you haven't looked to see
22 if you could do it for the preceding four
23 years? I'm just looking at Exhibit 27.

30

1      A.    I'm sorry, what's Exhibit 27?
2      Q.    That's the Rule.
3      A.    Yes, sir. I'm sorry, what was
4  the question?
5      Q.    You haven't looked to see how
6  much you can reconstruct?
7      A.    That's right.
8      Q.    You never saw Rufus Woodley,
9  did you?
10     A.    No, sir.
11     Q.    Your first involvement was
12 after he passed away and after the -- Well,
13 were you involved in this matter before suit
14 was filed?
15     A.    (Witness shakes head in the
16 negative.)
17     Q.    When you shake your head side
18 to side --
19     A.    No, sir, I was not.
20     Q.    I can understand you, but I
21 think you and I both want a good Record
22 about what we're communicating.
23         When was your first

31

1  involvement?
2      A.    It would have been the spring
3  of 2007, I believe.
4      Q.    Had suit been filed by that
5  time or do you know?
6      A.    I don't know. I don't know.
7  I occasionally see cases before suit is
8  filed and offer opinions.
9      Q.    Yes, sir. Your training and
10 previous work was as a pathologist; is that
11 correct?
12     A.    My training is in internal
13 medicine and forensic pathology. I'm board
14 certified in both.
15     Q.    Please, sir, as a pathologist,
16 when you're doing work as a pathologist, you
17 typically examine tissue on a body, don't
18 you?
19     A.    That is one test that a
20 forensic pathologist uses, yes.
21     Q.    Well, that's what you do when
22 you perform an autopsy, isn't it?
23     A.    That is an autopsy.

32

1      Q.    You look at tissue from a
2  body?
3      A.    The autopsy is one bit of
4  information that a forensic pathologist
5  uses, yes, sir.
6      Q.    What other bits of information
7  does a forensic pathologist use?
8      A.    Seeing circumstances, all of
9  the investigative reports that are
10 available, all of the preceding medical
11 history; all of that goes together to allow
12 the forensic pathologist to establish a
13 cause and manner of death. The autopsy,
14 itself, is only one bit of information that
15 may or may not actually even contribute to
16 establishing cause and manner of death.
17     Q.    Would you interview or find
18 out what treating physicians might be able
19 to tell you about a patient?
20     A.    If they are immediately
21 available. Otherwise, the medical records
22 are the substitute for that.
23     Q.    Yes, sir. Would you consider

8  (Pages 29 to 32)

# FREEDOM COURT REPORTING

33

1    what a treating -- what a board certified
2    treating physician had to say about a
3    witness before and leading up to the time of
4    death?
5        A.    Yes. I would take all
6    information I could get.
7        Q.    All right, sir. There was no
8    autopsy of Rufus Woodley, was there?
9        A.    That's right.
10       Q.    By you or anyone?
11       A.    That's correct.
12       Q.    And nobody with pathologist
13   qualifications, that you're aware of, ever
14   saw Rufus Woodley, did they?
15       A.    That's right.
16       Q.    Your report, Exhibit 28, says
17   that his cause of death was progressive
18   cardiac deterioration leading to cardiac
19   arrest; is that correct?
20       A.    Yes. There is a typo there.
21   There should be a comma between those two
22   last sentences as I read them. Yes, that is
23   the immediate cause of death.

34

1        Q.    A typo. Who prepared the
2    document that you signed? Did you prepare
3    it?
4        A.    I did, yeah.
5        Q.    I see. But you signed it --
6        A.    I did.
7        Q.    -- with the typo in there?
8        A.    Yes. And unfortunately typos
9    do occur.
10       Q.    That's actually a fairly
11   significant typo in what it communicates
12   about the man's death, isn't it?
13       A.    I'm sorry that you read it
14   that way. I see it clearly as showing that
15   the severe cervical spine injury led to his
16   progressive cardiac deterioration and
17   cardiac arrest. And perhaps I can help
18   clarify that for you right now in that that
19   was a typo. And instead of a period there
20   should be a comma there.
21       Q.    Well, also you have to
22   eliminate the second space between the two
23   sentences?

35

1        A.    Exactly right.
2        Q.    And change the capital letter
3    H to a lower case?
4        A.    That's right. Those are all
5    typos that happened.
6        Q.    Did you prepare that on a
7    computer like the laptop you've got in front
8    of you?
9        A.    Yes, sir.
10       Q.    So the correction of that typo
11   would simply involve back spacing and keying
12   in what you wanted it to say?
13       A.    I certainly agree that
14   correction of a typo on a computer is very
15   easy. Recognition of a typo is sometimes
16   not that easy.
17       Q.    There's nothing in your report
18   stating any opinion about Mr. Woodley's
19   death being proximately caused by the
20   vehicle accident, is there? Your report
21   doesn't even mention a vehicle accident,
22   does it?
23       A.    The first sentence in my

36

1    report says that following a motor vehicle
2    accident and cervical spine injury.
3             And I'm sorry I'm unclear
4    about that. But by that, I mean there was a
5    motor vehicle accident and an associated
6    cervical spine injury.
7        Q.    Yes, sir. But you don't
8    report the motor vehicle accident as the
9    cause of death, do you?
10       A.    The motor vehicle accident,
11   sir, was the cause of the cervical spine
12   injury. I don't think that's contested.
13       Q.    That's not where I'm going.
14   But you don't report that the automobile
15   accident caused the man's death in the
16   report, do you?
17       A.    If it is not specifically
18   stated, it certainly is implied that the
19   motor vehicle accident caused the cervical
20   spine injury, which then led to his death.
21       Q.    All right. And you've told us
22   you don't have any exhibits; is that right?
23       A.    Yes, that's right.

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

37

1    Q.    Your report does not refer to
2    your personal qualifications, training,
3    history, or anything else. But you've given
4    me your CV today; is that right?
5        A.    Yes. And does Rule 26 say
6    that I need to put my personal
7    qualifications in there? I'm sorry if it
8    does.
9        Q.    I think it does.
10       A.    In my report?
11       Q.    Look at it.
12           I believe it calls for the
13   qualifications of the witness, including a
14   list of all publications and so forth.
15       A.    All right. Well, my resume
16   will be the substitute for that, sir.
17       Q.    Yes, sir.
18           You're not trained in
19   cardiology, are you?
20       A.    I am not board certified in
21   cardiology, that's correct.
22       Q.    And you didn't take any
23   specialized training in cardiology, did you?

38

1        A.    Except as an internal
2    medicine, that's correct.
3        Q.    You never practiced medicine
4    as a cardiologist, did you?
5        A.    I ran the cardiac care unit in
6    the U.S. Navy at Portsmouth Naval
7    Hospital -- I'm sorry at Newport Naval
8    Hospital.                .
9        Q.    When was that?
10       A.    May I see my resume? 1977 to
11   1979.
12       Q.    But you haven't done any
13   cardiology since then?
14       A.    I practiced internal medicine,
15   which included cardiology, at Chickasha in
16   Chickasha, Oklahoma, after the Navy.
17       Q.    When was that?
18       A.    1979 to 1980.
19       Q.    Since then have you done any
20   work in cardiology?
21       A.    No, sir.
22       Q.    Do you currently have hospital
23   privileges to admit patients? You list here

39

1    some hospitals.
2        A.    Not to admit patients.
3        Q.    Yes, sir. And you'd have to
4    have that to practice cardiology, wouldn't
5    you?
6        A.    I may not be clear. I'm not
7    practicing cardiology, I'm a forensic
8    pathologist.
9        Q.    And you haven't practiced
10   cardiology since about 1980 or so; is that
11   right? Or when you were practicing internal
12   medicine?
13       A.    Yes, sir, that's right.
14       Q.    How long has it been since
15   you've admitted a patient to a hospital?
16       A.    It would be about that time,
17   yes, sir.
18       Q.    And that's a part of treating
19   folks with heart problems is admitting them
20   to the hospital when they have significant
21   problems that they need hospitalization,
22   isn't it?
23       A.    Yes. As a treating physician,

40

1    that is correct.
2        Q.    You said that you last
3    admitted somebody to a hospital around 1980.
4    Was that when you were in Oklahoma?
5        A.    Yes.
6        Q.    Would I then be correct in my
7    understanding that you've never had
8    privilege to admit a patient to a hospital
9    in Alabama?
10       A.    That is correct.
11       Q.    What did you -- What was the
12   reason for your leaving Oklahoma?
13       A.    Oklahoma is when I resumed my
14   pathology training.
15       Q.    Yes, sir. And never looked
16   back? You've been doing pathology from then
17   on?
18       A.    Yes.
19       Q.    When did you first get to
20   Alabama?
21       A.    1986. Yes.
22       Q.    You're not a member of the
23   Medical Association of the State of Alabama,

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

41

1  are you?
2      A.    No, sir.
3      Q.    Is there a reason?
4      A.    The premium, the fees to join,
5  don't match the benefits for me.
6      Q.    Aren't most of the doctors in
7  Alabama a member of the medical association,
8  practicing physicians?
9      A.    I don't know the answer if
10  most are or not.
11      Q.    Being a doctor, being a member
12  of the medical association is sort of like a
13  lawyer being a member of the bar
14  association, isn't it? Don't —
15      A.    Being a member of the bar?
16      Q.    Yes, sir.
17      A.    No. Having a medical license
18  and being able to practice medicine would be
19  similar to being a member of the bar as I
20  understand it.
21      Q.    Tell me — I was talking about
22  the bar association. You list here three
23  professional organizations of which you are

42

1  a member, but none of those are Alabama
2  associations.
3      A.    That's right. The specialty
4  of forensic pathology is a relatively small
5  specialty, and the organizations that deal
6  with and benefit those specialists through
7  training are national associations.
8      Q.    Your practice would come
9  within the scope of some of the medical
10  societies and organizations here in Alabama
11  though, wouldn't it?
12      A.    I'm — Can you give me an
13  example?
14      Q.    No. I'm asking you. There's
15  no association in the state of Alabama that
16  would cover your specialty?
17      A.    A forensic pathologist is able
18  to effectively practice forensic pathology
19  without belonging to any state medical
20  associations.
21      Q.    Well, help me with this: Tell
22  me your definition of forensic pathology,
23  please, sir.

43

1      A.    A forensic pathologist is a
2  pathologist who is trained and board
3  certified in either anatomic and clinical or
4  anatomic followed by formal training in an
5  accredited training program in forensic
6  pathology, followed by the successful
7  completion of a certification process and
8  examination.
9      Q.    What sort of examination?
10      A.    What sort of an examination?
11      Q.    Yes, sir.
12      A.    It's an examination set up by
13  the American Board of Medical Examiners.
14      Q.    I understand. But in what
15  specialty?
16      A.    Forensic pathology.
17      Q.    Forensic pathology.
18      A.    Yes, sir. I misspoke, it's
19  not the American Board of Medical Examiners.
20      Q.    Tell me, please, sir, how many
21  forensic pathologists are there in Alabama?
22      A.    In Alabama?
23      Q.    Yes, sir.

44

1      A.    Maybe board certified forensic
2  pathologists, there may be ten. And, again,
3  that's an estimate. I don't have an exact
4  number.
5      Q.    You're not an approved health
6  care provider by Blue Cross/Blue Shield of
7  Alabama, are you?
8      A.    No. There's no reason for us
9  to even ask for those kinds of funding.
10  That deals with living patients.
11      Q.    Well, doesn't — Blue
12  Cross/Blue Shield has, what, eighty-five
13  percent of the health care insurance in the
14  state, something in that range, is that your
15  understanding?
16      A.    I don't have any understanding
17  of that.
18      Q.    Your understanding is it's by
19  far the largest health insurer in the state,
20  don't you?
21      A.    I'm not even sure of that. I
22  know it's prominent.
23      Q.    Doesn't health insurance pay

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

45

1  for autopsies, for example?
2      A.    No.
3      Q.    Never?
4      A.    Not in my experiences, it has
5  never paid.
6      Q.    All right. When was the last
7  time you did an autopsy?
8      A.    Monday of this week.
9      Q.    How many do you do in a year?
10     A.    About twenty. Might be closer
11 to fifteen. I don't have that number here.
12     Q.    For whom do you do those
13 autopsies?
14     A.    I do them for hospitals in
15 Dothan and for persons who ask to have
16 autopsies performed.
17     Q.    Do you do those for attorneys?
18     A.    Rarely. And asking if I'm
19 contacted directly by a law firm to do an
20 autopsy?
21     Q.    Directly or indirectly.
22     A.    Rarely that will happen. The
23 last one I turned down.

46

1      Q.    Got it. Where do you perform
2  these autopsies? You told me about a
3  hospital in Dothan. Do you go to funeral
4  homes and such?
5      A.    I do occasionally, yes.
6      Q.    Is that generally where those
7  are performed or hospitals or where?
8      A.    The hospital autopsies are
9  performed in a hospital.
10     Q.    Yes, sir. Where do you
11 perform yours generally?
12     A.    In the hospital when it's for
13 a hospital case. And in a funeral home when
14 it's not a hospital case.
15     Q.    I'm curious about something.
16 Your report is different on paper. You
17 don't use any professional letterhead at
18 all?
19     A.    No, sir. I'm not a
20 professional in your sense of the word. I
21 offer opinions, and I don't have a
22 letterhead.
23     Q.    Got it.

47

1      A.    Is that what you mean I don't
2  have a letterhead?
3      Q.    Yes, sir.
4      A.    I don't have a letterhead.
5      Q.    You told me your office is at
6  home?
7      A.    Yes, sir.
8      Q.    Do you have any other offices?
9      A.    No, sir.
10     Q.    Have you've had any other
11 offers besides your home in the last ten
12 years?
13     A.    Yes, sir.
14     Q.    Tell me where.
15     A.    Once with the Department of
16 Forensic Sciences.
17     Q.    Anywhere else?
18     A.    And once when I was with
19 Beasley.
20     Q.    When were you with Beasley?
21     A.    May I see my resume?
22     Q.    Yes, sir.
23     A.    2001 to 2005.

48

1      Q.    What -- Were you employed by
2  the Beasley firm there?
3      A.    I was, yes.
4      Q.    In what capacity?
5      A.    I was director of graphics for
6  Beasley.
7      Q.    Do you still do that kind of
8  work for the Beasley firm?
9      A.    No.
10     Q.    Why not?
11     A.    It was time for me to move on
12 and to start doing my own individual case
13 work.
14     Q.    I see. Do you consider
15 yourself as practicing medicine now?
16     A.    Of course.
17     Q.    You're not part of any medical
18 group?
19     A.    I'm a member of the National
20 Association of Medical Examiners and the
21 American Academy of Forensic Sciences.
22     Q.    I didn't state my question.
23 You are not a member of any professional

12   (Pages 45 to 48)

# FREEDOM COURT REPORTING

49

1   group that practices together or has an
2   office together?
3       A.   No, sir.
4       Q.   From what source do you gain
5   your referrals and so forth?  Is that from
6   hospitals, for example, calling you in on a
7   special occasion?
8       A.   Are you talking about the
9   hospital autopsies?
10      Q.   Or --
11      A.   When a person dies in a
12  hospital, and an autopsy is requested by the
13  physician or the family, I do the case.
14      Q.   What else do you do besides
15  fifteen or twenty autopsies a year?  I'm
16  trying to understand what your work is now.
17      A.   I do autopsies.
18      Q.   Yes, sir.
19      A.   I do case consultations, and I
20  do clinical medicine.
21      Q.   All right.  Tell me about your
22  clinical medicine practice.
23      A.   I work at Gunter Air Force

50

1   Base doing admission physicals.
2       Q.   Is that for new inductees into
3   the armed forces?
4       A.   Yes.
5       Q.   How many days a week do you
6   work at Gunter?
7       A.   It depends upon the
8   scheduling.  It averages about one to two
9   days a week.
10      Q.   Did you ever know Mr. Woodley
11  before his accident?
12      A.   No.
13      Q.   Know anything about him?
14      A.   No.
15      Q.   Any mutual friends or
16  acquaintances, any contact like that at all?
17      A.   No.
18      Q.   What else do you do?  You told
19  me you go to Gunter and do physicals and
20  autopsies.  What else do you do now?
21      A.   What else do I do?
22      Q.   Yes, sir.
23      A.   Case consultations.

51

1       Q.   Who do you do case
2   consultations with?
3       A.   You want the category of case
4   consultations or what?
5       Q.   Do you do those with lawyers,
6   with physicians?  I'm trying to understand
7   who you work with.  I'm trying to understand
8   what kind of work you're doing now.
9       A.   Most of those are contacts
10  from lawyers, the vast majority are defense
11  attorneys.
12      Q.   How many of those do you do in
13  a year, for example?
14      A.   When you say I do, how many
15  times am I contacted or how many times do I
16  complete a case?
17      Q.   How many consultations do you
18  perform in a year?
19      A.   Complete consultations?
20      Q.   However you would express it.
21  I'm just trying to understand what you do,
22  sir.
23      A.   I probably have maybe four

52

1   contacts a month.  Many of those never --
2   just so you will understand, when a person
3   contacts me, generally an attorney, okay, I
4   will say that I will review a case and then
5   tell them whether I can help them or not.
6   And by help them, whether my opinion is --
7   will help assist them in their case.  If my
8   opinion doesn't assist them in their case,
9   then that's the end of the consult.  And a
10  significant number of those end up that way.
11      Q.   Yes, sir.  How many of those
12  are civil versus criminal?  Can you break it
13  down by percentages or fractions?
14      A.   Most are criminal.  Most are
15  criminal defense.
16      Q.   Does your resume, Exhibit 39,
17  list all of your employments since medical
18  school?
19      A.   Since medical school?
20      Q.   Yes, sir.
21      A.   No.
22      Q.   What else have you -- What
23  other employments have you had since medical

13  (Pages 49 to 52)

## FREEDOM COURT REPORTING

53

1  school?
2      A.     Okay.  Since medical school.
3  Yes, since medical school, I believe it
4  does, yes.  There should not be any gaps in
5  here.
6              (Whereupon, Defendant's
7              Exhibit No. 30 was marked
8              for identification.)
9      Q.    I'm showing you what I'm going
10 to mark as Exhibit 30 --.  Did I mark 29?
11            Let me show you what I'm going
12 to mark as Exhibit 30.  Do you remember
13 speaking at some sort of an expert witness
14 conference, SEAK, or S-E-A-K?
15     A.    Yes, I remember this.
16     Q.    What was that about, please,
17 sir?
18     A.    Part of the graphics that I
19 had done while I was working with
20 Mr. Beasley and his group were used in a --
21 one of the cases that they had tried, and
22 this group which is called -- the initials
23 are S-E-A-K, and I've forgotten exactly what

54

1  it means, saw that I did graphics for
2  Beasley, Allen, and they asked if I would
3  speak to their conference on how to use
4  graphics in trial.
5      Q.    Yes, sir.
6      A.    So I gave them this talk, and
7  I don't even see it on here to be quite
8  honest with you.  I'm sure it's in here
9  somewhere.
10     Q.    I think it's on the third
11 page.  That lists you as the director of
12 graphics at the Beasley, Allen firm?
13     A.    That's right.
14     Q.    Tell me, please, sir, what did
15 you do as director of graphics?  What was
16 your job description?
17     A.    We started out as just myself.
18 And at that time, the use of computer
19 graphics in the court room to clarify the
20 issues was coming to the fore, so that the
21 jurors would have a better understanding of
22 what amounts to fairly complex cases that
23 come to court.  And so I began to do that in

55

1  this firm.  And then eventually it was
2  myself, and I had two assistants.  And we
3  were doing -- generating the graphics for
4  case-specific graphics, and then providing
5  the technical support for the presentation
6  of these graphics in depositions and in
7  trials.
8      Q.    Were you salaried in that
9  position?
10     A.    Yes.
11     Q.    Do you remember what that
12 salary was?
13     A.    I think it started out at a
14 hundred and twenty thousand.
15     Q.    And apparently it went up?
16     A.    It did.  And I don't remember
17 where it ended, but I think it was a hundred
18 and fifty, something like that.
19     Q.    Hundred and fifty thousand
20 dollars a year?
21     A.    Yes, sir.
22     Q.    Was that exclusive employment
23 or were you doing some other work as well?

56

1  Did you continue being a pathologist at that
2  time?
3      A.    The only thing that was in
4  addition to this, is I had a contract with
5  the Alabama Department of Forensic Sciences
6  to assist them in some of their cases.
7            Let's see.  Hold on.  Maybe
8  that wasn't during the same time.  Let me
9  make sure.  Yes.  There was a time when I
10 had -- I was -- had a contract with the
11 Alabama Department of Forensic Sciences to
12 assist them in some of their evaluations,
13 their case consultations.
14     Q.    I assume you submitted your
15 personal information for the write-up for
16 SEAK to prepare this?  Did you submit the
17 information about yourself and your own
18 history?
19     A.    Did I write this, is that the
20 question?
21     Q.    Either write this, or produce
22 the information from which it was prepared.
23     A.    Yes.

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

57

1   Your question about my
2   employment on this resume, I believe that
3   there is a gap.
4       Q.   Tell me what it is, please,
5   sir.
6       A.   There is a gap from about
7   April of 2001 to about October of 2001. And
8   during that time I was director of graphics
9   for the Alabama District Attorney's
10  Association.
11      Q.   What did you do for them? The
12  same kind of work that you were describing
13  for them that you did for the Beasley firm?
14      A.   Yes. That's where I started
15  doing the computer graphics.
16      Q.   When you started doing the
17  computer graphics, I assume you were
18  employed by the Alabama District Attorney's
19  Association?
20      A.   Yes.
21      Q.   And then you were employed at
22  the Beasley firm —
23      A.   Following that, yes, sir.

58

1       Q.   — following that.
2           That restricted your practice
3   of forensic pathology, obviously, didn't it?
4       A.   To the extent that I wasn't
5   doing daily cases, yes. I continued, as I
6   say, to be a consultant to the Department of
7   Forensic Sciences during part of that time.
8       Q.   Please, sir, looking back at
9   Exhibit 30, this SEAK, I don't — was there
10  some color brochure that was submitted?
11  This is just what I could find on the web.
12  Was there some glossy brochure that was
13  submitted to persons who might be candidates
14  to attend this program, or do you remember?
15      A.   I'm sure there was a handout
16  at the conference, but I don't remember
17  about it.
18      Q.   Your personal write-up there,
19  the paragraph or so about you, lists your
20  experience particularly with graphics and so
21  forth.
22      A.   Yes, sir.
23      Q.   It doesn't really — It refers

59

1   to you as an M.D., but it does not refer to
2   your medical qualifications or experience,
3   does it?
4           You were really at this
5   conference or seminar, you were speaking
6   about computer graphics as opposed to
7   medicine; is that right?
8       A.   That's right.
9       Q.   There's a last sentence down
10  there that says, Dr. Lauridson has written
11  and lectured extensively on the use of
12  computer graphics in the court room. Do you
13  see that?
14      A.   Yes.
15      Q.   But when we look at your CV,
16  and your publications, I don't see any of
17  your publications on computer graphics.
18      A.   This writing and lecturing, it
19  was all local.
20      Q.   Yes, sir.
21      A.   In relationship to the Alabama
22  Department — Alabama District Attorney's
23  Association and within Beasley, Allen.

60

1   There was not — I don't think I've ever
2   done a — Are you asking about peer reviewed
3   articles in computer graphics, the answer is
4   no, there is none. I'm assuming that was
5   your question.
6       Q.   Well, sir, reports that you
7   have written extensively on the use of
8   computer graphics —
9       A.   Uh-huh.
10      Q.   — and you brought in the
11  subject of peer review, those publications
12  on use of computer graphics in the court
13  room would have been presented to persons
14  who go to court, like lawyers and judges —
15      A.   Yes. That's exactly right.
16      Q.   — and folks who do what you
17  do and go in the court room. Others who
18  testify as experts would have access to
19  those publications, wouldn't they?
20      A.   Yes.
21      Q.   What sort of — How were those
22  matters published?
23      A.   In handouts to lectures and

15 (Pages 57 to 60)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

61

1  that sort of thing. I don't have a list of
2  all of those. But I spent a lot of time
3  lecturing to district attorneys, to
4  prosecutors in these realms and to their
5  assistants.
6      Q.    And apparently you've held
7  yourself out as having qualifications. For
8  gosh sakes, you worked in the area of
9  graphics, preparing graphics for the
10 district attorneys, for the Beasley firm,
11 and preparing matters to be presented in
12 court to juries, just like the jury that
13 will try this case?
14     A.    I think the answer to your
15 question is what were my qualifications. I
16 think my qualifications were judged by my
17 work product --
18     Q.    Yes, sir.
19     A.    -- and the folks who hired me
20 to do those things.
21     Q.    And you considered yourself
22 qualified in the area or you wouldn't have
23 held yourself out as somebody to speak on

62

1  this subject to other experts, would you?
2      A.    I'm not sure what you mean by
3  held myself out. Is there a certification
4  in court computer graphics, the answer is
5  no. My background is in engineering, as you
6  know from having read my resume, which gave
7  me a firm foundation in the sciences needed
8  to do accurate computer graphics.
9      Q.    Yes, sir. And you considered
10 yourself having expertise in computer
11 graphics and the presentation of those
12 graphics to juries and courts, didn't you?
13     A.    Yes. It was accepted in
14 courts and used.
15     Q.    And that's what you did for a
16 living at that time?
17     A.    Yes. That's right.
18     Q.    And, in fact, this program was
19 to be presented to people who, like
20 yourself, would offer expert witness
21 testimony; is that right?
22     A.    That's correct.
23     Q.    Why are none of these computer

63

1  graphics writings listed in either your
2  report, Exhibit 28, or on your CV, which is
3  Exhibit 39?
4      A.    Let's see, Exhibit 28, which
5  is my report --
6      Q.    You didn't list any of your
7  publications there.
8      A.    I didn't list any publications
9  there because it was included in my resume.
10     Q.    Yes, sir. But we didn't get
11 your resume until today.
12         But just begging that
13 question, your resume, Exhibit 39, does not
14 list any of these extensive writings on the
15 use of computer graphics in the court room,
16 does it?
17     A.    No. And this resume isn't
18 meant to include everything that I have
19 written in the past. It's a resume having
20 to do with my qualifications as a
21 pathologist.
22     Q.    Yes, sir. But there's not a
23 limitation, I don't believe, in the Rule

64

1  that's Exhibit 27. It just says that all
2  publications.
3      A.    Okay.
4      Q.    And all of your publications
5  aren't listed, are they?
6      A.    I don't have a listing of all
7  my publications.
8      Q.    Do you have some of them?
9      A.    Of the handouts from --
10     Q.    Yes, sir.
11     A.    No. I don't save those.
12     Q.    Do you have any of them?
13     A.    Probably not.
14     Q.    Please, sir, were you paid or
15 were your expenses paid for appearing on
16 this program?
17     A.    Expenses were paid, yes.
18     Q.    Did you listen to the other
19 speakers at the program?
20     A.    To be quite honest with you, I
21 did not.
22     Q.    Why not?
23     A.    Because it was more appealing

16  (Pages 61 to 64)

# FREEDOM COURT REPORTING

65

1  to see that part of Massachusetts that I
2  hadn't seen.
3      Q.    All right. Did you listen to
4  any of them?
5      A.    I think I may have listened to
6  the ones right before me or right after me,
7  because it was a session, and I don't
8  remember which ones those were.
9      Q.    Well, did you -- Were you
10  provided with copies of the papers written
11  by the others?
12      A.    I'm sure I was, yes.
13      Q.    Did you review any of them?
14      A.    I don't believe I did. You're
15  asking me questions that I just can't
16  answer. I don't remember.
17      Q.    I think we've established that
18  this program on which you were speaking was
19  designed to attract those who offer expert
20  testimony to learn more about being --
21  providing expert testimony and how to be
22  more effective at their craft; is that
23  right?

66

1      A.    That was the general theme of
2  this conference, that's correct.
3      Q.    And did you consider, before
4  you put yourself out and participated in a
5  program, whether you wanted to be associated
6  with the other speakers and --
7      A.    I'll be honest with you, I
8  didn't realize until I got to this
9  conference what the general theme of the
10  conference was. I went to this conference
11  primarily because as an employee of Beasley,
12  Allen, I had been invited.
13      Q.    Yes, sir. Did anybody else
14  from Beasley, Allen go up there?
15      A.    No. I have not been back to
16  this conference.
17      Q.    Well, have you -- Do you
18  consider that the other speakers were
19  talking about matters that should be of
20  concern and interest to expert witnesses,
21  objectivity, for example, just looking at
22  Dr. Speckart on top of the same page where
23  your name is. Dr. Speckart will explain how

67

1  experts can be successful in enhancing their
2  credibility and creating a favorable
3  disposition among jurors and fact finders.
4  He will review the three-dimensional theory
5  of persuasiveness which includes expertise,
6  objectivity, and communicativeness.
7          Would you consider that to be
8  something of consequence and importance to
9  you as an expert witness?
10      A.    To me?
11      Q.    Yes, sir.
12      A.    No. I don't need a lecture to
13  be objective and credible and truthful.
14      Q.    I see. Objectivity is
15  important and you know that anyway, don't
16  you?
17      A.    Yes, sir.
18      Q.    All right. There were other
19  subjects in here: How far experts can and
20  should go in collaborating with retaining
21  counsel. Is that something of importance to
22  an expert witness?
23      A.    To me?

68

1      Q.    Yes, sir.
2      A.    No. I have my own ethics and
3  my own standards, and I didn't need what
4  this conference was directed to.
5      Q.    For example, Ryan Reed spoke,
6  among other things, about suggestions for
7  what experts should and should not commit to
8  writing. You didn't consider that was
9  something you needed to listen to?
10      A.    No.
11      Q.    A fellow by the name of Bruce
12  Dubinsky talked about: He will also explain
13  personal qualities of the expert and the
14  ability to work as a part of a team.
15          Is that something that you do
16  as an expert witness?
17      A.    To work as a part of a team?
18      Q.    Yes, sir.
19      A.    I'm not sure what the
20  implication is there. I'll tell you how I
21  work as an expert witness.
22      Q.    Yes, sir.
23      A.    Okay. I review evidence that

17  (Pages 65 to 68)

**FREEDOM COURT REPORTING**

69

1  is given to me. If I think there is more
2  evidence that I need to see, I ask for it.
3  Then I issue, either orally or written, my
4  opinion of a case. And then whoever is
5  asking for that opinion can decide whether
6  they want to use that opinion or not. And
7  that's how I operate.
8      Q.  Do you consider that you work
9  as a team with the attorneys who retain you
10  to help them present their case and develop
11  the case?
12      A.  I am congenial with the
13  attorneys. If they have difficulties in
14  presenting my opinion in court, I will
15  explain terminology and issues like that.
16  So I guess, that is team work, but I don't
17  know what more I can say beyond that.
18      Q.  All right, sir. The fellow
19  just before you, Edward Ohlbaum, was talking
20  about how to avoid being discredited by
21  one's own report.
22          You're weren't concerned about
23  that?

70

1      A.  No. My wife and I had not
2  been to the Cape, and we spent, with the
3  exception of my lecture and the time that I
4  needed to be in the lecture hall to present
5  it, away from this conference.
6          (Whereupon, Defendant's
7          .  Exhibit No. 31 was marked
8          for identification.)
9      Q.  I'm going to show you what I'm
10  marking as Exhibit 31. It's the first page
11  and the last page of an article that appears
12  on the Beasley, Allen website in 2007. I've
13  got the whole article if you want to see it.
14          Apparently a paper about
15  technology as a storyteller's tool. And
16  what I'm looking at is just on page nine, it
17  refers to your article Computer Graphics for
18  the Complex Trial.
19      A.  Uh-huh.
20      Q.  Apparently the paper that you
21  presented at that seminar we were just
22  talking about; is that right?
23      A.  I think it's the title of it,

71

1  yes, sir.
2      Q.  Was that the paper that you
3  prepared and presented at that conference?
4      A.  I believe that's what they're
5  referring to. I don't recognize that title,
6  but I believe that's what they're referring
7  to on the website.
8      Q.  Well, all I know is what I
9  found on the web. But it looks like a copy
10  that paper was still around in this office
11  last year. Does that sound correct to you?
12      A.  I haven't been in this office
13  for two or three years, so I can't speak to
14  that.
15      Q.  At any rate, that paper is not
16  included as one of your publications, is it,
17  in the documents you've presented?
18      A.  No, sir. I don't have a copy
19  of this paper.
20      Q.  But that wasn't the question.
21  The question is whether you had listed it as
22  one of your publications -- as one of your
23  writings, and it's not, is it?

72

1      A.  It's not, no, that's right.
2      Q.  You had an e-mail address here
3  at Beasley, Allen when you were working
4  here; is that right?
5      A.  Yes.
6      Q.  Do you still use that address?
7      A.  At Beasley, Allen?
8      Q.  Yes.
9      A.  Oh, no.
10      Q.  Did you have an office at
11  Beasley, Allen?
12      A.  Yes.
13      Q.  And you had an office in this
14  building?
15      A.  It started off in this
16  building and then ended up in the building
17  next door.
18      Q.  But another Beasley, Allen
19  office?
20      A.  Yes. Yes.
21      Q.  Did you -- All right. Have
22  you been involved in other business
23  ventures?

18  (Pages 69 to 72)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

73

1    A.    Other business ventures?
2    Q.    Yes, sir. You've told me
3    about your computer graphics work, you've
4    told me about your consultations, you've
5    told me about what you used to do with the
6    state, about doing the -- about what you do
7    with -- at Gunter. Do you -- Have you had
8    any other business ventures in the last ten
9    years or so?
10    A.    No. Not that I can -- I think
11    the answer is no, unless --
12    Q.    What is Nibbana Graphics,
13    L.L.C.?
14    A.    Yeah. Nibbana. You're right.
15            (Whereupon, Defendant's
16            Exhibit No. 33 was marked
17            for identification.)
18    Q.    I'll show you Exhibit 33, a
19    document --
20    A.    It that says it on my resume.
21    Did I not put that on my resume?
22            Just so it doesn't look like
23    I'm trying to hide Nibbana Graphics, it's

74

1    clearly on my resume. And Nibbana Graphics
2    is what I do my computer graphics work on at
3    home. So I guess you're right, that is a
4    business venture.
5    Q.    Is that business still
6    operating?
7    A.    Nibbana Graphics still exists.
8    Q.    You're still operating?
9    A.    It still exists. Now,
10    operating meaning do I still do computer
11    graphics? Occasionally, yes.
12    Q.    Do you use the Nibbana
13    Graphics name?
14    A.    The checks are made out to me.
15    Q.    Yes, sir. As opposed to
16    running through the corporation?
17    A.    As opposed to going to Nibbana
18    Graphics.
19    Q.    Yes, sir.
20    A.    I have a checking account that
21    says Nibbana Graphics, so all of that
22    business stuff stays in Nibbana Graphics.
23    Q.    Yes, sir. Well, Nibbana

75

1    Graphics, according to this record, was
2    formed on February 9th, 2001. I believe you
3    said 2001 was when you went to work for the
4    Beasley firm; is that right?
5    A.    It says 2001, I've got on my
6    resume in 1998. I had Nibbana Graphics
7    before I came to Beasley, Allen.
8    Q.    That's what I found with the
9    Secretary of State.
10    A.    Well, I don't know how to
11    explain that. That may have been when I got
12    a business license. But Nibbana Graphics,
13    itself, was formed in 1998.
14    Q.    I understood you to say that
15    when you were employed at the Beasley firm
16    from, I think, 2001 through 2005, that you
17    worked for them exclusively, with the
18    exception that you explained about some work
19    contracts you had with the district
20    attorney's group?
21    A.    Sure.
22    Q.    This appears to have been
23    operating -- appears to have been formed

76

1    about the time you started at Beasley. I'm
2    just trying to understand.
3    A.    It was formed in 1998 because
4    I wanted to start to do computer graphics.
5    Q.    Right.
6    A.    Okay. And then I went to work
7    for the Alabama District Attorney's
8    Association doing it full time, and then
9    came over here. When I came over here,
10    Nibbana Graphics didn't do any graphics. It
11    didn't do anything. It existed. So if your
12    definition of operation is that it exists,
13    the answer is yes. But it didn't do
14    anything.
15    Q.    It was not operating from 2001
16    forward?
17    A.    What do you mean by operating?
18    Q.    A cash flow in and out, doing
19    work for people, billing folks, that kind of
20    thing.
21    A.    I think I may have had one or
22    two cases -- No. There was one or two cases
23    from an attorney that came through Beasley,

19  (Pages 73 to 76)

# FREEDOM COURT REPORTING

77

1 Allen, and they said would you do it for us
2 privately. And I got permission from them,
3 and that was it. But it was all cases that
4 came through here that I did for them
5 outside, but it was one or two cases. It
6 was next to nothing.
7     Q.    All right, sir. What does the
8 name Nibanna come from? Is there some
9 significance to that name?
10     A.    Nibbana is from an Asian
11 language called Pali, P-A-L-I, it's an
12 extinct language. You may have heard of
13 Sanskrit, Sanskrit is probably its
14 successor. The word Nibbana in Pali is
15 synonymous to the word Dharma -- I'm sorry.
16 There actually isn't a similar word, I'm
17 confusing --
18     Q.    I'm wondering where you got
19 the name.
20     A.    That's where I got it.
21     Q.    It doesn't relate to anything
22 to do with computer graphics obviously?
23     A.    No.

