## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA,
## NORTHERN DIVISION

| | | |
|---|---|---|
| **LILIAN WOODLEY, as the** | * | |
| **administratrix of the Estate of** | * | |
| **RUFUS WOODLEY,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **CASE No.:  2:07-CV-74-ID** |
| | * | |
| **PFG-LESTER BROADLINE, INC.,** | * | |
| **KENNETH O. LESTER COMPANY,** | * | |
| **INC., et al.,** | * | |
| | * | |
| **Defendants.** | * | |

## BRIEF IN SUPPORT OF MOTION TO EXCLUDE

COME NOW the defendants, by and through the undersigned counsel, and in support of their motion to exclude the testimony of James R. Lauridson, M. D. submit the following brief:

## INTRODUCTION

In this lawsuit, Plaintiff seeks to recover as the Administratrix of the Estate of Rufus Woodley against Kenneth O. Lester Company, Inc. and PFG-Lester Broadline, Inc.  The plaintiff contends that that the defendants caused a motor vehicle accident and the accident caused Rufus Woodley's death.

1

On or about August 18, 2006, Rufus Woodley and his wife Lillian Woodley were traveling on Interstate 59 North in Dekalb County at or near Fort Payne, Alabama. (Compl.¶ 5). They were involved in what the police report describes as a single-vehicle accident. As a result of the accident Mr. Woodley suffered a cervical spine injury which caused him to be paralyzed from the chest down. He was hospitalized at University Hospital in Birmingham, Alabama. On August 30, 2006, two weeks after the accident, Woodley was scheduled to be discharged to a rehabilitation facility. Before leaving the hospital on August 31, 2006, Woodley suffered a heart attack due to a 100% occlusion of his right coronary artery which caused his death. There was no autopsy.

The primary issues in this case are whether or not the defendants did in fact cause the motor vehicle accident involved in this matter and, most importantly to this motion, whether the motor vehicle accident was the cause of heart attack suffered by Woodley and his resulting death.

Plaintiff offers the testimony of a James R. Lauridson, M. D. in support of her wrongful death claims against the defendants. Plaintiff's expert's anticipated testimony is set forth in the Plaintiff's Rule 26 expert disclosure. (*See,* Ex A). Lauridson was deposed on February 27, 2008. (*See,* Ex B). Lauridson acknowledges that Woodley had known severe coronary disease for several years, but he says that the accident caused Woodley's death. Specifically, Lauridson is

expected to opine, that following the injury to the cervical spinal cord, and due to the associated cardiovascular complications and stress, Woodley suffered progressive cardiac deterioration leading to the heart attack and eventual death. (*See,* Ex. A and Ex. B).

Defendants challenge the admissibility of Lauridson's testimony.


## STANDARD OF REVIEW

"The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). To be admissible, expert testimony must satisfy the standards of Federal Rule Evidence 702, as interpreted by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Company v. Carmichael*, 526 U.S. 137 (1999).

In *Daubert* and *Kumho Tire*, the Supreme Court held that federal courts must act as gatekeepers to ensure than any proffered expert testimony – whether based on scientific, technical, or other specialized knowledge -- is adequately reliable and relevant. *Daubert*, 509 U.S. at 593-94; *Kumho Tire,* 526 U.S. at 141. Under this framework, proffered expert testimony is admissible only if (1) the expert is qualified to testify competently regarding the matters he intends to address; and (2)

the methodology by which the expert reaches his conclusion is sufficiently reliable. *Allison*, 184 F.3d at 1309.

In *Daubert*, the Supreme Court focused on the admissibility of scientific expert testimony. The Court listed several factors to assist in the determination of whether evidence is scientifically reliable: (1) whether the theory or technique employed by the expert is generally accepted in the scientific community; (2) whether the theory has been subject to peer review and publication; (3) whether the theory can and has been tested; and (4) whether the known or potential rate of error is acceptable. *Daubert*, 509 U.S. at 592-95.

The subject of an expert's testimony must be "scientific, technical or other specialized knowledge." *See* Fed. R. Evid. 702. "[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Thus, "[u]nder the regime of *Daubert* . . . a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Allison*, 184 F.3d at 1316-17 (quoting *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996), *cert. denied*, 519 U.S. 819 (1996)). *Accord Cartwright v. Home Depot U.S.A. Inc.*, 936 F. Supp. 900, 905 (M.D. Fla. 1996) ("Even experts must show that they used science and not speculation to come to their conclusions."); *Goomar v. Centennial Life Insurance Co.*, 855 F. Supp. 2d 319, 326 (S.D. Cal. 1994), *aff'd*,

76 F.3d 1059 (9th Cir. 1996) (under *Daubert*, speculative expert testimony regarding the onset and existence of a mental disability is inadmissible).