78

1     Q.    Do you assist the Beasley,
2 Allen firm in evaluation of personal injury
3 and death cases?
4     A.    Beg your pardon?
5     Q.    Do you assist the Beasley,
6 Allen firm in evaluation of personal injury
7 and death cases?
8     A.    Now?
9     Q.    Have you ever?
10     A.    I did not act as an expert to
11 Beasley, Allen while I was here as the
12 director of computer graphics.
13     Q.    Did you before, do you now,
14 have you ever assisted the Beasley, Allen
15 firm in evaluation of personal injury
16 and death cases?
17     A.    I have received occasional
18 cases. Mike's is a case that has gone to
19 fruition, so to speak. For example, in the
20 last six months, Julie Beasley has asked me
21 to look at two cases to see if they had any
22 credibility, are these cases worth pursuing.
23 And in both of those, I have told Julie, no,

79

1 and those cases stopped at that point.
2     Q.    So you do assist the firm in
3 evaluating personal injury and death cases?
4     A.    Probably four or five times a
5 year, yeah.
6     Q.    And you still do that?
7     A.    If they ask me, yes.
8     Q.    I'm showing you what I've --
9 Does working at the Beasley firm give you
10 opportunities to do work you couldn't do
11 somewhere else?
12     A.    Yes. That was the reason to
13 come here.
14     Q.    What kind of work are you
15 talking about?
16     A.    I had technical resources here
17 that I could not have gotten working for
18 other agencies, particularly for the state.
19         (Whereupon, Defendant's
20         Exhibit No. 34 was marked
21         for identification.)
22     Q.    I'll show you what I've marked
23 as Exhibit 34, that's the first and

80

1 fifty-third pages of the Jere Beasley
2 report, dated April 2003. I've printed a
3 copy of the whole page if you want to see
4 it. And looking on page fifty-three --
5     A.    Yes.
6     Q.    -- refers to your assisting in
7 the making of essential medical decisions
8 and evaluations in our product liability
9 mass torts and personal injury and death
10 cases. Is that an accurate statement?
11     A.    I'm sorry, where is it?
12     Q.    He assists in the making of
13 essential medical decisions and evaluations
14 in our product liability, mass torts, and
15 personal injury and death cases. Is that an
16 accurate statement of some of the work that
17 you do here?
18     A.    This refers to the sort of
19 work that I just referred to you with --
20 that I mentioned with Julie's cases. And
21 that is when a case was beginning, often --
22 I don't want to say often, occasionally one
23 of the attorneys would say, take a look at

20 (Pages 77 to 80)

# FREEDOM COURT REPORTING

81

1  this and see what the substance of this case
2  is.
3    Q.  Yes, sir.
4    A.  And I would offer my opinion.
5  It would never be taken to court, obviously,
6  because I was not a medical expert for
7  Beasley.
8    Q.  But you assisted in making the
9  essential evaluations and medical decisions
10 in those cases?
11   A.  Did I?
12   Q.  Yes.
13   A.  Yes.  I think that's a true
14 statement.
15   Q.  And is it also a true
16 statement that you were a member of the
17 litigation team?  I've marked that.
18   A.  Yes, it says that.  And I
19 guess by that, Mr. Beasley means that I was
20 providing graphic support and technical
21 support in the court room and then offering
22 these preliminary medical decisions as to
23 whether a case had substance or not.  So in

82

1  that sense I would agree, I was a member of
2  the team.
3          (Whereupon, Defendant's
4           Exhibit No. 35 was marked
5           for identification.)
6    Q.  I will show you also a couple
7  of pages of the Jere Beasley report, dated
8  May 2004.
9    A.  Okay.
10   Q.  The front page and page
11 twenty-eight.  I have printed the total
12 document if you'd like to see it.
13       You were still working for
14 them then.  Do you remember helping them
15 make a decision about putting defibrillators
16 in their offices?
17   A.  Yes.  That was -- Mr. Beasley
18 came to me and he said, do you think it's a
19 good idea for a firm our size and with our
20 patient population to provide additional
21 safety for our employees and visitors by
22 having automatic external defibrillators
23 installed.  And after reviewing the

83

1  situation, we decided in fact that that was.
2  And Mr. Beasley was ahead of his time in
3  that.  And I'm proud of that decision.  I'm
4  proud of his decision to put automatic
5  external defibrillators in this office.
6    Q.  How many folks are employed at
7  the Beasley, Allen firm or were at the time
8  you were employed with them?
9    A.  I think it was about a hundred
10 and eighty to two hundred.  But -- hundred
11 and fifty to two hundred.  And if you have
12 more accurate information, I just simply
13 don't know.
14   Q.  I'm just asking the question,
15 and I don't know.
16       Would you defer to the
17 cardiologist who is actually treating Rufus
18 Woodley concerning his cardiology matters,
19 his heart, his cardiology matters that were
20 occurring and developing during the time
21 that that cardiologist was actually treating
22 Rufus Woodley?  Would you consider that such
23 a cardiologist would know more about his

84

1  situation than you, for example?
2    A.  I'm not sure I understand the
3  question.  A cardiologist referring to as
4  Dr. Williams?
5    Q.  Whoever.  Would you defer to a
6  cardiologist who is actually treating Rufus
7  Woodley hands on, seeing him, putting a
8  stethoscope on his chest, looking at an EKG
9  if he needs one, running lab tests that he
10 orders and doing what he considers
11 appropriate based on what he's physically
12 observing and watching develop in front of
13 him?  Would you defer to a cardiologist in
14 that situation as having more knowledge
15 about Mr. Woodley's circumstances than you
16 can perform -- than you can develop now?
17   A.  The cardiologist expertise and
18 my expertise are different areas.
19   Q.  Yes, sir.
20   A.  I would certainly defer to the
21 cardiologist in establishing what
22 medications Mr. Woodley should have and how
23 he should be evaluated.  But in establishing

21  (Pages 81 to 84)

# FREEDOM COURT REPORTING

85

1  a sequence of events that eventually led to
2  Mr. Woodley's death, and that is the realm
3  of the forensic pathologist who, on a daily
4  basis, looks at complex factors often
5  involving accidents or other misfortunes and
6  resulting in death. So the answer is, yes,
7  I defer to the cardiologist in his area of
8  expertise.
9      Q.    But you don't consider his
10 area of expertise to form an opinion about
11 the cause of death?
12     A.    Well, he can form an opinion.
13 I won't say anything about that. But I can
14 tell you that the forensic pathologist forms
15 those opinions far more often and on an
16 almost daily basis and is trained to form
17 those opinions.
18     Q.    And you don't consider a
19 cardiologist is trained to form those
20 opinions about his or her own patients?
21     A.    Not when it involves a complex
22 series of events. I'm not talking about
23 evaluating or managing a heart attack or

86

1  managing coronary artery disease. But we're
2  going beyond that in this case.
3      Q.    So you would consider your
4  expertise superior to determine the cause of
5  Rufus Woodley's death to that of a
6  cardiologist who is actually treating him at
7  the time he expired, for example?
8      A.    I'd prefer not to use the term
9  superior. But my area of expertise is more
10 specialized than his in this particular
11 question.
12     Q.    Would you consider the
13 cardiologist qualified to form an opinion
14 about the cause of death?
15     A.    The immediate cause of death,
16 yes, I don't have any problem with that.
17     Q.    Do you have available to you
18 any information that was not available to
19 Rufus Woodley's treating cardiologist at the
20 time of his death?
21     A.    I strongly suspect that the
22 cardiologist, at the time of his death, did
23 not have available to them all of the

87

1  medical records that Dr. Williams had that I
2  have reviewed and the other medical records
3  of Mr. Woodley's health care prior to his
4  cervical spine fracture.
5      Q.    Do you know that?
6      A.    No, I don't know that for
7  certain. But I know that it would be most
8  unusual for them to have the complete
9  medical record that I have and have been
10 able to review.
11     Q.    Who is Sylvio Papapietro?
12     A.    Who is he?
13     Q.    Yes, sir.
14     A.    My understanding is, he is the
15 cardiologist who did the catheterization at
16 the time of the acute myo- -- the fatal but
17 acute myocardial infarction.
18     Q.    Have you reviewed his
19 deposition?
20     A.    I have, yes.
21     Q.    You didn't list that or didn't
22 refer to it as part of your file.
23     A.    Let me see here. It is right

88

1  here (indicating). You may not have seen
2  it, but it's right here (indicating).
3      Q.    You went down the list for me
4  and you -- I'm sorry. I said that -- I
5  misspoke. Please forgive me.
6          You did say that you had the
7  deposition?
8      A.    It's right here. Would you
9  like to see it?
10     Q.    You told me. I misspoke.
11 When you looked -- I went back to my notes,
12 and that's what I wrote down, you did have
13 that.
14         Did you consider his testimony
15 in forming your own opinion?
16     A.    No. I had formed my opinion
17 before his testimony.
18     Q.    I see. Why would you not
19 consider Dr. Papapietro's testimony?
20     A.    His deposition testimony?
21     Q.    Yes, sir.
22     A.    Because the facts as
23 documented in the medical records were clear

22  (Pages 85 to 88)

# FREEDOM COURT REPORTING

89

1 enough.
2    Q.    In fact, your report, Exhibit
3 28, is dated about a month before
4 Dr. Papapietro's deposition, isn't it?
5    A.    That may be. I'm not sure
6 what his deposition date was.
7    Q.    I believe his deposition date
8 was November --
9    A.    7th.
10    Q.    -- 7th, 2007.
11    A.    Uh-huh.
12    Q.    And your report, I believe
13 it's Exhibit 28, is dated October 17th.
14    A.    Yes.
15    Q.    So you, as you stated just a
16 minute ago, formed your own opinion before
17 Dr. Papapietro's opinion was available to
18 us; is that right?
19    A.    That's correct.
20    Q.    And even though your report
21 was not delivered until December 18th, about
22 a month after his deposition, you never went
23 back to consider Dr. Papapietro's testimony?

90

1    A.    No.
2    Q.    Why would you not have even
3 considered his testimony?
4    A.    Because the medical records
5 are very clear as to what happened.
6    Q.    I see.
7    A.    And he doesn't deny what's
8 documented in the medical records as being
9 factual.
10    Q.    Tell me what medical records
11 you refer to.
12    MR. CROW:  Can we take about a
13 five-minute break?
14    A.    We have medical records from
15 UAB Hospital from Dr. Williams, Dr. Wybenga.
16    Q.    This is just a list of the
17 records that you told me about earlier?
18    A.    Yes. And the records from
19 Dekalb Emergency Room, Hospital.
20    Q.    What are the portions of those
21 records that are significant to you? Can
22 you tell me the parts of those records that
23 tell you that Dr. Papapietro is not correct

91

1 in his opinion?
2    A.    Can I tell you?
3    Q.    Can you identify the pages?
4    A.    And I'm sorry, I need to know
5 what his opinion was as to the causation
6 relationship between the cervical spine
7 fracture and the fatal myocardial
8 infarction. As I read his deposition, he
9 didn't offer an opinion to that causation.
10    Did I misread his deposition?
11    (Whereupon, Defendant's
12    Exhibit No. 36 was marked
13    for identification.)
14 Depo
15    Q.    You have read it, as I
16 understand what you just told us. And I'll
17 mark as Exhibit 36, just a copy of page
18 twenty-four of the deposition of
19 Dr. Papapietro.
20    A.    Are we going to go through
21 this page by page?
22    Q.    I hope not.
23    MR. WOOD:  This would be a

92

1 good time for a break?
2    (Recess taken.)
3    Q.    (BY MR. WOOD):  Have you had
4 the occasion now during this break to take a
5 look at Exhibit 36?
6    A.    Yes.
7    Q.    I understand Dr. Papapietro
8 said that he just can't tell whether the
9 spinal cord injury contributed or caused the
10 heart attack. Is that what you understand?
11    A.    That is what he said on page
12 twenty-four, yes, sir.
13    Q.    And is that what you
14 understand to be the gist of his testimony
15 through his entire deposition as far as
16 causation?
17    A.    No. That's not how I
18 understand his deposition.
19    Q.    Tell me how you understand it.
20    A.    On page ninety-one he talks
21 about stresses that a person is undergoing
22 as possibly precipitating a heart attack.
23    Q.    Yes, sir. And then on page

23  (Pages 89 to 92)

### FREEDOM COURT REPORTING

93

1    ninety-one onto ninety-two, a question was
2    posed to this doctor as to whether this
3    heart attack was a natural progression of
4    the coronary artery disease, and he
5    specifically says:  No, not necessarily.
6    Many patients live with blockages for years
7    and years and never have a heart attack.
8            That, taken together with his
9    admission that stresses can produce heart
10   attacks, and his admission that many
11   patients can live with blockages for years
12   and years and never have a heart attack is
13   an implication that there be in his opinion,
14   causation between the cervical spine
15   fracture and the fatal heart attack and in
16   fact, corresponds almost exactly with my
17   interpretation of this case.
18      Q.    Which is what?
19      A.    Which is that Mr. Woodley was
20   a man with severe coronary disease.  And
21   Dr. Williams had partially treated him in
22   2003 with a stent and then a redo of the
23   stent with angioplasty.  At that point,

94

1    Mr. Woodley then began to be treated
2    medically rather than with surgery.  And
3    interestingly over those succeeding years,
4    he really stabilized so that his coronary
5    disease was no longer an important issue as
6    far as needing surgical therapy.  And, in
7    fact, he had two stress tests, one in 2004,
8    and one in 2006 that were remarkable for a
9    man who had a severe coronary disease as he
10   had.  And, in fact, the one in 2006, he got
11   a heart rate up to about a hundred and
12   thirty beats per minute, which is, for a man
13   his age, remarkable, indicating that his
14   heart was receiving enough blood to the
15   myocardium in the face of exercise and that
16   his coronary disease was now stable and, in
17   fact, corresponds exactly to what
18   Dr. Papapietro said on page ninety-two, that
19   many patients can live with blockages for
20   years and years and years and never have a
21   heart attack.
22           That's even confirmed with a
23   visit to Dr. Fallahi just a few days before

95

1    this accident in which it was documented
2    that Mr. Woodley was able to have extreme
3    amounts of exercise for his age:  He was
4    walking several times a week, he was playing
5    golf, he was mowing his grass.  And so here
6    was a man who had severe disease but was
7    stable.  Then he has this accident, has a
8    cervical spine injury which sets up the
9    usual complications with cervical spine
10   injury, and that is problems with
11   maintaining stable blood pressures, problems
12   with fluid balance.  And, in fact, if one
13   reads the medical record closely, there is a
14   specific admonition to maintain the mean
15   arterial pressure above eighty-five.  And
16   the importance of that, obviously, is to
17   keep enough blood flowing through the
18   coronary arteries to prevent the heart
19   attack.  It's well documented in a couple of
20   places that the mean arterial pressure fell
21   below that, down to sixty, and the day
22   before his heart attack, it was documented
23   to be down at about sixty.  Those are the

96

1    stresses, the physiologic stresses, that led
2    to a deterioration of his coronary artery
3    disease and the fatal heart attack, not to
4    mention the psychological stresses of pain
5    and the emotional stresses that also have
6    deleterious effects on the heart.
7       Q.    You do not understand
8    Dr. Papapietro as saying that this man's
9    death could have been a natural progression
10   of his coronary artery disease?
11      A.    Dr. Papapietro, in my opinion,
12   refused to offer an opinion as to whether he
13   thought the spinal injury caused the heart
14   attack or not.
15      Q.    Yes, sir.  His testimony will
16   speak for itself.  But you don't understand
17   him to say that it could be or it could not
18   be a natural progression of his coronary
19   artery disease; is that right?
20      A.    I'm not sure that I understand
21   your question.
22      Q.    I want to understand your
23   interpretation of Dr. Papapietro's

24   (Pages 93 to 96)

# FREEDOM COURT REPORTING

97

1  deposition. And what I understand you to
2  say is that you do not acknowledge that
3  Dr. Papapietro said it either could be or
4  could not be a progression of his coronary
5  artery disease.
6      A.    As I read the whole context of
7  his deposition, I don't see him offering an
8  opinion either way.
9      Q.    He said he couldn't tell.
10     A.    Yes.
11     Q.    But you can?
12     A.    Yes. I think the facts speak
13 for themselves.
14     Q.    You live here in Montgomery?
15     A.    Yes.
16     Q.    So there's no reason you can't
17 be available in this case -- as a live
18 witness when this case will be tried?
19     A.    When will it be tried?
20     Q.    I don't think we have a trial
21 date yet.
22          MR. CROW: We do. June.
23     Q.    So you will be available in

98

1  June?
2      A.    I can be available in June,
3  yes, sir.
4      Q.    All right.
5          MR. WOOD: Thank you, Mike.
6          MR. CROW: I will say this, I
7  think on the Rule 16 order we have, he has
8  set a trial date in June, don't hold me to
9  it, but at least the week of June 24th. But
10 he did put a footnote on the bottom of that
11 and that says that the trial calendar is
12 full -- his trial docket is full and the
13 case may get passed to his next docket, if I
14 recall it. And I've got that order on my
15 desk. After June, I assume August, maybe
16 September.
17     Q.    Sir, you understand Rufus
18 Woodley's right cardiac artery was one
19 hundred percent occluded?
20     A.    At the time he had the
21 myocardial infarction, yes.
22     Q.    What caused that artery to be
23 completely blocked?

99

1      A.    Without an autopsy, one can't
2  be very specific. It might have been purely
3  a thrombus or it might have been a plaque
4  rupture with associated development of a
5  thrombus.
6      Q.    Could have been a blood clot
7  from his leg or could have been any number
8  of things?
9      A.    A clot from his leg into a
10 coronary artery?
11     Q.    Yes, sir.
12     A.    Oh, no.
13     Q.    You don't think so?
14     A.    No. Blood clots from the leg
15 go to the right side of the heart. The
16 coronary arteries arise from the left side
17 of the heart. Unless he has a foramen ovale
18 that's open, that would be most unusual.
19     Q.    Wasn't his right artery the
20 one that was occluded?
21     A.    Yes.
22     Q.    That's what I thought.
23     A.    You understand that the

100

1  coronary arteries arise from the aorta?
2      Q.    Yes. I'm not going to try to
3  be a doctor, my job is to be a lawyer.
4          But he could have had a blood
5  clot that could have come from any number of
6  places to occlude that artery, couldn't he?
7      A.    You're talking about an
8  embolus to the coronary artery?
9      Q.    Yes, sir.
10     A.    There are very few places in
11 the heart that would give rise to an embolus
12 into a coronary artery, certainly not the
13 legs.
14     Q.    I misunderstood -- I'm not
15 articulating my question to you incorrectly.
16 He could have had any number of causes for
17 that artery to occlude, couldn't he?
18          It could have been any number
19 of causes for the blockage of that
20 cardiac -- that right cardiac artery?
21     A.    If you're including an embolus
22 to the coronary artery in that
23 classification, I would like you to propose

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

101

1  the site of the origin of the thrombus. I
2  couldn't imagine where it's coming from.
3      Q.    I'm just asking you, sir, are
4  there any number of causes --
5      A.    Thrombus?
6      Q.    -- that could -- Aren't there
7  any number of things that could have caused
8  that right artery to block?
9      A.    Thrombus, ruptured plaque are
10  by far and away the -- And you could have a
11  constriction.
12      Q.    Yes, sir.
13      A.    Coronary artery spasm. But
14  it's very unusual to have spasm in a man who
15  has a stent in place and has a calcified
16  artery.
17      Q.    Was a stent in the proper
18  place?
19      A.    I don't know that.
20      Q.    Was there not some difficulty
21  in getting the stent in the proper place?
22      A.    Yes. But I don't know if it
23  was in the proper place or not. There was

102

1  difficulty with the stent, but I'm not here
2  to offer an opinion as to whether the stent
3  was effective or not.
4      Q.    Yes, sir. Tell me, please,
5  sir, have you read Dr. Arciniegas' report?
6      A.    Yes, I have.
7      Q.    Do you agree with his report
8  or disagree with it?
9      A.    Do I agree with his report --
10  Let me just make sure that I've -- When you
11  say do I agree with this report, are you
12  talking about his conclusion or the facts as
13  documented?
14      Q.    Is there any part of his
15  report that you disagree with?
16      A.    The general.
17          (Whereupon, Defendant's
18          Exhibit No. 37 was marked
19          for identification.)
20      Q.    For the Record, I'm making a
21  copy of Dr. Arciniegas as Exhibit Number 37.
22  I think you're looking at it on your
23  computer?

103

1      A.    I am, yes.
2          I would disagree with it in
3  the following context in that I don't think
4  enough importance was given to the cervical
5  spine fracture as the precipitating event in
6  this myocardial infarction, and I do not
7  believe that this was a natural progression
8  of Mr. Woodley's coronary artery disease.
9      Q.    Why not?
10      A.    Because I think that Mr. --
11  that Dr. Papapietro's conclusion that there
12  are people with severe coronary artery
13  disease that go for years and years and
14  years without having myocardial infarction
15  fits perfectly Mr. Woodley's situation, and
16  that's well documented in Dr. Williams
17  records and Dr. Fallahi's records that
18  Mr. Woodley was able to successfully
19  complete exercise stress test, in fact,
20  beyond what one would normally expect as far
21  as his target heart rate and was also very
22  active playing golf, mowing the lawn,
23  walking, et cetera.

104

1          I think Mr. Woodley falls into
2  that category that Dr. Papapietro very
3  clearly delineated that he was a person with
4  stable coronary disease, that he could go
5  for years and years without myocardial
6  infarction, who had a very traumatic
7  accident which interrupted that stability.
8      Q.    So you do not accept then even
9  the possibility that this was a natural or a
10  progression of Mr. Woodley's coronary artery
11  disease?
12      A.    Beyond reasonable medical
13  certainty, it is my opinion that the
14  cervical spine fracture caused this
15  progression. And I think that there is good
16  strong evidence for that.
17      Q.    And you've explained all that
18  for me on the Record today?
19      A.    I've answered -- I believe
20  I've answered your questions that you've
21  asked today.
22      Q.    Have you explained to me all
23  the reasons that you believe to a

26  (Pages 101 to 104)

# FREEDOM COURT REPORTING

105

1    reasonable — beyond a reasonable medical
2    certainty, that the spinal fracture caused
3    the heart attack?
4        A.    I believe that if I were --
5    had the opportunity to review what I've said
6    today that I've covered the major points.
7    There may be some points that I haven't
8    covered, but only with reviewing the depo
9    would I be able to answer that question.
10        Q.    You can't think of anything
11    now?
12        A.    Not within the limitations
13    that I just said in the previous answer.
14        Q.    You understand that the right
15    coronary artery was one hundred percent
16    occluded as reported in the catheterization
17    summary?
18        A.    Yes.  At the time of the fatal
19    event, that's correct.
20        Q.    Do you have any opinion as to
21    what caused that hundred percent occlusion?
22        A.    Without an autopsy, one cannot
23    be certain.  It was thrombus or ruptured

106

1    atherosclerotic plaque with overlying
2    thrombus, possibly, but not likely, coronary
3    spasm with associated thrombus.
4        Q.    That's really -- It was the
5    blockage of that artery that actually caused
6    the man's death?
7        A.    Yes.
8            MR. WOOD:  I think that's all.
9            MR. CROW:  I have nothing.
10    (The deposition was concluded at 3:15 p.m.,
11    February 27th, 2008.)
12
13
14
15
16
17
18
19
20
21
22
23

107

1            REPORTER'S CERTIFICATE
2    STATE OF ALABAMA,
3    ELMORE COUNTY,
4        I, Sara Mahler, Certified Court
5    Reporter and Commissioner for the State of
6    Alabama at Large, do hereby certify that the
7    above and foregoing proceeding was taken
8    down by me by stenographic means, and that
9    the content herein was produced in
10    transcript form by computer aid under my
11    supervision, and that the foregoing
12    represents, to the best of my ability, a
13    true and correct transcript of the
14    proceedings occurring on said date and at
15    said time.
16        I further certify that I am neither
17    of kin nor of counsel to the parties to the
18    action; nor in any manner interested in the
19    result of said case.
20
21
22
                    _____
                    Sara Mahler, CCR
23                    ACCR #420

27  (Pages 105 to 107)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

LILIAN WOODLEY, as the          *
Administratrix of the Estate of  *
RUFUS WOODLEY,                  *
                                *
    Plaintiffs,          *
                                *
vs.                             *
                                *    2:07-CV-74-ID
                                *
PFG-LESTER BROADLINE, INC.,     *
and KENNETH O. LESTER           *
COMPANY, INC., et al.,          *
                                *
    Defendants.          *

## NOTICE TO TAKE DEPOSITION UPON ORAL EXAMINATION

TO:   Michael J. Crow
      Beasley, Allen, Crow
      Methvin, Portis & Miles, PC
      Post Office Box 4160
      Montgomery, AL  36103-4160

Please take notice that the defendants in the above styled cause will take the deposition of

**Dr. James Lauridson,** upon oral examination, on **February 27, 2008, beginning at 1:00 p.m.,**

**at the offices of Beasley, Allen, Crow Methvin, Portis & Miles, P.C.** under the Federal Rules

of Civil Procedure, for the purpose of discovery or for use as evidence in the action, or for both

purposes, before a court reporter, a notary public, or before some other office authorized by law

to administer oaths.  The oral examination will continue until completed.

## REQUEST FOR DOCUMENTS

The deponent is requested to bring to the deposition the original and all copies of each of

the following items:



DEFENDANT'S
EXHIBIT

26

1.     The witness' entire file and all documents available to the witness or viewed by the witness at any time concerning the decedent Rufus Woodley.

2.     The report from the witness as an expert required F.R.C.P. 26.

3.     All data or other information considered by the witness in forming any opinion.

4.     Any exhibits to be used as a summary or support for the witness' opinions.

5.     A resume or CV stating the witness' qualifications including a list of all publications authored by the witness within the preceding ten years.

6.     All records of compensation to be paid to the witness for study and testimony.

7.     A list of all other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.


WILLIAM C. WOOD
NORMAN, WOOD, KENDRICK & TURNER
Financial Center, Suite 1600
505 Twentieth Street North
Birmingham, AL  35203
Telephone:     (205) 328-6643
Facsimile:      (205) 251-5479
Email: wood@nwkt.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing pleading by fax transmission and by placing a copy of same in the U.S. mail, postage prepaid and properly addressed to all known counsel on this the 26th day of February, 2008, as follows:

Michael J. Crow
Beasley, Allen, Crow
  Methvin, Portis & Miles, PC
Post Office Box 4160
Montgomery, AL  36103-4160

BY _____

another party's disclosures or because another party has not made its disclosures.

**(2)** *Disclosure of Expert Testimony.*

**(A)** In addition to the disclosures required by paragraph (1), a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.

**(B)** Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

**(C)** These disclosures shall be made at the times and in the sequence directed by the court. In the absence of other directions from the court or stipulation by the parties, the disclosures shall be made at least 90 days before the trial date or the date the case is to be ready for trial or, if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under paragraph (2)(B), within 30 days after the disclosure made by the other party. The parties shall supplement these disclosures when required under subdivision (e)(1).

**(3)** *Pretrial Disclosures.* In addition to the disclosures required in the preceding paragraphs, a party shall provide to other parties the following information regarding


DEFENDANT'S EXHIBIT

27

# Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.

JERE LOCKE BEASLEY
J. GREG ALLEN
   RL J. CROW
   .S J. METHVIN
J. COLE PORTIS
W. DANIEL MILES, III
R. GRAHAM ESDALE, JR.
JULIA ANNE BEASLEY
RHON E. JONES
LABARRON N. BOONE
ANDY D. BIRCHFIELD, JR.
RICHARD D. MORRISON
C. GIBSON VANCE
J. P. SAWYER
C. LANCE GOULD
JOSEPH H. AUGHTMAN

DANA G. TAUNTON
J. MARK ENGLEHART
CLINTON C. CARTER
BENJAMIN E. BAKER, JR.
DAVID B. BYRNE, III
TED G. MEADOWS
FRANK WOODSON
KENDALL C. DUNSON
SCARLETTE M. TULEY
ROMAN ASHLEY SHAUL
W. ROGER SMITH, III
P. LEIGH O'DELL
D. MICHAEL ANDREWS
BENJAMIN L. LOCKLAR
LARRY A. GOLSTON, JR.
MELISSA A. PRICKETT

*Attorneys at Law*
238 COMMERCE STREET
POST OFFICE BOX 4160
MONTGOMERY, ALABAMA
36103-4160
(334) 269-2343

TOLL FREE
(800) 898-2034

TELECOPIER
(334) 954-7555

BEASLEYALLEN.COM

JOHN E. TOMLINSON
NAVAN WARD, JR.
WESLEY CHADWICK COOK
WILLIAM B. ROBERTSON, V
H. CLAY BARNETT, III

OF COUNSEL:
ALYCE S. ROBERTSON
RUSSELL T. ABNEY

ALSO ADMITTED IN ARIZONA
ALSO ADMITTED IN ARKANSAS
ALSO ADMITTED IN FLORIDA
ALSO ADMITTED IN GEORGIA
ALSO ADMITTED IN KENTUCKY
ALSO ADMITTED IN LOUISIANA
ALSO ADMITTED IN MINNESOTA
ALSO ADMITTED IN MISSISSIPPI
ALSO ADMITTED IN MISSOURI
ALSO ADMITTED IN NEW YORK
ALSO ADMITTED IN OHIO
ALSO ADMITTED IN OKLAHOMA
ALSO ADMITTED IN PENNSYLVANIA
ALSO ADMITTED IN SOUTH CAROLINA
ALSO ADMITTED IN TENNESSEE
ALSO ADMITTED IN TEXAS
ALSO ADMITTED IN WASHINGTON, D.C.
ALSO ADMITTED IN WEST VIRGINIA
NOT LICENSED IN ALABAMA

JAMES W. TRAEGER
1953-1987

RONALD AUSTIN CANTY
1963-2004

December 18, 2007

Mr. William C. Wood, Jr.
Norman, Wood, Kendrick and Turner
Financial Center, Suite 1600
505 Twentieth Street North
Birmingham, Alabama 35203

      RE:  **Woodley, Lillian v. Kenneth Lester Company, Inc.**

Dear Bill:

      Enclosed, you will find a copy of Plaintiff's Expert Disclosure and his Rule 26(b) information.

      If you need anything further, please do not hesitate to let me know.

          My best regards,

          BEASLEY, ALLEN, CROW,
           METHVIN, PORTIS & MILES, P.C.

          MICHAEL J. CROW

MJC/anc

Enclosure



DEFENDANT'S
EXHIBIT
28

DEC 19 2007

In matter of the death of Robert R. Woodley, following a motor vehicle accident and cervical spine injury on August 18, 2006, I have reviewed the emergency medical records from Dekalb Regional Medical Center, medical records of hospitalization at the University of Alabama at Birmingham, the medical records of Dr. John Williams, and the medical records of Dr. Martin Wybenga.

Mr. Woodley's coronary artery disease was treated by Dr. Williams. Mr. Woodley initially presented with angina, which was established to be due to coronary artery disease of the right coronary artery. A stent was placed in the right coronary artery on July 29, 2003 and because of continuing symptoms. Coronary angiography was again conducted on August 19, 2003. At that time, Mr. Woodley was found to have calcifications of his right coronary artery as well as calcification of the left anterior descending diagonal branch that prevented further placement of intraluminal stents. It was felt at that time that Mr. Woodley was a candidate for bypass surgery.

However, over the next three years. Mr. Woodley's cardiac condition stabilized with the exception of occasional mild chest pain. He did not require bypass surgery. On July 11, 2006 on a visit to Dr. Williams, Mr. Woodley was free of symptoms and considered to be doing well. His blood pressures were stable. An electrocardiogram, conducted by Dr.Wybenga on March 6, 2006 was normal except for insignificant sinus arrhythmia.

On August 18, 2006 Mr. Woodley was involved in a motor vehicle accident resulting in severe paralytic cervical spine injury. He underwent surgical repair of the injury, but had very little recovery of neurologic function. His postoperative course was complicated by shifts in blood pressure and fluid imbalance, complications common following spinal cord injury. At one point his documented blood pressure got as low as 93/40. After transfer to Spain Rehabilitation Center he continued to have labile blood pressures as low as systolic in the 90s and the diastolic in the 40s.

On August 31, 2006. He suffered a cardiac arrest, and after resuscitation remained in cardiogenic shock. He was noted to have probable fluid overload as well as electrolyte disturbances at that time. Cardiac catheterization after the arrest revealed a 50 to 60% occlusion of the left main coronary artery, 50% occlusion that portion of the left anterior descending coronary artery, a 30% occlusion of the diagonal coronary artery and calcification and occlusion of the proximal portions of the right coronary artery. He expired September 1, 2006.

In summary, Mr. Woodley had known severe coronary disease for several years, but prior to the automobile accident had been well managed and was clinically stable and active. However, following the severe cervical spinal cord injury, and due to the associated cardiovascular complications and stress. He suffered progressive cardiac deterioration leading to cardiac arrest and eventual death.

James R. Lauridson, MD
October 17, 2007

I do not have a written record of prior court testimonies and depositions. I have testified over 200 times in criminal and civil court proceedings. A partial summary of recent testimony includes criminal cases: State versus Jones, Arkansas, 2007; US versus Seale, Mississippi, 2007; State versus McLemore, Alabama, 2007; civil cases: Upton, versus RPS, Alabama, 2006.