Fundamentally, the question is whether there is "some objective, independent validation of the expert's methodology." *Siharath v. Sandoz Pharmaceuticals Corp.*, 131 F. Supp. 2d 1347, 1351 (N.D. Ga. 2001), *aff'd*, 295 F.3d 1194 (11th Cir. 2002) (quoting *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)). An expert opinion that is not based on reliable objective data is *per se* inadmissible. *See, e.g., Allison*, 184 F.3d at 1315 (expert testimony of physician inadmissible because of lack of data supporting opinion); *Siharath*, 131 F. Supp. 2d at 1373 (expert testimony inadmissible because objective data did not support expert's opinion).

## ARGUMENT

## I.    Introduction

In the simplest of terms, expert testimony is used to assist the trier of fact in its understanding of the evidence in a given case.  *See*, *City of Tuscaloosa v. Harcros Chemicals, Inc.,* 158 F.3d 548, 562 (11th Cir. 1998).  The admissibility of expert evidence is governed by Rule 702 of the Federal Rules of Evidence, which contains three indicia of reliability that the trial court must review to determine the admissibility of the evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Nelson v. Freightliner,* LLC, 154 Fed. Appx. 98, 106-107 (11th Cir. 2005) (quoting Fed. R. Evid. 702).  Lauridson's testimony fails to meet these criteria and therefore is due to be excluded by this Court.

In acting as a gatekeeper, this Court is charged with the responsibility of keeping unreliable and irrelevant information from the jury, because of the inability of this type of evidence to assist in factual determinations, its potential to create confusion, and its lack of probative value.  *Allison v. McGhan Med. Corp.,* 184 F.3d 1300 (11th Cir. 1999).

## II.    <u>Lauidson's proposed testimony is not sufficiently reliable.</u>

Lauidson's testimony does not meet the threshold requirements of Rule 702. It lacks the scientific reliability and validity required by Federal Rule of Evidence 702.

Lauridson final opinion as to the cause of Woodley's death was a heart attack due to the 100% blockage of the right coronary artery:

Q.    You understand that the right coronary artery was one hundred percent occluded as reported in the catheterization summary?

A.    Yes.  At the time of the fatal event, that's correct.

Q.    Do you have any opinion as to what caused that hundred percent occlusion?

A.    Without an autopsy, one cannot be certain.  It was thrombus or ruptured atherosclerotic plaque with overlying thrombus, possibly, but not likely, coronary spasm with associated thrombus.

Q.    That's really -- It was the blockage of that artery that actually caused the man's death?

A.    Yes.

(Lauridson Dep. p. 105 ln. 14 – p. 106 ln. 7).  Despite the acknowledgement that there was a blockage of the artery, Lauridson claims that the cervical spine injury suffered by Woodley lead to the heart attack. (Lauridson Dep. p. 104 ln. 12-16). However, Lauridson admits that without an autopsy he cannot be certain as to what caused the blockage of the artery and Woodley's death:

Q.    Do you have any opinion as to what caused that hundred percent occlusion?

A.    Without an autopsy, one cannot be certain.  It was thrombus or ruptured atherosclerotic plaque with overlying thrombus, possibly, but not likely, coronary spasm with associated thrombus.

(Lauridson Dep. p. 105 ln. 20 – p. 106 ln. 3).  Because 1) Lauridson does not know what caused the blockage, the 100% total occlusion; and 2) an autopsy, which was not preformed, would be required to determine that caused the occlusion, Lauridson can only offer speculation about the cause of the fatal heart attack.  This lack of certainty invalidates Lauridson's opinion and requires the exclusion of his

7

testimony.   As the Supreme Court noted in *Daubert*, Rule 702 imposes a duty on trial courts to act as gatekeepers. To insure that speculative and unreliable opinions do not reach the jury.  *Daubert*, 509 U.S. 579, 589 (1993); *McClain v. Metabolife Int'l Inc.*, 401 F.3d 1253, 1237 (11th Cir. 2005).