My professional fee for case review is $300/hour

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

LILLIAN WOODLEY as the       *
administratrix of the Estate of     *
RUFUS WOODLEY,            *
                            *
     Plaintiffs,             *
                            *   CIV. ACT. NO.: 2:07cv74-ID
v.                          *
                            *
PFG-LESTER BROADLINE, INC.;   *
KENNETH O. LESTER COMPANY,  *
INC.,                     *
                            *
     Defendants.           *
                            *

## PLAINTIFF'S SUPPLEMENTAL EXPERT DISCLOSURE

Plaintiff, Lillian Woodley, pursuant to the Court's Order dated March 13, 2007 hereby discloses the identity of the following persons who may be used at the trial of this matter:

    1.    James Lauridson.

                             /s/Michael J. Crow
                             MICHAEL J. CROW (CRO039)
                             Attorney for Plaintiffs

OF COUNSEL:

BEASLEY, ALLEN, CROW,
 METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
Montgomery, AL 36103-4160
(334) 269-2343

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon all counsel of record listed below via e-file, on this the 18th day of December, 2007.

/s/Michael J. Crow
OF COUNSEL

Matthew W. Robinett
William C. Wood
Norman, Wood, Kendrick and Turner
Financial Center, Suite 1600
505 Twentieth Street North
Birmingham, Alabama 35203

Case 2:07-cv-00074-WHA-TFM     Document 40-3     Filed 04/04/2008     Page 38 of 138

Contact SEAK                     # SEAK, Inc.                                    About SEAK

Join SEAK's Mailing List            Excellence In Education Since 1980

| Webstore | Seminar Schedule | Expert Witness Directory | IME Directory | Customized Training | Free Resources |

►**Complete Schedule**
*SEAK's Thirteenth Annual*
**National Expert Witness Conference**
*The program for experts of all disciplines and levels of experience*

Four Points by Sheraton Hyannis Resort, Hyannis, Massachusetts

**June 24 and 25, 2004**                                                     Schedule

*Conference Leaders:*                                                     Hotel and Travel
                                                                          Information

       **Steven Babitsky, Esq. & James J. Mangraviti, Jr., Esq.**     Registration Info

                                                                          Registration Form

Expert Witness Directory                                                  PDF of Brochure

SEAK, Inc. is pleased to present its Thirteenth Annual National Expert Witness Conference. Experts from all disciplines and with all levels of experience will benefit from multi-disciplinary advanced techniques. Nationally recognized attorneys, experts, judges, and educators will discuss all aspects of expert witness testimony, ethics, and trial techniques. Conference participants will be presented with practical suggestions for succeeding as expert witnesses. This advanced two-day program will include lectures, trial demonstrations, lively question and answer periods, intensive breakout sessions led by a highly qualified faculty, and roundtable discussions where participation by attendees is encouraged.

Conference registrants will have an opportunity to improve their skills while networking and meeting other professionals in a stimulating and collegial atmosphere. We are proud to present four preconferences this year including two new preconferences. We are also pleased to provide continental breakfast each day, an hors d'oeuvre reception on June 24 and a conference luncheon on June 25. Our faculty this year includes four distinguished judges. Our expanded program will permit participants to obtain even more information than in past years.

    *Here is what past attendees have to say about the program:*

*"Excellent! Excellent! Excellent!"*

*"The presenters were excellent."*

*"This is my fourth year of attendance. I keep coming as long as I go away with new gems of knowledge or technique."*

*"Informative, attention holding, practical! Exceeded my expectations in terms of what I would be able to take back with me!"*

*"User friendly."*

*"Very professionally done."*

*"By far the best value of all training I've attended."*



*"Good job well done, excellent conference."*

*"All speakers were outstanding and should be invited back."*

*"Thanks for the great opportunity to enhance my skills."*

*"Right on point."*

*"All speakers were good."*

*"All speakers were superb. I would not hesitate to recommend the seminar to others and already have!"*

*"Very well done, great faculty."*

*"Excellent presentations, information, handouts, and interaction."*

*"High quality exceeded expectations."*

*"Well done, on time, excellent speakers and good topics."*

*"All speakers and presentations were very good."*

*"Impressed with the intellectual atmosphere, the thought-provoking questions of the attendees and the insight brought by judges, lawyers and trial consultants."*

*"Excellent, clear speakers, very good breakout sessions."*

*"Very professional, well organized."*

*"Your program was a pot of gold."*


## Schedule

Thursday, June 24th, 2004
Friday, June 25, 2004

## Thursday, June 24th, 2004

| | |
|---|---|
| 7:30-8:30 | Registration (Subject to space availability) |
| 8:30-9:30 | **A View From The Bench**<br>By The Honorable Melvin Wright |

Judge Wright will discuss the type of experts and expert testimony that does and does not impress a judge and jury. He will review the biggest and most common mistakes experts make. Judge Wright will offer practical suggestions for experts to improve their testimony and their effectiveness. The Honorable Melvin R. Wright is an Associate Judge of the Superior Court of the District of Columbia. He received his BA from Federal City College (University of the District of Columbia) and his JD from Georgetown University Law Center. Judge Wright was appointed to the Superior Court bench in April 1998 by President Bill Clinton. He has served in Juvenile and Criminal Division assignments. From January 2001 to December 2002 Judge Wright was the Presiding Judge of the Superior Court Drug Intervention Program (Drug Court), and continued his involvement in family court cases where drug addicted parents and their children were the issues. While he presided over Drug Court, Judge Wright chaired the Drug Court Committee for the DC Superior Court, which was made up of representatives from the United States Attorney's Office, Public Defender Service, Pretrial Services Agency, DC Department of Corrections, Criminal Defense Bar, and other treatment and community organizations. Judge Wright is currently assigned to a Civil Trial calendar where he hears jury and non-jury trials and renders oral and/or written decisions. **Questions and Answers**

| | |
|---|---|
| 9:30-10:30 | **Persuasiveness of Expert Witnesses: How to Excel**<br>By George R. Speckart, PhD |

Dr. Speckart will explain how experts can be successful in enhancing their credibility and creating a favorable disposition among jurors and fact finders. He will review the three dimensional theory of persuasiveness which includes expertise, objectivity, and communicativeness. Dr. Speckart will discuss the impact of expert's compensation and offer practical suggestions on how experts can enhance their persuasiveness. George R. Speckart, PhD is a senior litigation analyst for Courtroom Science, Inc., in Irving, Texas. Dr. Speckart received his BA, MA, and PhD in Psychology from UCLA. He has written and lectured extensively on persuasiveness of experts, jurors, and communication. Dr. Speckart has personally directed over four hundred research programs designed to assist litigators in achieving favorable verdict outcomes and minimizing damages exposure to corporate clients. He is a member of the American Society of Trial Consultants' Jury Selection Standards Committee. He has given presentations for the Defense Research Institute, the American Corporate Counsel Association, the International Association for Defense Counsel, the Association of Southern California Defense Counsel and numerous State Bar conventions throughout the nation. **Questions and Answers**

| | |
|---|---|
| 10:30-11:30 | **Discrediting the Truthful Expert Witness: How to Best Prepare for the Onslaught**<br>By Professor Edward D. Ohlbaum |

Professor Ohlbaum will explain how testifying experts are now being cross-examined with the use of the reports of non-testifying experts and what the testifying experts can and should do. He will discuss and demonstrate trick questions, impeachment, and cross-examination techniques and explain how the expert can best prepare for them. Professor Ohlbaum will discuss the materials all experts should have before they prepare their reports and how to avoid being discredited by one's own report. Edward D. Ohlbaum is a Professor of Law and Director of Trial Advocacy and Clinical Legal Education at Temple Law School in Philadelphia, Pennsylvania. Professor Ohlbaum received his BA from Wesleyan University and his JD from Temple University School of Law. He has tried over 75 jury trials and teaches as well as consults nationally on evidence, litigation strategy, advocacy, and ethics. Professor Ohlbaum is the former co-chair of the ABA Trial Evidence Sub-committee on Experts and has written and lectured extensively on evidence, advocacy, litigation, and expert witnesses. **Questions and Answers**

| | |
|---|---|
| 11:30-12:00 | **Roundtable:** Including Conference Attendees |
| 12:00-1:30 | **Lunch** (On Your Own) |
| 1:30-2:30 | **Breakout Sessions:** Choose One |

**Effective Use of Computer Graphics By Experts: Cost-Effective Techniques That Work**
By James R. Lauridson, MD

Dr. Lauridson will explain the advantages and disadvantages of experts using computer graphics in the courtroom with an emphasis on selecting the most effective and economical methods of presentation. He will discuss computers - backups of hardware and software, the processing and enhancement in the trial setting of digital images, and the use and advantages of graphic still images. He will discuss and demonstrate a few Power Point tricks. Dr. Lauridson will take a look at animations from the eyes of a juror, and ways to save money-using 2 dimensional versus 3 dimensional animation and 3 dimensional models without animation. The presentation will be visually stimulating, informal, and interactive. James R. Lauridson, MD is the Director of Graphics at the Montgomery, Alabama personal injury law firm of Beasley, Allen, Crow, Methvin, Portis & Miles. He received his BS in Electrical Engineering at the University of Colorado, Boulder, and his MD from the University of Colorado School of Medicine in Denver. Dr. Lauridson is the former Director of Graphics, Office of Prosecution Services at the Alabama District Attorney's Association and is a former member of the Scientific Working Group on Imaging Technology for the Federal Bureau of Investigation. Dr. Lauridson has written and lectured extensively on the use of computer graphics in the courtroom. **Questions and Answers**

OR

**Dealing Effectively With Retaining and Opposing Counsel: Avoiding Abuse**
By James A. Williams, PhD

Dr. Williams will review how to professionally and effectively relate to both retaining and opposing counsel while avoiding adverse consequences. He will discuss what the expert should seek to accomplish in the conference with retaining counsel and how to build an excellent rapport and working relationship with counsel. Dr. Williams will explain how to best deal with opposing counsel's tactics, traps, and trick questions. Dr. Williams will demonstrate how and what to do when attacked by opposing counsel. James A. Williams, PhD, is an international consultant for law enforcement practices, policy, and procedures, and principal of Williams and Associates in Cherry Hill, New Jersey. Dr. Williams holds a Doctorate Degree in Criminal Justice with specialized studies in the Pharmacology of Drug Abuse and Criminology. His undergraduate degree is in Sociology. He is also a graduate of the National Training Institute in Washington, DC where he completed courses on organizational security, internal security, law, conspiracy, advanced investigative techniques, organized crime, white-collar crime, and financial investigations. He taught Criminal Justice studies as an adjunct professor at Rowan University, Glassboro, New Jersey, and has written and published numerous

papers on police management and security. As a Federal Agent on deep undercover assignment, Dr. Williams penetrated the infrastructure of the national organized crime movement of "Black Incorporated." The United States Department of Justice (USDOJ) Organized Crime Strike Force investigation, code named Operation OXALIC, resulted in the arrests of targeted top level drug kingpins in eight states, Italy, and Jamaica. Dr. Williams is a highly experienced expert witness. **Questions and Answers**

**2:30-3:30**        **Breakout Sessions:** Choose One

**Ethics and the Expert Witness: What Every Expert Needs to Know to Stay Out of Trouble**

By Professor Edward D. Ohlbaum

Professor Ohlbaum will explain the actions and inactions of experts which can subject them to sanctions, civil suits, professional discipline, damaged reputations, loss of referrals, and prosecution for perjury. He will discuss the ethical standards of professional groups, sins of omissions and commissions, when and what to put in writing, disclaimers versus destruction of reports and other documents, the differences between testifying and consulting experts and how far experts can and should go in collaborating with retaining counsel. Professor Ohlbaum will offer practical advice and suggestions to assist experts in maintaining their reputations, integrity, and credibility. **Questions and Answers**

OR

**The Litigation Fee Agreement: An In-Depth Analysis**
By Rodney G. Richmond, RPh, MS, CGP, FASCP

Mr. Richmond will review the elements of a successful, bulletproof fee agreement for consultants and experts. He will discuss all of its terms including services performed, fee schedule, payment terms, project approval, terminations, injuries, indemnification, confidentiality, and deposition and courtroom testimony/appearances and expenses. Mr. Richmond will explain the rationale for the terms and how they work in a real world setting. Rodney G. Richmond, RPh, MS, CGP, FASCP, is a registered pharmacist and forensic consultant with The Mackenzie Group, a clinical and forensic pharmaceutical consulting company in Morgantown, West Virginia. He received his BS from West Virginia University and his MS from the University of North Carolina at Chapel Hill. Mr. Richmond is a clinical instructor in the Department of Clinical Pharmacy at West Virginia University, and a member of the American Society of Pharmacy Law. **Questions and Answers**

**3:30-4:30**        **Breakout Sessions:** Choose One

**Correspondence Between Expert Witnesses and Counsel: Traps, Minefields, and Other Potential Disasters**
By Ryan C. Reed, Esquire

Attorney Reed will explain the limited protection of "work product" concepts and the likely outcome of discovery requests for correspondence between expert witnesses and counsel. He will discuss highlighting, drafts, notes, correspondence, preliminary conclusions, and reports of experts. Attorney Reed will review the use of oral versus written reports and how experts increase their vulnerability to cross-examination by accepting excessive "help" from counsel when drafting their reports. Attorney Reed will offer practical suggestions for what experts should and should not commit to writing. Ryan C. Reed, Esquire is a trial attorney with the Bowling Green, Kentucky law firm of English, Lucas, Priest & Owsley. Attorney Reed received his BA in Economics from Western Kentucky University and his JD from the University of Kentucky College of Law. He is engaged in a broad range of litigation matters, including municipal defense, business and commercial litigation, and workers' compensation. Attorney Reed is the author of *Corresponding With Testifying Experts* and is a member of the Defense Research Institute. **Questions and Answers**

OR

**Making the Complex Understandable: What Works for Expert Witnesses**
By Daniel E. Krane, PhD

Dr. Krane will discuss how to translate and explain complex scientific concepts, principles, and results in a fashion that can be readily understood by a judge, fact finder, and jury. He will demonstrate how an effective technical expert witness can make juries and judges feel comfortable with the understanding of complex evidentiary material. Dr. Krane will demonstrate by use of examples how all experts can work with retaining counsel to offer coherent, understandable expert testimony even in the most complex and difficult cases. Dan E. Krane is an associate professor of Biological Sciences at Wright State University in Dayton, Ohio, where he routinely teaches introductory biology classes that contain hundreds of students taking their first college-level science course. He is also the lead author of a widely used introductory text on bioinformatics - an intersection of the disciplines of molecular biology and computer science. Dr. Krane's litigation experience includes expert witness and consultation regarding topics pertaining to DNA profiling before many Federal and state courts over the past 12 years including several with high-profile defendants such as O.J. Simpson. **Questions and Answers**

**4:30-5:30**        **Breakout Sessions:** Choose One

**Trial Demonstration: Direct and Cross-Examination of the Expert Witness**

By Ellsworth T. Rundlett, III, Esquire, David A. Dodge, CSP, and James J. Mangraviti, Jr., Esquire

A mock trial demonstration will be presented by Attorneys Ellsworth T. Rundlett III and James J. Mangraviti, Jr., and David A. Dodge, CSP. The stipulated facts are as follows: The plaintiff, Ms.Haley, went into a Wal Mart store in Farmington, Maine. She located a "creeper" device and reached up with both hands from a stack. She

was then struck when a number of creepers allegedly fell from the shelf striking her back and right elbow. Counsel for the Plaintiff: Ellsworth T. Rundlett, III, Esquire, is a partner in the Portland, Maine law firm of Childs, Rundlett, Fifield, Shumway & Altshuler. Attorney Rundlett received his BA from Bowdoin College and his JD from the University of Maine School of Law. He is a trial attorney and civil trial specialist certified by the National Board of Trial Advocacy. Counsel for the Defense: James J. Mangraviti, Jr., Esquire, is a former trial lawyer with experience in defense and plaintiff personal injury law and insurance law. He currently serves as Vice President and General Counsel of SEAK, Inc. Mr. Mangraviti received his BA degree in mathematics *summa cum laude* from Boston College and his JD degree *cum laude* from Boston College Law School. Expert Witness: David A. Dodge, CSP, is a safety consultant performing accident analysis in the area of safety, worker/machinery accidents and products liability in Standish, Maine. Mr. Dodge received his BS from Maine Maritime Academy and is a registered professional engineer and certified safety specialist. **Questions and Answers**

OR

**Direct Examination and Experts: How Experts Can Excel**
By Kevin J. Conway, Esquire

Attorney Conway will explain how the expert can, through direct examination, provide a basic primer translating scientific jargon into plain English. He will discuss preparation and interaction with retained counsel and the use of demonstrative evidence to explain and teach the unfamiliar to the jury. Attorney Conway will show how the expert's opinion can be driven home in a forceful and believable way under direct examination. Attorney Conway will demonstrate how the expert, working with counsel, can soften the blows of anticipated cross-examination. Kevin J. Conway is a partner and shareholder in the Chicago, Illinois personal injury law firm of Cooney & Conway. He received his JD from the Loyola University School of Law in 1976 and his BA in 1973 from Loyola University of Chicago. Attorney Conway has achieved million-dollar-plus settlement and/or verdicts in all areas of personal injury law, including aviation, construction, mass torts, and asbestos. Kevin was a member of the Board of Managers of the Illinois Trial Lawyers Association from 1988-1997 and has been a member of the Executive Committee since 1995. As an active member of the Chicago Bar Association, Mr. Conway also chaired the CBA Tort Litigation Committee and co-chaired the Young Lawyers Section of the Trial Technique Committee. He is a Fellow in the American College of Trial Lawyers and is listed in Who's Who in American Law. In 1998, Kevin Conway was nominated as a finalist for Trial Lawyer of the Year by Trial Lawyers for Public Justice in Washington, DC. He will become President of the Illinois Trial Lawyers Association in 2004.**Questions and Answers**

5:30-6:30          **RECEPTION**


## Friday, June 25, 2004

7:30-8:30          **Late Registration (subject to space availability)**
8:30-9:30          **A View From The Bench**
                   By The Honorable Allan van Gestel

Judge van Gestel will explain the factors that go into presenting persuasive expert testimony to a judge and jury. He will discuss how experts lose credibility and believability when they testify. Judge van Gestel will offer practical suggestions on how experts can maintain their integrity while still offering persuasive and convincing expert testimony. The Honorable Allan van Gestel is an Associate Justice of the Massachusetts Superior Court. He obtained his BA from Colby College and his LLB from Boston University School of Law where he was a member of the Law Review. Judge van Gestel was a former partner at Goodwin, Procter & Hoar and is a Fellow of the American College of Trial Lawyers. He is a member of the Standing Advisory Committee for the Massachusetts Rules of Civil Procedure and is currently the Presiding Justice of the Superior Court Business Litigation Session. **Questions and Answers**


9:30-10:30          **Marketing and Building a Forensic/Expert Witness Practice: Cost-Effective Techniques That Work**
                    By Bruce G. Dubinsky, MST, CPA, CVA, CFE

In order to market, you must effectively network. In order to build a practice, you must have referrals. Mr. Dubinsky will discuss how these two essential factors are key to a successful practice. He will review tracking of results, speaking, writing, reputation, and building word of mouth. He will explain various activities to aid in targeting the appropriate audience while maintaining a reasonable marketing budget and demonstrate how certain cases can help your firm's reputation and exposure. Mr. Dubinsky will offer practical suggestions all experts can use to "get your name out there." Bruce G. Dubinsky is a partner and the Director of Forensic Accounting and Dispute Analysis Services for the public accounting firm of Klausner Dubinsky + Associates, PC, in Bethesda, Maryland. He received his BS from the University of Maryland and his MS from Georgetown University. Mr.Dubinsky has provided support in fraud cases, investment Ponzi scheme cases, bankruptcy cases, tax fraud cases, malpractice cases, commercial damage cases, marital dissolution cases, and personal injury cases. He has been qualified as an expert in cases involving criminal and civil fraud, business valuations, commercial damages, and other financial and tax matters in both federal courts and numerous state level courts. In 2001, Mr. Dubinsky was awarded the Fraud Examiner of the Year Award by the Washington Association of Certified Fraud Examiners. He headed the forensic investigation on campaign finance fraud for the United States Department of Justice through appointment by the US District Court for the Southern District of New York during the International Brotherhood of Teamsters (IBT) Rerun Election during 1998 and again in 2001. He furnished the forensic audit for the Washington Teachers Union fraud investigation in early 2003. Mr. Dubinsky has numerous published articles on investigating and working with fraud cases and has acquired a formidable reputation as an experienced trial witness. **Questions and Answers**

**10:30-11:30**     **How Lawyers Cross-Examine, Impeach, and Destroy Expert Witnesses**
By Marcus Z. Shar, Esquire

Attorney Shar will explain and demonstrate numerous techniques attorneys use to destroy the effectiveness and credibility of expert witnesses. Attorney Shar will discuss inconsistent statements, motivation, truthfulness, learned treatises, and other techniques that experts need to understand and be prepared for. He will offer practical suggestions on how experts can defend themselves against each of these techniques, and in some instances, turn the tables on opposing counsel. Marcus Z. Shar is a partner in the Baltimore, Maryland law firm of Shar, Rosen & Warshaw, LLC, which represents plaintiffs in medical malpractice cases throughout the United States. He is listed in *Woodward and White's, The Best Lawyers in America*; is a Fellow in the prestigious American College of Trial Lawyers; and was one of the first two lawyers in the country to be named a Diplomat of The National College of Advocacy. Mr. Shar is an adjunct faculty member at the University of Maryland School of Law and an associate clinical professor at the University of Maryland School of Medicine. The author of numerous articles on trial techniques and three treatises, Mr. Shar lectures to lawyers, judges, experts, and lay groups around the country. **Questions and Answers**

**11:30-12:00**     **Roundtable: Including Conference Attendees**

**12:00-1:00**      **Conference Luncheon-Provided**

**1:00-2:00**       **Breakout Sessions:**

**How Attorneys Prepare to Depose Experts: What Experts Can Expect and How To Prepare For It**
By Michael F. Imprevento, Esquire

Attorney Imprevento will discuss how attorneys prepare to build a record using gaps in the expert's qualifications, foundation methodology, or reasoning. He will explain how good trial attorneys prepare for the expert's deposition as if they were preparing their own expert. Attorney Imprevento will review thirteen non-Daubert issues attorneys use during an expert's depositions including the classic 5 "Silver Bullets" of John Romano. Attorney Imprevento will offer practical suggestions on how experts can prepare for their deposition. Michael F. Imprevento, Esquire, is a partner and trial lawyer with the personal injury Norfolk, Virginia law firm of Breit, Drescher & Imprevento. He received his BA from Fordham University and his JD from Hofstra University. Mr. Imprevento is a former Special Assistant United States Attorney and served as a Lieutenant in the U.S. Navy Judge Advocate Generals Corps. Attorney Imprevento is Vice-Chair, Products Liability Section of the Virginia Trial Lawyers Association and has written and lectured extensively about products liability and litigation. **Questions and Answers**

OR

**Maintaining Your Integrity and Credibility in the Face of the Adversarial System**
By Vince A. Gallagher, CHCM, CSHM

Mr. Gallagher will discuss the many ways that an expert's integrity is likely to be challenged by lawyers on both sides of the case. He will share his experiences in dealing with unethical lawyers of all kinds. Mr. Gallagher will offer practical, realistic suggestions on how experts can best serve clients while still maintaining their integrity and credibility.

Vincent A. Gallagher, CHCM, CSHM, is the President of Safety Research, Inc., in Audubon, New Jersey. Mr. Gallagher has worked in the field of worker safety for thirty years. Mr. Gallagher has a master's degree in occupational safety and health from New York University. He has consulted for major corporations, unions, and for various United Nations agencies in seven countries. Mr. Gallagher has taught in several universities. He has investigated over five hundred serious or fatal industrial accidents. Mr. Gallagher has testified as an expert witness in court over one hundred times and in depositions more than five hundred times.

**2:00-3:00**       **Breakout Sessions:**
**Acting as a Non-Disclosed Expert: Moving the Goal Posts**
By Crispin Hales, PhD, CEng

In many cases, a seemingly insignificant or overlooked piece of evidence holds the key to what happened. Unless the investigation of such situations is carried out in a meticulous way, based on the application of extensive practical experience, it is likely that erroneous conclusions will be drawn as to the root cause of the problem. Often a theory of what happened is put forward by one party or another early in the discovery phase of a case and it becomes the basis for mainstream deposition questions, testing programs, expert analysis and the development of alternative theories. It is at this stage when the non-disclosed expert has the opportunity to bring all the evidence together and view it from a totally different perspective. If this reveals an entirely different theory, overwhelmingly supported by the evidence, then suddenly the goalposts have been moved and settlement of the case may follow very rapidly, without the need for endless further dispute or trial. Dr. Hales will present several examples to demonstrate where this approach has led to early settlement of otherwise hotly disputed cases, with practical suggestions on the type of evidence to look for and how to help re-orientate the thinking of clients already focused on the theories put forward by other parties. Crispin Hales, PhD, CEng, is a principal mechanical engineer at Triodyne, Inc. in Northbrook, Illinois. He received his BE in mechanical engineering from Canterbury University, his MTech from Loughborough University and his PhD from Cambridge University. Dr. Hales is a Fellow of the American Society of Mechanical Engineers and works in forensic engineering, failure analysis, engineering design, and mechanical systems. Dr. Hales has written and lectured extensively and has broad experience in acting as a consulting and testifying expert in the field of mechanical engineering. **Questions and Answers**

OR

**How Attorneys Really Select Experts: The Impact of Expertise, Experience, Reputation, Writing, Speaking, Marketing, Expert Witness Services, and Other Criteria**
By Anthony R. Zelle, Esquire

Attorney Zelle will discuss how experienced trial attorneys identify, select and prepare expert witnesses for trial. He will explain what attorneys are really looking for and the weight counsel gives to expertise, experience, reputation, writing, speaking, and marketing of expert witnesses. He will offer practical suggestions on how experts can best position themselves for selection by trial counsel and will also discuss the process through which expert witnesses and counsel work together in the interests of advancing their clients' claims. Anthony R. Zelle, Esquire, is a trial attorney specializing in complex litigation in the Boston law firm of Robinson & Cole. He received his JD from Boston College Law School and a BA from the University of Minnesota. He represents plaintiffs and defendants in commercial and insurance related litigation. Attorney Zelle has extensive experience handling fraud claims, and in 2002, he was awarded one of the top three jury verdicts in Massachusetts in an action against a real estate escrow agent and a national brokerage firm. In his representation of clients in the insurance industry, he handles coverage and bad faith cases. He also represents insurers in subrogation cases. He has tried cases across the country and has appeared in the appellate courts of Massachusetts, Rhode Island, New York, New Jersey, Pennsylvania, West Virginia, and Ohio and in the First, Second, and Third Circuit Courts of Appeal. Attorney Zelle is a member of the Defense Research Institute and chairs the Insurance Committee's Extra-Contractual/Bad Faith Claims Committee. He is a frequent speaker at DRI programs and has also served on the faculty of the Loss Executive Association's National Forum for Property Loss Professionals. **Questions and Answers**

**3:00-4:00**   **Breakout Sessions: Choose one**

**Establishing Defensible Opinions**
By Jeffrey D. Zwirn, CPP, CFPS, CFE, DABFET, CHS-III

Mr. Zwirn will discuss effective methods for establishing defensible opinions when retained by plaintiffs or defendants. Mr. Zwirn will explain the proper steps to take in establishing defensible opinions and will demonstrate these steps with examples. Mr. Zwirn will provide practical advice to assist the expert attendee in establishing their own defensible opinions for deposition and trial testimony. Jeffrey D. Zwirn, CPP, CFPS, CFE, DABFET, CHS-III, is a security and alarm expert and President of IDS Research and Development, Inc., in Teaneck, New Jersey. Mr. Zwirn has developed, designed, serviced, installed, and monitored thousands of access control, fire alarm, and security systems for commercial, industrial, and residential clients. Mr. Zwirn has served as an instructor for the NYPD Police Training Academy, International Security Conference, ASIS, museum library, and cultural property protection committee and many other associations and organizations. Mr. Zwirn has developed training curriculum and written alarm and security test examinations for the New York City Police Department and the Joint Terrorist Task Force. Mr. Zwirn is also a member of UL and NFPA technical committees. Mr. Zwirn has been involved in hundreds of cases over the last 23 years including the Revelle murder case. **Questions and Answers**

OR

**How to Stand Up Under Cross-Examination and a Daubert Hearing**
By Melvin L. Tucker

Mr. Tucker will discuss the preparation of expert witnesses for cross-examination and Daubert hearings. He will examine and demonstrate some of the commonly employed tactics and strategies used by attorneys in cross-examination to impeach or damage the credibility and testimony of the expert witness during cross-examination. Mr. Tucker will provide practical suggestions on how to survive and thrive during cross-examination and during Daubert hearings. Melvin L. Tucker is a criminal justice and security consultant. He is a former Special Agent with the Federal Bureau of Investigation and a Chief of Police in four cities. He received his BA from the University of South Florida and his MPA from Appalachian State University. Chief Tucker has written and lectured extensively on law enforcement and security issues. He served as a regular instructor for the Florida Center for Advanced Law Enforcement Studies and the Florida Criminal Justice Institute. Chief Tucker has testified extensively in both state and federal court on criminal justice and security issues.

**Questions and Answers**

**4:00-5:00**   **Breakout Sessions: Choose one**

**Preparing to Testify: Deposition and Trial**
By Bruce G. Dubinsky, MST, CPA, CVA, CFE

Mr. Dubinsky will review credentials and standards required for the court to accept a witness as an expert as well as training requirements. He will also explain personal qualities of the expert and the ability to work as part of a team. Mr. Dubinsky will explain his roles in testifying in depositions and trials and the preparation involved in order to meet the challenges of each step of the litigation process, from pretrial proceedings and depositions to trial exhibits and expert testimony. He will demonstrate how to gather evidence and most crucially, determine what is relevant and needed to support an expert opinion. Mr. Dubinsky will offer practical, time-tested advice on how to play it smart, be effective, and obtain success in the courtroom.

OR

**Communication In the Courtroom: How Experts Can Excel**
By Marcus Z. Shar, Esquire

Attorney Shar will explain and demonstrate the expert's use of demonstrative evidence, verbal and nonverbal techniques, and preparation with counsel to effectively communicate at deposition and at trial. Attorney Shar will offer practical advice on how to win over the fact finder or jury and dramatically improve the expert's effectiveness and persuasiveness while testifying. **Questions and Answers**

---

## SEAK in Hyannis -- June 2004
## Thirteenth Annual Conference-Main Page

Registration    Testifying   Advanced Trick and    Expert Report    Expert    Registration

| Info | Skills Workshop | Difficult Questions Workshop | Writing Workshop | Witness Practice Management Workshop | Form |
|------|------|------|------|------|------|
| Expert Witness Directory | | | | | Additional Hotels |

**Contact SEAK**

| Customer Service | Orders | Fax | Email |
|------|------|------|------|
| 508.548.7023 | 508.457.1111 | 508.540.8304 | seakinc@aol.com |

Mail/Orders:   PO Box 729, Falmouth, MA 02541
Courier:      316 Gifford St., Falmouth, MA 02540

technical questions or suggestions regarding the website: seakinckb@aol.com

## Technology as a StoryTeller's Tool

**Dana G. Taunton**
&
**Leslie C. Ellis**
**Beasley, Allen, Methvin, Portis & Miles, P.C.**
**218 Commerce Street**
**Montgomery, Alabama 36104**

### I.    Introduction – The Art of Persuasion

No doubt, great trial lawyers are remembered most fondly by their closing arguments.    The closing argument is the trial lawyer's single opportunity for pure oratory in the trial process. By the time trial counsel rises to deliver his closing arguments, there is no longer an issue of a "burden of proof." Instead, the concern is now focused on the "burden of persuasion." However, it is a rare case that can be salvaged through even the most eloquent of closing arguments if the foundation or building blocks of persuasion have not been firmly established throughout the preceding stages of trial.

> At best the closing argument confirms jurors' general impressions and conclusions to which they are already predisposed by the evidence. It provides a logic within which facts can be organized and reasoned and rationales that jurors can rely on to support their opinions and defend them during deliberations. Ideally, it is the goal of every trial lawyer to fashion a closing argument that turns skeptics into committed advocates. But, in the final resolve, it will be the facts of the case and not the fashion of counsel which will be of paramount persuasion.

William L. Mock, Closing Argument:  A Checklist for the Experienced Trial Lawyer, Trial Advocacy College:  Essentials of Civil Litigation, October 1996.



DEFENDANT'S
EXHIBIT

31

Taunton- 1

Copyright © 2007 Beasley Allen, et al.  All rights reserved.

References:

1.  "Courtroom Technology: Tools for Persuasion." Frank Herrera Jr. and Sonia M. Rodriguez – published in TRIAL, May, 1999.

2.  "The Use of Technology and Presentation Graphics in Closing Argument" Ed Walsh, Walsh, Knippen, Knight & Diamond – Wheaton, Illinois – Website: www.wkkd.law.com.

3.  "Computer Graphics for the Complex Trial." James R. Lauridson, M.D. - Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. – presented at the 13th Annual National Expert Witness Conference, Hyannis, Cape Cod, MA – June 24-25, 2004.

4.  "Closing Statements" – Mastering Trial Skills – Jere L. Beasley October 31, 2003.

5.  "Using Litigation Technology Successfully" – Visual Evidence Center – Website: www.visevidence.com.

www.beasleyallen.com                    Copyright © 2007 Beasley Allen, et al. All rights reserved.



**Government Records**
**ALABAMA SECRETARY OF STATE**
**BETH CHAPMAN**

## Corporate Details

**INITIATE NEW BROWSE**

| | | |
|---|---|---|
| Company Legal Name: | Hibbana Graphics, L.L.C. | DLL 674-317 |
| County Filed: | Montgomery County | |
| Formed Date.: | 02-09-2001 | |
| Report Date.: | * Not On Data Base | |
| Reg Agent...: | LAURIDSON, JAMES R 528 SEMINOLE PLACE MONTGOMERY, AL  36117 | |
| Prin Address: | MONTGOMERY, AL | |
| Offc Of Rec.: | * Not On Data Base | |
| Capital Amt.: | * Not On Data Base | |
| Nat Of Bus..: | PREPARE ILLUSTRATIVE GRAPHICS FOR LEGAL/EDUCATIONAL PURPOSES | |
| Members.....: | LAURIDSON, JAMES R | |

**PREVIOUS PAGE**

ISDWebServices

Statements/Policies | info.alabama.gov | alabama.gov | Contact Us     Phone: (334) 242-7200



DEFENDANT'S
EXHIBIT
33

# THE JERE BEASLEY REPORT

Beasley, Allen, Crow, Methvin, Portis, & Miles, P.C., Attorneys at Law

APRIL 2003

## IN THIS ISSUE

I.     Capitol Observations . . . . . . . . . . . 1
II.    The National Scene . . . . . . . . . . . 7
III.   Nursing Home Update. . . . . . . . 16
IV.    Legislative Happenings . . . . . . . . . 19
V.     Court Watch . . . . . . . . . . . . . . . . . 19
VI.    Congressional Update . . . . . . . . . . 20
VII.   Product Liability . . . . . . . . . . . . . 20
VIII.  Premises Liability Update . . . . . . . 27
IX.    Workplace Hazards . . . . . . . . . . . . 27
X.     Transportation . . . . . . . . . . . . . . . 28
XI.    Corporate Happenings . . . . . . . . . 29
XII.   Arbitration Update. . . . . . . . . . . . 32
XIII.  Mass Torts Update . . . . . . . . . . . . 33
XIV.   Business Litigation . . . . . . . . . . . . 38
XV.    Healthcare Issues . . . . . . . . . . . . . 40
XVI.   Tobacco Update . . . . . . . . . . . . . . 43
XVII.  Environmental Concerns . . . . . . . . 43
XVIII. Monsanto Update . . . . . . . . . . . . 45
XIX.   Insurance and Finance Update . . . 46
XX.    Predatory Lending Update . . . . . . . 47
XXI.   Consumer Corner . . . . . . . . . . . . . 48
XXII.  Recalls Update . . . . . . . . . . . . . . . 49
XXIII. Firm Activities . . . . . . . . . . . . . . . 52
XXIV.  Closing Remarks. . . . . . . . . . . . . . 54

## I. CAPITOL OBSERVATIONS

### Nursing Homes Mislead People

As expected, the nursing home industry has come with a package of tort reform bills. However, the four-bill package is even worse than we anticipated. If passed, these bills would, among other things, put a cap of $250,000 on both non-economic damages for an injury and a cap of $250,000 on all wrongful death cases. These bills will do nothing to improve case and protect residents or address any problems nursing homes may have in getting insurance. What they will do is further harm those residents already suffering the greatest damage from a nursing home's abuse or neglect, and provide a windfall to the worst homes, especially repeat offenders, at the expense of good homes that try to offer good care. Clearly, the nursing home industry is intentionally misleading people in our state about their financial condition and the reason for any increases in insurance rates. What most Alabama citizens don't know is that the owners of nursing homes in our state have a monopoly under current Alabama law because the number of nursing home beds is set and can get no higher. That means no new or better facilities can be built. The Certificate of Need process that governs new facilities is locked up and must be changed

While the nursing home owners are crying wolf, even the worst of the existing nursing homes could sell out for a tremendous profit at any time if they wanted to. Under the Certificate of Need law, which makes nursing homes a state protected monopoly, there is no incentive for the owners to operate the homes efficiently or to provide quality care and treatment of residents.