Further, the *Daubert* standards require that the proposed expert testimony must be based on sufficient facts or data.  Lauridson does not rely on sufficient facts in coming to his opinions.  According to his report, Lauridson reviewed emergency room medical records from Dekalb Regional Medical Center, medical records of hospitalization at the University of Alabama at Birmingham, medical records of Dr. John Williams, and medical records of Dr. Martin Wybenga.  (*See,* Ex. A).   However, Lauridson admits that this information is insufficient to determine causation of the blockage and fatal heart attack.  Lauridson admits that he cannot be certain as to the cause of Woodley's blocked artery which caused the heart attack which caused the death without an autopsy.  (Lauridson Dep. p. 105 ln. 20 – p. 106 ln. 3).  There was no autopsy conducted in this case:

> Q.    All right, sir.  There was no autopsy of Rufus Woodley, was there?
>
> A.    That's right.
>
> Q.    By you or anyone?
>
> A.    That's correct.

Q.    And nobody with pathologist qualifications, that you're aware of, ever saw Rufus Woodley, did they?

A.    That's right.

(Lauridson Dep. p. 33 ln. 7-15).  Again, by his own testimony, Lauridson shows that the reliability of his proposed expert testimony is insufficient to pass through the *Daubert* gates and come before this court or a jury.  No autopsy was conducted. An autopsy would be needed to determine what caused the total occlusion of the right coronary artery.  Lauridson does not have the necessary information to make a conclusion and therefore this motion to exclude is due to be granted.

## III.    Lauridson's methodology is flawed.

Lauridson did not conduct his review of the case in accordance with the methodology relied upon by experts in his field, by his own admission.  He testified that an autopsy was only a "bit of information" that goes into a pathologist's opinion:

Q.    Please, sir, as a pathologist, when you're doing work as a pathologist, you typically examine tissue on a body, don't you?

A.    That is one test that a forensic pathologist uses, yes.

Q.    Well, that's what you do when you perform an autopsy, isn't it?

A.    That is an autopsy.

Q.    You look at tissue from a body?

A.    The autopsy is one bit of information that a forensic pathologist uses, yes, sir.

Q.    What other bits of information does a forensic pathologist use?

A.    Seeing circumstances, all of the investigative reports that are available, all of the preceding medical history; all of that goes together to allow the forensic pathologist to establish a cause and manner of death.  The autopsy, itself, is only one bit of information that may or may not actually even contribute to establishing cause and manner of death.

Q.    Would you interview or find out what treating physicians might be able to tell you about a patient?

A.    If they are immediately available.  Otherwise, the medical records are the substitute for that.

Q.    Yes, sir.  Would you consider what a treating -- what a board certified treating physician had to say about a witness before and leading up to the time of death?

A.    Yes.  I would take all information I could get.

Q.    All right, sir.  There was no autopsy of Rufus Woodley, was there?

A.    That's right.

(Lauridson Dep. p. 31 ln. 15 – p. 33 ln. 9).  However, Lauridson requires an autopsy to be certain as to the cause of the blockage.  (Lauridson Dep. p.105 ln. 14 – p. 106 ln. 7).  As such, his methodology embodies the very *ipse dixit* evidence courts have been urged to reject. *See, e.g., General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (the district court erred in "admit[ting] opinion evidence that [was]

connected to the existing data only by the *ipse dixit* of the expert"); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311 (9th Cir. 1995) (excluding scientific evidence based "entirely on the experts' unadorned assertions that the methodology they employed comports with standard scientific procedures," since "the expert's bald assurance of validity is not enough" to show that a proffered methodology is based on "scientifically valid principles"); *Allison*, 184 F.3d 1300, 1319 (the lower court correctly excluded evidence "based more on personal opinion than on scientific knowledge," since such evidence was "not generally accepted by the scientific community, and was unsupported by other studies"). Lauridson's bald assurances and assertions are not scientifically valid by his own admission and therefore his testimony is due to be excluded.