Instead of spending millions of dollars for high-priced lobbyists and paying for a multi-million dollar television advertising campaign trying to pass their lawsuit immunity bills, the owners of the nursing homes should use that money to improve conditions in their facilities and properly staff them. What the state really needs to do, however, is to open things up and bring some real competition into the marketplace. If that can be accomplished, it would guarantee that the conditions in nursing homes in Alabama would be improved greatly.

We have seen firsthand how bad many of the nursing homes are in Alabama. Our investigations have revealed some unbelievable and sometimes shocking incidents of abuse, neglect, and bad treatment of persons who reside in the facilities. For example, I don't believe that people in our state expect to find fire ants eating their loved ones. Neither do they expect maggots, which thrive in filth, to be found in the feeding tubes and bodies of their relatives. I am also convinced that finding a wheelchair-bound lady locked in a nursing home meat freezer overnight is something



DEFENDANT'S EXHIBIT

34

real busy competing in cutting-horse competitions. She made the finals last month (placing 4th out of 108 entrants) in a prestigious event held in Jackson, Mississippi. Julie is part owner of Double B Ranch, which is located south of Montgomery, Alabama. She is responsible for a good number of horses and does all of the "hard" work required of a ranch hand. This highly successful lawyer attends Fresh Anointing International Church in Montgomery. One of the highest compliments that "trial lawyers" can receive is that they truly care about their clients. I can attest for the fact that Julie Beasley, who just happens to be my oldest daughter, cares about all of her clients and wants them to be completely satisfied when their cases are over.

## Dr. Jim Lauridson Heads Up Our Graphic Design Department

The complexity of our cases, especially death and serious bodily injury claims, has increased drastically over the years. As a result, we must use the latest technology to present these cases properly to judges and juries. With the hiring of Dr. James Lauridson to serve as our Director of Graphics, we have recognized this trend, and arguably the need, to add digital graphics to our case preparations in order to reduce the risk that jurors might not fully understand the essential points of a case. The Multimedia Graphics Section is devoted exclusively to preparing various types of images to serve as crucial illustrations during trials and mediations. We believe this has greatly increased our firm's ability to represent our clients in litigation.

Dr. Lauridson, a licensed medical doctor, was a member of the team that drafted the Child Team Review Law in Alabama. Subsequently, he

served on the State of Alabama Child Death Review Team and was the first Chairman of the Montgomery County Child Death Review Team. In the mid-1990's, Dr. Lauridson began to apply the new technology of computer graphics to illustrate the types of child abuse to healthcare providers, the police, and juries. At that time he became associated with the National Center on Shaken Baby Syndrome, and under the Center's sponsorship produced a collection of these graphics that have been used by prosecutors and educators nationally and internationally.

Dr. Lauridson served as Deputy Chief Medical Examiner with the Alabama Department of Forensic Sciences until 2001. He joined our firm that year, and with our encouragement and support, Dr. Lauridson has continued to be active in child abuse consultation and education. In the past year, he has presented his work to the San Diego Child Abuse Conference, the Alabama Chapter of the American Academy of Pediatrics, and the Georgia Council on Child Abuse. We believe his work has been beneficial and is most important.

"The use of visual computer generated graphics is a wonderful tool in the often difficult area of children who are abused and neglected," observed Dr. Lauridson. "I am very fortunate to have the opportunity to apply these tools in the area of child abuse. Being at Beasley Allen gives me opportunities to do this work that I would not have had elsewhere." In addition to Dr. Lauridson's work described above, he assists in the making of essential medical decisions and evaluations in our product liability, mass torts, and personal injury and death cases. Having a medical doctor on staff has proved to be extremely important and highly beneficial to our clients. This experienced doctor has acquired a great

number of additional skills that few other medical doctors possess. We are fortunate to have Dr. Jim Lauridson, a dedicated and compassionate man, as a member of our litigation team.

## Bruce Huggins Heads Up The Firm's Investigative Division

Bruce Huggins, as Chief Investigator, heads up the firm's Investigative Division. Bruce, who grew up in rural Autauga County, obtained a Criminal Justice Degree from AUM in 1977. He was employed as an Investigator with the Montgomery County Sheriff's Office from 1977 through 1988. Bruce received the Montgomery Officer of the Year award in 1983 and was the first member of the Sheriff's Office to ever attend the prestigious FBI National Academy in Quantico, Virginia. Bruce is married to his high school sweetheart, Cindy McKinnon Huggins, who is a registered nurse. They have two children (Amanda, age 21, a student at TSUM School of Nursing, and Brett, age 18, a senior at LAMP High School.) Bruce came to work as the only investigator for what was then Beasley, Wilson, Allen and Mendelsohn on April 1st, 1988. The firm had a total of 13 people at that time and was located in an old wood frame house on Hull Street. Since that time, the firm has evolved to one with 42 lawyers and 210 support staff on board.

Our Investigative Division has proven to be a tremendous asset to the Personal Injury Section and other Sections by investigating potential cases, aiding attorneys in properly evaluating these cases, offering expert analysis and advice, and assisting in the actual preparations for trial. The Investigative Division employs seven full-time investigators, who are professionally trained law enforcement officers, each having

# THE

# JEREBEASLEYREPORT

MAY 2004

Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., Attorneys at Law

## A NATIONAL LAW FIRM LOCATED IN MONTGOMERY, ALABAMA

*Helping those who need it most for over twenty-five years*

www.BeasleyAllen.com

DEFENDANT'S
EXHIBIT

35

I see nothing unrealistic or ambitious about the deadlines. In fact, these measures should have been put in place years ago to insure that automobile manufacturers put safe cars on the highways.

### ALCOHOL AND DRIVING DON'T MIX

The mother of a 19-year-old killed in a traffic accident has filed a civil lawsuit against Coors Brewing Co., claiming that the company promotes underage drinking. The mother, a Reno, Nevada, resident, contends Coors has failed in its duty to protect the country's youth from drinking. Her son was killed in 2002 after he drank Coors at a party and later drove his girlfriend's car into a light pole at 90 mph. The lawsuit, which seeks unspecified damages, accused Coors of "glorifying a culture of youth, sex and glamour while hiding the dangers of alcohol abuse and addiction." Golden, Colorado-based Coors issued a statement saying that althoug the company could not comment on pending litigation, the company "doesn't want underage consumers - period." It is difficult for me to believe that the beer companies don't market this product to young people. It is clear that much of their marketing efforts are directed at younger people. In fact, some advertising appears to be designed to appeal to teenagers. Underage drinking and drunk driving is a problem in this country and it may take more lawsuits against those who market the products in order to help stamp out the problem to the extent possible. There is one thing for certain, and that is alcohol and driving – at any age – don't mix!

### U.S. JETS MUST NOW HAVE DEFIBRILLATORS ON BOARD

Every large jet in the U.S. fleet must now have a defibrillator on board. This may result in making an airliner one of the safest places to have a cardiac arrest. A Federal Aviation Administration rule, four years in the making, has taken effect as of April 12th, requiring an automated external defibrillator and more advanced medical kits on all big jets. But, commuter planes are exempt

from the requirement. A defibrillator is an easy-to-use device that delivers a lifesaving shock when the heart develops a deadly short-circuit known as ventricular fibrillation. When the heart is quivering in this electrical chaos, a shock must be delivered within six minutes to save the person's life. The devices are becoming common in public places, largely because of lessons learned in the air. We are putting a defibrillator in each of the 4 buildings occupied by employees of our firm. Having Dr. Jim Lauridson, a medical doctor, on staff helped us make this decision. We are currently providing training for all employees.

## XVI. ARBITRATION UPDATE

### SOME COURTS DEAL WITH THE EVILS OF ARBITRATION

A federal district court in Georgia has refused to change its order in a payday lending case that was good for consumers. In that case, the court struck down an arbitration clause in a payday lending contract on mostly procedural unconscionability grounds. The court found, among other things, that the class of people who are so desperate as to go to payday lenders are in a particularly vulnerable contract position. The court upheld its original ruling by denying a motion to reconsider. The court's order included some good language about the history of payday lenders, and how "arbitration is just another means for high-cost lenders to circumvent state laws."

The payday loan industry is a multi-billion dollar enterprise nationwide. People who have to do business with this industry usually have few, if any, alternatives. However, that fact doesn't justify the payday lenders taking advantage of their customers. It is government's responsibility, both at the federal and state levels, to protect those persons who deal with payday lenders. If I had the authority to do so, I would close down the payday loan operators

or at the very least require them to charge reasonable interest rates.

### ARBITRATION STILL A CONSUMER NIGHTMARE

Even though courts on occasion – such as the federal court mentioned above in Georgia – will strike down an arbitration agreement, those decisions are still too few and far between. In my opinion, the courts in our state and elsewhere have an obligation to protect consumers from the evils of pre-dispute arbitration of a mandatory and binding nature. However, the obligations of both the U.S. Congress and state legislature bodies are much stronger. No legal scholar can justify the transformation of the Federal Arbitration Act, from what it was intended by Congress to be, into a device used by large corporations to "stick it to consumers." Clearly, based on the history of the FAA, it was never intended by Congress to apply to consumer transactions.

Unfortunately, legislative action has also been slow in coming. Consumers have no chance to get justice from mandatory, binding arbitration that comes about from an agreement they were forced to sign before any dispute ever arose. Politicians who take campaign funding from proponents of arbitration have not seen fit to take on their donors. I think it is time for that to change! Congress should amend the FAA to take all consumer transactions and personal injury and death cases out of the Act. State legislatures should pass local legislation to curb the use of pre-dispute arbitration to the extent possible.

## XVII. NURSING HOME UPDATE

### SETTLEMENT BY KINDRED HEALTHCARE

Kindred Healthcare, a national healthcare services company operating hospitals and nursing homes across the country, recently agreed to settle claims resulting from a four-year investigation

1    A.    But your question, I understood, was the heart

2          attack caused or the result of the spinal cord

3          injury?

4    Q.    Well, did the spinal cord injury contribute in

5          any way to his heart -- the heart attack --

6    A.    I don't know.

7    Q.    -- and the other causes or -- that are listed

8          on the death certificate?

9    A.    I don't know.  I don't have any way of proving

10         or disproving that the spinal cord injury

11         contributed.  It might have contributed.

12   Q.    It could have, but you just don't know?

13   A.    I don't know.  It might have contributed.  It

14         might not have contributed.

15   Q.    All right.

16                    MR. CROW:  I believe that's all the

17              questions I've got, Doctor.

18                    Mr. Wood might have some

19              questions for you.

20                 CROSS-EXAMINATION

21   BY MR. WOOD:

22   Q.    Doctor, I'm going to show you what I have

23         marked as some records concerning this

DEFENDANT'S
EXHIBIT

36

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455



**Alabama
Cardiovascular
Group, P.C.**

Alvaro A. Aldana, M.D., F.A.C.C.
Joaquin G. Arciniegas, M.D., F.A.C.C.
Vikram J. Arora, M.D., F.A.C.C.
Jack W. Brand, Jr., M.D., F.A.C.C.
Hasan Güven, M.D., F.A.C.C.
Randall G. Hess, D.O., F.A.C.C.
Byron D. Jones, M.D., F.A.C.C.
William A.H. MacLean, M.D., F.A.C.C.
Edward F. Mahan, III, M.D., F.A.C.C.
Raymond W. Workman, M.D., F.A.C.C.

January 30, 2008

Law Firm of Norman, Wood, Kendrick and Turner



DEFENDANT'S
EXHIBIT

**37**

**RE: ROBERT R. WOODLEY**

I have reviewed of all the records that were available to me in the matter of Mr. Robert R. Woodley.

This unfortunate gentleman sustained a motor vehicle accident on August 18, 2006, with initial stabilization at Ft. Payne Hospital. Then he was transferred to the UAB Hospital and underwent surgical intervention for management of his post-traumatic cervical spine injury and paralysis. On August 31 (that is 13 days after his motor vehicle accident), he suffered an extensive inferior myocardial infarction and went into shock requiring balloon counter pulsation, interventional revascularization of the right coronary artery, and stenting by Dr. Papapietro. This occurred in the setting of longstanding coronary artery disease documented by cardiac catheterization in 2003 at which time he underwent placement of drug-eluting stent (Cypher) by Dr. Williams in Montgomery. The results were less than ideal because of the tortuosity and calcification of the right coronary artery. His coronary artery disease as is usually the case was not limited to the right coronary artery. There was indication of lesions and calcification of the left coronary arterial tree (LAD) although not of critical nature. A few days later from the original procedure a second catheterization was performed at that time because of angina. Consideration for coronary artery bypass grafting was entertained. However, the patient appeared to have stabilized medically and this operation was never carried out. In December of the same year, he was still having some angina pectoris responsive to nitroglycerin as documented in a clinic visit on 12/23/03. Prior to 2006, he was on medical therapy. A note of 07/11/06 indicated that he was not having angina pectoris. It indicated that he was not taking his cholesterol medicines. After his motor vehicle accident, he underwent surgery at UAB on August 19. He had a fracture dislocation at C6-C7 level with residual paralysis. Postoperative course at that time was associated with not infrequent problems of hyponatremia and blood pressure shifts, both of which are not unusual after the type of injury he sustained. In review of the records from UAB, I did not see where he was treated postoperatively with aspirin and Plavix and beta blockers, I guess for obvious reasons, due to the nature of the surgery and changes in his clinical condition. He received low-dose Lovenox, an anticoagulant. His myocardial infarction goes along with

Administrative Offices: St. Vincent's Hospital, 2700 Tenth Ave., So. (POB II), Suite 305, Birmingham, AL 35205 (205) 939-0139 Fax (205) 939-4997
Medical Center East, 48 Medical Park East Dr., Suite 453, Birmingham, AL 35235 (205) 838-3895 Fax (205) 838-3014
UAB Medical West, 985 Ninth Ave. SW, Suite X01, Bessemer, AL 35022 (205) 481-7557 Fax (205) 481-7560
UAB Medical West, 985 Ninth Ave. SW, Suite 403, Bessemer, AL 35022 (205) 481-8470 Fax (205) 481-8473

Letter re Robert Woodley
January 30, 2008
Page 2

long-term coronary artery disease with progression evidenced by the development of left main
coronary disease as reported in Cardiac Catheterization Report of the day of his myocardial
infarction (which was not reported in the earlier caths). Traumatic events have been considered
as possible triggers for the acute myocardial infarction but certainly in a patient who has a
longstanding history of coronary artery disease, requiring right coronary artery stenting, the well-
known natural progression of coronary artery disease is not surprising. Certainly the 15 days
elapsed from his initial trauma make it less likely a precipitating event. His myocardial infarction
was very well managed by Dr. Papapietro and his associates. The amount of damage produced
by the infarction was insurmountable which is not infrequently the case.

For your information, I have never been an expert witness in any trial or legal proceedings. I do
not provide opinions in legal matters on a regular basis. For your review, I am enclosing a copy
of my CV.

My hourly fee is $300.00.

Sincerely yours,

Joaquin G. Arciniegas, M.D.
Fellow ACC
Fellow AHA

JGA/cr

# CURRICULUM VITAE
# JOAQUIN G. ARCINIEGAS, M.D.

**DATE OF BIRTH:**          July 19, 1948

**PLACE OF BIRTH:**          Ibaque, Colombia, South America

**EDUCATION:**          UNDERGRADUATE
Liceo De Cervantes
Bogota, Colombia
Bachelor Degree, November 1965

MEDICAL SCHOOL
National University of Colombia,
      School of Medicine
Bogota, Colombia
M.D., January 1973

**HOSPITAL TRAINING:**          INTERNSHIP
Hospital San Juan de Dios
Bogota, Colombia
1972 to 1973

Henry Ford Hospital
Detroit, Michigan
July 1975 to June 1976

RESIDENCY
Henry Ford Hospital
Detroit, Michigan
July 1976 to June 1978

CHIEF RESIDENT – MEDICINE
Henry Ford Hospital
Detroit, Michigan
July 1977 to June 1978

FELLOWSHIP
University of Alabama at Birmingham
Birmingham, Alabama
July 1978 to June 1980

JOAQUIN G. ARCINIEGAS, MD
PAGE 2

APPOINTMENTS:

ATTENDING PHYSICIAN
Hospital San Rafael
Espinal, Colombia
January 1973 to January 1974

INSTRUCTOR
Department of Anatomy and Physiology
National University of Colombia
School of Medicine
January 1974 to June 1975

INSTRUCTOR
Department of Medicine
Division of Cardiology
University of Alabama at Birmingham
July 1980 to September 1981

ASSISTANT PROFESSOR
Department of Medicine
Division of Cardiology
University of Alabama at Birmingham
October 1981 to January 1983

CURRENT POSITIONS:

PRESIDENT
Alabama Cardiovascular Group, P.C.
(Private Practice)
Birmingham, Alabama
February 1, 2003 – Present

STAFF CARDIOLOGIST
Carraway Methodist Medical Center and
Norwood Clinic
Birmingham, Alabama
January 1983 to 1/31/2003

VICE PRESIDENT
Norwood Clinic, Largest Multi-
Specialty Clinic, Alabama
Birmingham, Alabama
September, 1997 to February 2003

CHAIRMAN
Department of Cardiology
Norwood Clinic
Birmingham, Alabama
January 1998 to 2002

CHAIRMAN
Department of Cardiology
Carraway Methodist Medical Center
Birmingham, Alabama
January 1998 to 2002

DIRECTOR
Electrophysiology Laboratory
Carraway Methodist Medical Center
Birmingham, Alabama
January 1984 to 2001

CLINICAL ASSISTANT PROFESSOR
Department of Medicine
Division of Cardiology
University of Alabama at Birmingham

**CERTIFICATION:**                     Educational Council for Foreign Medical
                                       Graduates (ECFMG)
                                       1972

                                       Federation Licensing Examination (FLEX)
                                       1977

                                       American Board of Internal Medicine
                                       1978

                                       American Board of Internal Medicine
                                       Subspecialty of Cardiovascular Diseases
                                       1981

                                       American Board of Internal Medicine
                                       Subspecialty in Interventional Cardiology
                                       March, 2000

                                       Examination of Special Competency in
                                       Cardiac    Pacing    and    Cardioversion
                                       Defibrillation for the physician
                                       7/24/06 – 2016
                                       Certificate #:

**LICENSURE:**                         Michigan, 1977
                                       Alabama, 1978

JOAQUIN G. ARCINIEGAS, MD
PAGE 5

| | |
|---|---|
| **SOCIETY MEMBERSHIPS:** | Fellow, American College of Cardiology |
| | Fellow, American College of Chest Physicians |
| | Fellow, Council of Clinical Cardiology, American Heart Association |
| | Member, American College of Physicians |
| | Member, American Medical Association |
| | Member, Birmingham Cardiovascular Society |
| | Member, Birmingham Society of Internists |
| | Member, American Federation for Clinical Research |
| | Member, Medical Association of the State of Alabama |
| | Member, Jefferson County Medical Society |
| | Member, North American Society for Cardiac Pacing and Electrophysiology |
| | Honorary Member, Colombian Society of Cardiology |
| | Member, New York Academy of Science |
| | Member, American Society of Echocardiography |
| | Member, The Society for Cardiac Angiography and Interventions |
| | |
| **INVITED PROFESSOR:** | Cardiology Grand Rounds |
| | Medical College of Virginia |
| | 1981 |
| | |
| | Research Seminar |
| | University of Texas, San Antonio |
| | 1982 |
| | |
| **AWARDS:** | Daniel Vega Award, Best Medical Student |
| | National University of Colombia School of Medicine |
| | 1972 |
| | |
| | Honor Degree, Best Medical Student |
| | National University of Colombia School of Medicine |
| | 1972 |
| | |
| | Carlos Esguerra Award, Best Intern |
| | Colombian National Academy of Medicine |
| | 1972 to 1973 |

JOAQUIN G. ARCINIEGAS, MD
**PAGE 6**

INVITED INTERNATIONAL LECTURER:           Colombian Society of Cardiology
Course in Cardiac Arrhythmias
1982

Medellin Society of Cardiology
December 1982

Colombian Cardiovascular Center
Santa Maria Clinic
Medellin, Colombia
December 1982

BIBLIOGRAPHY:

1.      ARCINIEGAS JG, Rubens M, Soto B: Axial cineangiography in the diagnosis of univentricular hearts. Proceedings of Latin America Congress of Cardiology. Brazil, 1978.

2.      ARCINIEGAS JG, Papapietro SE, Soto B: Cinangiography in the diagnosis of aortic dissection. Circulation 60:II-263, 1978.

3.      Soto B, Ceballos R, ARCINIEGAS JG: Anatomia angiografica de la valvula mitral. Revista Espanola de Cardiologia 33:307, 1980.

4.      Mantle JA, ARCINIEGAS JG, Little WC, Coghlan HC, Russell RO Jr, Rackley CE: Coronary artery spasm. (W. Raffenbuel, editor) Proceedings of the International Symposium on Unstable Angina Pectoris. Hanover, Germany, Theime-Stratton, Inc, New York, 1980.

5.      Klein H, ARCINIEGAS JG, Frank G, Karp RB, Kouchoukos NT, James TN, Waldo AL: Identification of the electrophysiologic milieu associated with ventricular arrhythmias in patients with abnormally contracting myocardium. Proceedings of VIII European Congress of Cardiology. June 1980, page 73.

6.      ARCINIEGAS JG, Klein H, Karp RB, Kouchoukos NT, James TN, Kirklin JW, Waldo AL: Surgical treatment of life-threatening ventricular tachyarrhythmias. Circulation 62:III-42, 1980.

7.      Waldo AL, Plumb VJ, ARCINIEGAS JG, James TN: Overdrive pacing of AV bypass pathway type PAT - A model for demonstrating and understanding reentrant rhythms. Circulation 62:II-47, 1980.

8.      ARCINIEGAS JG, Papapietro SE, Soto B: Cineangiography in the diagnosis of aortic dissection. American Journal of Cardiology 47:890, 1981.

9.      Little WC, ARCINIEGAS JG, Mantle JA: A safe, rapid method of transfemoral retrograde left ventricular catheterization in valvular aortic stenosis. Catheterization and Cardiovascular Diagnosis 7:417, 1981.

10.     Waldo AL, ARCINIEGAS JG, Klein H: Surgical treatment of life-threatening arrhythmias. The role of intraoperative mapping and consideration of the presently available surgical techniques. Progress in Cardiovascular Diseases 23:247, 1981.

11.     Waldo AL, Plumb VJ, ARCINIEGAS JG: Treatment of life-threatening arrhythmias. Alabama Journal of Medical Sciences 18:262, 1981.

BIBLIOGRAPHY (con't)

12.   ARCINIEGAS JG, Plumb VJ, Waldo AL:  Characterization of the onset of ectopic atrial
      tachycardia with AV block. American Journal of Cardiology 47:496, 1981.

13.   ARCINIEGAS JG, Little WC, Coghlan HC, Russell RO Jr, Rackley CE, Mantle JA: Coronary
      artery spasm:  An isolated phenomenon or one manifestation of a more diffuse vascular
      hyper-reactivity. American Journal of Cardiology 47:450, 1981.

14.   ARCINIEGAS JG, Coghlan HC, Soto B:  Angiographic approach to the diagnosis of
      congenital heart disease. American Journal of Radiology 137:673, 1981.

15.   Little WC, Reeves RC, ARCINIEGAS JG, Katholi RE, Rogers EW:  Mechanism of abnormal
      inerventricular septal motion during delayed left ventricular activation. Circulation 65:1486-
      1491, 1982.

16.   Henthorn RW, Plumb VJ, ARCINIEGAS JG, Waldo AL:  Entrainment of "ectopic atrial
      tachycardia": Evidence for re-entry. Clinical Research 29:811A, 1981.

17.   Zimmern SH, Karp RB, Smith LR, Waldo AL, ARCINIEGAS JG, Plumb VJ:  The effects of
      lidocaine on electrical impulse conduction time in the human heart. Clinical Research
      29:858, 1981.

18.   Maddox WT, Plumb VJ, ARCINIEGAS JG, Henthorn RW, Zimmern SH, Waldo AL:
      Electrophysiologic properties of intravenous quinidine in man. Clinical Research 21:812A,
      1981.

19.   ARCINIEGAS JG, Plumb VJ, Karp RB, Zorn GL Jr, Zimmern SH, Henthorn RW, Waldo AL:
      Endocardial mapping during sinus rhythm in patients with recurrent sustained life-
      threatening ventricular arrhythmias. Clinical Research 29:853A, 1981.

20.   Waldo AL, ARCINIEGAS JG, Klein H:  Surgical treatment of life-threatening ventricular
      arrhythmias:  The role of the intraoperative mapping and consideration of the presently
      available surgical techniques.  In: Sudden Cardiac Death.  Edited by Edmund H.
      Sonnenblick and Michael Lesch, Grune and Stratton, New York, 1981, pages 269-286.

21.   Henthorn RW, Plumb VJ, ARCINIEGAS JG, Waldo AL:  Entrainment of "ectopic atrial
      tachycardia": Evidence for re-entry. American Journal of Cardiology 49:920, 1982.

22.   ARCINIEGAS JG, Plumb VJ, Karp RB, Zorn GL Jr, Zimmern SH, Henthorn RW, Waldo AL:
      Endocardial mapping during sinus rhythm in patients with recurrent sustained life-
      threatening ventricular arrhythmias. American Journal of Cardiology 49:935, 1982.

23.   Little WC, Reeves RC, ARCINIEGAS JG, Katholi RE, Rogers EW:  Mechanism of abnormal
      intraventricular septal motion during delayed left ventricular activation. Circulation 65:1486-
      1491, 1982.

24.   Waldo AL, Plumb VJ, ARCINIEGAS JG, Henthorn RW, Zimmern SH:  Verapamil therapy in
      the treatment of supraventricular arrhythmias following open heart surgery.  Angiology
      34:755-763, 1983.

BIBLIOGRAPHY (con't)

25.     Waldo AL, Plumb VJ, ARCINIEGAS JG, MacLean WAH, Cooper TB, Priest MF, James TN:
        Transient entrainment and interruption of AV bypass pathway type paroxysmal atrial
        tachycardia. A model for understanding and identifying reentrant arrhythmias. Circulation
        67:73-83, 1983.

26.     Page PL, ARCINIEGAS JG, Plumb VJ, Henthorn RW, Karp RB, Waldo AL: Value of early
        postoperative epicardial programmed ventricular stimulation studies after surgery for
        ventricular tachyarrhythmias. Journal of the American College of Cardiology 2:1046-1052,
        1983.

27.     Kay GN, Plumb VJ, ARCINIEGAS JG, Henthorn RW, Waldo AL: Torsades de pointes: The
        long-short initiating sequence and other clinical features: Observations in 32 patients.
        Journal of the American College of Cardiology 2:806-817, 1983.

28.     Siler W, Cooper TB, ARCINIEGAS JG, MacLean WAH. Papapietro SE, Hess RG, Stanley
        AWH Jr, Powell VG, McEachern M, Jolly P, Morrison R, Buckley J:  Controlled image
        acquisition, segmentation, feature extraction and classification of echocardiographic sector
        scans. Computers in Cardiology. IEEE Computer Society, 117-120, 1983.

29.     Papapietro SE, MacLean WAH, Stanley AWH Jr, Cooper TB, Hess RG, Corley N,
        ARCINIEGAS JG: Nonsurgical revascularization for acute evolving myocardial infarction:
        Effects on mortality and left ventricular function. Clinical Research 31, No 5:827A, 1983.

30.     Stanley AWH Jr, ARCINIEGAS JG, Cooper TB, Corley N, Hess RG, MacLean WAH,
        Papapietro SE:  Glucose-insulin-potassium following successful coronary reperfusion
        improves survival during myocardial infarction. Circulation 70, No 4:II-153, 1984.

31.     Papapietro SE, MacLean WAH, Stanley AWH Jr, Hess RG, Corley N, ARCINIEGAS JG,
        Cooper TB:  Percutaneous transluminal coronary angioplasty after intracoronary
        Streptokinase in evolving acute myocardial infarction.  The American Journal of Cardiology
        55, No 1, 48-53, 1985.

32.     Papapietro SE, Corley N, MacLean WAH, ARCINIEGAS JG, Hess RG, Siler W, Cooper TB,
        Stanley AWH Jr:  Coronary artery recanalization with intracoronary thrombolysis and
        transluminal angioplasty in evolving myocardial infarction:   Effects on mortality and
        ventricular function. Abstracts, XII Interamerican Congress of Cardiology.

33.     Corley N, Siler W, MacLean WAH, ARCINIEGAS JG, Hess RG, Cooper TB, Stanley
        AWH Jr, Papapietro SE: Predictors of outcome in patients with acute myocardial infarction
        undergoing coronary arterial recanalization.  Abstracts, XII Interamerican Congress of
        Cardiology.

34.     Stanley AWH Jr, Prickett C, Simpson MT, Teague J, ARCINIEGAS JG, Cooper TB, Hess
        RG, MacLean WAH, Papapietro SE, Downey J: Failure to detect xanthine oxidase activity in
        reperfused human myocardium. Clinical Research 35, No 1:35A, 1987.

35.     ARCINIEGAS JG, Hassett JA, MacLean WAH, Cooper TB, Papapietro SE, Stanley AWH Jr,
        Hess RG, Simpson MT: Flecainide in recurrent or persistent supraventricular tachycardia.
        PACE 10, No 3:109, 1987.

JOAQUIN G. ARCINIEGAS, MD
PAGE 9

## BIBLIOGRAPHY (con't)

36.    Papapietro SE, ARCINIEGAS JG, Cooper TB, Walls D, Carroll P, Simpson MT, Hess RG, Stanley AWH Jr, MacLean WAH: New strategies in the treatment of acute myocardial infarction. In "Avances en Cardiopatia Isquemica" (Advances in Ischemic Heart Disease), editors: Carlos Saenz de la Calzada and P. Zarco Gutierrez, Spain. In press.

37.    Papapietro SE, ARCINIEGAS JG, Cooper TB, Walls D, Carroll P, Simpson MT, Hess RG, Stanley AWH Jr, MacLean WAH: New developments in the treatment of acute myocardial infarction. Part I of III. Alabama Medicine 56, No 7, 18-20, 1987.

38.    Papapietro SE, ARCINIEGAS JG, Cooper TB, Walls D, Carroll P, Simpson MT, Hess RG, Stanley AWH Jr, MacLean WAH: New developments in the treatment of acute myocardial infarction. Part II of III. Alabama Medicine 56, No 8, 16-18, 1987.

39.    Papapietro SE, ARCINIEGAS JG, Cooper TB, Walls D, Carroll P, Simpson MT, Hess RG, Stanley AWH Jr, MacLean WAH: New developments in the treatment of acute myocardial infarction. Part III of III. Alabama Medicine 56, No 9, 20-23, 1987.

40.    Athanasuleas CL, Geer DA, ARCINIEGAS JG, Cooper TB, Hess RG, MacLean WAH, Papapietro SE, Stanley AWH Jr, McEachern M: A reappraisal of surgical intervention for acute myocardial infarction. Journal of Thoracic and Cardiovascular Surgery 93, 405-414, 1987.

41.    Rogers WJ, Bourge RC, Papapietro SE, Wackers FJ, Zaret BC, Forman S, for the TIMI Investigators: Left ventricular function following r-tPA in the NHLBI TIMI-II Pilot Study. Circulation 76, No 4:II-1037, 1987.

42.    MacLean WAH, ARCINIEGAS JG, Corley N, McEachren M, Hess RG, Cooper TB, Hefner LL, Stanley AWH Jr, Papapietro SE: Percutaneous transluminal coronary angioplasty for evolving acute myocardial infarction in 244 patients. Clinical Research 36, No 1:6A, 1988.

43.    Passamani E, Hodges M, Herman M, for the TIMI investigators: The thrombolysis in myocardial infarction (TIMI) Phase II Pilot Study: Tissue Plasminogen Activator followed by percutaneous transluminal coronary angioplasty. Journal of the American College of Cardiology 10, No 5, 51B-64B.

44.    The TIMI Research Group: TIMI IIA Results. Immediate vs delayed catheterization and angioplasty following thrombolytic therapy for acute myocardial infarction. The Journal of the American Medical Association 26, No 18, 2849-2858, 1988.

45.    ARCINIEGAS JG, Papapietro SE, Cooper TB, Hefner LL, Hess RG, MacLean WAH, Simpson MT, Stanley AWH Jr: Current concepts in the pathophysiology and management of acute myocardial infarction. Revista Colombiana de Cardiologia 2, No 5, 327-350, 1988.

46.    Hassett JA, Elrod PA, ARCINIEGAS JG, MacLean WAH, Duncan JL: Non-invasive diagnosis and treatment of atrial flutter utilizing previously implanted dual chamber pacemaker. PACE 11, No 11, Part II, 1662-1666, 1988.

## BIBLIOGRAPHY (con't)

47.   Rogers WJ, Bourge RC, Papapietro SE, Wackers FJ, Zaret BL, Forman S, Dodge HT, Robertson TL, Passamani ER, Braunwald E, for the TIMI investigators: Variables predictive of good functional outcome following thrombolytic therapy in the Thrombolysis in Myocardial Infarction Phase II (TIMI-II) Pilot Study. The American Journal of Cardiology 63, 503-512, 1989.

48.   The TIMI Study Group: Comparison of invasive and conservative strategies after treatment with intravenous tissue plasminogen activator in acute myocardial infarction. Results of the Thrombolysis in Myocardial Infarction (TIMI) Phase II Trial. The New England Journal of Medicine 320, No 10, 618-627, 1989.