## IV.    Lauridson's proposed testimony does not assist the trier of fact.

Expert testimony is necessary to prove to the trier of fact the cause of the heart attack which led to Woodley's death.  However, Lauridson's testimony does not provide the necessary testimony to help in this regard.  Admissible expert testimony must be more than just an implication. Expert testimony is used to explain complex issue to the jury.  In the case of Lauridson's testimony, he provides only an implication, not a scientific determination as to the cause of death.  Regarding the cause of Woodley's death, Lauridson testified that the physiologic stresses from the cervical spine injury lead to the deterioration of

Woodley's coronary artery disease and the fatal heart attack.  (Lauridson Dep. p. 95 ln. 23 – p. 96 ln. 6).  He also states that the blockage of Woodley's artery caused his death. (Lauridson Dep. 105 ln. 14 – p. 106 ln. 7).  As noted previously, Lauridson requires an autopsy to make a certain determination as to the cause of the blockage which caused the fatal heart attack.  (*See, Id.*).  The expert cannot merely testify to arguments of counsel.  *See, U. S. v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) (noting that expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments).  The expert's testimony must logically advance a material aspect of the proposing party's case.  *Haney v. Eaton Elec. Inc.*, 538 F. Supp. 2d 1262 (N. D. Ala. 2007).

The court in *Haney* noted that the must be a scientific connection between the expert's testimony and the undisputed facts. *Id.*  In the present case, there is no such connection.  Lauridson merely provides testimony that follows the plaintiff's argument, not the science.  There is no scientific connection because the science Lauridson admittedly requires in order to determine what caused the occluded artery, an autopsy, was never performed.  (*See,* Lauridson Dep. p. 33).

The proffered theory neither constitutes nor reflects scientific knowledge and thus must be excluded.  Even if the theory reflected some small degree of scientific knowledge, it would nevertheless have to be excluded from evidence as it

does not materially advance any aspect of this case.  Lauridson states that the motor vehicle accident and cervical spine fracture led to the cardiac event which caused the Woodley's death.  (Lauridson Dep. p. 104 ln. 8-16).  However, it is just as likely that as Lauridson testified the 100% calcification of the artery, a plaque rupture with associated development of a thrombus, or a coronary spasm, that caused the event; Lauridson does not know. (Lauridson Dep. p. 98 ln. 22 – p. 101 ln. 16).  "Without an autopsy, one can't be very specific."  (Lauridson Dep. p. 99 ln. 1-2).  Thus, the only role that Lauridson's testimony could play would be that of confusion. There is too great a gap between the facts, Lauridson's methodology, and his final opinion:

> Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Joiner*, 522 U.S. 136.  *See also, Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349, 1360 (6th Cir. 1992), *cert. denied*, 506 U.S. 826 (1992).  Lauridson's testimony is due to be excluded.

## V.    <u>Lauridson is not qualified to give expert testimony.</u>

As to the qualifications of the proposed expert witness, Defendants assert that Lauridson lacks sufficient qualifications to testify with regard to the cause of Woodley's heart attack and death.

The U.S. District Court for the Middle District of Georgia provides a clear outline of the Eleventh Circuit's qualifications analysis with regard to expert witnesses in *Bowers v. Norfolk Southern Corp.*, ---F. Supp. 2d--- 2007 WL 2187396 (M. D. Ga. July 26, 2007):

> Beginning with the qualification requirement, the Eleventh Circuit has advised that "experts may be qualified in various ways." *U.S. v. Frazier,* 387 F.3d 1244, 1260-61 (11th Cir. 2004). Certainly, an expert's scientific training or education may provide one means by which an expert may qualify to give certain testimony; however, experience in a particular field may also qualify an expert to offer an opinion on a particular matter. *Id.* Indeed, "experts come in various shapes and sizes" and, consequently, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field." *Santos v. Posadas de Puerto Rico Assocs.,* 452 F.3d 59, 63 (1st Cir.2006). In all cases, the salient inquiry is whether the expert has the requisite skill, experience, training, and education to offer the testimony he intends to introduce. *Poulis-Minott v. Smith,* 388 F.3d 354, 359 (1st Cir. 2004).

*Bowers v. Norfolk Southern Corp.*, ---F. Supp. 2d--- 2007 WL 2187396 (M. D. Ga. July 26, 2007). Lauridson does not meet the qualifications requirements in order to be considered an expert by this court. Lauridson does not have the scientific training, education, and experience that would qualify him to give expert testimony regarding the cause of Woodley's heart attack.

While Lauridson appears to be a well educated medical doctor with board certification in internal medicine, pathology, anatomic pathology and forensic pathology; he does not have specific training, education, or experience in cardiology. He has never gone through a cardiology residency, fellowship

14

program, or received any other specialized training relating to the medicine of cardiology.  This training is necessary for him to have the ability to provide relevant and reliable testimony regarding the cause of Woodley's heart attack.