49.   The CAST Study Group: Preliminary Report: Effect of Encainide and Flecainide on mortality in a randomized trial of arrhythmia suppression after myocardial infarction. New England Journal of Medicine 321, 406-412, 1989.

50.   Chaitman BR, Thompson B, Wittry MD, Stump D, Hamilton WP, Hillis LD, Dwyer JG, Solomon RE, Knatterud GL, for the TIMI investigators: The use of tissue-type plasminogen activator for acute myocardial infarction in the elderly: Results from Thrombolysis in Myocardial Infarction Plase I, Open Label Studies and the Thrombolysis in Myocardial Infarction Phase II Pilot Study. Journal of the American College of Cardiology 14, 1159-1165, 1989.

51.   Papapietro SE, ARCINIEGAS JG, Simpson MT, Stanley AWH Jr, MacLean WAH: Coronary angioplasty in myocardial infarction: Lessons and uncertainties following the Thrombolysis in Myocardial Infarction Trial (TIMI II). Revista Chilena de Cardiologia 8, No 3, 195-202, 1989.

52.   Papapietro SE, ARCINIEGAS JG, Simpson MT, Stanley AWH Jr, Hess RG, Cooper TB, MacLean WAH, Rogers WJ: Coronary angioplasty in acute myocardial infarction: Lessons and uncertainties from the Thrombolysis in Myocardial Infarction Trial (TIMI II). Part I of II. Alabama Medicine 59, No 8, 32-34, 1990.

53.   Papapietro SE, ARCINIEGAS JG, Simpson MT, Stanley AWH Jr, Hess RG, Cooper TB, MacLean WAH, Rogers WJ: Coronary angioplasty in acute myocardial infarction: Lessons and uncertainties from the Thrombolysis in Myocardial Infarction Trial (TIMI II). Part II of II. Alabama Medicine 59, No 9, 24-26, 1990.

54.   Rogers WJ, Baim DS, Gore JM, Brown BG, Roberts R, Williams DO, Chesebro JH, Babb JD, Sheehan FH, Wackers FJ, Zaret BL, Robertson TL, Passamani ER, Ross R, Knatterud GL, Braunwald E, for the TIMI II-A investigators: Comparison of immediate invasive, delayed invasive and conservative strategies after tissue-type plasminogen activator. Circulation 81, 1457-1476, 1990.

55.   The SOLVD Investigators: Effect of Enalapril on survival in patients with reduced left ventricular ejection fractions and congestive heart failure. The New England Journal of Medicine 325:293-302, 1991.

## BIBLIOGRAPHY (con't)

56.    Rogers WJ, Babb JD, Baim DS, Cheseboro JH, Gore JM, Roberts R, Williams DO, Frederick M, Passamani ER, Braunwald E, for the TIMI II Investigators: Selective versus routine predischarge coronary arteriography after therapy with recombinant tissue-type plasminogen activator, heparin and aspirin for acute myocardial infarction. Journal of the American College of Cardiology 17:1007-1016, 1991.

57.    Epstein AE, Bigger JT, Wyse DG, Romhilt DW, Reynolds-Haertle RA, Hallstrom AP, and the CAST Investigators: Events in the Cardiac Arrhythmia Suppression Trial (CAST): Mortality in the entire population enrolled. Journal of the American College of Cardiology 18:14-19, 1991.

58.    Wyse DG, Hallstrom A, McBride R, Cohen JD, Steinberg JS, Mahmarian J, and the CAST Investigators: Events in the Cardiac Arrhythmia Suppression Trial (CAST): Mortality in patients surviving open label titration but not randomized to double-blind therapy. Journal of the American College of Cardiology 18:20-28, 1991.

59.    Bovill EG, Terrin ML, Stump DC, Berke AD, Frederick M, Collen D, Feit F, Gore JM, Hillis LD, Lambrew CT, Leiboff R, Mann KG, Markis JE, Pratt CM, Sharkey SW, Sopko G, Tracy RP and Chesebro JH for the TIMI Investigators: Hemorrhagic events during therapy with recombinant tissue-type plasminogen activator, heparin and aspirin for acute myocardial infarction. Annals of Internal Medicine Vol 115, No 4:256-265, 1991.

60.    Denes P, Gillis AM, Pawitan Y, Kammerling JM, Wilhelmsen L, Salerno DM and the CAST Investigators: Prevalence, characteristics and significance of ventricular premature complexes and ventricular tachycardia detected by 24-hour continuous electrocardiographic recording in the Cardiac Arrhythmia Suppression Trial. American Journal of Cardiology 68:887-896, 1991.

61.    Maske LE, Paine TD, Bradley EL, Rogers WJ for the Alabama Registry of Myocardial Ischemia Investigators: Management of prolonged ischemic chest pain with or without ST elevation: Practice patterns in tertiary care hospitals. Clinical Research 39, No 4:877A, 1991.

62.    Cox DA, Davis WR, Williams JA, Bradley EL, Rogers WJ for the Alabama Registry of Myocardial Ischemia Investigators: Do patients with prior coronary artery bypass grafting and severe chest pain differ in presentation, management and in-hospital outcome? Clinical Research 39, No 4:800A, 1991.

63.    The Cardiac Arrhythmia Suppression Trial II Investigators: Effect of the antiarrhythmic agent moricizine on survival after myocardial infarction. New England Journal of Medicine 327:227-233, 1992.

64.    The SOLVD Investigators: Effect of Enalapril on mortality and the development of heart failure in symptomatic patients with reduced left ventricular ejection fractions. New England Journal of Medicine 327:685-691, 1992.

65.    The TIMI Investigators: A pilot trial of recombinant desulfatohirudin compared with heparin in conjunction with tissue plasminogen activator and aspirin for acute myocardial infarction (TIMI IV Trial). Journal of the American College of Cardiology 23:993-1003, 1994.

**BIBLIOGRAPHY** (con't)

66.     Rogers WJ, Dean LS, Moore PB, Wool KJ, Burgard SL, Bradley EL, for the Alabama Registry of Myocardial Ischemia Investigators: Comparison of primary angioplasty versus thrombolytic therapy for acute myocardial infarction. American Journal of Cardiology 74:111-118, 1994.

67.     Williams JD, Snow RM, ARCINIEGAS JG: Myocardial involvement in a patient with human Ehrlichiosis. American Journal of Medicine 98:414-415, 1995.

Dr. Fallahi



MONTGOMERY RHEUMATOLOGY
1421 NARROW LANE PARKWAY
MONTGOMERY AL 36111-2654

(334) 284-3105
STATEMENT
19-OCT-06

All Producers Selected
Account # 000020847

Mr. Rufus R Woodley
175 Lakebend
Elmore AL 36025

| Date of service | Description | Procedure | Qty | Diag | PROD | ID | PLS | Amount |
|---|---|---|---|---|---|---|---|---|
| History A/R | | | | | | | | |
| 11/21/96 | OFFICE CONSULT LEVEL 3 | 99243 | 1 | 720.0 | SF OF 3 | | * | $200.00 |
| 11/21/96 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | | * | $12.50 |
| 11/21/96 | PRINTS AP | 72170 | 1 | 720.0 | SF OF 3 | | * | $62.00 |
| 11/21/96 | FILED: $274 Y CHAMPUS TRI | | | | SF | | | $0.00 |
| 12/23/96 | PMT: CHAMPUS TRICARE PROG | | | | SF | | | $0.00 |
| 12/23/96 | RSP: DEDUCTIBLE ( 41.08 ) | | | | SF | | * | $0.00 |
| 2/23/96 | PMT: CHAMPUS TRICARE PROG | | | | SF | | | $0.00 |
| 12/23/96 | RESPONSIBILITY CHANGE ( 23.93 ) | | | | SF | | ^ | $0.00 |
| 12/23/96 | RSP: DEDUCTIBLE ( 7.00 ) | | | | SF | | | $0.00 |
| 12/23/96 | WRT-OFF: MISC. INS/ADJ | | | | SF | | * | $158.92- |
| 12/23/96 | WRT-OFF: MISC. INS/ADJ | | | | SF | | * | $5.50- |
| 12/23/96 | WRT-OFF: MISC. INS/ADJ | | | | SF | | * | $38.07- |
| 01/24/97 | CHECK PAYMENT | | | | SF | | | $41.08- |
| 01/24/97 | CHECK PAYMENT | | | | SF | | | $7.00- |
| 01/24/97 | CHECK PAYMENT | | | | SF | | | $23.93- |
| 03/21/97 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | | * | $75.00 |
| 03/21/97 | ROUTINE VENIPUNCTURE | 36415-90 | 1 | 720.0 | SF OF 3 | | * | $12.50 |
| 03/21/97 | FILED: $87 Y CHAMPUS TRI | | | | SF | | | $0.00 |
| 04/21/97 | PMT: CHAMPUS TRICARE PROG | | | | SF | | * | $25.78- |
| 04/21/97 | PMT: CHAMPUS TRICARE PROG | | | | SF | | * | $5.25- |
| 04/21/97 | COST SHARE ( 1.75 ) | | | | SF | | | $0.00 |
| 04/21/97 | WRT-OFF: MISC. INS/ADJ | | | | SF | | ^ | $5.50- |
| 04/21/97 | COST SHARE ( 8.59 ) | | | | SF | | | $0.00 |
| 04/21/97 | WRT-OFF: MISC. INS/ADJ | | | | SF | | * | $40.63- |
| 05/19/97 | CHECK PAYMENT | | | | SF | | | $8.59 |
| 05/19/97 | CHECK PAYMENT | | | | SF | | | $1.75 |
| 05/22/97 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | | * | $75.00 |
| 05/22/97 | ROUTINE VENIPUNCTURE | 36415-90 | 1 | 720.0 | SF OF 3 | | ^ | $12.50 |
| 05/22/97 | FILED: $87 Y CHAMPUS TRI | | | | SF | | | $0.00 |
| 06/28/97 | PMT: CHAMPUS TRICARE PROG | | | | SF | | * | $25.78- |
| 06/28/97 | RESPONSIBILITY CHANGE ( 8.59 ) | | | | SF | | | $0.00 |
| 06/28/97 | PMT: CHAMPUS TRICARE PROG | | | | SF | | * | $5.25- |
| 06/28/97 | RESPONSIBILITY CHANGE ( 1.75 ) | | | | SF | | | $0.00 |
| 06/28/97 | WRT-OFF: MISC. INS/ADJ | | | | SF | | ^ | $5.50- |
| /28/97 | WRT-OFF: MISC. INS/ADJ | | | | SF | | * | $40.63- |

| Date of service | Description | Procedure | Qty | Diag | PROD | TO | PLS | Amount |
|---|---|---|---|---|---|---|---|---|
| 08/18/97 | CHECK PAYMENT | | | | SF | | | $8.59- |
| 08/18/97 | CHECK PAYMENT | | | | SF | | | $1.75- |
| 09/22/97 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | | * | $75.00 |
| 09/22/97 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | | * | $12.50 |
| 09/22/97 | FILED: $87 Y CHAMPUS TRI | | | | SF | | | $0.00 |
| 10/13/97 | PMT: CHAMPUS TRICARE PROG | | | | SF | | * | $25.78- |
| 10/13/97 | RESPONSIBILITY CHANGE ( | 8.59 ) | | | SF | | | $0.00 |
| 10/13/97 | PMT: CHAMPUS TRICARE PROG | | | | SF | | * | $5.25- |
| 10/13/97 | RESPONSIBILITY CHANGE ( | 1.75 ) | | | SF | | | $0.00 |
| 10/13/97 | WRT-OFF: MISC. INS/ADJ | | | | SF | | * | $5.50- |
| 10/13/97 | WRT-OFF: MISC. INS/ADJ | | | | SF | | * | $40.63- |
| 11/17/97 | CHECK PAYMENT | | | | SF | | | $8.59 |
| 11/17/97 | CHECK PAYMENT | | | | SF | | | $1.75- |
| 12/12/97 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | | * | $75.00 |
| 12/12/97 | ROUTINE VENIPUNCTURE | 36415-90 | 1 | 720.0 | SF OF 3 | | * | $12.50 |
| 12/12/97 | FILED: $87 Y CHAMPUS TRI | | | | SF | | | $0.00 |
| 01/14/98 | PMT: CHAMPUS TRICARE PROG | | | | SF | | * | $0.00 |
| 01/14/98 | DEDUCTIBLE ( | 34.37 ) | | | SF | | | $0.00 |
| 01/14/98 | WRT-OFF: MISC. INS/ADJ | | | | SF | | * | $40.63- |
| 01/14/98 | PMT: CHAMPUS TRICARE PROG | | | | SF | | * | $0.00 |
| 01/14/98 | DEDUCTIBLE ( | 7.00 ) | | | SF | | | $0.00 |
| 01/14/98 | WRT-OFF: MISC. INS/ADJ | | | | SF | | * | $5.50- |
| 02/11/98 | EST. PATIENT LEVEL 1 | 99211 | 1 | 710.0 | SF OF 3 | | * | $23.00 |
| 02/11/98 | ROUTINE VENIPUNCTURE | 36415 | 1 | 710.0 | SF OF 3 | | * | $12.50 |
| 02/11/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $10.03- |
| 02/11/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $9.50- |
| 02/11/98 | FILED: $15 Y MEDICARE PA | | | | SF | | | $0.00 |
| 02/11/98 | FILED: $15 Y SENIOR PART | | | | SF | | | $0.00 |
| 02/11/98 | ReFILED: $15 Y SENIOR PA | | | | SF | | | $0.00 |
| 02/23/98 | CHECK PAYMENT | | | | SF | | | $41.37- |
| 03/09/98 | No PMT: MEDICARE PART B | | | | SF | | * | $0.00 |
| 03/09/98 | PMT: MEDICARE PART B | | | | SF | | | $3.00- |
| 04/14/98 | EST. PATIENT LEVEL 3 | 99213 | 1 | 306 | SF OF 3 | | * | $75.00 |
| 04/14/98 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | | * | $24.00 |
| 04/14/98 | HEPATIC FUNCTION PANEL | 80076 | 1 | V58.69 | SF OF 3 | | * | $20.00 |
| 04/14/98 | CREATININE | 82565 | 1 | V58.69 | SF OF 3 | | * | $15.00 |
| 04/14/98 | ROUTINE VENIPUNCTURE | 36415 | 1 | V58.69 | SF OF 3 | | * | $12.50 |
| 04/14/98 | LUMBAR SP & PELVIS ALL VW | 72110 | 1 | 306 | SF OF 3 | | * | $110.00 |
| 04/14/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $38.20- |
| 04/14/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $12.73- |
| 04/14/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $9.19- |
| 04/14/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $7.93- |
| 04/14/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $9.50- |
| 04/14/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $64.87- |
| 04/14/98 | FILED: $114 Y MEDICARE PA | | | | SF | | | $0.00 |
| 04/14/98 | FILED: $114 Y SENIOR PART | | | | SF | | | $0.00 |
| 04/14/98 | ReFILED: $114 Y SENIOR PA | | | | SF | | | $0.00 |
| 04/28/98 | PMT: MEDICARE PART B | | | | SF | | * | $29.44- |
| 04/28/98 | PMT: MEDICARE PART B | | | | SF | | * | $11.27- |
| 04/28/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $4.26- |
| 04/28/98 | PMT: MEDICARE PART B | | | 1 | | SF | | * | $6.55- |
| 04/28/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $2.78- |
| 04/28/98 | PMT: MEDICARE PART B | | | | SF | | * | $4.29- |
| 04/28/98 | PMT: MEDICARE PART B | | | | SF | | * | $3.00- |
| 04/28/98 | PMT: MEDICARE PART B | | | | SF | | * | $36.10- |
| 07/21/98 | EST. PATIENT LEVEL 3 | 99213 | 1 | 306 | SF OF 3 | | * | $75.00 |
| 07/21/98 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | | * | $24.00 |

| Date of service | Description | Procedure | Qly | Diag PROD 10 PLS | | Amount |
|---|---|---|---|---|---|---|
| 07/21/98 | URINALYSIS W/OUT MICRO. | 81003 | 1 | V58.69 | SP OF 3 | * $10.00 |
| 07/21/98 | HEPATIC FUNCTION PANEL | 80076 | 1 | V58.69 | SP OF 3 | * $20.00 |
| 07/21/98 | CREATININE | 82565 | 1 | V58.69 | SP OF 3 | * $15.00 |
| 07/21/98 | ROUTINE VENIPUNCTURE | 36415 | 1 | V58.69 | SP OF 3 | * $12.50 |
| 07/21/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * $38.20 |
| 07/21/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * $12.73 |
| 07/21/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * $6.90 |
| 07/21/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * $9.19 |
| 07/21/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * $7.93 |
| 07/21/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * $9.50 |
| 07/21/98 | FILED:   $72 Y MEDICARE PA | | | | SP | $0.00 |
| 07/21/98 | FILED:   $72 Y SENIOR PART | | | | SP | $0.00 |
| 07/21/98 | ReFILED:   $74 Y SENIOR PA | | | | SP | $0.00 |
| 08/10/98 | PMT: MEDICARE PART B | | | | SP | * $29.44 |
| 08/10/98 | PMT: MEDICARE PART B | | | | SP | * $11.27 |
| 08/10/98 | PMT: MEDICARE PART B | | | | SP | * $3.10 |
| 08/10/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * $4.26 |
| 08/10/98 | PMT: MEDICARE PART B | | | | SP | * $6.55 |
| 08/10/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * $2.78 |
| 08/10/98 | PMT: MEDICARE PART B | | | | SP | * $4.29 |
| 08/10/98 | PMT: MEDICARE PART B | | | | SP | * $3.00 |
| 09/01/98 | PMT: SENIOR PARTNERS | | | | SP | * $12.97 |
| 09/25/98 | PMT: SENIOR PARTNERS | | | | SP | * $7.36 |
| 09/25/98 | PMT: SENIOR PARTNERS | | | | SP | * $9.03 |
| 11/20/98 | EST. PATIENT LEVEL 3 | 99213 | 1 | 715.09 | SP OF 3 | * $75.00 |
| 11/20/98 | ROUTINE VENIPUNCTURE | 36415 | 1 | 715.09 | SP OF 3 | * $12.50 |
| 11/20/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * $38.20 |
| 11/20/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * $9.50 |
| 1/20/98 | FILED:   $39 Y MEDICARE PA | | | | SP | $0.00 |
| 1/20/98 | FILED:   $39 Y SENIOR PART | | | | SP | $0.00 |
| 12/07/98 | PMT: MEDICARE PART B | | | | SP | * $29.44 |
| 12/07/98 | PMT: MEDICARE PART B | | | | SP | * $3.00 |
| 03/02/99 | PMT: SENIOR PARTNERS | | | | SP | * $7.36 |
| 03/23/99 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SP OF 3 | * $75.00 |
| 03/23/99 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SP OF 3 | * $12.50 |
| 03/23/99 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * $36.19 |
| 03/23/99 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * $9.50 |
| 03/23/99 | FILED:   $41 Y MEDICARE PA | | | | SP | $0.00 |
| 03/23/99 | FILED:   $41 Y SENIOR PART | | | | SP | $0.00 |
| 03/23/99 | ReFILED:   $41 Y SENIOR PA | | | | SP | $0.00 |
| 04/10/99 | PMT: SENIOR PARTNERS | | | | SP | * $7.36 |
| 04/12/99 | PMT: MEDICARE PART B | | | | SP | * $31.05 |
| 04/12/99 | PMT: MEDICARE PART B | | | | SP | * $3.00 |
| 10/11/99 | PMT: SENIOR PARTNERS | | | | SP | * $7.76 |
| 10/12/99 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SP OF 3 | * $75.00 |
| 10/12/99 | FLU SHOT | 90658 | 1 | V04.8 | SP OF 3 | * $30.00 |
| 10/12/99 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SP OF 3 | * $12.50 |
| 10/12/99 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * $36.19 |
| 10/12/99 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * $25.84 |
| 10/12/99 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * $9.50 |
| 10/12/99 | FILED:   $45 Y MEDICARE PA | | | | SP | $0.00 |
| 10/12/99 | FILED:   $45 Y BLUE CROSS/ | | | | SP | $0.00 |
| 10/26/99 | PMT: MEDICARE PART B | | | | SP | * $31.05 |
| 10/26/99 | PMT: MEDICARE PART B | | | | SP | * $4.16 |
| 10/26/99 | PMT: MEDICARE PART B | | | | SP | * $3.00 |
| 10/28/99 | PMT: BLUE CROSS/PMD/HARD | | | | SP | * $7.76 |
| 10/28/99 | No PMT: BLUE CROSS/PMD/HA | | | | SP | $0.00 |

| Date of service | Description | Procedure | Qty | Diag | PROD | ID | PLAS | Amount |
|---|---|---|---|---|---|---|---|---|
| 10/28/99 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | | $0.00 |
| 12/06/99 | PMT: SENIOR PARTNERS | | | | SF | | * | $0.00 |
| 04/11/00 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF | OF | 3 | $75.00 |
| 04/11/00 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF | OF | 3 | $24.00 |
| 04/11/00 | URINALYSIS W/OUT MICRO. | 81003 | 1 | V58.69 | SF | OF | 3 | $10.00 |
| 04/11/00 | HEPATIC FUNCTION PANEL | 80076 | 1 | V58.69 | SF | OF | 3 | $20.00 |
| 04/11/00 | CREATININE | 82565 | 1 | V58.69 | SF | OF | 3 | $15.00 |
| 04/11/00 | ROUTINE VENI PUNCTURE | 36415 | 1 | 720.0 | SF | OF | 3 | $12.50 |
| 04/11/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $31.21 - |
| 04/11/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $12.73- |
| 04/11/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $6.90- |
| 04/11/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $9.16- |
| 04/11/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $7.93 - |
| 04/11/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $9.50 - |
| 04/11/00 | FILED:  $79 Y MEDICARE PA | | | | SF | | | $0.00 |
| 04/11/00 | FILED:  $79 Y BLUE CROSS/ | | | | SF | | | $0.00 |
| 04/25/00 | PMT: MEDICARE PART B | | | | SF | | * | $35.03- |
| 04/25/00 | PMT: MEDICARE PART B | | | | SF | | * | $11.27- |
| 04/25/00 | PMT: MEDICARE PART B | | | | SF | | * | $3.10- |
| 04/25/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $3.76- |
| 04/25/00 | PMT: MEDICARE PART B | | | | SF | | * | $7.08 - |
| 04/25/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $2.45- |
| 04/25/00 | PMT: MEDICARE PART B | | | | SF | | * | $4.62- |
| 04/25/00 | PMT: MEDICARE PART B | | | | SF | | * | $3.00- |
| 04/27/00 | PMT: BLUE CROSS/PMD/HARD | | | | SF | | * | $8.76- |
| 08/15/00 | EST. PATIENT LEVEL 3 | 99213 | 1 | 715.09 | SF | OF | 3 | $75.00 |
| 08/15/00 | SED RATE | 85651 | 1 | 720.0 | SF | OF | 3 | $16.00 |
| 08/15/00 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF | OF | 3 | $24.00 |
| 9/15/00 | URINALYSIS W/OUT MICRO. | 81003 | 1 | V58.69 | SF | OF | 3 | $10.00 |
| 8/15/00 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SF | OF | 3 | $25.00 |
| 08/15/00 | ROUTINE VENI PUNCTURE | 36415 | 1 | V58.69 | SF | OF | 3 | $12.50 |
| 08/15/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $31.21- |
| 08/15/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $11.09- |
| 08/15/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $12.73- |
| 08/15/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $6.90- |
| 08/15/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $10.39- |
| 08/15/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $9.50 - |
| 08/15/00 | FILED:  $80 Y MEDICARE PA | | | | SF | | | $0.00 |
| 08/15/00 | FILED:  $80 Y BLUE CROSS/ | | | | SF | | | $0.00 |
| 08/29/00 | PMT: MEDICARE PART B | | | | SF | | * | $35.03- |
| 08/29/00 | PMT: MEDICARE PART B | | | | SF | | * | $4.91 - |
| 08/29/00 | PMT: MEDICARE PART B | | | | SF | | * | $11.27- |
| 08/29/00 | PMT: MEDICARE PART B | | | | SF | | * | $3.10 - |
| 08/29/00 | PMT: MEDICARE PART B | | | | SF | | * | $14.61- |
| 08/29/00 | PMT: MEDICARE PART B | | | | SF | | * | $3.00- |
| 08/31/00 | PMT: BLUE CROSS/PMD/HARD | | | | SF | | * | $8.76- |
| 08/31/00 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | | $0.00 |
| 08/31/00 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | | $0.00 |
| 08/31/00 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | | $0.00 |
| 08/31/00 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | | $0.00 |
| 08/31/00 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | | $0.00 |
| 12/19/00 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF | OF | 3 | $75.00 |
| 12/19/00 | ROUTINE VENI PUNCTURE | 36415 | 1 | V58.69 | SF | OF | 3 | $12.50 |
| 12/19/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $31.21- |
| 12/19/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $9.50 - |
| 12/19/00 | FILED:  $46 Y MEDICARE PA | | | | SF | | | $0.00 |
| 12/19/00 | FILED:  $46 Y BLUE CROSS/ | | | | SF | | | $0.00 |

| Date of service | Description | Procedure | Qty | Diag | PROD 10 | PLS | Amount |
|---|---|---|---|---|---|---|---|
| 01/08/01 | PMT: MEDICARE PART B | | | | SF | * | $35.03- |
| 01/08/01 | PMT: MEDICARE PART B | | | | SF | * | $3.00- |
| 01/11/01 | PMT: BLUE CROSS/PMD/HARD | | | | SF | * | $8.76- |
| 01/11/01 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | $0.00 |
| 06/25/01 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | * | $75.00 |
| 06/25/01 | SED RATE | 85651 | 1 | 720.0 | SF OF 3 | * | $16.00 |
| 06/25/01 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | * | $24.00 |
| 06/25/01 | URINALYSIS W/OUT MICRO. | 81003 | 1 | V58.69 | SF OF 3 | * | $10.00 |
| 06/25/01 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SF OF 3 | * | $25.00 |
| 06/25/01 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | * | $12.50 |
| 06/25/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $28.31- |
| 06/25/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $11.09- |
| 06/25/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $12.73- |
| 06/25/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $6.90- |
| 06/25/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $10.39- |
| 06/25/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50- |
| 06/25/01 | FILED:  $83 Y MEDICARE PA | | | | SF | | $0.00 |
| 06/25/01 | FILED:  $83 Y BLUE CROSS/ | | | | SF | | $0.00 |
| 07/10/01 | PMT: MEDICARE PART B | | | | SF | * | $37.35- |
| 07/10/01 | PMT: MEDICARE PART B | | | | SF | * | $4.91- |
| 07/10/01 | PMT: MEDICARE PART B | | | | SF | * | $11.27- |
| 07/10/01 | PMT: MEDICARE PART B | | | | SF | * | $3.10- |
| 07/10/01 | PMT: MEDICARE PART B | | | | SF | * | $14.61- |
| 07/10/01 | PMT: MEDICARE PART B | | | | SF | * | $3.00- |
| 07/12/01 | PMT: BLUE CROSS/PMD/HARD | | | | SF | * | $9.34- |
| 07/12/01 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | $0.00 |
| 07/12/01 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | $0.00 |
| 07/12/01 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | $0.00 |
| 07/12/01 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | $0.00 |
| 07/12/01 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | $0.00 |
| 12/21/01 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | * | $75.00 |
| 12/21/01 | ROUTINE VENIPUNCTURE | 36415-90 | 1 | 720.0 | SF OF 3 | * | $12.50 |
| 12/21/01 | PRINTS AP | 72170 | 1 | 720.2 | SF OF 3 | * | $62.00 |
| 12/21/01 | LUMBAR SPINE AP&LA | 72100 | 1 | 720.2 | SF OF 3 | * | $85.00 |
| 12/21/01 | OS CALCIS/HEEL | 73650-RT | 1 | 729.5 | SF OF 3 | * | $60.00 |
| 12/21/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $28.31- |
| 12/21/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50- |
| 12/21/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $34.68- |
| 12/21/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $49.83- |
| 12/21/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $34.72- |
| 12/21/01 | FILED: $137 Y MEDICARE PA | | | | SF | | $0.00 |
| 12/21/01 | FILED: $137 Y TRICARE REG | | | | SF | | $0.00 |
| 12/21/01 | ReFILED:   $3 Y MEDICARE | | | | SF | | $0.00 |
| 12/21/01 | ReFILED:   $3 Y TRICARE R | | | | SF | | $0.00 |
| 01/08/02 | PMT: MEDICARE PART B | | | | SF | * | $37.35- |
| 01/08/02 | PMT: MEDICARE PART B | | | | SF | * | $21.86- |
| 01/08/02 | PMT: MEDICARE PART B | | | | SF | * | $28.14- |
| 01/08/02 | PMT: MEDICARE PART B | | | | SF | * | $20.22- |
| 01/22/02 | PMT: MEDICARE PART B | | | | SF | | $3.00- |
| 01/22/02 | DB.MEMO: MISC/ADJ | | | | SF | | $3.00 |
| 01/23/02 | PMT: TRICARE REGION 3 & 4 | | | | SF | * | $9.34- |
| 01/23/02 | WRT-OFF: MEDICARE ADJ | | | | SF | * | $3.00- |
| 01/23/02 | PMT: TRICARE REGION 3 & 4 | | | | SF | * | $5.46- |
| 01/23/02 | PMT: TRICARE REGION 3 & 4 | | | | SF | * | $7.03- |
| 01/23/02 | PMT: TRICARE REGION 3 & 4 | | | | SF | * | $5.06- |
| 05/30/02 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | * | $75.00 |
| 05/30/02 | SED RATE | 85651 | 1 | 720.0 | SF OF 3 | * | $16.00 |

| Date of service | Description | Procedure | Qty | Diag | PROD TO PTS | | Amount |
|---|---|---|---|---|---|---|---|
| 05/30/02 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | * | $24.00 |
| 05/30/02 | URINALYSIS W/OUT MICRO. | 81003 | 1 | V58.69 | SF OF 3 | * | $10.00 |
| 05/30/02 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SF OF 3 | * | $25.00 |
| 05/30/02 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | * | $12.50 |
| 05/30/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $28.67- |
| 05/30/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $11.09- |
| 05/30/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $12.73- |
| 05/30/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $6.90- |
| 05/30/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $10.39- |
| 05/30/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50- |
| 05/30/02 | FILED: $83 Y MEDICARE PA | | | | SF | | $0.00 |
| 05/30/02 | FILED: $83 Y TRICARE REG | | | | SF | | $0.00 |
| 06/17/02 | PMT: MEDICARE PART B | | | | SF | * | $37.06- |
| 06/17/02 | PMT: MEDICARE PART B | | | | SF | * | $4.91- |
| 06/17/02 | PMT: MEDICARE PART B | | | | SF | * | $11.27- |
| 06/17/02 | PMT: MEDICARE PART B | | | | SF | * | $3.10- |
| 06/17/02 | PMT: MEDICARE PART B | | | | SF | * | $14.61- |
| 06/17/02 | PMT: MEDICARE PART B | | | | SF | * | $3.00- |
| 06/20/02 | PMT: TRICARE REGION 3 & 4 | | | | SF | * | $9.27- |
| 11/19/02 | EST. PATIENT LEVEL 3 | 99213 | 1 | 715.09 | SF OF 3 | * | $75.00 |
| 11/19/02 | SED RATE | 85651 | 1 | 720.0 | SF OF 3 | * | $16.00 |
| 11/19/02 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | * | $24.00 |
| 11/19/02 | URINALYSIS WITH MICRO. | 81001 | 1 | V58.69 | SF OF 3 | * | $13.00 |
| 11/19/02 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SF OF 3 | * | $25.00 |
| 11/19/02 | ROUTINE VENIPUNCTURE | 36415 | 1 | 715.09 | SF OF 3 | * | $12.50 |
| 11/19/02 | CERVICAL SPINE APALA | 72040 | 1 | 723.1 | SF OF 3 | * | $66.00 |
| 11/19/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $28.67- |
| 11/19/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $11.09- |
| 11/19/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $12.73- |
| 11/19/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $8.63- |
| 11/19/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $10.39- |
| 11/19/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50- |
| 11/19/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $36.57- |
| 11/19/02 | FILED: $113 Y MEDICARE PA | | | | SF | | $0.00 |
| 11/19/02 | FILED: $113 Y TRICARE REG | | | | SF | | $0.00 |
| 12/09/02 | PMT: MEDICARE PART B | | | | SF | * | $37.06- |
| 12/09/02 | PMT: MEDICARE PART B | | | | SF | * | $4.91- |
| 12/09/02 | PMT: MEDICARE PART B | | | | SF | * | $11.27- |
| 12/09/02 | PMT: MEDICARE PART B | | | | SF | * | $4.37- |
| 12/09/02 | PMT: MEDICARE PART B | | | | SF | * | $14.61- |
| 12/09/02 | PMT: MEDICARE PART B | | | | SF | * | $3.00 |
| 12/09/02 | PMT: MEDICARE PART B | | | | SF | * | $23.55- |
| 12/19/02 | PMT: TRICARE REGION 3 & 4 | | | | SF | * | $9.27- |
| 12/19/02 | PMT: TRICARE REGION 3 & 4 | | | | SF | * | $5.88- |