Lauridson's cardiology related medical work was more than two decades ago:

> Q.    Yes, sir.  You're not trained in cardiology, are you?

> A.    I am not board certified in cardiology, that's correct.

> Q.    And you didn't take any specialized training in cardiology, did you?

> A.    Except as an internal medicine, that's correct.

> Q.    You never practiced medicine as a cardiologist, did you?
> A.     I ran the cardiac care unit in the U.S. Navy at Portsmouth Naval Hospital -- I'm sorry at Newport Naval Hospital.

> Q.    When was that?

> A.    May I see my resume?  1977 to1979.

> Q.    But you haven't done any cardiology since then?

> A.     I practiced internal medicine, which included cardiology, at Chickasha in Chickasha, Oklahoma, after the Navy.

> Q.    When was that?

> A.    1979 to 1980.

> Q.    Since then have you done any work in cardiology?

> A.    No, sir.

(Lauridson Dep. p. 37 ln. 17 – p. 38 ln. 21).  Furthermore, Lauridson has spent recent years working completely outside the medical profession entirely.  He spent from 2001 through 2005 working as Director of Graphics at the plaintiff's lawyer's firm, the very law firm that is employing him in this case.  For a period of time Lauridson was earning up to $150,000 per year in this non-medical position:

> Q.    I'm showing you what I'm going to mark as Exhibit 30 --. Did I mark 29? Let me show you what I'm going to mark as Exhibit 30.  Do you remember speaking at some sort of an expert witness conference, SEAK, or S-E-A-K?
>
> A.    Yes, I remember this.
>
> Q.    What was that about, please, sir?
>
> A.    Part of the graphics that I had done while I was working with Mr. Beasley and his group were used in a -- one of the cases that they had tried, and this group which is called -- the initials are S-E-A-K, and I've forgotten exactly what it means, saw that I did graphics for Beasley, Allen, and they asked if I would speak to their conference on how to use graphics in trial.
>
> Q.    Yes, sir.
>
> A.    So I gave them this talk, and I don't even see it on here to be quite honest with you.  I'm sure it's in here somewhere.
>
> Q.    I think it's on the third page.  That lists you as the director of graphics at the Beasley, Allen firm?
>
> A.    That's right.
>
> Q.    Tell me, please, sir, what did you do as director of graphics?  What was your job description?

A.    We started out as just myself. And at that time, the use of computer graphics in the court room to clarify the issues was coming to the fore, so that the jurors would have a better understanding of what amounts to fairly complex cases that come to court.  And so I began to do that in this firm.  And then eventually it was myself, and I had two assistants.  And we were doing -- generating the graphics for case-specific graphics, and then providing the technical support for the presentation of these graphics in depositions and in trials.

Q.    Were you salaried in that position?

A.    Yes.

Q.    Do you remember what that salary was?

A.    I think it started out at a hundred and twenty thousand.

Q.    And apparently it went up?

A.    It did.  And I don't remember where it ended, but I think it was a hundred and fifty, something like that.

Q.    Hundred and fifty thousand dollars a year?

A.    Yes, sir.

(Lauridson p. 53 ln. 9 – p. 55 ln. 21).  This work in the legal, rather than medical field, limited the amount of pathology work Lauridson was able to do:

Q.    And then you were employed at the Beasley firm –

A.    Following that, yes, sir.

Q.    -- following that.  That restricted your practice of forensic pathology, obviously, didn't it?

A.    To the extent that I wasn't doing daily cases, yes.  I continued, as I say, to be a consultant to the Department of Forensic Sciences during part of that time.

17

(Lauridson p. 57 ln. 21 – p. 58 ln. 7).   Furthermore, Lauridson appears more

qualified to provide expert opinions on computer graphic than on the cause of a

heart attack in a patient with coronary artery disease:

> Q.    It doesn't really -- It refers to you as an M.D., but it does not refer to your medical qualifications or experience, does it?  You were really at this conference or seminar, you were speaking about computer graphics as opposed to medicine; is that right?
>
> A.    That's right.
>
> Q.    There's a last sentence down there that says, Dr. Lauridson has written and lectured extensively on the use of computer graphics in the court room.  Do you see that?
>
> A.    Yes.
>
> Q.     But when we look at your CV, and your publications, I don't see any of your publications on computer graphics.
>
> A.    This writing and lecturing, it was all local.
>
> Q.    Yes, sir.
>
> A.     In relationship to the Alabama Department -- Alabama District Attorney's Association and within Beasley, Allen.  There was not -- I don't think I've ever done a -- Are you asking about peer reviewed articles in computer graphics, the answer is no, there is none.  I'm assuming that was your question.
>
> Q.     Well, sir, reports that you have written extensively on the use of computer graphics –
>
> A.    Uh-huh.
>
> Q.     -- and you brought in the subject of peer review, those publications on use of computer graphics in the court room would

18

have been presented to persons  who go to court, like lawyers and judges –

A.    Yes.  That's exactly right.

Q.    -- and folks who do what you do and go in the court room. Others who testify as experts would have access to those publications, wouldn't they?