Current A/R

| Date of service | Description | Procedure | Qty | Diag | PROD TO PTS | | Amount |
|---|---|---|---|---|---|---|---|
| 03/19/03 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | * | $75.00 |
| 03/19/03 | ROUTINE VENIPUNCTURE | 36415 | 1 | V58.69 | SF OF 3 | * | $12.50 |
| 03/19/03 | PELVIS AP | 72170 | 1 | 306 | SF OF 3 | * | $62.00 |
| 03/19/03 | LUMBAR SPINE APALA | 72100 | 1 | 306 | SF OF 3 | * | $85.00 |
| 03/19/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $30.73- |
| 03/19/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50- |
| 03/19/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $37.96- |
| 03/19/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $53.59- |
| 04/07/03 | PMT: MEDICARE PART B | | | | SF | * | $35.42- |
| 04/07/03 | PMT: MEDICARE PART B | | | | SF | * | $3.00- |

| Date of service | Description | Procedure | Qty | Diag | PROD | TO PTS | Amount |
|---|---|---|---|---|---|---|---|
| 04/07/03 | PMT: MEDICARE PART B | | | | SP | * | $19.23 |
| 04/07/03 | PMT: MEDICARE PART B | | | | SP | * | $25.13 |
| 04/24/03 | PMT: TRICARE REGION 3 & 4 | | | | SP | * | $8.85 |
| 04/24/03 | PMT: TRICARE REGION 3 & 4 | | | | SP | * | $4.81 |
| 04/24/03 | PMT: TRICARE REGION 3 & 4 | | | | SP | * | $6.28 |
| 07/28/03 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SP OF 3 | * | $75.00 |
| 07/28/03 | ROUTINE VENUPUNCTURE | 36415 | 1 | 720.0 | SP OF 3 | * | $12.50 |
| 07/28/03 | SHOULDER 2 VWS | 73030-RT | 1 | 719.41 | SP OF 3 | * | $66.00 |
| 07/28/03 | SHOULDER 2 VWS | 73030-LT | 1 | 719.41 | SP OF 3 | * | $66.00 |
| 07/28/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $27.92 |
| 07/28/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $9.50 |
| 07/28/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $38.17 |
| 08/18/03 | PMT: MEDICARE PART B | | | | SP | * | $38.17 |
| 08/18/03 | PMT: MEDICARE PART B | | | | SP | * | $37.66 |
| 08/18/03 | PMT: MEDICARE PART B | | | | SP | * | $3.00 |
| 08/18/03 | PMT: MEDICARE PART B | | | | SP | * | $22.26 |
| 10/06/03 | PMT: TRICARE REGION 3 & 4 | | | | SP | * | $22.27 |
| 10/06/03 | PMT: TRICARE REGION 3 & 4 | | | | SP | * | $9.42 |
| 10/06/03 | PMT: TRICARE REGION 3 & 4 | | | | SP | * | $5.57 |
| 12/01/03 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SP OF 3 | * | $5.56 |
| 12/01/03 | CBC W/DIFF. PLT. CT. | 85025 | 1 | 720.0 | SP OF 3 | * | $75.00 |
| 12/01/03 | URINALYSIS W/OUT MICRO. | 81003 | 1 | V58.69 | SP OF 3 | * | $24.00 |
| 12/01/03 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SP OF 3 | * | $10.00 |
| 12/01/03 | ROUTINE VENUPUNCTURE | 36415 | 1 | 720.0 | SP OF 3 | * | $25.00 |
| 12/01/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $12.50 |
| 12/01/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $27.92 |
| 12/01/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $13.14 |
| 12/01/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $6.86 |
| 12/01/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $10.23 |
| 12/01/03 | FILED:  $78 Y MEDICARE PA | | | | SP | * | $9.50 |
| 12/01/03 | FILED:  $78 Y TRICARE REG | | | | SP | | $0.00 |
| 12/17/03 | PMT: MEDICARE PART B | | | | SP | | $0.00 |
| 12/17/03 | PMT: MEDICARE PART B | | | | SP | * | $37.66 |
| 12/17/03 | PMT: MEDICARE PART B | | | | SP | * | $10.86 |
| 12/17/03 | PMT: MEDICARE PART B | | | | SP | * | $3.14 |
| 12/17/03 | PMT: MEDICARE PART B | | | | SP | * | $14.77 |
| 01/07/04 | PMT: TRICARE REGION 3 & 4 | | | | SP | * | $3.00 |
| 04/06/04 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SP OF 3 | * | $9.42 |
| 04/06/04 | SED RATE | 85651 | 1 | 720.0 | SP OF 3 | * | $75.00 |
| 04/06/04 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SP OF 3 | * | $16.00 |
| 04/06/04 | URINALYSIS WITH MICRO. | 81001 | 1 | V58.69 | SP OF 3 | * | $24.00 |
| 04/06/04 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SP OF 3 | * | $13.00 |
| 04/06/04 | ROUTINE VENUPUNCTURE | 36415 | 1 | 720.0 | SP OF 3 | * | $25.00 |
| 04/06/04 | FILED: $165 Y MEDICARE PA | | | | SP | * | $12.50 |
| 04/06/04 | FILED: $165 Y TRICARE REG | | | | SP | | $0.00 |
| 04/21/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | | $0.00 |
| 04/21/04 | PMT: MEDICARE PART B | | | | SP | * | $26.08 |
| 04/21/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $39.14 |
| 04/21/04 | PMT: MEDICARE PART B | | | | SP | * | $11.04 |
| 04/21/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $4.96 |
| 04/21/04 | PMT: MEDICARE PART B | | | | SP | * | $13.14 |
| 04/21/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $10.86 |
| 04/21/04 | PMT: MEDICARE PART B | | | | SP | * | $8.57 |
| 04/21/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $4.43 |
| 04/21/04 | PMT: MEDICARE PART B | | | | SP | * | $10.23 |
| 04/21/04 | PMT: MEDICARE PART B | | | | SP | * | $14.77 |
| 04/21/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $9.50 |

| Date of service | Description | Procedure | Qty | Diag | PROD ID PLS | Amount |
|---|---|---|---|---|---|---|
| 4/21/04 | PMT: MEDICARE PART B | | | | SP * | $3.00 |
| 05/06/04 | PMT: TRICARE REGION 3 & 4 | | | | SP * | $9.78 |
| 08/10/04 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SP OF 3 * | $75.00 |
| 08/10/04 | SED RATE | 85651 | 1 | 720.0 | SP OF 3 * | $16.00 |
| 08/10/04 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SP OF 3 * | $24.00 |
| 08/10/04 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SP OF 3 * | $25.00 |
| 08/10/04 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SP OF 3 * | $12.50 |
| 08/10/04 | FILED: $152 Y MEDICARE PA | | | | SP | $0.00 |
| 08/10/04 | FILED: $152 Y TRICARE REG | | | | SP | $0.00 |
| 08/16/04 | THYEST | 86580 | 1 | 720.0 | SP OF 3 * | $15.00 |
| 08/16/04 | FILED: $15 Y MEDICARE PA | | | | SP | $0.00 |
| 08/16/04 | FILED: $15 Y TRICARE REG | | | | SP | $0.00 |
| 08/17/04 | PMT: MEDICARE PART B | | | | SP * | $39.14 |
| 08/17/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP * | $11.04 |
| 08/17/04 | PMT: MEDICARE PART B | | | | SP * | $4.96 |
| 08/17/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP * | $13.14 |
| 08/17/04 | PMT: MEDICARE PART B | | | | SP * | $10.86 |
| 08/17/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP * | $10.23 |
| 08/17/04 | PMT: MEDICARE PART B | | | | SP * | $14.77 |
| 08/17/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP * | $9.50 |
| 08/17/04 | PMT: MEDICARE PART B | | | | SP * | $3.00 |
| 08/17/04 | WRT-OFF: MEDICARE ADJ | | | | SP * | $26.08 |
| 08/23/04 | PMT: MEDICARE PART B | | | | SP * | $7.22 |
| 09/28/04 | PMT: TRICARE FOR DEPE | | | | SP * | $9.78 |
| 09/28/04 | PMT: TRICARE FOR DEPE | | | | SP * | $1.81 |
| 09/28/04 | WRT-OFF: MEDICARE ADJ | | | | SP * | $5.97 |
| 11/02/04 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SP OF 3 * | $75.00 |
| 11/02/04 | SED RATE | 85651 | 1 | 720.0 | SP OF 3 * | $16.00 |
| /02/04 | C-REACTIVE PROTEIN | 86140 | 1 | 720.0 | SP OF 3 * | $10.00 |
| 11/02/04 | RHEUMATOID LATEX | 86430 | 1 | 720.0 | SP OF 3 * | $24.00 |
| 11/02/04 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SP OF 3 * | $24.00 |
| 11/02/04 | URINALYSIS WITH MICRO. | 81001 | 1 | V58.69 | SP OF 3 * | $13.00 |
| 11/02/04 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SP OF 3 * | $25.00 |
| 11/02/04 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SP OF 3 * | $12.50 |
| 11/02/04 | FILED: $199 Y MEDICARE PA | | | | SP | $0.00 |
| 11/02/04 | FILED: $199 Y TRICARE FOR | | | | SP | $0.00 |
| 11/16/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP * | $26.08 |
| 11/16/04 | PMT: MEDICARE PART B | | | | SP * | $39.14 |
| 11/16/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP * | $11.04 |
| 11/16/04 | PMT: MEDICARE PART B | | | | SP * | $4.96 |
| 11/16/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP * | $2.77 |
| 11/16/04 | PMT: MEDICARE PART B | | | | SP * | $7.23 |
| 11/16/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP * | $16.07 |
| 11/16/04 | PMT: MEDICARE PART B | | | | SP * | $7.93 |
| 11/16/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP * | $13.14 |
| 11/16/04 | PMT: MEDICARE PART B | | | | SP * | $10.86 |
| 11/16/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP * | $8.57 |
| 11/16/04 | PMT: MEDICARE PART B | | | | SP * | $4.43 |
| 11/16/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP * | $10.23 |
| 11/16/04 | PMT: MEDICARE PART B | | | | SP * | $14.77 |
| 11/16/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP * | $9.50 |
| 11/16/04 | PMT: MEDICARE PART B | | | | SP * | $3.00 |
| 12/06/04 | PMT: TRICARE FOR DEPE | | | | SP * | $9.78 |
| 03/08/05 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SP OF 3 * | $75.00 |
| 03/08/05 | SED RATE | 85651 | 1 | 720.0 | SP OF 3 * | $16.00 |
| 03/08/05 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SP OF 3 * | $24.00 |
| /08/05 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SP OF 3 * | $25.00 |

| Date of service | Description | Procedure | Qty | Diag | MOD | TO | PUS | Amount |
|---|---|---|---|---|---|---|---|---|
| 3/08/05 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | | * | $12.50 |
| 03/08/05 | FILED: $152 Y MEDICARE PA | | | | SF | | | $0.00 |
| 03/08/05 | FILED: $152 Y TRICARE FOR | | | | SF | | | $0.00 |
| 03/28/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $26.32- |
| 03/28/05 | PMT: MEDICARE PART B | | | | SF | | * | $38.94- |
| 03/28/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $11.04- |
| 03/28/05 | PMT: MEDICARE PART B | | | | SF | | * | $4.96- |
| 03/28/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $13.14 |
| 03/28/05 | PMT: MEDICARE PART B | | | | SF | | * | $10.86- |
| 03/28/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $10.23- |
| 03/28/05 | PMT: MEDICARE PART B | | | | SF | | * | $14.77- |
| 03/28/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $9.50- |
| 03/28/05 | PMT: MEDICARE PART B | | | | SF | | * | $3.00- |
| 04/08/05 | PMT: TRICARE FOR LIFE | | | | SF | | * | $9.74- |
| 07/12/05 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | | * | $75.00 |
| 07/12/05 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | | * | $24.00 |
| 07/12/05 | URINALYSIS WITH MICRO. | 81001 | 1 | V58.69 | SF OF 3 | | * | $13.00 |
| 07/12/05 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SF OF 3 | | * | $25.00 |
| 07/12/05 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | | * | $12.50 |
| 07/12/05 | FILED: $149 Y MEDICARE PA | | | | SF | | | $0.00 |
| 07/27/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $26.32- |
| 07/27/05 | PMT: MEDICARE PART B | | | | SF | | * | $38.94- |
| 07/27/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $13.14- |
| 07/27/05 | PMT: MEDICARE PART B | | | | SF | | * | $10.86- |
| 07/27/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $8.57- |
| 07/27/05 | PMT: MEDICARE PART B | | | | SF | | * | $4.43- |
| 07/27/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $10.23- |
| 07/27/05 | PMT: MEDICARE PART B | | | | SF | | * | $14.77- |
| 07/27/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $9.50- |
| 07/27/05 | PMT: MEDICARE PART B | | | | SF | | * | $3.00- |
| 08/02/05 | PMT: TRICARE FOR LIFE | | | | SF | | * | $9.74- |
| 08/02/05 | PMT: TRICARE FOR LIFE | | | | SF | | * | $0.00 |
| 08/02/05 | PMT: TRICARE FOR LIFE | | | | SF | | * | $0.00 |
| 08/02/05 | PMT: TRICARE FOR LIFE | | | | SF | | * | $0.00 |
| 08/02/05 | PMT: TRICARE FOR LIFE | | | | SF | | * | $0.00 |
| 01/31/06 | EST. PATIENT LEVEL 4 | 99214 | 1 | 720.0 | SF OF 3 | | * | $88.00 |
| 01/31/06 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | | * | $12.50 |
| 01/31/06 | FILED: $100 Y MEDICARE PA | | | | SF | | | $0.00 |
| 01/31/06 | FILED: $100 Y TRICARE FOR | | | | SF | | | $0.00 |
| 02/15/06 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $11.86- |
| 02/15/06 | PMT: MEDICARE PART B | | | | SF | | * | $60.91- |
| 02/15/06 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $9.50- |
| 02/15/06 | PMT: MEDICARE PART B | | | | SF | | * | $3.00- |
| 03/16/06 | PMT: TRICARE FOR LIFE | | | | SF | | * | $15.23 |
| 03/16/06 | PMT: TRICARE FOR LIFE | | | | SF | | * | $0.00 |
| 08/15/06 | EST. PATIENT LEVEL 4 | 99214 | 1 | 720.0 | SF OF 3 | | * | $88.00 |
| 08/15/06 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | | * | $24.00 |
| 08/15/06 | URINALYSIS WITH MICRO. | 81001 | 1 | V58.69 | SF OF 3 | | * | $13.00 |
| 08/15/06 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SF OF 3 | | * | $25.00 |
| 08/15/06 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | | * | $12.50 |
| 08/30/06 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $11.86- |
| 08/30/06 | PMT: MEDICARE PART B | | | | SF | | * | $60.91- |
| 08/30/06 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $13.14- |
| 08/30/06 | PMT: MEDICARE PART B | | | | SF | | * | $10.86- |
| 08/30/06 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $8.57- |
| 08/30/06 | PMT: MEDICARE PART B | | | | SF | | * | $4.43- |
| 30/06 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $10.23- |

| Date of service | Description | Procedure | Qty | Diag | PROD | LO | PLS | Amount |
|---|---|---|---|---|---|---|---|---|
| 08/30/06 | PMT: MEDICARE PART B | | | | SF | | * | $74.77 |
| 08/30/06 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $9.50- |
| 08/30/06 | PMT: MEDICARE PART B | | | | SF | | * | $3.00- |

Note:    PLS means "Place of service"

BALANCE:        $15.23
Amount suspended: (    $15.23 )

Total patient payments in 1997:    $103.03-
"        "        "    in 1998:    $41.37-

Location   (LO): OF - MONTGOMERY RHEU/OFFICE
Provider (PROD):  SF  -  FALLAND M.D., SOHRAB

DATE: 8/15/06

CHIEF COMPLAINT

WELL BEING B W S

AM STIFF _____ SLEEP

ACT OF DAILY    DRESS

HELP

INDE

MED TOX    RASH    MUL

YES

NO

OTHER _____

MUSCLES    NF    NE    D

R    S/A    /    /    /

L    S/A    /    /    /

ULN DEV    R_____

HBN    R_____ L____

X RAY _____

HEENT _____ LUN

OTHER _____

BUTT    DOOR

HA    EDEM

INT HAND
/

/

LEX  B  T  K  A
R
L

L

has bony hypertrophy of the knees with crepitus on flexion and extension. His mobility is fine.

His social activity is great. He is playing golf and cutting grass. He walks 2 miles 3 days a week.

ASSESSMENT/PLAN:
(1) Ankylosing spondylitis – under very good control.
(2) Monitoring the side effects of medications.

I checked CBC, liver panel and creatinine.

(3) Osteoarthritis – appropriate for age.

I will see him back in 6 months for re-evaluation.

Sohrab Fallahi/ef

End

N F/E R___/___ L___/___
E F/R R___/___ L___/___
K F/E R___/___ L___/___
S I/A R___/___ L___/___
HPF/I/E R    /    /
L    /    /

FAILAHI

ATE: _____  CHIEF COMPLAINT _____
M STIFF _____  SLEEP _____  WELL BEING  B  W  S
CT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR
N        HELP
         INDE

ED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
    YES
    NO
THER

USCLES    NF    NE    D    B    T    W    WF    HF    HAB    HAD    KF    KE    APF    ADF    GTOE    INT  HAND
    S/A    /    /    /    /    /    /    /    /    /    /    /    /    /    /    /         /

    S/A    /    /    /    /    /    /    /    /    /    /    /    /    /    /         /

N DEV    R_____    L_____    SN R_____    L_____    BOU R_____    L_____
N    R_____    L_____    BOUC N R_____    L_____    GRIP R_____    _____    REFLEX    B    T    K    A
                                                                                                R
                                                                                                L

RAY
ENT _____  LUNG  CLEAR  HEART _____  ABD _____  SKIN _____

E/E PIPR |___|___|___|___| L |___|___| MCPR |___|___|___|___| L |___|___|
    WT  20    T 97.6    P    145    SS
                                    161

— WOODLEY, RUFUS R.
— 8/15/06

This patient is here toady for follow-up of
his ankylosing spondylitis and osteoarthritis.
He is self-administering Enbrel.    He is
extremely happy.  He does not have any SAE
with respect to the medications.   He denies
URI, UTI, cough, congestion or PIR.   In short,
he does not have any SAE.

IPMH:    Unremarkable for medical or surgical
intervention.

FHx:  Non-contributory.

PE:    His peripheral joint exam shows DJD
manifesting with Heberdens and Bouchards.   He

CONT

DATE: 1 31 06   CHIEF COMPLAINT

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
L  3   HELP
       INDE

MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
YES
NO

OTHER

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| L  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV   R _____ L _____   SN R _____ L _____   BOU R _____ L _____
HBN   R _____ L _____   BOUC N R _____ L _____   GRIP R _____ L _____   REFLEX  B  T  K  A
                                                                                      R
                                                                                      L

RAY _____
EENT _____   LUNG _____   HEART _____   ABD _____   SKIN _____
THER _____

F/E PIPR |   |   |   |   | L |   |   | MCPR |   |   |   | L |   |   |

WOODLEY, RUFUS R.
1/31/06

This patient is here today for follow-up of
his ankylosing spondylitis for which he is now
taking Enbrel, 15 mg subcu, as a monotherapy.
He is doing excellently.  He is very happy.
He says he used to have a lot of back problems
when he was not taking any medicine until he
got this medicine on board.  Since then at
times he is aware of some discomfort in his
back but he doesn't have any pain that wakes
him up and he is resting well.  The quality of
life has improved considerably.

IPMH since the last visit with me is
remarkable for dental work for which he had to
take antibiotics for a while.

F/E R
F/R R
F/A R
F/I/E R
L

DATE: 1/31/06    CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR

LI    ;    HELP
INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM

YES

NO

OTHER _____

| MUSCLES | NF | NE | D |
|---|---|---|---|
| R    S/A | / | / | / |
| L    S/A | / | / | / |

ULN DEV    R_____

HBN    R_____ L___

X RAY_____

HEENT_____ L

OTHER_____

WELL BEING
INT HAND
/
_____
/
_____
_L_____
:FLEX  B  T  K  A
R
L

Otherwise he did not have any URI, UTI, cough, congestion or PIR.  In short, he did not have any SAE in regard to his Enbrel.

PE:  He has very good range of motion of every single small, medium and large size joint of the upper and lower extremities on both sides of the body.  Chest, heart and abdominal exams are unremarkable.

SH:  Remarkable for him working around the house.  Although he is not employed, he does do some tax preparation work.

ASSESSMENT/PLAN:
(1) Ankylosing spondylitis - under good control with improvement of the quality of

life and improvement of the mobility of the spine.
(2) Osteoarthritis - appropriate for age.
(3) Monitoring the side effects of medicine.

I checked CBC, liver panel and creatinine.

I will see him back in 6 months for re-evaluation.

Sohrab Fallahi/ef

W F/E R___/___ L___/___
E F/R R___/___ L___/___
K F/E R___/___ L___/___
S I/A R___/___ L___/___
HPF/I/E R   /   /
L   /   /

2 of 2 end RR

DATE: 7/12/05   CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
LVG   HELP
   INDE

MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
   YES
   NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| L   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV   R_____ L_____ SN R_____ L_____ BOU R_____ L_____
HBN   R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
   R
   L

X RAY _____
HEENT _____ LUNG _____ HEART NSR _____ ABD soft _____ SKIN _____
OTHER _____

F/E PIPR |||||||| L ||||| MCPR ||||||| L ||||

WT) 193   T) 97   P) 64   B/P) 134/61

Went to Kirkland Clinic
for kidney problem, they
(Dr at Kirkland Clinic) did
Not find anything wrong with
at least healt domen

W F/E R __/__ L __/__
E F/R R __/__ L __/__
K F/E R __/__ L __/__
S I/A R __/__ L __/__
HPF/I/E R __/__
   L __/__

WOODLEY, RUFUS R.
7/12/05

This patient is here today for follow-up of
his ankylosing spondylitis for which he is now
taking monotherapy with Enbrel once weekly.
He is not taking any NSAIDs.

IPMH since the last visit is remarkable for
him being found to have elevation of his
creatinine. For that reason he was sent to
Birmingham and he saw a nephrologist in
Kirklin Clinic. By then his creatinine had
come down. He attributes that problem to the
heavy work that he did with painting and with
physical activity that went on for 3 weeks or
so. Now they have told him that his kidney is

DATE:_____

C: coming back to normal. He assured me that he was not taking any kind of NSAID.

AM STIFF _____ SLEEP ___

ACT OF DAILY    DRESS    E

LI    3    HELP

    INDE

DOOR

With careful inquiry he denies any URI, UTI, cough, congestion or PIR. In short, he did not have any SAE in regard to his Enbrel. He thinks that the Enbrel really helped his back and now he feels better than he did before.

MED TOX    RASH    MULCER

    YES

    NO

EDEM

OTHER _____

MUSCLES    NF    NE    D    B

R    S/A    /    /    /

    S/A    /    /    /

PE:    Peripheral    joint    exam    shows osteoarthritis manifesting with Heberdens and Bouchards and bony hypertrophy of the knees, but his mobility is fine. The cardiopulmonary exam is unremarkable.

T HAND

    /

    /

LN DEV    R_____

BN    R_____    L_____

ASSESSMENT/PLAN:
(1) Ankylosing    spondylitis    -    stable    at    the present time.

EX    B    T    K    A
    R
    L

RAY_____

EENT_____    L

THER_____

I advised him to continue taking the Enbrel on a weekly basis.

(2) History of renal failure.

I    will    check    his    creatinine    and    liver function.

I    will    see    him    back    in    6    months    for    re-evaluation.

                    Sohrab Fallahi/ef

E R___/___ L_
R R___/___ L___/___
E R___/___ L___/___
A R___/___ L___/___
E R    /    /
    L    /    /

DATE: 3/8/05     CHIEF COMPLAINT _____

AM STIFF _____     SLEEP _____     WELL BEING  B  W  S

ACT OF DAILY     DRESS     BATHE     DRIVE     HWORK     CHAIR     CANE     WALKER     BUTT     DOOR
I     G     HELP
         INDE

MED TOX     RASH     MULCER     ALOPECIA     COUGH     SOB     NAUSEA     DIAR     ABD PAIN     HA     EDEM
     YES
     NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---------|----|----|---|---|---|---|----|----|-----|-----|----|----|-----|-----|------|----------|
| R   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| L   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV     R_____ L_____     SN R_____ L_____     BOU R_____ L_____

HBN     R_____ L_____     BOUC N R_____ L_____     GRIP R_____ L_____     REFLEX  B  T  K  A
                                                                                                      R
                                                                                                      L

X RAY _____

HEENT _____     LUNG_____     HEART_____     ABD_____     SKIN_____

OTHER _____

F/E PIPR |  |  |  |  | L |  |  |  | MCPR |  |  |  | L |  |  |

Wt 196   BP 141/64   P 66   T 97.5

WOODLEY, RUFUS R.
3/8/05

This patient is here today for follow-up of
his ankylosing spondylitis for which he is
taking the combination of Enbrel and
Azulfidine twice daily. He is doing very well
in respect to the symptoms. He has
practically no morning stiffness or night
pain. Since he decreased the Azulfidine to
two tablets daily he has not gotten any worse.

ROS: There are no stigmata of inflammatory
process now.

PE: His mobility is fine. His peripheral
joint exam shows DJD manifesting with

F/E R___/___ L___/___
F/R R___/___ L___/___
F/E R___/___ L___/___
I/A R___/___ L___/___
PF/I/E R ___/___
       L ___/___

DATE: 3-8-05    CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY    DRESS    BATHE                                          DOOR

LI G    HELP
        INDE                    Heberdens  and  Bouchards.  Back  exam  is
MED TOX  RASH  MULCER  AL  unremarkable.                                EDEM
        YES
        NO                     ASSESSMENT/PLAN:
OTHER _____            Ankylosing  spondylitis  -  under  excellent
MUSCLES  NF  NE  D  B  T       control with Enbrel and Azulfidine.        AND
R  S/A   /   /   /  /  /                                                  /
                              I advised him to stop taking the Azulfidine.
L  S/A   /   /   /  /  /       We are hoping the Enbrel alone will take care  /
                              of  the  problem.  I  will  do  the  blood  test
                              today.  I will see him back in 4 months for
ULN DEV  R_____ L____      re-evaluation.
HBN  R_____  L_____ BOU                    Sohrab Fallahi/ef        B T K A
                                                                          R
                                                                          L
                                                                          —
X RAY _____
HEENT _____ LUNG _____                                           _____
OTHER _____                                            _____
                                                                         ─┼─┼─┼─
            F/E PIPR

V F/E R___/___ L___/___
 E F/R R___/___ L___/___
  F/E R___/___ L___/___
  I/A R___/___ L___/___
IPF/I/E R   /   /
       L   /   /

DATE: 11/2/04    CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING  B W S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR
LI  :    HELP
        INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
    YES
    NO
OTHER _____

MUSCLES    NF    NE    D    B    T    W    WF    HF    HAB    HAD    KF    KE    APF    ADF    GTOE    INT HAND
R    S/A    /    /    /    /    /    /    /    /    /    /    /    /    /    /    /    /
L    S/A    /    /    /    /    /    /    /    /    /    /    /    /    /    /    /    /

ULN DEV    R _____ L _____    SN R _____ L _____    BOU R _____ L _____
HBN    R ___ L ___    BOUC N R ___ L ___    GRIP R ___ L ___    REFLEX    B  T  K  A
                                                                            R
                                                                            L

X RAY _____
HEENT _____    LUNG _____    HEART _____    ABD _____    SKIN _____
OTHER _____

F/E PIPR |  |  |  | L |  |  | MCPR |  |  |  | L |  |
Wt 193    BP 114/66    P 80    T 96.3

WOODLEY, RUFUS R.
11/2/04

This patient is here today for follow-up of
his ankylosing spondylitis for which he is now
taking a biological agent, i.e. Enbrel, and he
is still on 2 grams of sulfasalazine. To both
of these he has a very good response.  Since
he has started the Enbrel he has improved
considerably as far as the quality of life
goes.  He has much less morning stiffness and
practically none.  He has no night pain
whatsoever.  He has degenerative arthritis of
the peripheral joints.

ROS:  He does not have any SAE like cough,
congestion, bronchitis or sinusitis.

DATE:_____CHIEF COMPLAINT _____ 11-2-0

AM STIFF _____ SLEEP __    WELL BEING B W S

ACT OF DAILY    DRESS                                                    T    DOOR

IN    J    HELP

      INDE

MED TOX    RASH    MULCEF

      YES

      NO

OTHER _____

MUSCLES    NF    NE    D    B

      S/A    /    /    /    /

      S/A    /    /    /    /

LN DEV    R_____ l

BN    R_____ L_____

RAY_____

EENT_____LUNG_

THER_____

                            F/E

**PE:** His peripheral joint exam shows degenerative arthritis manifesting with Heberdens and Bouchards. His mobility is fine without assistive device. Chest, heart and abdominal exams are unremarkable.

**ASSESSMENT/PLAN:**
(1) Ankylosing spondylitis – under very good control.

He is doing so well on biological agents that I think it would be prudent for his sulfasalazine to be decreased gradually. To that end I advised him to take only 1 gram daily.

(2) Monitoring the side effects of sulfasalazine.

—I checked CBC, liver panel and creatinine.
—
_I will see him back in 3-4 months for re-evaluation.

                            Sohrab Fallahi/ef

                            2 of 2
                            End FR

EDEM

HAND

/

/

B T K A

R

L

L

F/E R__/___ L___/___
F/R R__/___ L___/___
F/E R__/___ L___/___
A R__/___ L___/___
F/I/E R    /    /
      L    /    /

DATE: 5-10-04    CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING  B  W  S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR

LI  3    HELP
         INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
    YES
    NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| L  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV    R_____ L_____    SN R_____ L_____    BOU R_____ L_____

HBN   R_____ L_____    BOUC N R_____ L_____    GRIP R_____ L_____    REFLEX  B  T  K  A
                                                                                            R
                                                                                            L

X RAY _____

HEENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____

OTHER _____

F/E PIPR | | | | | | L | | | | | MCPR | | | L | | |

WT 196    BP 130/64    P 62    Temp 96.6

PMH/ 5-04, urine test showed
kidney problem, by d W/berg,
who sent me to Dr. Krissaman
Kirkland Clinic, nephrologist
she did not have enough
evidence, but stay away from
nonsteroidals. He says
I want to go to Pa clinic
had U/S of Kidneys. had 24
hour protein

WOODLEY, RUFUS R.
8/10/

DATE: 8/10/04

AM STIFF _____ SL
ACT OF DAILY DRES
L    G    HELP
          INDE

MED TOX   RASH  M
      YES
      NO
OTHER _____
MUSCLES  NF  NE  I
R   S/A    /   /   /

L   S/A    /   /   /

ULN DEV   R_____
HBN  R_____ L__

X RAY_____
HEENT_____LU
OTHER_____

BUTT    DOOR

HA    EDEM

INT HAND
    /

    /

L_____
FLEX  B  T  K  A
      R
      L

W F/E R___/___ L__/
E F/R R___/___ L__/
K F/E R___/___ L__/
S I/A R___/___ L__/
HPF/I/E R   /   /
        L   /   /

This patient is here today for follow-up of his ankylosing spondylitis for which he is taking Azulfidine, four daily. He was taking different kinds of NSAIDs.

IPMH since the last visit is remarkable for him being off the NSAID because of the "kidney problem," he says. Apparently he describes that Dr. Wybenga found some abnormality in the kidney and sent him to a nephrologist in Birmingham Kirklin Clinic. It was a month later before he was evaluated by that nephrologist and her evaluation showed that whatever problem he had was resolved. Nevertheless, he was advised by the nephrologist, he says, that he should not take any NSAIDs.

Since he has stayed away from NSAIDs his pain has gotten a whole lot worse. He is now having so much pain that he is seeking some advice from a pain clinic. I explained to him that his problem with ankylosing spondylitis is nothing the pain clinic can help with. He remembers that he was advised about Enbrel and is going to find out from his insurance whether or not they provide that. After that we have to prepare him with a TB test. He understands the dos and don'ts with Enbrel. I still discussed this with him in depth and the potential risks of that, including increased risk of infectious process, were explained. I gave him a prescription to take to his insurance company to see if they provide this or not. In case he gets the medicine he is to bring it here and we will teach him how to get it. Also, we will check a PPD skin test at that time. In the meanwhile he is to continue Azulfidine but stay away from NSAIDs.

In order to monitor the potential risks of Azulfidine, I checked CBC, liver panel and creatinine. I tentatively plan to see him back in one month for re-evaluation.

Sohrab Fallahi/ef

Cc: Dr. Wybenga

DATE: 04 06 04    CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR

LIV S    HELP
         INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
    YES
    NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | |
| L  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | | / |

ULN DEV    R_____ L_____    SN R_____ L_____ BOU R_____ L_____
HBN    R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____    REFLEX  B  T  K  A
                                                                                                R
                                                                                                L

X RAY _____
HEENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____
OTHER _____

F/E PIPR |  |  |  |  |  |  | L |  |  | MCPR |  |  | L |  |  |

wt 198    B/P 147/59    P 74    T 96°

off Vioxx → swelly

WOODLEY, RUFUS R.
4/6/04

This patient is here today for follow-up of
his ankylosing spondylitis for which he is now
taking Bextra. He used to be taking Vioxx
with good results. However, that made him
swell up. Dr. Wybenga appropriately took him
off of that. He called us and we gave him
samples of Bextra and he is taking 10 mg
daily. Up until yesterday he thought the
Bextra was not helping but today he is
somewhat better. He has taken it for only 4
days and he would like to give it a little
more time.

FHx: No change.

DATE:_____
AM STIFF _____ SLE
ACT OF DAILY    DRESS
I'''NG    HELP
          INDE
MED TOX   RASH   MU
    YES
    NO
OTHER _____
MUSCLES   NF   NE   D
R    S/A    /    /    /
L    S/A    /    /    /

ULN DEV    R_____
HBN   R_____L__

X RAY_____
HEENT_____
OTHER_____

F/E R___/___ L___/___
F/R R___/___ L___/___
F/E R___/___ L___/___
I/A R___/___ L___/___
PF/I/E R    /    /
        L    /    /

SH: No., contributory.

ROS: I carefully inquired to see if he might have any AE to his existing medications and the answer seems to be negative.

PE: Peripheral joint exam shows OA manifesting with Heberdens and Bouchards. He does not have any inflammatory process. He has OA manifesting with Heberdens and Bouchards. His back exam is unremarkable. He continues to have difficulty with his back with prolonged morning stiffness.

ASSESSMENT/PLAN:
(1) Ankylosing spondylitis - stable with partial remission - on Azulfidine and Bextra.
(2) Osteoarthritis - on Bextra.

(3) Monitoring the side effects of Azulfidine and NSAIDs.

I checked CBC, liver panel and creatinine.

He is now seriously considering taking the Enbrel. He is going to check with his insurance company. If they give the okay he is to get back with us and we will prepare him logistically by checking his chest x-ray and doing a PPD skin test, I discussed with him and elaborated on that.

At this time I have given him samples of Mobic to take one daily only if he thought the Bextra was not helping. Otherwise he should continue taking the Bextra. (I, clearly

explained that he should not mix the Bextra and Mobic.)

I will see him back in 4 months for re-evaluation.

Sohrab Fallahi/ef

BUTT    DOOR

HA    EDEM

INT HAND
    /

    /

    L
EFLEX  B  T  K  A
       R
       L

L

DATE: 12-01-03     CHI... ...MPLAINT _____

AM STIFF _____ SLEEP _____  WELL BEING ........

ACT OF DAILY     DRE                                              BUTT     DOOR

LI  ;     HELP          WOODLEY, RUFUS R.
          INDE          12/1/03                                  J   HA    EDEM

MED TOX   RASH         This patient is here today for follow-up of
     YES               his AS for which he is taking Azulfidine now.
     NO                He takes Vioxx.

OTHER _____                                              'E   INT HAND

MUSCLES   NF   NE     IPMH since the last visit is unremarkable.  He      /
R    S/A   /    /     has read extensively about Enbrel and would
                      like very much to take that.                        /
_    S/A   /    /
                      ROS:  I inquired to see if he might have any    __ L_____
ULN DEV    R_____    AE to his existing medications and the answer  REFLEX  B  T  K  A
HBN   R_____L_   seems to be negative.                                 R
                                                                            L
                      He did not have any nausea or vomiting.  In
X RAY_____     July he underwent cardiac cath and stint
HEENT_____    placement by Dr. Williams.
OTHER_____

...........|  |  |  |  |  |L  |‾|‾|‾|‾|MCPR|‾|  |  |  |L  |‾|‾|‾|
          W ZOY  BlP  11/8/ (oS  P  56        T97-5

          had a flu shot

          Cardiac Cath done Jnl ly

          D Williams

                      PE:   His  peripheral  joints  show  only
                      degenerative arthritis but not inflammatory
V F/E R__/__ L__/__   process.
E F/R R__/__ L__/__
C F/E R__/__ L__/__   As far as his AS is concerned, he still has
S I/A R__/__ L__/_.   some stiffness of his back.
NPF/I/E R   /    /
        L   /    /    The cardiopulmonary exam is unremarkable.

                      ASSESSMENT/PLAN:
                      (1) AS - in partial remission with Azulfidine.
                      (2) Monitoring the side effects of Azulfidine.

                      I checked CBC, liver panel and creatinine.