A.    Yes.

Q.    What sort of -- How were those matters published?

A.    In handouts to lectures and that sort of thing.  I don't have a list of all of those.  But I spent a lot of time lecturing to district attorneys, to prosecutors in these realms and to their assistants.

Q.    And apparently you've held yourself out as having qualifications.  For gosh sakes, you worked in the area of graphics, preparing graphics for the district attorneys, for the Beasley firm, and preparing matters to be presented in court to juries, just like the jury that will try this case?

A.    I think the answer to your question is what were my qualifications.  I think my qualifications were judged by my work product –

Q.    Yes, sir.

A.    -- and the folks who hired me to do those things.

Q.    And you considered yourself qualified in the area or you wouldn't have held yourself out as somebody to speak on this subject to other experts, would you?

A.    I'm not sure what you mean by held myself out.  Is there a certification in court computer graphics, the answer is no.  My background is in engineering, as you know from having read my resume, which gave me a firm foundation in the sciences needed to do accurate computer graphics.

19

Q.    Yes, sir.  And you considered yourself having expertise in computer graphics and the presentation of those  graphics to juries and courts, didn't you?

A.    Yes.  It was accepted in courts and used.

Q.    And that's what you did for a living at that time?

A.    Yes.  That's right.

Q.    And, in fact, this program was to be presented to people who, like yourself, would offer expert witness testimony; is that right?

A.    That's correct.

(Lauridson 58 ln. 8 – p. 62 ln. 22).  Clearly, Lauridson is not qualified to render any expert medical opinions in this matter regarding the cause of Woodley's death.

## **CONCLUSION**

The preponderance of the evidence shows that the plaintiff has failed to meet the requirements of the Federal Rules of Evidence and the *Daubert* line of case law with regard to the admissibility of expert testimony.  The contradictory testimony provided by Lauridson at his deposition makes this clear.

WHEREFORE, PREMISES CONSIDERED, the defendants request this Honorable Court to grant its motion and exclude the testimony of James L. Lauridson, M. D.

Respectfully submitted,

s/ Matthew W. Robinett

WILLIAM C. WOOD
WOO007 – ASB-2689-DA4W
MATTHEW W. ROBINETT
ROB127 – ASB-3523-172M
*Attorneys for Defendants*
NORMAN, WOOD, KENDRICK & TURNER
Financial Center, Suite 1600
505 20th Street North
Birmingham, AL  35203
Telephone:  (205) 328-6643
Fax:          (205) 251-5479
Email:        wood@nwkt.com
               mrobinett@nwkt.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA,
### NORTHERN DIVISION

| | | |
|---|---|---|
| **LILIAN WOODLEY, as the** | * | |
| **administratrix of the Estate of** | * | |
| **RUFUS WOODLEY,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **CASE No.:  2:07-CV-74-ID** |
| | * | |
| **PFG-LESTER BROADLINE, INC.,** | * | |
| **KENNETH O. LESTER COMPANY,** | * | |
| **INC., et al.,** | * | |
| | * | |
| **Defendants.** | * | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2008, I electronically filed the foregoing with the Clerk of the Court through the CM/ECF system which will send notification of such filing to the following:

Michael J. Crow
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, PC
P.O. Box 4160
Montgomery, AL 36103-4160

Respectfully submitted,

s/ Matthew W. Robinett
WILLIAM C. WOOD
WOO007 – ASB-2689-DA4W
MATTHEW W. ROBINETT
ROB127 – ASB-3523-172M
*Attorneys for Defendants*
NORMAN, WOOD, KENDRICK & TURNER
Financial Center, Suite 1600
505 20th Street North

22

Birmingham, AL  35203
Telephone:  (205) 328-6643
Fax:            (205) 251-5479
Email:         wood@nwkt.com
                   mrobinett@nwkt.com