                      I extensively discussion with him about the
                      fact that the AS would be very responsive to

DATE:_____

AM STIFF _____ SLEE

ACT OF DAILY    DRESS

|‍ ‍    HELP
            INDE

MED TOX    RASH    MUL

    YES
    NO

OTHER _____

MUSCLES    NF    NE    D

R    S/A    /    /    /

    S/A    /    /    /

_____

ULN DEV    R_____

IBN    R_____ L____

RAY_____

EENT_____LUI

OTHER_____

TNF in general, Enbrel in particular, and advised him to consider that. He is worried about the price of the medicine and doesn't know if his insurance would let him have it or not. I also discussed with him about the alternative, considering methotrexate, and to that end I gave him information to read about methotrexate and brought to his attention that it was a cancer chemotherapy medicine with negative impact on the bone marrow and liver. I provided him with literature to read.

(3) Need for flu shot.

He assures me that it has been furnished already for this year.

F/E PIPR |  |  |  |  | L |  |  |  | MCPR |  |  |  | L |  |  |  |

_____

I will see him back in 4 months for re-evaluation. However, if the Enbrel is furnished he will have to have a PPD skin test, I explained, and also we need to teach him how to receive this medicine. I gave him a prescription for this. He is going to check with his insurance company.

                                        Sohrab Fallahi/ef

BUTT    DOOR

HA    EDEM

INT HAND
    /

    /

L_____
LEX B T K A
    R
    L

_____

V F/E R___/___ L___/___
    F/R R___/___ L___/___
    F/E R___/___ L___/___
    I/A R___/___ L___/___
PF/I/E R    /    /
    L    /    /

DATE: 7/28/03    CHIEF COMPLAINT

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR
LIV    ,    HELP
          INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
    YES
    NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R    S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV    R_____ L_____    SN R_____ L_____    BOU R_____ L_____
HBN    R_____ L_____    BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
                                                                                                    R
                                                                                                    L

E RAY _____
HEENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____
OTHER _____

F/E PIPR |  |  |  |  |  | L |  |  |  |  | MCPR |  |  |  | L |  |  |
WT 195    BP 140/65    Temp 97'

WOODLEY, RUFUS
7/28/03

This patient is here today for follow-up of
his ankylosing spondylitis for which he is now
taking the Sulfasalazine, 4 a day. He is on
Vioxx. He has a lot of shoulder pain. The
pain in the shoulder is consistent on a daily
basis and keeps him very uncomfortable. He is
worried about the possibility of a heart
problem and that is why he has seen Dr. John
Williams who is going to do a cardiac cath
tomorrow, he says.

ROS: I inquired to see if he might have any
AE to his existing medications and the answer
seems to be negative. He has a lot of morning

DATE:_____ CHIEF COMPLAINT _____
AM STIFF _____ SLEEP _____ WELL BEING  B  W  S
ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR
LIVING        HELP
              INDE
MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
      YES
      NO
OTHER _____

MUSCLES    NF    NE    D    B
R    S/A    /    /    /    /                    stiffness and still has pain in the shoulders        HAND
                                               and neck.                                              /
L    S/A    /    /    /    /
                                               PE:  His neck and back motion is limited.             /

ULN DEV    R_____  I
HBN    R_____  L____                       ASSESSMENT/PLAN:
                                               (1) Ankylosing spondylitis.                           B  T  K  A
                                               (2) Osteoarthritis.                                   R
X RAY_____                            (3)   Monitoring   the   side   effects   of          L
EENT_____LUNG_                           medications.
OTHER_____
                                               I checked CBC, liver panel and creatinine.

                              F/E              I discussed with him the option of using
                                               Enbrel.  We discussed the pros and cons and
                                               the potential risks vs benefits.  He said he
                                               was not that bad and did not want to try that.
                                               However, for educational purpose he was given

                                               information to take home and read.    I
                                               increased the Azulfidine to 6 a day now.   He
                                               is to continue Vioxx.

                                               I checked a blood test today and x-rayed his
                                               shoulder because he is hurting so much.    I
                                               will see him back in 4 months for re-
                                               evaluation, sooner if needed.

F/E R___/___ L___/___                          X-RAY READING:  Internal and external rotation
F/E R___/___ L___/___                          of the left shoulder shows OA of the AC
F/E R___/___ L___/___                          junction.
A R___/___ L___/___
F/I/E R    /    /                              Internal and external rotation of the right
      L    /    /                              shoulder shows OA of the AC junction.  The
                                               head of the humerus itself is round and
                                               smooth.

                                                              Sohrab Fallahi/ef

                                                              End of _____

DATE: 3·19·03 ___ CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR

IN    HELP
      INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
    YES
    NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

LN DEV    R_____ L_____ SN R_____ L_____ BOU R_____ L_____

BN    R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
                                                                                                    R
                                                                                                    L

RAY _____

EENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____

THER _____

F/E PIPR |  |  |  |  | L |  |  |  | MCPR |  |  |  | L |  |  |  |

197    $Cl_i^2$    130/70

F/E R ___/___ L ___/___
F/R R ___/___ L ___/___
F/E R ___/___ L ___/___
I/A R ___/___ L ___/___
PF/I/E R  /   /
        L  /   /

WOODLEY, RUFUS R.
3/19/03

This patient is here today for follow-up of his ankylosing spondylitis for which he is supposed to be taking 4 Azulfidine daily and Vioxx once daily. It turned out that he was taking only 3 Azulfidine. He says he is tired of taking so much medicine. His back, however, has started to hurt him more recently, he says.

IPMH since the last visit is unremarkable for medical or surgical intervention.

FHx:  Non-contributory.

SH:  Unchanged.

He takes several other medications for other purposes.

ROS:  I inquired and he has nothing to suggest that he might have a problem with taking the medications.

1st of 2 pages

DATE:_____
AM STIFF _____ SLEEP ____
ACT OF DAILY    DRESS    BA
LIVING    HELP
          INDE
MED TOX    RASH    MULCER
    YES
    NO
OTHER _____
MUSCLES    NF    NE    D    B
    S/A    /    /    /    /    /

    S/A    /    /    /    /

LN DEV    R_____ L
BN    R_____ L_____

RAY_____
EENT_____LUNG_
THER_____

F/E R___/___ L___/___
F/R R___/___ L___/___
F/E R___/___ L___/___
I/A R___/___ L___/___
PF/I/E R    /    /
    L    /    /

FU:  Peripheral joint exam is unremarkable. His mobility is fine without assistive device.

ASSESSMENT/PLAN:
(1) Lumbalgia - mostly due to ankylosing spondylitis.

This is in flare with him decreasing the number of Azulfidine. For that reason I suggested he increase the Azulfidine to 4 daily or consider taking methotrexate. We explained and elaborated on this. He decided to increase the Azulfidine to 4. He does not want to take the methotrexate. He is afraid of the side effects.

(2) Osteoarthritis - diffuse and reasonable responsive to Vioxx.
(3) Monitoring the side effects of medications.

I checked CBC, liver panel and creatinine.

I will x-ray his back today. I will see him back in 4 months for re-evaluation, sooner if needed.

X-RAY READING:  AP and lateral view of the lumbosacral spine shows normal looking pedicles. In the upper lumbar area he is developing classic bamboo spine.

Lateral view shows anterior fusion of the upper lumbar area with some osteoarthritic change in the lower part.

AP of the pelvis shows complete fusion of both sacroiliac joints indicative of bilateral sacroiliitis. Hip joints are fairly well preserved. There is x-ray evidence of OA of the hips.

Sohrab Fallahi/ef

DOOR

EDEM -

AND

B  T  K  A
R
L

F/E

MRA-12A

DATE: 11-19-02   CHIEF  1PLAINT

AM STIFF _Little_   SLEEP _N O N O_   WELL BEING B W S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
LIVING   HELP
   INDE

MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
   YES
   NO
OTHER

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT | HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | | / |
| L   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | | L |

ULN DEV   R_____   L_____   SN R_____   L_____   BOU R_____   L_____
IBN   R_____   L_____   BOUC N R_____   L_____   GRIP R _Good_  L _Good_   REFLEX B T K A
   R
   L

RAY
EENT_____LUNG_____HEART_____ABD_____SKIN_____
OTHER

F/E PIPR |—|—|—|—| L |—|—|—| MCPR |—|—|—| L |—|—|

Temp 96.1     Weight 196 lbs     Pulse 61     BP 158/78

— WOODLEY, RUFUS R.
— 11/19/02

This patient is here today for follow-up of his ankylosing spondylitis for which he is taking Azulfidine, 4 tablets a day. Since he finished his study with Celebrex he is on Vioxx, 25 mg daily. To that he has a good tolerance.

— IPMH since the last visit is unremarkable.

F/E R _90/80_ L _90/80_
F/E R _90/80_ L _90/80_
F/E R _90/70_ L _90/80_
I/A R _70/70_ L _70/78_
PF/I/E R   /   /
   L   /   /

— FHx:  Non-contributory.

— SH:  Remarkable for the fact that he is retired but he can do anything he wants including playing golf and all kinds of social activities.

— ROS:  I inquired to see if he might have any
— AE to his existing medications.  The answer
— seems to be negative, as the details have been
— hand marked on the ROS sheet by myself.

— PE:  The findings for the small, medium and
— large size joints of the upper and lower
— extremities on both sides of the body have
— been summarized in the chart in my handwritten
— note.

Cont'd

DATE:_____ CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR

'G    HELP    INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
        YES
        NO                                    cont'd 11-19-02                            AND

OTHER _____

| MUSCLES | NF | NE | D | B |
|---|---|---|---|---|
| R   S/A | / | / | / | / |
| L   S/A | / | / | / | / |

ULN DEV    R_____ L_
HBN    R_____ L_____

X RAY _____
HEENT _____ LUNG___
OTHER _____

F/E F

**ASSESSMENT/PLAN:**

(1) Ankylosing spondylitis – stable.

He is considering stopping his medicine, Azulfidine, for a while to find out if he gets worse or not. I discussed with him the pros and cons of this idea.

(2) Osteoarthritis.

He is taking Vioxx with good tolerance, which we will continue for the time being.

(3) Monitoring the side effects of medications.

I checked a CBC, liver panel and creatinine.

I will see him back in 4 months for re-evaluation, sooner if needed.

X-RAY READING: AP and lateral view of the neck shows severe OA of the apophyseal junction and subaxial area manifesting with degenerative disk disease and osteophyte formation. C1/C2 relationship is okay.
                        Sohrab Fallahi/ef

W F/E R__/__ L__/__
E F/R R__/__ L_____
K F/E R__/__ L__/__
S I/A R_____ L__/__
HPF/I/E R   /   /
      L   /   /

B T K A
R
L

MRA-1

DATE: 5/30/02    CHIEF COMPLAINT

AM STIFF _____ SLEEP _____ WELL BEING  B  W  S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR
LIVING        HELP
              INDE
MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
        YES
        NO
OTHER

MUSCLES    NF  NE  D  B  T  W  WF  HF  HAB  HAD  KF  KE  APF  ADF  GTOE  INT HAND
R    S/A    /   /   /  /  /  /   /   /    /    /   /   /    /     /     /         /
L    S/A    /   /   /  /  /  /   /   /    /    /   /   /    /     /

ULN DEV    R _____ L _____    SN R _____ L _____    BOU R _____ L _____
HBN    R ____ L ____    BOUC N R ____ L ____    GRIP R _____ _____ REFLEX  B  T  K  A
                                                                            R
                                                                            L

X RAY _____
HEENT _____    LUNG _____    HEART _____    ABD _____    SKIN _____
OTHER _____

F/E PIPR |   |   |   |   | L |   |   | MCPR |   |   | L |   |   |

Wt 191    Temp 96.5    BP 146/70

WOODLEY, RUFUS R.
5/30/02

This patient is here today for follow-up of
his ankylosing spondylitis, which is
responding very nicely to Vioxx and
Azulfidine; however, he has heard about the
negative publicity against Vioxx in the news
media and he would like to change the
medicine.    Since he heard this negative
publicity he thinks he might have some
headache.  I inquired and he did not have any
stomach problems or rash.   He denies any
edema.

PE:  He has a very good range of motion of all
the small, medium and large size joints of the
upper and lower extremities.    Mobility is
fine.   He has OA manifesting with Heberdens
and Bouchards and bony overgrowth of the
knees.   Chest, heart and abdominal exams are
unremarkable.

ASSESSMENT/PLAN:
(1) OA - diffuse and stable - responsive to
Vioxx.
(2) Ankylosing spondylitis - responsive to
Azulfidine and Vioxx.

F/E R 70,60,70,60
F/R R L
F/E R L
I/A R
PF/I/E R    /    /
       L   /    /

DATE:_____CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR

L'  'G    HELP
         INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM

     YES
     NO

OTHER _____

| MUSCLES | NF | NE | D | B |
|---|---|---|---|---|
| R  S/A | / | / | / | / |
| L  S/A | / | / | / | / |

ULN DEV    R_____

HBN  R_____L_____

X RAY_____

HEENT_____LUNG_

OTHER_____

He wants to change the Vioxx and we offered
for him to participate in a study for Celebrex
vs Naprosyn on ankylosing spondylitis.  He is
going to consider that.  If he gets on that
study, fine, otherwise, we will put him on
Celebrex or Bextra, we discussed in depth.
(3)  Monitoring the side effects of
medications.

I checked a CBC, liver panel and creatinine.

I will see him back in 4 months for re-
evaluation, sooner if needed.

F/L ......                        Sohrab Fallahi/ef

INT HAND

X B T K A
     R
     L

W F/E R___/___ L___/___
E F/R R___/___ L___/
X F/E R___/___ L___/___
S I/A R___/___ L___/___
HPF/I/E R   /   /
        L   /   /

AM STIFF _____ SLEEP
ACT OF DAILY    DRE
LIVING    HELP
    INDE
MED TOX    RASH   I
    YES
    NO
OTHER _____
MUSCLES   NF   NE
R   S/A   /   /

    S/A   /   /

ULN DEV   R_____
MBN   R_____ L_

RAY_____
EENT_____
OTHER_____

BUTT    DOOR

HA    EDEM

E   INT HAND
    /

    /

    L
REFLEX   B  T  K  A
    R
    L

WOODLEY, RUFUS R.
12/21/01

This patient is here today complaining of low
back pain and stiffness.  He has ankylosing
spondylitis.  He also complains of right heel
numbness and some soreness.  The numbness is
more than the soreness, he says.  This is off
and on and sometimes mostly when he stands up.

This gentleman has ankylosing spondylitis and
takes Azulfidine, 1000 mg b.i.d.  He is on
Vioxx.  So far he is OK and can get by, but he
is not definitely sure if the combination has
helped him or not.  On the other hand, he is
quick to say he doesn't know how he would be
if he didn't take it and he wants to continue
it.

P/E PIPR|   |   |   |    |L   |   |   |   |MCPR|   |   |   |   |L|   |   |   |
207 lbs . 96.5 . 138/62
had a flu shot.

IPMH since  the  last  visit  with  me  is
unremarkable   for   medical   or   surgical
intervention.

FHx/SH:  Non-contributory and unchanged.

ROS:  I inquired to find out if he has any
problem with the medicine and the answer seems
to be negative.  He denies bladder or bowel
dysfunction.

PE:  His mobility is without assistive device.
Peripheral joint exam shows a very good range
of  motion  without  inflammatory  process.
Chest,  heart  and  abdominal  exams  are
unrevealing.

F/E R___/___ L___/___
F/E R___/___ L___/___
F/E R___/___ L___/___
I/A R___/___ L___/___
PF/I/E R   /   /
    L   /   /

DATE: ___ 12 ___   CHIEF   IMPLANT _____

AM STIFF _____   SLEEP ___   WELL BEING B. W. S.

ACT OF DAILY ____ DRI

LIVING      HELP
            INDE

MED TOX    RASH
    YES
    NO
OTHER _____
MUSCLES   NF   NE
    S/A    /    /

    S/A    /    /

LN DEV    R_____
BN   R_____ L_

RAY_____
EENT_____
THER_____

F/E R___/___ L___/___
F/R R___/___ L___/___
F/E R___/___ L___/___
/A R___/___ L___/___
F/I/E R    /    /
       L   /    /

BUTT     DOOR

I  HA   EDEM

E   INT HAND
        /

        /

__ L_____
REFLEX  B  T  K  A
        R
        L

—| L —|—|—|

The ankle joint is fine. There is no atrophy in the heel area and no cellulitis.

ASSESSMENT/PLAN:
(1) Lumbalgia due to ankylosing spondylitis.
(2) Heel pain and numbness due to spinal stenosis. (He had an MRI of the back in 1998 showing this problem.)

This is due to his ankylosing spondylitis.

(3) Osteoarthritis - appropriate for age.
(4) Monitoring the side effects of medicine.

I checked a CBC, liver panel and creatinine.

I discussed my views with him. Since he is not a surgical candidate and can easily cope

with the heel numbness, we are not going to change the medicine right now or do any surgical procedure. I tentatively plan to see him back in 4 months for re-evaluation.

X-RAY READING: AP of the pelvis shows normal cartilage of the hip joints. SI joints seem to be fused bilaterally. This is typical for ankylosing spondylitis. Sacral bone is intact.

In the thoracolumbar area on the AP view the patient has typical bamboo spine. Lateral view shows anterior fusion of the thoracolumbar spine, again typical for ankylosing spondylitis.

The right heel x-ray shows no spur and no lytic or blastic lesion.

_____ Sohrab Fallahi/ef

DATE: 6·25·01    CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING  B  W  S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR

LIV.    HELP

INDE

MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM

YES

NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---------|----|----|---|---|---|---|----|----|-----|-----|----|----|-----|-----|------|----------|
| R   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV  R ___ L ___  SN R ___ L ___  BOU R ___ L ___
IBN  R ___ L ___  BOUC N R ___ L ___  GRIP R ___ L ___  REFLEX  B  T  K  A
R
L

RAY _____
EENT _____   LUNG _____   HEART _____   ABD _____   SKIN _____
OTHER _____

F/E PIPR ║║║║║ L ║║║║ ║MCPR ║║║║ L ║║║

Wt 201    Temp 92.2    BP 130/60

_Daw D Newman_
_& D w/bengos.3-01_

WOODLEY, RUFUS
6/25/01

This patient is here today.  He is doing very
well.  He has ankylosing spondylitis for which
he is taking Azulfidine.    For OA he takes
Vioxx.  He has a very good tolerance to both
of those.

IPMH  since  the  last  visit  with  me  is
unremarkable.

ROS:  I inquired and he does not have any side
effects.  He is very active playing golf four
times a week and piddles around the house.

PE:  He has a very good range of motion of all
the small, medium and large size joints of the

_cont'd_ ↓

DATE:_____ CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR

'NG   HELP
INDE
MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
YES
NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---------|----|----|---|---|---|---|----|----|-----|-----|----|----|-----|-----|------|----------|
| R   S/A | /  | /  | / | / | / | / | /  | /  | /   | /   | /  | /  | /   | /   | /    | /        |
| L   S/A | /  | /  | / | / | / | / | /  | /  | /   | /   | /  | /  | /   | /   |      | /        |

ULN DEV   R_____   L_____   SN R_____   L_____   BOU R_____   L_____

HBN   R_____   L_____   BOUC N R_____   L_____   GRIP R_____   L_____   REFLEX B T K A
R
L

X RAY_____

HEENT_____LUNG____

OTHER_____

F/E PI



W F/E R___/___ L___/___
E F/R R___/___ L___/___
K F/E R___/___ L___/___
S I/A R___/___ L___/___
HPF/I/E R   /   /
L   /   /

Cont'd 10-25-01

upper and lower extremities on both sides of
the body.  He has some soreness in the lower
part of the back.  Chest, heart and abdominal
exams are unremarkable.

ASSESSMENT/PLAN:
(1) Lumbalgia – mostly due to ankylosing
spondylitis that is stable at the present
time.
(2) Monitoring the side effects of
medications.

I checked a CBC, liver panel and creatinine.

(3) Osteoarthritis – responsive to Vioxx.

I will see him back in six months for re-
evaluation, sooner if needed. SOHRAB FALLAHI/ef

MRA-12

DATE: 12-19-00          CHIE  OMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR

I    'G    HELP
        INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
    YES
    NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| L  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV    R_____    L_____    SN R_____    L_____    BOU R_____    L_____

HBN    R_____    L_____    BOUC N R_____    L_____    GRIP R_____    L_____    REFLEX  B  T  K  A
                                                                                                            R
                                                                                                            L

X RAY _____

HEENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____

OTHER _____

F/E PIPR |——|——|——|——| |L——|——|——|——| |MCPR|——|——|——| |L——|——|——|

W̶ 198    ,    T. 97        BP. 118/60

Had a flu shot 2 wks ago

V F/E R __/__ L __/__
F/R R __/__ L __/__
F/E R __/__ L __/__
I/A R __/__ L __/__
PF/I/E R  /  /
       L  /  /

WOODLEY, RUFUS R.
12/19/00

This patient is here today. He does not have
any particular complaint. He has ankylosing
spondylitis and OA. He takes Azulfidine and
Vioxx and is very pleased.

IPMH since the last visit with me is
unremarkable for medical or surgical
intervention.

FHx/SH: Non-contributory.

ROS: There is nothing to suggest inflammatory
process.

PE: He has a very normal chest without rale,
rhonchi or wheeze. Heart sounds are normal
without gallop, murmur or rub. The abdomen is
soft and benign.

Joint exam shows evidence of degenerative
arthritis manifesting with Heberden and
Bouchard nodes but there is no inflammatory
process.

DATE:_____  CHIEF  COMPLAINT

AM STIFF _____  SLEEP _____  WELL BEING B W S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR

L'...'G   HELP
          INDE
MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
    YES
    NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---------|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
| R  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| L  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV   R_____ L_____  SN R_____ L_____ BOU R_____ L_____ REFLEX B T K A

HBN  R_____ L_____  BOUC N R_____ L_____ GRIP R_____ L_____               R

                                                                                                        L

cont'd 12-19-00                                                                                          —

X RAY_____

HEENT_____LUNG__

OTHER_____

F/E F

**ASSESSMENT/PLAN:**
(1) Ankylosing spondylitis - stable and responsive to current medications.
(2) Osteoarthritis - on Vioxx.
(3) Monitoring the side effects of medications.

I checked a CBC, liver panel and creatinine.

I will see him back in four months for re-evaluation.

Sohrab Fallahi/ef

W F/E R___/___ L___/___
E F/R R___/___ L___/___
K F/E R___/___ L___/___
S I/A R___/___ L___/___
HPF/I/E R   /   /
      L   /   /

MRA-12A

ATE: 8-15-00    CHIEF COMPLAINT _____

M STIFF _____ SLEEP _____ WELL BEING  B W S

CT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR

V'        HELP
          INDE

ED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
          YES
          NO
THER _____

| USCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|--------|----|----|----|----|----|----|----|----|-----|-----|----|----|-----|-----|------|----------|
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

LN DEV    R ____    L ____    SN R ____    L ____    BOU R ____    L ____    REFLEX    B T K A
BN    R ____    L ____    BOUC N R ____    L ____    GRIP R ____    L ____                    R
                                                                                              L

RAY _____
EENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____
THER _____

F/E PIPR |  |  |  |  |  | L |  |  | MCPR |  |  |  | L |  |  |

8-15-00  WT 200  BP 12/64  Temp 973

WOODLEY, RUFUS R.
8/15/00

This patient is here today. He is happy as long as he takes his Vioxx and Azulfidine. That has been controlling his ankylosing spondylitis. He has no inflammatory process.

IPMH since the last visit with me is unremarkable for medical or surgical intervention.

FHx/SH:  Non-contributory.

ROS:  Specific inquiries were directed towards the potential side effects of medications on different organ systems. He does not seem to have any problem.

PE:  His peripheral joint exam shows OA but no inflammatory process. His mobility is fine without assistive device.

ASSESSMENT/PLAN:
(1) Osteoarthritis - diffuse.
(2) Ankylosing spondylitis - stable.
(3) Monitoring the side effects of medications.

I checked a CBC, liver panel and creatinine.

I will see him back in four months for re-evaluation.
                                Sohrab Fallahi/ef

/ F/E R ___/___ L ___/___
F/R R ___/___ L ___/___
F/E R ___/___ L ___/___
1/A R ___/___ L ___/___
PF/I/E R ___/___
        L ___/___

E N D

DATE: 4/11/00   CHIEF COMPLAINT

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
LIVING   HELP
         INDE

MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
   YES
   NO
OTHER

MUSCLES   NF   NE   D   B   T   W   WF   HF   HAB   HAD   KF   KE   APF   ADF   GTOE   INT HAND
R    S/A   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /

     S/A   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /

ULN DEV   R_____ L_____   SN R_____ L_____   BOU R_____ L_____

IBN   R_____ L_____   BOUC N R_____ L_____   GRIP R_____ L_____   REFLEX  B  T  K  A
                                                                                            R
                                                                                            L

RAY _____
EENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____
OTHER _____

F/E PIPR |  |  |  |  |  |L|  |  |  |  |MCPR|  |  |  |  |L|  |  |  |

W = 202    T = 96²    BP 123/83    P = 73

- WOODLEY, RUFUS.
- 4/11/00

- This patient is here today. He does not have any
  particular complaint. He has AS and takes Azulfidine
- and Vioxx, 12.5 mg daily.

- FHx:   Non-contributory.

- SH:   Remarkable for the fact that he plays golf three
- days a week. He can keep up with that.

- ROS:   Specific inquiries were directed towards the
- potential side effects of medications on different
  organ systems as the details have been handmarked on
- the ROS sheet by myself. He does not seem to have any
- problems.

- PE:   The findings for the small, medium and large size
  joints of the upper and lower extremities on both sides
- of the body have been summarized in the chart in my
- handwritten note. His mobility is fine without
  assistive device. The chest, heart and abdominal exams
- are unremarkable.

- ASSESSMENT/PLAN:
- (1) OA - diffuse.
- (2) Ankylosing spondylitis - stable on Azulfidine and
       Vioxx.

- I increased the dose of Vioxx to 25 mg because he still
- has some residual pain which is a combination of his OA
  and AS.

cont'd

ATE:_____ CHIEF ○ ⊃LAINT _____
M STIFF _____ SLEEP _____ WELL BEING B W S
CT OF DAILY  DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
VI∿    HELP
       INDE
ED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
    YES
    NO
THER _____
USCLES   NF   NE   D   B   T   W   WF   HF   HAB   HAD   KF   KE   APF   ADF   GTOE   INT HAND
   S/A   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /           /

   S/A   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /           /

N DEV   R_____ L_____ SN R_____ L_____ BOU R_____ L_____
BN   R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
                                                                                        R
                                                                                        L
RAY_____
EENT_____ LUN⌐    *Cont'd 4-11-00*
THER_____          especially with combination of NSAIDs and
                        Azulfidine.

                        For that I checked a CBC, liver panel and creatinine.

                        I will see him back in four months for re-evaluation.
                                                  Sohrab Fallahi/ef

F/E R___/___ L___/___
F/R R___/___ L___/___
F/E R___/___ L___/___
I/A R___/___ L___/___
F/I/E R___/___ L___/___
     L___/___

DATE: 10/12/99    CHIEF COMPLAINT

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY  DRESS  BATHE  DRIVE  HWORK  CHAIR  CANE  WALKER  BUTT  DOOR
LIV 3    HELP
         INDE

MED TOX  RASH  MULCER  ALOPECIA  COUGH  SOB  NAUSEA  DIAR  ABD PAIN  HA  EDEM
  YES
  NO
OTHER

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

LN DEV  R_____ L_____ SN R_____ L_____ BOU R_____ L_____
BN  R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
                                                                                    R
                                                                                    L
RAY_____

EENT_____LUNG_____HEART_____ABD_____SKIN_____

THER_____

F/E PIP R |  |  |  | L |  |  |  | MCP R |  |  |  | L |  |  |

10-12-99 wt 198 BP 110/68 Temp 92.6

WOODLEY, RUFUS R.
10/12/99

This patient is here today. He is doing fairly well as
long as he takes the Voltaren and Cytotec to which he
has a good tolerance. He takes Azulfidine. He has
been off of it for the past week or two only because he
ran out of the medicine. He wants to try Cox II
inhibitors but he knows that Maxwell doesn't carry
that. He is hoping that Cox II inhibitors will take
the place of the Voltaren and Cytotec combined so that
he doesn't have to take so much medicine, he says.

IPMH since the last visit with me is unremarkable for
medical or surgical intervention.

FHx/SH:  Non-contributory.

ROS:  Specific questions were directed towards the
potential side effects of Voltaren, especially on the
GI tract. He does not have any problems with his
medications.

PE:  The peripheral joint exam shows a very good range
of motion of all the small, medium and large sized
joints of the upper and lower extremities on both sides
of the body. His mobility is fine without assistive
device. Back motion is fine.

ASSESSMENT:
(1) Ankylosing spondylitis - stable at the present time
    with NSAID alone.

We will continue that. I gave him a sample of

F/E R  /  L  /
F/R R  /  L  /
F/E R  /  L  /
I/A R  /  L  /
F/I/E R  /  /
    L  /  /

| AM STIFF | | SLEEP | | WELL BEING B W S | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ACT OF DAILY | DRESS | BATHE | DRIVE | HWORK | CHAIR | CANE | WALKER | BUTT | DOOR |
| LIVING | HELP | | | | | | | | |
| | INDE | | | | | | | | |

| MED TOX | RASH | MULCER | ALOPECIA | COUGH | SOB | NAUSEA | DIAR | ABD PAIN | HA | EDEM |
|---|---|---|---|---|---|---|---|---|---|---|
| YES | | | | | | | | | | |
| NO | | | | | | | | | | |
| OTHER | | | | | | | | | | |

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

LN DEV  R_____ L_____ SN R_____ L_____ BOU R_____ L_____
BN  R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
R

This would take the place of Voltaren and Cytotec combined. I explained this to him.

XRAY _____
EENT _____ LI (2) Monitoring the side effects of Azulfidine and
THER _____ Voltaren.

We will check a CBC, liver panel and creatinine.

We will check his blood sugar on his request because he wants to know what his blood sugar is and he has a "strange feeling" and wants to see that his blood sugar is not high. He denies polydipsia or polyuria.

(3) Need for flu shot.

This was provided on his request after an explanation about the potential risks including possibility of flu-like symptoms and remote possibility of a CNS problem. (I elaborated on this.)

I will see him back in four months for re-evaluation. I explained that if for some reason he could not get the Vioxx he should go back and take Voltaren and Cytotec together.

Sohrab Fallahi/ef

2nd of 2 parts

F/E R___/___ L___/___
F/R R___/___ L___/___
F/E;R___/___ L___/___
I/A R___/___ L___/___
F/I/E R___/___ L___/___

DATE: 3/23/99    CHIE  MPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
LIVING    HELP
          INDE

MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
    YES
    NO
OTHER

MUSCLES   NF   NE   D   B   T   W   WF   HF   HAB   HAD   KF   KE   APF   ADF   GTOE   INT HAND
R  S/A   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /

   S/A   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /

ULN DEV   R ___ L ___   SN R ___ L ___   BOU R ___ L ___
HBN  R ___ L ___   BOUC N R (—) L (—)   GRIP R _good_ L _good_   REFLEX B T K A
                                                                          R
                                                                          L

X RAY

HEENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____

OTHER

F/E PIPR |  |  |  |  | L |  |  | MCPR |  |  |  | L |  |

F/E R ___ ___ ___
F/R R ___ ___ ___
F/E R ___ ___ ___
I/A R ___ ___ ___
PF/I/E R ___ ___
L ___ ___

3/23/99 WT 195 BP 100/60 Temp 98.2

WOODLEY, RUFUS R.
3/23/99

This patient is here today. He is having some aches
and pains. He has ankylosing spondylitis and takes
Voltaren, Cytotec and Azulfidine. This combination has
helped him. He has heard about the Celebrex. He
inquired and I explained to him that the base didn't
carry that. He wished to try the Celebrex. I provided
him with a two week supply of 200 mg b.i.d. to try and
see if it helps him better than the Voltaren. I
explained that it would take the place of his Voltaren
and Cytotec combined.

IPMH since the last visit with me is unremarkable for
medical or surgical intervention.

FHx/SH: Non-contributory.

ROS: Specific questions were directed towards the
potential side effects of Voltaren, Cytotec and
Azulfidine. He does not seem to have any problem.

PE: The peripheral joints have a very good range of
motion of all the small, medium and large sized joints
of the upper and lower extremities on both sides of the
body. The cardiopulmonary exam is unremarkable. His
mobility is fine.

ASSESSMENT/PLAN:
(1) Ankylosing spondylitis - stable on current
    treatment.
                                    cont'd ↓
I gave him a two week supply of Celebrex. (See above.)



DATE:_____ CHIEF \MPLAINT    WELL BEING  B  W  S
AM STIFF_____ SLEEP_____ DRIVE   HWORK    CHAIR    CANE    WALKER    BUTT    DOOR
ACT OF DAILY    DRESS    BATHE
L   3.    HELP
        INDE
MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
    YES
    NO
OTHER_____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
|  |  |  |  |  |  |  |  | / | / | / | / | / | / | / |  | / |
| L  S/A | / | / | / | / | / | / | / |  |  |  |  |  |  |  |  |  |

                                            BOU R_____      L_____
ULN DEV    R_____    L_____    SN R_____    L_____    L_____    REFLEX  B  T  K  A
                      BOUC N R_____    L_____    GRIP R_____    L_____    R
HBN  R_____    L_____                                                              L

X RAY_____                    Cont'd  3-23-99
HEENT_____ LUNG  If  he  was  not  happy  with  that  he  is  to  fill  his
OTHER_____        Voltaren and Cytotec and continue them as they are now.

    F/ (2) Monitoring the side effects of medications,
            especially Voltaren and Azulfidine.

    I checked a CBC, liver panel and creatinine.

    I will see him back in 3-4 months for re-evaluation,
    sooner if needed.                    Sohrab Fallahi/ef

W F/E R___/___  L___/___
E F/R R___/___  L___/___
K F/E R___/___  L___/___
S I/A R___/___  L___/___
HPF/I/E R   /   /
        L   /   /

MRA-1

DATE: 11/20/98   CHI   COMPLAINT

AM STIFF _____   SLEEP _____   WELL BEING B W S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
LIVING   HELP
   INDE
MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
   YES
   NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| L   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV R _____ L _____ SN R _____ L _____ BOU R _____ L _____
HBN R _____ L _____ BOUC N R _____ L _____ GRIP R _____ L _____ REFLEX B T K A
   R
   L

X RAY _____
HEENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____
OTHER _____

F/E P|PR | | | | | |L | | | | |MCPR | | | | | |L | | | |

Ht 196↑   BP 110/66   Temp 96.8

WOODLEY, RUFUS R.
11/20/98

This patient is here today. He is having some aches and pains since he has switched from Voltaren to Disalcid. He does not believe Disalcid helps him as well. He wants to switch back to Voltaren, he says. He gets his medicine from Maxwell and they give him Cytotec. He has to buy his Voltaren separately. He has ankylosing spondylitis and degenerative arthritis. The combination of Voltaren with Azulfidine has helped him some; however, he still has a considerable amount of aches and pains.

IPMH since the last visit with me in July is unremarkable for any medical or surgical intervention.

FHx/SH: Non-contributory.

ROS: Specific questions were directed towards the potential side effects of Azulfidine and Voltaren on different organ systems such as skin, mucosa, GI, lungs, etc. He does not have any problem and seems to be very tolerant.

PE: His peripheral joints show very good range of motion of all the small, medium and large sized joints of the upper and lower extremities on both sides of the body. His chest is clear without rale, rhonchi or wheeze. Heart sounds are normal without gallop, murmur or rub. The abdomen is soft and benign.

Peripheral joints show degenerative arthritis but not inflammatory synovitis, septic joint or effusion. His

W F/E R ___/___ L ___/___
E F/E R ___/___ L ___/___
K F/E R ___/___ L ___/___
S I/A R ___/___ L ___/___
HPF/I/E R ___/___
   L ___/___

DATE: 11/20/98 cm          CHIEF    COMPLAINT

M STIFF _____ SLEEP _____ WELL BEING  B  W  S

CT OF DAILY    DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR

V`~ ~          HELP
               INDE

ED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
   YES
   NO

THER _____

USCLES   NF   NE   D   B   T   W   WF   HF   HAB   HAD   KF   KE   APF   ADF   GTOE   INT HAND
   S/A   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /       /

   S/A   /   /   /   /   /   /   /   /   /   /   /   /   /   /       /

LN DEV   R_____ L_____ SN R_____ L_____ BOU R_____ L_____
BN   R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A

neck motion is somewhat decreased. His mobility
generally is acceptable.

RAY _____
EENT _____         ASSESSMENT/PLAN:
THER _____         (1) Ankylosing spondylitis - reasonably stable on
                            Azulfidine and NSAIDs.
                        (2) Monitoring the side effects of those medications.

                        I checked a CBC, liver panel and creatinine.

                        (3) OA - stable with combination of those medications.

                        I asked him if he had his flu shot and he assured me he
                        had.  I switched his medicine to Voltaren and Cytotec.
                        However, I informed him that there is a product called
                        Arthrotec and I gave him some samples.  If he likes the
                        results he might consider buying it in this combined
                        form.  I will see him back in four months for
                        re-evaluation.

                                                Sohrab Fallahi/ef

                        End of z part

F/E R ___/___ L ___/___
F/R R ___/___ L ___/___
F/E R ___/___ L ___/___
I/A R ___/___ L ___/___
PF/I/E R ___/ ___/
      L ___/ ___/

ATE: 7/21/99   CHEN   WHA TFM
M STIFF _____ SLEEP _____ WELL BEING B W S
CT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
VING   HELP
INDE
ED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
·YES
NO
THER

| USCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | | / |

N DEV   R_____ L_____ SN R_____ L_____ BOU R_____ L_____
INS R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
E B                                                                                                R
                                                                                                   L
RAY
EENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____
THER

F/E PIPR |  |  |  |  | L |  |  |  | MCPR |  |  |  | L |  |  |
Weight - 191#        BP- 126/62        T-97²

WOODLEY, RUFUS R.
- 7/21/98

This patient is here today. His back is a whole lot
better. This gentleman has low back pain which is
multifactorial, mostly from degenerative disk disease
with some herniated disk. Since he has been taking
Voltaren it has helped him quite a bit. he says. He is
tolerating it with taking the Cytotec.

ROS: He has no GI problem. The back is better
although the pain is not completely gone. He does not
have radiation of the pain down the leg. He wants to
try a NSAID from Maxwell AFB and has brought a list of
them.

PE: His mobility is fairly good without assistive
device. He has degenerative arthritis. There is no
indication of surgically correctable back problem.

ASSESSMENT:
(1) Lumbalgia - multifactorial, mostly from
    degenerative disk disease and osteoarthritis.
(2) Diffuse osteoarthritis.
(3) Monitoring the side effects of non-steroidal
    medicine, i.e. Voltaren.

For that I checked a CBC, liver panel and urinalysis.

PLAN: On his request I changed his medicine and gave
him a prescription for Disalcid to take two t.i.d. with
meals with GI precautions. I have cautioned him for
ringing in the ear. He was advised not to mix this



DATE:_____  CHIEF    PLAIN
AM STIFF _____ SLEEP _____ WELL BEING B W S
ACT OF DAILY    DRESS   BATHE    DRIVE   HWORK    CHAIR    CANE    WALKER    BUTT    DOOR
IV               HELP
                 INDE
MED TOX    RASH   MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
       YES
       NO
OTHER _____
MUSCLES   NF   NE   D   B   T   W   WF   HF   HAB   HAD   KF   KE   APF   ADF   GTOE   INT HAND
R    S/A    /    /       /   /   /   /    /    /     /     /    /    /     /      /        /

     S/A    /    /        /  /   /   /    /    /     /     /    /    /     /      /        /

ULN DEV   R _____    L _____ SN R _____   L _____ BOU R _____    L _____   REFLEX  B  T  K  A
HBN   R _____    L _____ BOUC N R _____   L _____ GRIP R _____   L _____              R
                                                                                                                  L

X RAY _____
HEENT _____               LUNG
OTHER _____
                               F,

Cont'd  7-21-98

he can switch back to Voltaren.  Therefore I gave him
two prescriptions with the understanding that he is not
going to mix them.  He is to take Cytotec with either
of those medications.

I will see him back in four months for re-evaluation.
                                        Sohrab Fallahi/cf

2nd of 2 part

W F/E R ___/___ L ___/___
E F/R R ___/___ L ___/___
K F/E R ___/___ L ___/___
S I/A R ___/___ L ___/___
HPF/I/E R ___/___ L ___/___

MRA-12A

DATE: _____

M STIFF _____ SLEEP _____ WELL BEING B W S

CT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   —WALKER   BUTT   DOOR
VING   HELP
         INDE

| ED TOX | RASH | MULCER | ALOPECIA | COUGH | SOB | NAUSEA | DIAR | ABD PAIN | HA | EDEM |
|---|---|---|---|---|---|---|---|---|---|---|
| YES | | | | | | | | | | |
| NO | / | / | / | / | / | / | / | / | / | / |

| THER | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| USCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

S/A   /   /   /   /   /   /   /   /   /   /   /   /   /   /

LN DEV   R_____ L_____ SN R_____ L_____ BOU R_____ L_____
BN   R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
                                                                                                    R
                                                                                                    L

RAY _____
ENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____
THER _____

F/E PIPR |  |  |  |  |L|  |  |  |MCPR|  |  |  |  |L|  |  |  |

4/14/98  WT 196  BP 11%00  Temp 97.5  pulse-80  R18

WOODLEY, RUFUS R.
4/14/98

This patient is here today complaining of low back pain, especially in the left SI area. This pain does not have any radiation and he does not have any paresthesia of the leg. He does not have any difficulty with his bowel or bladder movement.

This gentleman has ankylosing spondylitis and at times this acts up and gets very severe. He is taking Azulfidine. Ultram has not helped him much. In the past he tried Indocin but is not sure if it is helping him or not.

ROS: He is tolerating Azulfidine very nicely and does not have any GI upset, rash or any other problem as the details had been handmarked on the ROS sheet by myself.

FHx/SH: Unremarkable. I learned that he cannot tell me if the pain is worse on sitting, lying down or walking. Apparently in any position the pain is there but whenever he stooped over to play golf the pain sometimes catches.

PE: He is a WD, WN, WM, A&O, in NAD. The chest is clear without rale, rhonchi or wheeze. Heart sounds are normal without gallop, murmur or rub. The abdomen is soft and benign.

Joint exam shows fairly good range of motion of all the small, medium and large sized joints of the upper and lower extremities on the left and right sides of the body. Straight leg raising is negative

F/E R __/__ L __/__
F/E R __/__ L __/__
F/E R __/__ L __/__
I/A R __/__ L __/__
F/I/E R __/__ L __/__

have localized soreness in the SI area. Reflexes are equal and normal. His mobility is fine without assistive device. There is no pulsative mass in the abdomen or bruit.

ASSESSMENT:
(1) Ankylosing spondylitis with severe pain in the left lower back which comes episodically and it "catches" and he cannot walk.

He could have spinal stenosis, I explained and elaborated by showing him on the mannequin. He should have an MRI of his back for that reason.

(2) Monitoring the side effects of Azulfidine which has helped his ankylosing spondylitis.

For that I will check a CBC, liver panel and urinalysis.

PLAN: I put him on Voltaren, 75 mg b.i.d., to take with Cytotec, 100 mcg t.i.d., along with Azulfidine.

I will see him back in three months for re-evaluation or sooner if needed.

AP of the lumbosacral spine shows fusion of the sacroiliac bilaterally. There also is some bamboo spine in the upper part of the lumbar spine and lower part of the thoracic spine; however, in the lateral view the lowest part of the lumbar spine is not fused together.

AP of the pelvis shows normal looking hip joint cartilage, but sacroiliac joint again _____.

Sohrab Fallahi/ef

2nd of 2 part.

DATE:
AM STIFF _____ SLEEP _____ WELL BEING B W S
ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
LIVING    HELP
          INDE
MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
   YES
   NO
OTHER
MUSCLES  NF  NE  D  B  T  W  WF  HF  HAB  HAD  KF  KE  APF  ADF  GTOE  INT HAND
R  S/A
   S/A
ULN DEV  R      L      SN R      L      BOU R      L
HBN  R      L      BOUC N R      L      GRIP R  good  L good  REFLEX  B  T  K  A
                                                                          R
                                                                          L
X RAY
HEENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____
OTHER

F/E PIPR |  |  |  |  |L |  |  |  | MCPR |  |  |  | L |  |  |
wt. 192 lbs.            BP 122/66            Temp. 96.9



WOODLEY, RUFUS R.
12/12/97

This patient is here today with aches and pains,
especially of the hands, particularly the left second
finger. The gentleman has ankylosing spondylitis for
which he is taking Azulfidine, about 1 1/2 grams daily
now. He takes Ultram as well. Generally he is doing
fairly well and does not have any major medical
problems by history since the last visit with me.

SH: He is looking forward to turning 65 and getting
Medicare underway. He is active.

ROS: He has some stiffness in the PIPs and DIPs,
especially in the morning, he describes. He does not
have any swelling of the joints, Raynauds,
photosensitivity, mucositis or serositis. The details
of the ROS have been handmarked on the ROS sheet by
myself.

PE: He is a WD, WN, WM, A&O and in NAD. His general
exam of the chest, heart and abdomen is benign. He has
mild Heberden and Bouchard nodes throughout. He can
make a good grip. His exam of the joints shows full
range of motion of the wrists, elbows, shoulders, hips,
knees and ankles bilaterally.

ASSESS: (1) Ankylosing spondylitis - somewhat better.
In hopes of better control, I advised him to increase
his Azulfidine to six a day, although this might
irritate his stomach. He is taking the Ultram. (2)
Osteoarthritis - continue current medications. I

CHIEF COMPLAINT

TE:
STIFF _____  SLEEP _____  WELL BEING  B  W  S
T OF DAILY   DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR
N
        HELP
        INDE
O TOX   RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
    YES
    NO
HER

| SCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S/A | / | ./ | /. | / | / | / | / | / | / | / | / | / | / | / | / | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

N DEV   R_____   L_____   SN R_____   L_____   BOU R_____   L_____
N  R_____   L_____   BOUC N R_____   L_____   GRIP R_____   L_____   REFLEX B T K A
                                                                                            R
                                                                                            L

AY _____
ENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____
HER _____

F/E PIPR ╫╫╫╫ L ╫╫╫╫ MCPR ╫╫╫╫ L ╫╫╫

he is afraid  of because  it runs in  his family.  (3)
Monitoring the side effects of Azulfidine.  I checked a
CBC and liver panel today.

PLAN:  I would like for him to check his blood  test in
a couple of months.  I will see him back in four months
for re-evaluation.

                              Sohrab Fallahi/ef

End of report

/E R __/__ L__/__
/R R __/__ L__/__
/E R __/__ L__/__
A  R __/__ L__/__
F/I/E R  /    /
     L   /   /

DATE:

AM STIFF _____ SLEEP

ACT OF DAILY    DRESS

LIVING    HELP

INDE

MED TOX    RASH    MUI

YES

NO

OTHER _____

MUSCLES    NF    NE    D

R    S/A    /    /    /

L    S/A    /    /    /

ULN DEV    R_____

HBN  R_____ L____

X RAY _____

HEENT _____ LUI

OTHER _____

F/E R __/__ L __/__
F/R R __/__ L __/__
F/E R __/__ L __/__
I/A R __/__ L __/__
PF/I/E R __/ / /
L __/ / /

WOODLEY, RUFUS R.
9/22/97

JOOR

This patient is here today for follow-up of his anky-
losing spondylitis and back pain as a result of that.
He is now receiving Azulfidine.  He is taking six
Ascriptin daily and is still in pain.  He is taking
Cytotec and his ENT doctor recently put him on Zantac,
he says.  He wants verification as to whether or not
the Cytotec and Zantac are both necessary or not.

:M

Interim past medical history since the last visit with
me is quite unremarkable.

SH:  Unchanged.

PE:    Peripheral  joints  have  no  inflammatory  arthro-
pathy, septic joint or effusion.  His mobility is fine

K A

without any assistive device.

He has not done any blood tests since the last visit
with me. His cardiopulmonary exam is unrevealing.

ASSESS/PLAN:  (1) Ankylosing spondylitis - continues to
be  symptomatic  in  spite  of  the  combination  of  several
medications.    (2)  Monitoring  the  side  effects  of
Azulfidine and six aspirin a day.  For this I checked a
CBC, liver panel and urinalysis.

I gave him a sample of Ultram to try every six hours
on  an  as-needed  basis  for  relief  of  pain.   I  have
cautioned him for all the potential risks including the
remote possibility of seizures.

I  provided  him  with  literature  to  read  and  consider

methotrexate  so  that  if  the  combination  of  these
current  medications  (refer  to  medicine  list  that  I
reviewed  with  him  today)  did  not  work,  I  will  consider
giving him MTX.  I tentatively plan to see him back in
three months for re-evaluation.

Sohrab Fallahi/ef



DATE: 5-22-97    CHIEF COMPLAINT _____

M STIFF _____ SLEEP _____ WELL BEING B W S

CT OF DAILY / DRESS  BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR

VI__ __   HELP
          INDE
ED TOX   RASH  MULCER  ALOPECIA  COUGH  SOB  NAUSEA  DIAR  ABD PAIN  HA  EDEM
   YES
   NO
THER _____

USCLES  NF  NE  D  B  T  W  WF  HF  HAB  HAD  KF  KE  APF  ADF  GTOE  INT HAND
  S/A  /  /  /  /  /  /  /  /  /  /  /  /  /  /          /
  S/A  /  /  /  /  /  /  /  /  /  /  /  /  /  /          /

LN DEV  R_____ L_____ SN R_____ L_____ BOU R_____ L_____
BN  R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
                                                                            R
                                                                            L

RAY _____
EENT _____ LUNG_____ HEART_____ ABD_____ SKIN_____
THER _____

F/E PIPR |  |  |  |  | L |  |  |  | MCPR |  |  |  | L |  |  |

5-22-97 WT 192 BP 110/74 Temp 96.8 Pulse 88 R 20

WOODLEY, RUFUS
5/22/97

This patient is here today for follow-up of his anky-
losing spondylitis for which he was taking Indocin and
Azulfidine. (Please refer to my note of 3/21/97.)

Interim past medical history since then is significant
for the fact that he developed a lot of GI symptoms.
Because of that he stopped taking it. He is not sure
if the problem was coming from Azulfidine alone or was
due to the combination of that and Cytotec and Indocin.

After he left them off for a while he started taking
Cama and is taking four a day. He is having possibly
some benefit from it, i.e. relieving stiffness and
pain, but he is not sure about the benefit, but he has
good tolerance.

FHx/SOCIAL HISTORY: Unrevealing.

ROS: The patient tells me that he would like to get a
second line medication. (This is for controlling
effect of that on the nature of the disease which
usually does not happen with Indocin or Cama.) For
this he was given the option for either trying Azulfi-
dine again or taking MTX. After a full discussion
about these he decided to go ahead and try Azulfidine
again; however, he would like to read about the metho-
trexate as well.

PE: The peripheral joints are fine. His mobility is
fine.

F/E R ___/___ L ___/___
F/R R ___/___ L ___/___
F/E R ___/___ L ___/___
I/A R ___/___ L ___/___
PF/I/E R ___/___ L ___/___

DATE:_____ CHIEF MPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
LIVING        HELP
              INDE
MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
    YES
    NO
OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV   R_____ L_____ SN R_____ L_____ BOU R_____ L_____

HBN  R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
                                                                                         R
                                                                                         L

X RAY_____

HEENT_____ LUNG_   ASSESS:   (1) Ankylosing spondylitis.   (2) Monitoring

OTHER_____   the side effects of medications, i.e. non-steroidal
                       medicine and partly because of Azulfidine.  For this I
F/E   checked a CBC and liver panel.

PLAN:  He is going to try the Azulfidine again, 500 mg
t.i.d., to find out if this is going to work.  He will
read about MTX and if Azulfidine eventually did not
work he may consider taking the MTX, he said.  I will
see him back in four months for re-evaluation; how-
ever, every other month he is to stop by and check his
blood test, I advised him.
                              Sohrab Fallahi/ef

cont'd 5-22-97

W F/E R__/__ L__/__
E F/R R__/__ L__/__
X F/E R__/__ L__/__
S I/A R__/__ L__/__
HPF/I/E R   /   /
     L   /   /

DATE: _____   CHIEF COMPLAINT

AM STIFF _____   SLEEP _____   WELL BEING  B  W  S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR
LIVING    HELP
          INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
       YES
       NO
OTHER

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT | HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | | / |
| L   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | | / |

ULN DEV    R_____  L_____  SN R_____  L_____  BOU R_____  L_____
HBN   R_____  L_____  BOUC N R_____  L_____  GRIP R_____  L_____  REFLEX  B  T  K  A
                                                                                              R
                                                                                              L
X RAY _____
HEENT _____  LUNG _____  HEART _____  ABD _____  SKIN _____
OTHER _____

F/E PIPR | | | | | L | | | | MCPR | | | | | L | | |

Weight 198    BP 142/80    Temp 97.8

WOODLEY, RUFUS R.
3/21/97

This patient is here today for follow-up of his anky-
losing spondylitis for which he is taking Indocin
t.i.d. He did not remember if he read about anky-
losing spondylitis, he says. However, he did read
about methotrexate and Azulfidine. He has some relief
with taking Indocin although he continues to have a lot
of thoracolumbar area pain and lower back stiffness,
especially in the morning. He never had inflammatory
change of his uveitis.

Pertinent lab data is positive B27, negative ANA and
rheumatoid factor. He has a history of occasional epi-
gastric area discomfort but he does not describe
penetrating pain. He has not passed any blood. He
generally feels fine.

ASSESS/PLAN: (1) Ankylosing spondylitis - continues to
be present with partial remission with taking Indocin.
(2) Monitoring the side effects of Indocin. We will
check a CBC and liver panel.

I discussed with him about the additional benefit he
might get from addition of Azulfidine to his regimen
although all the pros and cons about that were ex-
plained. He is willing to give that a try. I put him
on Azulfidine 100 mg t.i.d. along with Indocin. I
brought it to his attention that in case he had con-
siderable improvement to the extent that he feels
better, he could decrease the Indocin by himself to
twice or once daily. He was cautioned that every other
month back

DATE:_____ CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING  B  W  S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR
LIVING    HELP
         INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
    YES
    NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

LN DEV    R_____ L_____ SN R_____ L_____ BOU R_____ L_____
BN    R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX  B  T  K  A
                                                                                                      R
                                                                                                      L

RAY_____
ENT_____ LUNG_____ HEART_____ ABD_____ SKIN_____
HER_____

F/E PIPR |—|—|—|—| L |—|—|—| MCPR |—|—|—| L |—|—|—|

3-21-97 (cont)
him back in two months for re-evaluation.
                                    Sohrab Fallahi/ef

E R __/__ L __/__
R R __/__ L __/__
E R __/__ L __/__
A R __/__ L __/__
I/E R  /  L  /  /

RUFUS R. WOODLEY
INITIAL HISTORY AND PHYSICAL EXAMINATION:   11/21/96

This new patient is a 63-year-old white gentleman who was kindly
referred from Family Practice Clinic of Maxwell for office consultation.
The patient has the diagnosis of ankylosing spondylitis from the
air force in 1971 by a doctor whose name he has forgotten.   He
used to take Indocin for several years and then he took Coma for
a while.   Indocin was restarted a month ago because he was in
so much pain with stiffness and difficulty with his lower back.
Sometimes the pain gets so severe that he cannot climb down stairs.
He has gone to physical therapy and proper exercises were given.
He feels somewhat improved with that.   He has not taken any other
medicine.   He does have stiffness in the lower part of the back
lasting about two hours or so.   He has some pain in the bed.
The pain does not wake him up.

PAST MEDICAL HISTORY:   Negative for any surgery or major medical
problem.   He does not smoke or drink.   He is semi-retired and
is working as a general contractor and builds houses and on doing
so he has to lift and bend sometimes.

REVIEW OF SYSTEMS:   The details have been indicated in the chart.
Specifically he does not have any history of heart problems or
eye problems.

PHYSICAL EXAM:   He has no skin rash.   He is in good general condition
without any abnormality in the cardiopulmonary exam.   Chest is
clear.   His joints show no inflammatory arthritis, septic joint
or effusion.   He does have decreased motion of the lower part
of the back although chest expansion seems to be reasonably well-
preserved.   He brought an x-ray from his thoracic and lumbosacral
spine which did not have the AP pelvis in it.   I reviewed that.
In the upper spine in the thoracic spine he does have bamboo spine
although in the lower part of the back he does not have bambooing
of the spine.   Because he did not have AP of the pelvis with him
for me to see the sacroiliac joint, I did an AP pelvis today which
shows bilateral fusion of the sacrailiac joint typical for AS.
He does have diffuse osteopenia as well.   Sacral bone and hip
joints are fairly well-preserved.

ASSESSMENT:   (1) Ankylosing spondylitis.
              (2) Low back pain and stiffness due to that.
              (3) Evidence of osteoarthritis.

COUNSELLING/PLAN:   I discussed with him about the meanings of
ankylosing spondylitis and gene related, i.e. HLAB 27.   I advised
him to continue his Indocin.   However, I cautioned him carefully
about GI, liver problem and kidney problem that can happen with
any non-steroidal medicine in general.   I provided him with literature
to read about the side effects.   I put him on Cytotec to try 100
micrograms t.i.d. with meals with an explanation about the reason.
I gave him a brochure to read about methotrexate and Azulfidine
and explained the difference in the way these medications work

RE: Rufus R. Woodley
November 21, 1996
Page Two


vs the way NSAIDs work.  I advised him to continue his proper
regular exercises that have been provided by PT.  I checked a
diagnostic screen and rheumatoid profile today and checked B27
today.  I will see him back in four months for re-evaluation.


                              Sohrab Fallahi, M.D.


SF/ef

# James R. Lauridson, M.D.

528 Seminole Place

Montgomery, Alabama 36117

## Education

**Bachelor of Science** (electrical engineering), *with Special Honors*
University of Colorado Boulder, Colorado , May 1965

**Doctor of Medicine**, *summa cum laude*
University of Colorado School of Medicine Denver, Colorado, May, 1971

**Internal Medicine**
Bethesda Naval Hospital, Bethesda, Maryland, 1974 to 1977
**Pathology**
Stanford University, Stanford, California, 1971 to 1973. Anatomic pathology
Presbyterian Hospital, Denver, Colorado, 1983 to 1985. Anatomic and clinical pathology.
**Forensic Pathology**
Dade County Medical Examiner's Office, Miami, Florida, 1985 to 1986.

**Board Certification**
American Board of Internal Medicine, 1977
American Board of Pathology, Anatomic Pathology, 1985
American Board of Pathology, Forensic Pathology, 1986.

**Medical License**
**Alabama** (12621), 1986 (current)
**Florida** (003 7127), 1985(inactive)

Oklahoma (12080), 1979

Colorado (25450), 1983
New York (173618), 1988

California (23990), 1972

## Medical Practice

**Internal Medicine**
Staff Internist, Naval Hospital, Newport, Rhode Island, 1977-1979
Private Practice, Chickasha, Oklahoma, 1979-1980
Veterans Administration Hospital, Oklahoma City, Oklahoma, 1980-1982
Clinical Instructor in Medicine, University of Oklahoma School of Medicine, 1981-1982
Private Practice, Edmond, Oklahoma, 1982-1983
**Forensic Pathology**
*Associate Medical Examiner*, Dade County Medical Examiner's Office, Miami, Florida, 1985-1986
*Deputy Chief Medical Examiner*, Alabama Department of Forensic Sciences, Montgomery, Alabama, 1986 -2001



DEFENDANT'S
EXHIBIT

39

***Consultant to Alabama Department of Forensic Sceinces,*** Montgomery, Alabama, 2003 to 2005

***Chief Medical Examiner, Alabama Department of Forensic Sciences***, Montgomery, Alabama, 2005 to 2006

### Hospital Pathology Practice

**Southeast Alabama Medical Center,** Dothan, Alabama, 2007 to present.
**Flowers Hospital,** Dothan, Alabama, 2007 to present.
**Veterans Medical Center,** Montgomery, Alabama, 2007 to present.

## Medical Legal Illustration

*Founder and Member*, Nibbana Graphics, L.L.C., 1998 to present

*Director of Graphics*, Office of Prosecution Services, Alabama District Attorneys Association, 2001

*Director of Graphics*, Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., Montgomery, Alabama, 2001 to 2005

## Military Experience

*Lieutenant Colonel*, Medical Corps, U. S. Army Reserve, 1985-1993
*Lieutenant Commander,* Medical Corps, U.S. Navy, 1973-1979

### OTHER OFFICES:

*Chairperson*, Montgomery County Child Death Review Team, 1999 to 2001
*Member*, State of Alabama Child Death Review Team, 1998 to 2001 and 2003 to present

*Member*, Scientific Working Group on Imaging Technology, Federal Bureau of Investigation
*Member*, Commission on Continuing Education, Forensic Pathology, American Society of Clinical Pathologists, 1993-1994
*Member,* Check Sample Editorial Review Board, American Society of Clinical Pathologists, 1993-present

Invited Reviewer, "The Quarterly Update, reviews of current child abuse medical research," Robert M. Reece, executive editor, North Falmouth, Massachusetts

*Founder,* Nibbana Graphics, L.L.C.

## Professional Organizations

National Association of Medical Examiners
American Academy of Forensic Sciences, elected *Fellow*, 1997
National Association of Photoshop Professionals

## Academic Honorary Societies

Alpha Omega Alpha (medicine)
Et Kappa Nu (electrical engineering)
Tau Beta Pi (enqineering)

## Honors and Awards

Outstanding Employee for 1989, Region III Alabama Department of Forensic Sciences

Paul E. Shoffeitt Distinguished Service Award, 1992, Alabama Department of Forensic Sciences

C. J. Rehling Meritorious Service Certificate, 1993, Alabama Department of Forensic Sciences

C. J. Rehling Meritorious Service Certificate, 1994, Alabama Department of Forensic Sciences

C. J. Rehling Meritorious Service Certificate, 1995, Alabama Department of Forensic Sciences

C. J. Rehling Meritorious Service Certificate, 1998, Alabama Department of Forensic Sciences

C. J. Rehling Meritorious Service Certificate, 2001, Alabama Department of Forensic Sciences

## Publications

*Gilliland, M G. F.; Levin, Alex V. MD; Enzenauer, Robert W.; Smith, Charles; Parsons, M Andrew; Rorke-Adams, Lucy B.; Lauridson, James R.; La Roche, G Robert; Christmann, Linda M. MD; Mian, Marcellina; Jentzen, Jeffrey; Simons, Kenneth B.; Morad, Yair;*

*Alexander, Randell MD; Jenny, Carole MD; Wygnanski-Jaffe, Tamara,* " Guidelines for Postmortem Protocol for Ocular Investigation of Sudden Unexplained Infant Death and Suspected Physical Child Abuse," American Journal of Forensic Medicine & Pathology. 28(4):323-329, December 2007

*Lauridson, J, (panel moderator),* "Postmortem CT and MRI Imaging," Pediatric Abusive Head Trauma, Milton S. Hershey Medical Center, Hershey, Pennsylvania, July 12, 2007

*Lauridson, James R.,* Parrish, R. N,, "Use of Technology in Presenting Evidence," in Abusive Head Trauma in Infants and Children, Frasier, L, et. al., GW Medical Publishing, 2006.

*Lauridson, James,* Levin, A., Reece, R., "Shaken Baby Syndrome, A Visual Overview: Version 3.0, The National Center on Shaken Baby Syndrome, 2006
*Lauridson,* James R., Myers, Lawrence, "Evaluation of Fatal Dog Bites: The View of the Medical Excaminer and Animal Behaviorist---A Case Report," in Animal Law and Dog Behavior, Favre, D. and Borchelt, P.,(ed.), p. 325, Lawyers & Judges Publishing, 1999.

*Lauridson,* J., "Chylothorax and Child Abuse," Forensic Check Sample, FP-96-5, American Society of Clinical Pathologists, 1996
Embry, B., Embry, J., *Lauridson,* J.,"Missed Ectopic Pregnancies: A Report of Three Cases," Alabama Medicine, 63:13-16, March, 1994

*Lauridson,* James R., A Discussion of 'A Computer Program for the Estimation of Time of Death'," Letters to the Editor, J. Forensic Sciences, 39:601, May, 1994

*Lauridson,* James R., Myers, Lawerence, "Evaluation of Fatal Dog Bites: The View of the Medical Examiner and Animal Behaviorist," J. Forensic Sciences, 38:726-731, May, 1993.

*Lauridson,* James R., "Traumatic Occlusion of the Vertebral Artery," The American Society of Clinical Pathologists, Forensic Pathology Check Sample, FP 92-3 (FP-182), 1992.

*Lauridson,* James R., "Fatal Dog Bites," The American Society of Clinical Pathologists, Forensic Pathology Check Sample, FP 91-3, 33:3, 1991.

*Lauridson,* James R., Scheuerman, E. Hunt, "Unique Aspects of a New, Hand-Reloadable Ammunition," J. of Forensic Sciences, 35:987, July, 1990.

*Lauridson,* James R., "Sudden Death and Anomalous Origin of the Coronary Arteries from the Aorta, A case report and review," American Journal of Forensic Pathology and Medicine, 9(3):236, 1988.

*Lauridson,* James R., "Sudden Death and Anomalous Origin of the Coronary Arteries from the Aorta," Forensic Pathology Check Sample FP 89-2, The American Society of Clinical Pathologists, 1989.

*Lauridson*, James R., "The Importance of the Death Scene in SIDS Cases," The Alabama State Police Magazine, 2:29, April, 1989.

*Lauridson,* James R., "Neuroleptic Malignant Syndrome," The American Society of Clinical Pathologists, Forensic Pathology Check Sample FP 87-1, 1987.

*Lauridson,* James R., "Data Transmission Between Computers," Pathologist, April, 1985.

*Lauridson,* J.R., Rainer, W.G., Merrick, T.A., "The Dental Patient with Artificial Heart Valves," J. of Colorado Dental Association, p. 5, March/April, 1984.

Wolf, P.L., Kearns, T., Neuhoff, J., *Lauridson*, J.R., "Identification of CPK Isoenzyme MB in Myocardial Infarction," Laboratory Medicine, 5:48, 1974.

Pomerantz, M., Baumgartner, R., *Lauridson*, J., Eiseman, B., "Transthoracic Electrical Impedance for the Early Detection of PulmonarY Edema," Surgery, 66:260, 1969.

## Presentations to Professional Associations

Computer Graphics in Child Abuse, Sixth North American Conerence on Shaken Baby Syndrome, Park, City, Utah, September, 2006

Lauridson, J., Abusive Head Trauma,  invited speaker Prevent Child Abuse Alabama, Best Practices Conference,  July 23, 2004 Mobile, Alabama, and                August 3, 2004,  Birmingham, Alabama.

Regular seminars on court technology and trial graphics, The Alabama District Attorneys Association

*Lauridson*, J., Alexander, R., "Shaken Baby Syndrome," The Seventeenth National Symposium on Child Sexual Abuse, Huntsville, Alabama, march 15, 2001

*Lauridson*, J., "Graphics in Trial Presentation" Technology Conference Alabama Law Enforcement Technology Association, November, 2000

*Lauridson*, J., "Graphics and the Education of Police and Jurors in the Shaken Baby Syndrome," Third National Conference on Shaken Baby Syndrome, Salt Lake City, Utah, September 25, 2000

*Lauridson*, J., Cooper, S., Holmgren, B., "The Use of Computer Graphics in Physical Child Abuse," American Professional Society on the Abuse of Children, Annual Colloquium, Chicago, Illinois, July 13, 2000

*Lauridson*, J., "Closing Address," Southeastern Conference on Child Abuse, Hilton Head, South Carolina, May 15, 2000

*Lauridson*, J., Santoro, C., "Computer Graphics, Exhibits and Demonstrative Aids," 2000

Eastern Circuit Trial Counsel Conference, Eglin Air Force Base, April 6, 2000

*Lauridson*, J., "Forensic Pathology and Death Investigations," 2000 Eastern Circuit Trial Counsel Conference, Eglin Air Force Base, April 6, 2000

*Lauridson*, J., "Presenting Complex Concepts in Child Abuse to the Court and Lay Audiences," National Symposium on Child Sexual Abuse, Huntsville, Alabama, March 9, 2000

*Lauridson*, J., "The Use of Computer Animation In Homicide, Child Abuse and Violence Against Women Cases," Alabama District Attorneys Association, Winter Meeting, Birmingham, Alabama, January 7, 2000

Fierro, M., *Lauridson*, J., "Problems and Pitfalls in Forensic Pathology," American Society of Cilincal Pathologists, National Meeting, Fall, 1996, San Diego, California

Downs, J., *Lauridson*, J., Wanger, G., Riddick, L., "Sport Related Deaths in the Deep South," American Academy of Forensic Sciences, Nashville, February, 1996.

*Lauridson*, J., "Pitfalls in Forensic Pathology," American Society of Clinical Pathologists Teleconference, March, 1995.

Donoghue, E., *Lauridson*, J., "Problems and Pitfalls in Forensic Pathology," American Society of Clinical Pathologists National Meeting, Fall, 1994, Washington, D.C.

Hyde, D., *Lauridson*, J., "Skull Reconstruction Following Crush Injuries by Bulldozer-Was Murder for Insurance the Motive?" American Academy of Forensic Sciences, Boston, 1993.

*Lauridson*, J., Myers, L.,"Evalutaton of Fatal Dog Bites," American Academy of Forensic Sciences, New Orleans, La., February, 1992.

*Lauridson*, J., Myers, L., "Evaluation of a Fatal Dog Bite: Views of a Medical Examiner and a Behaviorist", Animal Behavior Society Meeting, Wilmington, N.C., June 1991

McChesney, Warren J., *Lauridson*, James R., "Multiple Stab Wound Suicides", American Academy of Forensic Sciences, Anaheim. California, February 1991.

Eldridge, Gary, *Lauridson*, James R., "Researching The Forensic Literature with Your Personal Computer", American Academy of Forensic Sciences, Anaheim, California, February 1991.

*Lauridson*, James R., "Comparison of Methods of Computerized Literature Searching," American Academy of Forensic Sciences, Pathology Section, Cincinnati, 1990.

*Lauridson*, James R., "Unique Aspects of Hand Reloadable Ammunition" American

Academy of Forensic Sciences, Pathology Section, Las Vegas, 1989.

*Lauridson*, James R., "Long-Term Wear Patterns in the Starr-Edwards Mitral Valve", Colorado Society of Clinical Pathology, 1985.