IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

LILIAN WOODLEY, as the     \*
administratrix of the Estate of     \*
RUFUS WOODLEY,     \*
    \*
     **Plaintiffs,**     \*
    \*
v.     \*     **CASE No.:  2:07-CV-74-ID**
    \*
PFG-LESTER BROADLINE, INC.,     \*
KENNETH O. LESTER COMPANY,     \*
INC., et al.,     \*
    \*
     **Defendants.**     \*

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COME NOW the defendants, by and through the undersigned counsel and in support of their motion for summary judgment submit the following brief:

## STATEMENT OF THE CASE

In this lawsuit, Plaintiff seeks to recover as the Administratrix of the Estate of Rufus Woodley against Kenneth O. Lester Company, Inc. and PFG-Lester Broadline, Inc.  (*See,* Compl. and Am. Compl.).  The complaint and amendments (hereinafter "complaint") allege the death of Mr. Woodley resulted from a single vehicle accident allegedly involving the defendant's semi-tractor trailer truck.  *Id.*

1

The plaintiff contends that that the defendants caused the accident and the accident caused Woodley's death.  *Id.*

The complaint lists causes of action for Negligence, Wantonness, Negligent/Wanton Entrustment, and Negligent/Wanton Hiring, Retention, Supervision or Maintenance.  (*See*, Compl. and Am. Compl.).

Defendants PFG-Lester Broadline, Inc., and Kenneth O. Lester Company, Inc**.** have answered the complaint and asserted affirmative defenses.  (*See,* Answer).

## UNDISPUTED FACTS

Rufus Woodley had a history of heart problems.  The seriousness of Woodley's illness began in 2002.  In January 2002, Woodley had anginal pain radiating down his arms indicating low blood flow from the heart.  (Papapietro Dep. p. 25 ln. 8-19).  Later, in July 2003, Woodley began to experience complications with his heart disease.  Medical records note that he may have experienced a small heart attack in 2003.  (Papapietro Dep. p. 30 ln. 3-7).  Additionally, Woodley had significant blockage and calcification of both the right and left arteries.  (Papapietro Dep. p. 31 ln. 19 – p. 37 ln. 14).  On July 29, 2003, when Woodley underwent heart surgery, his cardiologist noted that there was a 50% narrowing of his left descending artery.  (Papapietro Dep. p. 32 ln. 7-21).  At

this same time, Woodley's cardiologist noted calcified plaque in the right coronary artery. (Papapietro Dep. p. 34 ln. 4-16). This calcification prevented the optimal placement of a stent. (Papapietro Dep. p. 36 ln. 10 – p. 37 ln. 17). Only weeks after the placement of the stent in the summer of 2003, Woodley continued to experience chest pains. (Papapietro Dep. p. 39 ln. 2 – p. 40 ln. 4). On August 19, 2003, Woodley underwent another angiogram and heart catheterization. (Papapietro Dep. p. 42 ln. 17-21). During this procedure, Woodley's cardiologist noted that the right artery was somewhere between a 60-80% blockage. (Papapietro Dep. p. 45 ln. 3 – p. 46 ln. 2) However, Woodley never had heart by-pass surgery. (Papapietro Dep. p. 48 ln. 2-8). In September 2003, despite the two procedures that summer, Woodley continued to have angina. (Papapietro Dep. p. 52 ln. 17-20). He had been prescribed nitroglycerine and Lipitor. (Papapietro Dep. p. 51ln. 1-14). In January 2004, Woodley's cardiologist again noted that he was experiencing chest pains. (Papapietro Dep. p. 54 ln. 16 – p. 55 ln. 3).

Due to the onset of and complications from these heart problems, Woodley was more likely to have a heart attack than someone without these issues. (Papapietro Dep. p. 58 ln. 4-17). Nevertheless, it was possible that he could have lived a full life even with these problems. *Id.* From approximately 2003 until 2006, Woodley had been without heart problems. On July 11, 2006, Woodley's medical records reflect that he was asymptomatic and had a regular heart beat and

3

rhythm. (Papapietro Dep. p. 19 ln. 7-11). In January of 2006, Woodley underwent a stress test which showed a normal EKG and in which he experienced no chest pain. (Papapietro Dep. p. 19 ln 16-25). However, in July 2006, Woodley's medical records indicate that he has stopped taking his cholesterol medication, but there was no medical reason listed on his cardiologist's records. (Papapietro Dep. p. 60 ln. 17 – p. 61 ln. 18).

On or about August 18, 2006, Rufus Woodley and his wife Lillian Woodley were traveling on Interstate 59 North in Dekalb County at or near Fort Payne, Alabama. (Am. Compl.¶ 5). They were involved in what the police report describes as a single-vehicle accident. As a result of the accident Rufus Woodley suffered cervical spine fractures and had neurologic damage from the fractures. (Papapietro Dep. p. 11 ln. 9-14). On August 30, 2006, two weeks after the accident, Woodley was scheduled to be discharged to a rehabilitation facility. *Id.* Before leaving the hospital on August 31, 2006, Woodley suffered a heart attack due to 100% occlusion of right coronary artery which caused his death. (Lauridson Dep. p. 105 ln. 14 – p. 106 ln. 4).

The plaintiff has designated two expert witnesses, Silvio Papapietro, M. D. and James R. Lauridson, M. D. (*See*, Ex. A). Papapietro is a board certified cardiologist at the University of Alabama at Birmingham. (Papapietro Dep. p. 6 ln. 12 – p. 8 ln. 15). He treated Woodley on August 31, 2006. (Papapietro Dep. p. 9

ln. 9 – p. 10 ln. 14).  He was the treating cardiologist for Woodley when Woodley

suffered a heart attack on August 31, 2006.  *Id.*  He performed a heart

catheterization and other procedures on Woodley.  (Papapietro Dep. p. 10 ln. 3-14).

Papapietro opined that Woodley died of a large heart attack.  (Papapietro

Dep. p. 23 ln. 22).  However, he could not say whether the cervical spine injury

contributed to the heart attack. *Id.*  Papapietro testified:

> A.   And I don't really know, or at least I don't have any
> evidence one way or the other, if the heart attack was precipitated by
> the events that preceded the heart attack.  I mean, it is certainly
> possible that, you know, the spinal cord injury, the transient low blood
> pressure could have precipitated the heart attack; but it's also possible
> that the heart attack could have developed regardless, or it could have
> happened even if he had not had a spinal cord injury.  I mean, it's very
> difficult to tell.  In fact, don't have any way of knowing one way or
> the other, you know, if this is the case.

(Papapietro Dep. p. 20 ln. 14 – p. 21 ln. 4).

The plaintiff's second designated expert James R. Lauridson, M. D. testified

similar to Papapietro in that he did not know the cause of the heart attack.

Lauridson is board certification in internal medicine, pathology, anatomic

pathology, and forensic pathology; however, he does not have any specific training

or education in cardiology.  Furthermore, Lauridson has spent recent years working

completely outside the medical profession entirely.  He spent from 2001 through

2005 working as Director of Graphics at the law firm representing the plaintiff that

is employing him in this case.  (Lauridson Dep. p. 53 ln. 11 – p. 55 ln. 21).  In his

role as Director of Graphics, Lauridson prepared computer presentations for use at trial by attorneys and even spoke at seminars on the use of graphics in the courtroom. (Lauridson Dep. p. 58 ln. 8 – p. 68 ln. 10). Currently, Lauridson conducts autopsies at various hospitals and funeral homes in the Montgomery, Alabama area, provides case consultations for attorneys, and works at Gunter Air Force Base conducting admission physicals for new inductees. (Lauridson Dep. p. 48 ln. 14 – p. 50 ln. 9). Regarding the cause of Woodley's death, Lauridson testified that the physiologic stresses from the cervical spine injury lead to the deterioration of Woodley's coronary artery disease and the fatal heart attack. (Lauridson Dep. p. 95 ln. 23 – p. 96 ln. 6). He also states that the blockage of Woodley's artery caused his death. However, he admits that without an autopsy he cannot be certain as to what caused the blockage:

> Q.    You understand that the right coronary artery was one hundred percent occluded as reported in the catheterization summary?
>
> A.    Yes. At the time of the fatal event, that's correct.
>
> Q.    Do you have any opinion as to what caused that hundred percent occlusion?
>
> A.     Without an autopsy, one cannot be certain. It was thrombus or ruptured atherosclerotic plaque with overlying thrombus, possibly, but not likely, coronary spasm with associated thrombus.
>
> Q.     That's really -- It was the blockage of that artery that actually caused the man's death?

A.    Yes.

(Lauridson Dep. p. 105 ln. 14 – p. 106 ln. 7).


## STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c).  Further,

> The party moving for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact. The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party.

*Haney v. Eaton Elec., Inc.*, 528 F. Supp. 2d 1262, 1263 (N. D. Ala. 2007) (internal citations omitted).


## ARGUMENT

### I.    Introduction

The complaint lists causes of action for Negligence, Wantonness, Negligent/Wanton Entrustment, and Negligent/Wanton Hiring, Retention,

Supervision or Maintenance.  The complaint is an action for wrongful death.  The plaintiff alleges that the death of Woodley was caused a motor vehicle accident allegedly involving Kenneth O. Lester Company, Inc.  The plaintiff's theory of liability is that the defendant caused the accident; the accident caused the death, and therefore the defendant is liable for damages.  The plaintiff's cause of action fails, because she cannot prove the essential element in the chain of events, causation.

Under Alabama law, "in order to prove a claim of negligence a plaintiff must establish that the defendant breached a duty owed by the defendant to the plaintiff and that the breach proximately caused injury or damage to the plaintiff." *Proctor v. Fluor Enterprises Inc.* 494 F.3d 1346 (11th Cir. 2007) (quoting *Zanaty Realty, Inc. v. Williams,* 935 So. 2d 1163, 1167 (Ala. 2005)).  Despite any argument that can be made regarding the duty and breach elements of the negligence claims, summary judgment is due to be granted in favor of the defendants because the plaintiff cannot prove causation in that any alleged breach of duty caused Woodley's death.

It is well settled that simply conjecturing or raising the possibility that a defendant's actions resulted in the injury is insufficient to establish causation in a negligence case. *C. D. Lott v. C & W Trucking, Inc. et al.*, 15 F. Supp. 2d 1167 (M. D. Ala. 1997).  Further, Alabama courts have held that damages claims cannot be

presented to a jury without sufficient causation evidence. *D. A. C., by and through D. D. v. Thrasher*, 655 So. 2d 959 (Ala. 1995) (citing *Alabama Power Co. v. Bryant*, 146 So. 602, 604-05 (Ala. 1933). Moreover, there is a litany of case law in Alabama that this uncertainty in the causation evidence is a failure of proof, which the plaintiff must satisfy. *See, e.g.*, *Thrasher*, 655 So. 2d 959, (citing *Carlisle v. Central of Georgia R. Co.,* 62 So. 759 (Ala. 1913) (holding that if evidence leaves it uncertain as to whether the cause of the injury was something for which defendant was responsible, or something for which it was not responsible, there is a failure of proof, and the jury cannot be permitted to guess at the real cause.); *Koger v. Roden Coal Co.,* 73 So. 33 (Ala. 1917) (holding the mere possibility that the negligence of defendant caused the injury without evidence thereof, is not sufficient to carry the case to the jury, or to support a verdict.); *St. Louis & S.F.R. Co. v. Dorman,* 89 So. 70 (Ala. 1921) (holding where it was merely conjectural whether death of a servant resulted from negligence for which the master was liable or from other cause, there can be no recovery)).

The plaintiff bears the burden of proof regarding causation and she fail to meet this burden.

## II.   <u>Causation is properly resolved as a matter of law.</u>

Ordinarily, under Alabama law, the question of proximate cause is for a jury to decide. *Vesta Fire. Ins. Corp. v. Milam & Co. Const., Inc.*, 901 So. 2d 100-101

(Ala. 2004) (citing *Marshall County v. Uptain,* 409 So. 2d 423 (Ala. 1981); *Garner v. Covington County,* 624 So. 2d 1346, 1349 (Ala. 1993); *See also, Green v. Alabama Power Co.,* 597 So. 2d 1325 (Ala. 1992); and *Cain v. Sheraton Perimeter Park South Hotel,* 592 So. 2d 218 (Ala. 1991)).   However, as noted by the Supreme Court of Alabama in *Vesta Fire Ins. Corp.,* there are circumstances in which the issue of proximate cause is and should be resolved as a matter of law. *Id.*  This is one of those circumstances.

> The court in *Vesta Fire Ins. Corp.* noted:
>
> There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. On the other hand, if there is evidence which points to any one theory of causation indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination...

*Vesta Fire. Ins. Corp. v. Milam & Co. Const., Inc.*, 901 So. 2d 100-101 (Ala. 2004) (citing *Ex parte Mobile Power & Light Co.,* 810 So. 2d at 761) (internal citations omitted).

In the present case, the plaintiff's experts cannot provide an opinion as to what caused the 100% occlusion of the right artery.  The only opinion about cause of the death is conjecture and not appropriate for consideration by a jury. Therefore, as a matter of law, summary judgment is due to be granted in favor of this defendant.

III.   **The plaintiff has failed to present evidence in support of her negligence claims.**

The law in Alabama is:

> Proof which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause.   But a nice discrimination must be exercised in the application of this principle. As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference.  There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only.   On the other hand, if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence.

*Ervin v. Excel Properties, Inc.*, 831 So. 2d 38 (Ala. Civ. App. 2001) (internal citations and quotations omitted).

The plaintiff bases her claims on the testimony of the expert witnesses Silvio Papapietro and James R. Lauridson.  (*See*, Ex. A, Ex. B, and Ex. C).  Papapietro states that there were a number of possible explanations for Woodley's heart attack, and eventually in his deposition, Papapietro declines to form an opinion as to the cause of death and clearly says there is insufficient evidence to draw a conclusion and form and opinion.   Lauridson's opinion on causation is contradictory, indefinite, and made up of conjecture.   Additionally, his opinion

ought to be excluded under Federal Rule of Evidence 702 as outlined and briefed in the Defendants' Motion to Exclude filed contemporaneously herewith.

### A. Testimony of Papapietro is inconclusive as to the cause of death.

Silvio Papapietro, M. D. is a board certified cardiologist at the University of Alabama at Birmingham.  (Papapietro Dep. p. 6 ln. 12 – p. 8 ln. 15).  He treated Woodley on August 31, 2006.  (Papapietro Dep. p. 9 ln. 8 – p. 10 ln. 14).  He was the treating cardiologist for Woodley when Woodley suffered a heart attack on August 31, 2006.  *Id.*  He performed a heart catheterization and other procedures on Woodley.  (Papapietro Dep. p. 10 ln. 3-14).

Upon examination by plaintiff's counsel at deposition, Papapietro was questioned about the cause of Woodley's heart attack:

A.  Obviously he died of a large heart attack.

Q.  Right.

A.  But your question, I understood, was the heart attack caused or the result of the spinal cord injury?

Q.  Well, did the spinal cord injury contribute in any way to his heart – the heart attack –

A.  I don't know.

Q.  – and the other causes or – that are listed on the death certificate?

A.  I don't know.  I don't have any way of proving or disproving that the spinal cord injury contributed.  It might have contributed.

Q.  It could have, but you just don't know?

A.  I don't know.  It might have contributed.  It might not have contributed.

Q.  All right.

(Papapietro Dep. p. 23 ln. 22 – p. 24 ln. 15).  Thus, even the testimony of the physician that attended to Woodley while he was experiencing the heart attack cannot provide testimony that the heart attack was caused by the spinal cord injury from the alleged accident.  Papapietro testified as follows:

A.  And I don't really know, or at least I don't have any evidence one way or the other, if the heart attack was precipitated by the events that preceded the heart attack.  I mean, it is certainly possible that, you know, the spinal cord injury, the transient low blood pressure could have precipitated the heart attack; but it's also possible that the heart attack could have developed regardless, or it could have happened even if he had not had a spinal cord injury.  I mean, it's very difficult to tell.  In fact, don't have any way of knowing one way or the other, you know, if this is the case.

(Papapietro Dep. p. 20 ln. 14 – p. 21 ln. 4).  Based on this testimony elicited by plaintiff's counsel, it is clear that the plaintiff has failed to produce evidence of an essential element of their claims, causation.

"Evidence which affords nothing more than mere speculation, conjecture, or guess is wholly insufficient to warrant submission of the case to the jury."  *Turner v. Azalea Box Co.*, 508 So. 2d 253, 254 (Ala. 1987) (quoting *Roberts v. Carroll*, 377 So. 2d 944, 946 (Ala. 1979)).  Alabama juries are not permitted to speculate as

to the cause of an accident. *See, Brookwood Medical Ctr. v. Lindstrom,* 763 So. 2d

951 (Ala. 2000); *Azalea Box Co.,* 508 So. 2d at 254 ("[w]hen evidence points

equally to inferences that are favorable and to inferences that are unfavorable to the

moving party, the evidence lacks probative value; and the evidence may not be

used to support one inference over another because such use is mere conjecture and

speculation").    In *Azalea Box Co.*, the plaintiff brought an action against a

manufacturer of wooden pallets.  The action was for injuries the plaintiff sustained

allegedly as a result of a defective pallet.  However, in *Azalea Box Co.,* there were

three or four possible sources for the pallet which injured the plaintiff.  *Azalea Box

Co.*, 508 So. 2d at 254.  All of the pallets used at the warehouse where the plaintiff

worked were wooden, similar in size and they had no distinguishing markings that

would have allowed them to have identified as to the manufacturer.  *Id.*  The court

found that this evidence presented by the plaintiff that it could be equally inferred

that the pallet that injured the plaintiff was made by the defendant or just as likely

that it was made by one of the other manufacturers that supplied pallets to the

warehouse.  The court held that based on this evidence, the summary judgment

entered in favor of the defendant was due to be affirmed.  *Id.*

   In the present case we are faced with a scenario similar to that found in

*Azalea Box Co* in that there are multiple explanations for why and how Woodley

had a heart attack.  In the present case, the plaintiff has presented evidence that

there is no way of knowing one way or the other what caused the heart attack. It could have been the spine injury or it may have occurred despite the injury. (Papapietro Dep. p. 20 ln. 14 – p. 21 ln. 4). Thus, in line with the Alabama Supreme Court's holding in *Azalea Box Co,* clearly the plaintiff's evidence calls for speculation, conjecture, and even guesswork when determining the cause of death. So much so, that even her own expert Dr. Papapietro will not reach a conclusory opinion. Therefore, summary judgment is due to be granted.

### B. Testimony of Lauridson is insufficient to provide a cause of death.

The plaintiff also named Lauridson as an expert. (*See*, Ex. A and Ex. B). Lauridson's testimony is similar to Papapietro in that he is unable to identify the cause of death without relying on conjecture.

Lauridson's final opinion as to the cause of Woodley's death was a heart attack due to the 100% blockage of the right coronary artery:

> Q.     You understand that the right coronary artery was one hundred percent occluded as reported in the catheterization summary?
>
> A.     Yes.  At the time of the fatal event, that's correct.
>
> Q.     Do you have any opinion as to what caused that hundred percent occlusion?
>
> A.     Without an autopsy, one cannot be certain.  It was thrombus or ruptured atherosclerotic plaque with overlying thrombus, possibly, but not likely, coronary spasm with associated thrombus.
>
> Q.     That's really -- It was the blockage of that artery that actually caused the man's death?

15

   A. Yes.

(Lauridson Dep. p. 105 ln. 14 – p. 106 ln. 7).  Lauridson admits that he does not know what caused the blockage of the artery and Woodley's death.  It is just as likely that the 100% calcification of the artery, a plaque rupture with associated development of a thrombus, or a coronary spasm, caused the event; Lauridson does not know. (Lauridson Dep. p. 98 ln. 22 – p. 101 ln. 16).  "Without an autopsy, one can't be very specific."  (Lauridson Dep. p. 99 ln. 1-2).  Therefore, because there is a lack of certainty as to the cause of the blockage and Lauridson admission that an autopsy would be required to determine this cause, Lauridson is clearly uncertain as to the cause of Woodley's heart attack.

  There was no autopsy conducted in this case:

   Q. All right, sir.  There was no autopsy of Rufus Woodley,
 was there?

   A. That's right.

   Q. By you or anyone?

   A. That's correct.

   Q. And nobody with pathologist qualifications, that you're
 aware of, ever saw Rufus Woodley, did they?

   A. That's right.

(Lauridson Dep. p. 33 ln. 7-15).

  Lauridson attributes the heart attack to Woodley's cervical spine injury.

…And so here was a man who had severe disease but was stable. Then he has this accident, has a cervical spine injury which sets up the usual complications with cervical spine injury, and that is problems with maintaining stable blood pressures, problems with fluid balance. And, in fact, if one reads the medical record closely, there is a specific admonition to maintain the mean arterial pressure above eighty-five. And the importance of that, obviously, is to keep enough blood flowing through the coronary arteries to prevent the heart attack. It's well documented in a couple of places that the mean arterial pressure fell below that, down to sixty, and the day before his heart attack, it was documented to be down at about sixty. Those are the stresses, the physiologic stresses, that led to a deterioration of his coronary artery disease and the fatal heart attack, not to mention the psychological stresses of pain and the emotional stresses that also have deleterious effects on the heart.

(Lauridson Dep. p. 95 ln. 5 – p. 96 ln. 6). However, Lauridson's admission that it was a blockage of the artery that caused the heart attack and that he does not know what caused the blockage of the artery invalidates his opinion as to the cause of Woodley's death. (Lauridson Dep. p. 105 ln. 14 – p. 106 ln. 7). As a result of the contradictory testimony of this expert, the plaintiff has not met her burden. The plaintiff fails to provide the requisite testimony linking the cause of death to the alleged accident. Therefore, summary judgment is due to be granted in favor of the defendants.

### III.   Without causation evidence all other claims of the plaintiff are due to be dismissed as a matter of law.

The plaintiff's claims of Wantonness, Negligent/Wanton Entrustment, and Negligent/Wanton Hiring, Retention, Supervision or Maintenance all fail based on the insufficiency of the causation evidence presented by the plaintiff.

17

As illustrated previously through the testimony of the plaintiff's expert Lauridson, a 100% blockage of the right artery caused the heart attack and resulting death.    However, without an autopsy, Lauridson cannot know what caused this blockage.    Nor can Papapietro provide the necessary causation testimony to sustain the plaintiff's cause of action:  "…The specifics about this patient is, do I have any evidence one way or the other that, you know, a specific event caused that artery to close that day, I have no way to tell you one way or the other.  I know that when we went there the artery was closed…" (Papapietro Dep. p. 91 ln. 13-18).  Therefore, summary judgment is due to be granted in favor of the defendants on all of the plaintiff's claims.


## CONCLUSION

The plaintiff has failed to meet her burden as to the cause of Woodley's death.  Summary judgment is due to be granted against a party that has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Haney v. Eaton Elec., Inc.*, 528 F. Supp. 2d 1262, 1263 (N.D. Ala. 2007) (citing, *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).  The plaintiff's own expert witnesses cannot testify that the cause of death was related to the accident.  Therefore, because the plaintiff has not produced sufficient evidence

that the alleged accident was the cause in fact of Woodley's death, summary judgment is due to be granted.

WHEREFORE, PREMISES CONSIDERED, the defendants pray that this Honorable Court grant its summary judgment against the plaintiff and enter judgment in favor of the defendants as a matter of law.

Respectfully submitted,

s/ Matthew W. Robinett
WILLIAM C. WOOD
WOO007 – ASB-2689-DA4W
MATTHEW W. ROBINETT
ROB127 – ASB-3523-172M
*Attorneys for Defendants*
NORMAN, WOOD, KENDRICK & TURNER
Financial Center, Suite 1600
505 20th Street North
Birmingham, AL  35203
Telephone:   (205) 328-6643
Fax:          (205) 251-5479
Email:        wood@nwkt.com
              mrobinett@nwkt.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA,
### NORTHERN DIVISION

| | | |
|---|---|---|
| **LILIAN WOODLEY, as the** | * | |
| **administratrix of the Estate of** | * | |
| **RUFUS WOODLEY,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **CASE No.:  2:07-CV-74-ID** |
| | * | |
| **PFG-LESTER BROADLINE, INC.,** | * | |
| **KENNETH O. LESTER COMPANY,** | * | |
| **INC., et al.,** | * | |
| | * | |
| **Defendants.** | * | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2008, I electronically filed the foregoing with the Clerk of the Court through the CM/ECF system which will send notification of such filing to the following:

Michael J. Crow
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, PC
P.O. Box 4160
Montgomery, AL 36103-4160

Respectfully submitted,

s/ Matthew W. Robinett
WILLIAM C. WOOD
WOO007 – ASB-2689-DA4W
MATTHEW W. ROBINETT
ROB127 – ASB-3523-172M
*Attorneys for Defendants*
NORMAN, WOOD, KENDRICK & TURNER
Financial Center, Suite 1600
505 20th Street North

Birmingham, AL  35203
Telephone:  (205) 328-6643
Fax:            (205) 251-5479
Email:         wood@nwkt.com
                   mrobinett@nwkt.com

# **<u>Exhibit A</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

**LILLIAN WOODLEY as the**　　　　*
**administratrix of the Estate of**　　*
**RUFUS WOODLEY,**　　　　　　*
　　　　　　　　　　　　　　*
　　　　**Plaintiffs,**　　　　　*
　　　　　　　　　　　　　　*　　**CIV. ACT. NO.: 2:07cv74-ID**
**v.**　　　　　　　　　　　*
　　　　　　　　　　　　　　*
**PFG-LESTER  BROADLINE,  INC.;**　*
**KENNETH O. LESTER COMPANY,**　*
**INC.,**　　　　　　　　　　*
　　　　　　　　　　　　　　*
　　　　**Defendants.**　　　　*
　　　　　　　　　　　　　　*

## PLAINTIFF'S EXPERT DISCLOSURES

Plaintiff, Lillian Woodley, pursuant to the Court's Order dated March 13, 2007 hereby discloses the identity of the following persons who may be used at the trial of this matter:

1.　　Silvo Papapietro;

2.　　James Lauridson.

MICHAEL J. CROW (CRO039)
Attorney for Plaintiffs

OF COUNSEL:

BEASLEY, ALLEN, CROW,
  METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
Montgomery, AL 36103-4160
(334) 269-2343

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon all counsel of record listed below via e-file, on this the 22nd day of October, 2007.

*Michael Crow*

OF COUNSEL

Matthew W. Robinett
William C. Wood
Norman, Wood, Kendrick and Turner
Financial Center, Suite 1600
505 Twentieth Street North
Birmingham, Alabama 35203

# Exhibit B

# FREEDOM COURT REPORTING

**1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3        NORTHERN DIVISION
4
5    CASE NUMBER:  2:07-CV-74-ID
6    LILIAN WOODLEY, AS THE ADMINISTRATRIX
7    OF THE ESTATE OF RUFUS WOODLEY,
8        Plaintiffs,
9        vs.
10   PFG-LESTER BROADLINE, INC., ET AL.,
11       Defendants.
12
13       S T I P U L A T I O N
14       IT IS STIPULATED AND AGREED by and
15   between the parties through their respective
16   counsel, that the deposition of James R.
17   Lauridson may be taken before Sara Mahler,
18   CCR, at the offices of Beasley, Allen, Crow,
19   Methvin, Portis & Miles, at 218 Commerce
20   Street, Montgomery, Alabama 36103, on the
21   27th day of February, 2008.
22
23       DEPOSITION OF JAMES R. LAURIDSON

**2**

1        IT IS FURTHER STIPULATED AND
2    AGREED that the signature to and the reading
3    of the deposition by the witness is waived,
4    the deposition to have the same force and
5    effect as if full compliance had been had
6    with all laws and rules of Court relating to
7    the taking of depositions.
8        IT IS FURTHER STIPULATED AND
9    AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17       IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21       * * * * * * * * * * * * *
22
23

**3**

1        * * * * * * * * * * * * *
2            I N D E X
3            EXAMINATION
4                        PAGE
5    By Mr. Wood ......................... 6
6        DEFENDANT'S EXHIBITS
7                        PAGE
8    Exhibit 26 - Notice of Deposition ... 7
9    Exhibit 38 - Dr. Fallahi's
10       records .................. 17
11   Exhibit 39 - CV .................... 18
12   Exhibit 27 - Federal Rule 26
13       excerpt ................. 21
14   Exhibit 28 - Lauridson's report .... 22
15   Exhibit 30 - SEAK document ........ 53
16   Exhibit 31 - Article from Beasley
17       website ................. 70
18   Exhibit 33 - Nibbana Graphics
19       info ................... 73
20   Exhibit 34 - Jere Beasley Report,
21       April 2003 .............. 79
22   Exhibit 35 - Jere Beasley Report
23       dated May, 2004 .......... 82

**4**

1    Exhibit 36 - Page 24,
2        Dr. Papapietro's
3        deposition. ........... 91
4    Exhibit 37 - Dr. Arciniegas'
5        record ................ 102
6        * * * * * * * * * * * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

5

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         NORTHERN DIVISION
4    CASE NUMBER: 2:07-CV-74-ID
5    LILIAN WOODLEY, AS THE ADMINISTRATRIX
6    OF THE ESTATE OF RUFUS WOODLEY,
7         Plaintiffs,
8    vs.
9    PFG-LESTER BROADLINE, INC., ET AL.,
10        Defendants.
11   BEFORE:
12        SARA MAHLER, Commissioner.
13   APPEARANCES:
14        MICHAEL J. CROW, ESQUIRE, of
15   BEASLEY, ALLEN, CROW, METHVIN, PORTIS &
16   MILES, 218 Commerce Street, Montgomery,
17   Alabama 36103, appearing on behalf of the
18   Plaintiffs.
19        WILLIAM C. WOOD, ESQUIRE, of
20   NORMAN, WOOD, KENDRICK & TURNER, 505
21   Twentieth Street North, Suite 1600,
22   Birmingham, Alabama 35203, appearing on
23   behalf of the Defendants.

6

1         I, SARA MAHLER, CCR, a Court
2    Reporter of Wetumpka, Alabama, acting as
3    Commissioner, certify that on this date, as
4    provided by the Federal Rules of Civil
5    Procedure and the foregoing stipulation of
6    counsel, there came before me at the offices
7    of Beasley, Allen, Crow, Methvin, Portis &
8    Miles, 218 Commerce Street, Montgomery,
9    Alabama 36103, beginning at 1:00 p.m.,
10   James R. Lauridson, witness in the above
11   cause, for oral examination, whereupon the
12   following proceedings were had:
13        JAMES R. LAURIDSON,
14   being first duly sworn, was examined and
15   testified as follows:
16        COURT REPORTER: Usual
17   stipulations?
18        MR. CROW: Yes.
19        MR. WOOD: That would be fine.
20        EXAMINATION
21   BY MR. WOOD:
22        Q.   Tell us your name, please,
23   sir.

7

1         A.   James R. Lauridson.
2         Q.   All right, sir. And you live
3    and work here in the Montgomery area; is
4    that right?
5         A.   Yes, sir, that's correct.
6         Q.   Where are you presently
7    employed?
8         A.   I'm self-employed.
9         Q.   Doing what kind of work?
10        A.   I do some clinical medicine, I
11   do autopsies, privately and with a couple of
12   hospitals, and I do case consultations.
13        Q.   What kind of case
14   consultations, please, sir?
15        A.   The majority of them are on
16   the criminal side: Criminal defense, some
17   criminal prosecution, and then some civil.
18        (Whereupon, Defendant's
19        Exhibit No. 26 was marked
20        for identification.)
21        Q.   Let me show you what's been
22   marked as Exhibit 26, which is a Notice of
23   your deposition. Have you seen that before,

8

1    please, sir?
2         A.   I have, yes.
3         Q.   Have you brought the items
4    that were requested?
5         A.   Everything that is available,
6    I have brought, yeah.
7         Q.   What is not available?
8         A.   I don't have a complete record
9    of all of my testimonies in the past. I
10   have testified when I was a medical
11   examiner, I testified a large number of
12   times, and I did not keep a record of those.
13        Q.   All right, sir. Were those
14   all in criminal cases?
15        A.   For the most part, yes.
16        Q.   Well, were some of them in
17   civil cases?
18        A.   Yes.
19        Q.   How many were in civil cases?
20        A.   Again, it's a minority. But,
21   in medical examiner's work, we did generate
22   some civil cases.
23        Q.   How many times have you

# FREEDOM COURT REPORTING

9

1  testified in civil cases all total?
2       MR. CROW:  Are you talking
3  about trial testimony or deposition?
4       MR. WOOD:  Deposition or
5  trial.
6       A.    My estimate is probably
7  fifteen times.
8       Q.    And were those all when you
9  were in the medical examiner's office?
10      A.    No.  I've testified since.
11      Q.    How many times since in civil
12 cases?
13      A.    In civil cases, probably five.
14      Q.    Have you kept records of
15 those?
16      A.    I have not.
17      Q.    How far back do they go?
18      A.    It would go back two to three
19 years.
20      Q.    Do you have any billing or
21 time records that would allow you to
22 reconstruct that?
23      A.    Yes.

10

1       Q.    But you have not done that?
2       A.    I have not, no.
3       Q.    But you brought everything
4  else?
5       A.    Everything that's available,
6  yes, I brought.
7       Q.    But everything else is
8  available; is that correct?
9       A.    Everything that is available,
10 I have brought.  I guess we'd need to go
11 down step by step here.
12      Q.    Take a look at it and tell me
13 what else is not available.
14      A.    Number one is available.
15      Q.    Tell me any of them that are
16 not available.
17      A.    All but seven.
18      Q.    And you have produced to me
19 this morning a CV?
20      A.    Yes.
21      Q.    Resume?
22      A.    Yes.
23      Q.    All right.  That's the first

11

1  time we've seen that.  But that's our --
2  But, now, I want to be sure everything is
3  available except seven; is that correct?
4       A.    As I read this, yes, sir.
5  It's not available in hard copy, but it's
6  available digitally here.
7       Q.    All right.  Well, tell me,
8  then, what's in your file if it's not
9  available in hard copy?
10      A.    Yes, sir.  I can tell you that
11 now.  I have the report of Dr. -- let me go
12 down to the bottom here and see.  Joaquin
13 A-R-C-I-N --
14      Q.    Arciniegas?
15      A.    Arciniegas.  I have an invoice
16 of billing that I've given to Mike.
17      Q.    How much is that to date?
18      A.    It is five hundred and
19 twenty-five dollars.
20      Q.    Does that show the dates when
21 you've done work?
22      A.    No.  It shows the time and
23 that invoice, it was dated May 4th, 2007.

12

1  And there's not been an invoice since.
2       Q.    All right.  Do you have any
3  records of your time spent from that time
4  until now?
5       A.    Not listed, but I don't have
6  it with me.  It's going to be in the order
7  of five to ten hours.  I don't have that
8  with me.
9       Q.    All right.
10      A.    I have the deposition of
11 Dr. Papapietro; I have a copy of my report;
12 I have medical records from UAB Hospital; I
13 have medical records from Dekalb Hospital or
14 emergency room there; I have records from
15 Dr. Williams; medical records from
16 Dr. Wybenga; and I have a part of a clinical
17 record from Dr. Fallahi.
18      Q.    Tell me about that last one,
19 Dr. Who?
20      A.    F-A-L-L-A-H-I, who is a
21 rheumatologist that Mr. Woodley was seeing.
22 I have just one clinic visit from that.
23      Q.    Is that of any significance in

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

13

1  forming your opinion?
2      A.    It didn't alter my opinion,
3  but it strengthened my opinion.
4      Q.    In what way?
5      A.    This was a clinic visit on
6  August the 15th, 2006, just a few days
7  before the accident. And it's a
8  documentation of the physical activity that
9  Mr. Woodley was capable of performing.
10     Q.    Do you have a hard copy of
11  that there?
12     A.    Yeah.
13     Q.    May I see it, please, sir? Is
14  this all there is, these two pages?
15     A.    That's all I've reviewed. I'm
16  sure there's more medical records than that,
17  but that's all that I've reviewed.
18     Q.    I don't believe we've had this
19  man's name before, Dr. Fallahi.
20     MR. CROW:  You haven't got his
21  records?
22     MR. WOOD:  No.
23     MR. CROW:  There's the rest of

14

1  them (indicating). I thought you had.
2      MR. WOOD:  Thank you.
3      Q.    Have you reviewed all of the
4  records from Dr. Fallahi?
5      A.    No. Just this one.
6      Q.    Who selected the one that you
7  did review?
8      A.    Mr. Crow did.
9      Q.    I see. So Mr. Crow pulled
10  that one out from 8/15/06?
11     A.    Yes.
12     Q.    Have you seen the other
13  records to know whether they are of any
14  consequence?
15     A.    No.
16     Q.    What is your understanding of
17  what Dr. Fallahi was seeing Mr. Woodley for?
18     A.    Dr. Fallahi, as I understand
19  it, is a rheumatologist who was taking care
20  of some ankylosing spondylitis that
21  Mr. Woodley had.
22     Q.    What is ankylosing
23  spondylitis?

15

1      A.    Ankylosing spondylitis is a
2  degenerative condition of the spine.
3      Q.    Yes, sir. And does that have
4  some consequence with respect to this --
5  Mr. Woodley and this suit?
6      A.    No. That condition, in
7  itself, does not.
8      Q.    All right. What is of
9  consequence to you about the one report
10  that -- to which you have referred, the one
11  on 8/15, of '07?
12     A.    Right. This was a clinic
13  visit of Mr. Woodley's to this physician on
14  August the 15th, a few days before the
15  accident. And what is significant in my
16  opinion is the fact that there is a good
17  documentation as to the physical activity
18  that Mr. Woodley was able to perform;
19  specifically, he said he's playing golf,
20  cutting grass, he walks two to three miles
21  three times a week.
22     Q.    May I see that?
23     A.    Yes, sir.

16

1      MR. WOOD:  Mike, I do not see
2  this 8/15/06.
3      A.    It came out of here
4  (indicating).
5      MR. CROW:  It came out of
6  that. That's your copy.
7      MR. WOOD:  This is my copy?
8      MR. CROW:  The 8/15 visit.
9      MR. WOOD:  Well, the whole
10  thing.
11     MR. CROW:  Yeah, the whole
12  thing if you want it.
13     MR. WOOD:  Well, since I
14  didn't have a copy before and didn't know
15  about this witness, I'll --
16     Q.    So you haven't reviewed any of
17  the other records other than those that were
18  showed to you -- that one showed to you by
19  Mr. Crow?
20     A.    From Dr. Fallahi's record,
21  yes, that's right, just that one visit.
22     MR. WOOD:  I will probably ask
23  for you to make a copy of that before we

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

17

1  leave today.
2       (Whereupon, Defendant's
3       Exhibit No. 38 was marked
4       for identification.)
5   Q.   Anything else in your file,
6  please, sir?
7   A.   No, sir.
8   Q.   Is that everything that you
9  have reviewed that's in your file?
10  A.   Yes.
11  Q.   Is there anything that you
12  have asked for in addition to that to
13  review?
14  A.   No, sir.
15  Q.   Now, you have a copy of your
16  report that's been submitted through
17  Mr. Crow's office; is that right?
18  A.   Yes, I do.
19  Q.   Does your file, that we
20  discussed in item one, include all of the
21  data or other information that you've
22  considered in forming any opinion?
23  A.   Yes.

18

1   Q.   Have you prepared any exhibits
2  as a summary or to support -- as a support
3  for your opinions?
4   A.   No.
5   Q.   You really are kind of an
6  exhibit man, though, aren't you?
7   A.   I do that, yes.
8   Q.   But you haven't prepared any
9  in this case?
10  A.   No, sir.
11  Q.   And then your CV is what we
12  saw today for the first time; is that right?
13  A.   Yes, sir.
14       (Whereupon, Defendant's
15       Exhibit No. 39 was marked
16       for identification.)
17  Q.   All right.  I'm going to mark
18  that as Exhibit 39.
19       And the records of
20  compensation, do you have any time records
21  of the time that you've spent, other than
22  the statement there?  Do you keep up with
23  current records?

19

1   A.   I do.  But they're not on this
2  computer.
3   Q.   Where are they?
4   A.   They're at home, in my home
5  office.
6   Q.   How many offices do you have?
7   A.   One.
8   Q.   Is there some reason you
9  didn't bring those with you?
10  A.   I just forgot.  I could have
11  brought that.
12  Q.   Would you get those to
13  Mr. Crow.  I had asked for them, and I think
14  we're entitled to those.
15  A.   Yes, sir, we can do that.
16  Q.   Can you also produce for me a
17  hard -- Let me go ahead and let you make
18  your note.
19  A.   Okay.
20  Q.   Will you also produce for me a
21  hard copy of what you have on the statement?
22  A.   On the statement, yes, sir.
23       By statement, you mean by

20

1  invoice to Mr. Crow earlier?
2   Q.   Yes, sir.  Yes.
3       Can I look at that?
4   A.   Sure.  I can pull this around.
5       MR. CROW:  Off the Record.
6       (Off the Record.)
7   Q.   (BY MR. WOOD:)  Is it coming
8  up?
9   A.   This is it.  You wanted to see
10  the invoice?
11  Q.   Yes.
12  A.   Okay.
13  Q.   Your invoice just shows --
14  just reports the number of hours, but not
15  what work was done?
16  A.   Yes.  What was done was review
17  of records.
18  Q.   And that was about an hour and
19  a half's time?
20  A.   Hour and three-quarters.
21       (Whereupon, Defendant's
22       Exhibit No. 27 was marked
23       for identification.)

5  (Pages 17 to 20)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

21

```
1    Q.   Yes, sir. I'll show you what
2  I'll mark as Exhibit 27, it's an excerpt
3  from Federal Rule 26, with regard to expert
4  witness reports.
5         Have you ever seen Federal
6  Rule 26 before or read that?
7    A.   No.
8    Q.   Are you aware of the
9  requirements what's supposed to be included
10 in an expert report in federal court?
11   A.   According to Rule 26?
12   Q.   Yes, sir.
13   A.   I'm unfamiliar with Rule 26.
14   Q.   Well, take a look at that
15 paragraph 2B for a moment, please.
16   A.   Yes, sir.
17   Q.   Does your report in this case
18 meet the requirements of that?
19   A.   As best I was able to do, yes,
20 sir.
21   Q.   What was limiting to you?
22   A.   The fact that I don't have a
23 complete record of my prior testimonies.
```

23

```
1    A.   No, sir.
2    Q.   I'm not implying any -- when I
3  say, do you know why it was -- I'm not
4  implying anything wrong. That's not where I
5  was going.
6         There's a second page there
7  that apparently was a supplement that you
8  put with the report after?
9    A.   Yes.
10   Q.   What was the reason for
11 putting that supplement with the one-page
12 report?
13   A.   As I remember, Mr. Crow said
14 you need to add, as best you can, the cases
15 and your fees.
16   Q.   Yes, sir. That's what's
17 required in Exhibit 27, the Rule?
18   A.   Yes.
19   Q.   But you never actually saw the
20 Rule, itself; is that right?
21   A.   No.
22   Q.   All right. Tell me, please,
23 sir, what opinion you reported in Exhibit
```

22

```
1         (Whereupon, Defendant's
2          Exhibit No. 28 was marked
3          for identification.)
4    Q.   All right, sir.
5         Well, I will mark as Exhibit
6  28 a copy of your report as we received it.
7    A.   Yes.
8    Q.   Your report was sent to us on
9  December the 18th, it shows the date of
10 Mr. Crow's letter at the top. I want to be
11 certain I understand. Look at the second
12 page, you apparently signed your report,
13 however, on August the 17th, of 2007; is
14 that correct?
15   A.   Yes, sir.
16   Q.   Do you have any understanding
17 for why the essentially two-month delay from
18 the time you signed it until it was
19 forwarded?
20   A.   Are you asking do I have any
21 responsibility for that?
22   Q.   No. Do you understand any
23 reason for the delay?
```

24

```
1  28, that's your report. What was your
2  opinion, what was your conclusion that's
3  reported there?
4    A.   What's my conclusion?
5    Q.   Yes, sir.
6    A.   As I wrote it?
7    Q.   Yes, sir.
8    A.   In summary, Mr. Woodley had no
9  known severe coronary disease for several
10 years, but prior to the automobile accident
11 had been well managed and was clinically
12 stable and active. However, following the
13 severe cervical spine injury, and due to the
14 associated cardiovascular complications and
15 stress, he suffered progressive cardiac
16 deterioration, leading to cardiac arrest and
17 eventual death.
18   Q.   Yes, sir. The last sentence
19 is the conclusion, he suffered progressive
20 cardiac deterioration leading to cardiac
21 arrest and eventual death; is that correct?
22   A.   Yes.
23   Q.   And that's your opinion?
```

6  (Pages 21 to 24)

25

1    A.    Yes.
2    Q.    And that's the opinion that
3  you reported in this document, Exhibit 28;
4  is that right?
5    A.    Yes.
6    Q.    Dr. Lauridson, have you --
7  you've mentioned in your report on the
8  second page there --
9    A.    Yes.
10    Q.    -- that you've testified on a
11  number of occasions.
12    A.    Yes, sir.
13    Q.    Tell me, please, sir, have you
14  ever been disqualified or disallowed from
15  testifying as an expert?
16    A.    No.
17    Q.    Have you testified in federal
18  court before where you had to prepare and
19  sign and submit a report like this, under
20  the provisions of Federal Rule 26?
21    A.    U.S. versus Seale was in
22  federal court.
23    Q.    Yes, sir. But did you prepare

26

1  a report like this?
2    A.    I don't remember.
3    Q.    How long ago was it?
4    A.    That was in the summer of
5  2007.
6    Q.    What was that case about?
7    A.    It was a criminal case. Do
8  you want the details of that case?
9    Q.    No, sir. Maybe I should have
10  been more specific in my question. What I
11  meant to ask you was whether you have
12  testified in a civil case in federal court
13  that would be controlled by Federal Rule of
14  Civil Procedure 26, which required the
15  preparation, signing, and submission of a
16  report like you did in this case?
17    A.    I don't remember. And,
18  generally, I abide by what the requesting
19  attorney asks for me when I provide a
20  report.
21    Q.    Yes, sir.
22    A.    So, I'm trying to think. Was
23  there a civil case? I don't remember.

27

1    Q.    Well, I want to be clear on
2  this. You don't remember any other
3  testimony in federal court that required you
4  to prepare and submit a signed affidavit --
5  excuse me, a signed report, like you have in
6  this case, as required by Federal Rule of
7  Civil Procedures?
8    A.    As of this moment, I do not.
9  If you have a case that you know of --
10    Q.    I don't have any records, I'm
11  sorry.
12    A.    As of this moment, I do not.
13  But it may well be that I have and I just
14  simply do not remember.
15    Q.    All right. That would be
16  either -- All right. You didn't do a report
17  like this in that criminal case, I'm sure,
18  did you? U.S. versus Seale?
19    A.    I don't believe there was a
20  report issued in that case.
21    Q.    Yes, sir.
22    A.    Again, I can't remember
23  specifically. I would have to refer to

28

1  records.
2    Q.    Yes, sir. How many times have
3  you testified for the Beasley, Allen firm?
4    A.    For Beasley, Allen?
5    Q.    Yes, sir.
6    A.    I testified once about fifteen
7  or twenty years ago when I was a medical
8  examiner.
9    Q.    Was that a criminal or civil
10  case?
11    A.    It started as a medical
12  examiner's case, but it was a civil case as
13  far as Beasley was concerned.
14    Q.    Yes, sir.
15    A.    So it was in civil court. I
16  don't believe I've testified since then.
17    Q.    For the Beasley firm.
18        Well, you've testified in
19  other cases since then apparently. You just
20  told me about --
21    A.    Yes. I thought that you said
22  for the Beasley firm, and that was the
23  context in which I was trying to answer

7  (Pages 25 to 28)

29

1  that.
2      Q.    That's what -- I thought
3  that's what you meant, that's why I was
4  trying to clarify that.
5          Have you ever testified
6  against the Beasley firm?
7      A.    No. Not that I know of.
8      Q.    And you do have billing
9  records that would allow you to go back and
10  reconstruct the cases in which you've
11  testified?
12      A.    Only the last few years. You
13  know, there -- I did not keep medical
14  records -- or billing records when I was a
15  medical examiner.
16      Q.    What is the past few years?
17  Are we talking about ten, twelve years,
18  something like that?
19      A.    No, sir. The last two to
20  three years.
21      Q.    But you haven't looked to see
22  if you could do it for the preceding four
23  years? I'm just looking at Exhibit 27.

30

1      A.    I'm sorry, what's Exhibit 27?
2      Q.    That's the Rule.
3      A.    Yes, sir. I'm sorry, what was
4  the question?
5      Q.    You haven't looked to see how
6  much you can reconstruct?
7      A.    That's right.
8      Q.    You never saw Rufus Woodley,
9  did you?
10      A.    No, sir.
11      Q.    Your first involvement was
12  after he passed away and after the -- Well,
13  were you involved in this matter before suit
14  was filed?
15      A.    (Witness shakes head in the
16  negative.)
17      Q.    When you shake your head side
18  to side --
19      A.    No, sir, I was not.
20      Q.    I can understand you, but I
21  think you and I both want a good Record
22  about what we're communicating.
23          When was your first

31

1  involvement?
2      A.    It would have been the spring
3  of 2007, I believe.
4      Q.    Had suit been filed by that
5  time or do you know?
6      A.    I don't know. I don't know.
7  I occasionally see cases before suit is
8  filed and offer opinions.
9      Q.    Yes, sir. Your training and
10  previous work was as a pathologist; is that
11  correct?
12      A.    My training is in internal
13  medicine and forensic pathology. I'm board
14  certified in both.
15      Q.    Please, sir, as a pathologist,
16  when you're doing work as a pathologist, you
17  typically examine tissue on a body, don't
18  you?
19      A.    That is one test that a
20  forensic pathologist uses, yes.
21      Q.    Well, that's what you do when
22  you perform an autopsy, isn't it?
23      A.    That is an autopsy.

32

1      Q.    You look at tissue from a
2  body?
3      A.    The autopsy is one bit of
4  information that a forensic pathologist
5  uses, yes, sir.
6      Q.    What other bits of information
7  does a forensic pathologist use?
8      A.    Seeing circumstances, all of
9  the investigative reports that are
10  available, all of the preceding medical
11  history; all of that goes together to allow
12  the forensic pathologist to establish a
13  cause and manner of death. The autopsy,
14  itself, is only one bit of information that
15  may or may not actually even contribute to
16  establishing cause and manner of death.
17      Q.    Would you interview or find
18  out what treating physicians might be able
19  to tell you about a patient?
20      A.    If they are immediately
21  available. Otherwise, the medical records
22  are the substitute for that.
23      Q.    Yes, sir. Would you consider

# FREEDOM COURT REPORTING

33

1  what a treating -- what a board certified
2  treating physician had to say about a
3  witness before and leading up to the time of
4  death?
5      A.   Yes. I would take all
6  information I could get.
7      Q.   All right, sir. There was no
8  autopsy of Rufus Woodley, was there?
9      A.   That's right.
10     Q.   By you or anyone?
11     A.   That's correct.
12     Q.   And nobody with pathologist
13 qualifications, that you're aware of, ever
14 saw Rufus Woodley, did they?
15     A.   That's right.
16     Q.   Your report, Exhibit 28, says
17 that his cause of death was progressive
18 cardiac deterioration leading to cardiac
19 arrest; is that correct?
20     A.   Yes. There is a typo there.
21 There should be a comma between those two
22 last sentences as I read them. Yes, that is
23 the immediate cause of death.

34

1      Q.   A typo. Who prepared the
2  document that you signed? Did you prepare
3  it?
4      A.   I did, yeah.
5      Q.   I see. But you signed it --
6      A.   I did.
7      Q.   -- with the typo in there?
8      A.   Yes. And unfortunately typos
9  do occur.
10     Q.   That's actually a fairly
11 significant typo in what it communicates
12 about the man's death, isn't it?
13     A.   I'm sorry that you read it
14 that way. I see it clearly as showing that
15 the severe cervical spine injury led to his
16 progressive cardiac deterioration and
17 cardiac arrest. And perhaps I can help
18 clarify that for you right now in that that
19 was a typo. And instead of a period there
20 should be a comma there.
21     Q.   Well, also you have to
22 eliminate the second space between the two
23 sentences?

35

1      A.   Exactly right.
2      Q.   And change the capital letter
3  H to a lower case?
4      A.   That's right. Those are all
5  typos that happened.
6      Q.   Did you prepare that on a
7  computer like the laptop you've got in front
8  of you?
9      A.   Yes, sir.
10     Q.   So the correction of that typo
11 would simply involve back spacing and keying
12 in what you wanted it to say?
13     A.   I certainly agree that
14 correction of a typo on a computer is very
15 easy. Recognition of a typo is sometimes
16 not that easy.
17     Q.   There's nothing in your report
18 stating any opinion about Mr. Woodley's
19 death being proximately caused by the
20 vehicle accident, is there? Your report
21 doesn't even mention a vehicle accident,
22 does it?
23     A.   The first sentence in my

36

1  report says that following a motor vehicle
2  accident and cervical spine injury.
3          And I'm sorry I'm unclear
4  about that. But by that, I mean there was a
5  motor vehicle accident and an associated
6  cervical spine injury.
7      Q.   Yes, sir. But you don't
8  report the motor vehicle accident as the
9  cause of death, do you?
10     A.   The motor vehicle accident,
11 sir, was the cause of the cervical spine
12 injury. I don't think that's contested.
13     Q.   That's not where I'm going.
14 But you don't report that the automobile
15 accident caused the man's death in the
16 report, do you?
17     A.   If it is not specifically
18 stated, it certainly is implied that the
19 motor vehicle accident caused the cervical
20 spine injury, which then led to his death.
21     Q.   All right. And you've told us
22 you don't have any exhibits; is that right?
23     A.   Yes, that's right.

9 (Pages 33 to 36)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

37

1    Q.    Your report does not refer to
2  your personal qualifications, training,
3  history, or anything else. But you've given
4  me your CV today; is that right?
5    A.    Yes. And does Rule 26 say
6  that I need to put my personal
7  qualifications in there? I'm sorry if it
8  does.
9    Q.    I think it does.
10    A.    In my report?
11    Q.    Look at it.
12        I believe it calls for the
13  qualifications of the witness, including a
14  list of all publications and so forth.
15    A.    All right. Well, my resume
16  will be the substitute for that, sir.
17    Q.    Yes, sir.
18        You're not trained in
19  cardiology, are you?
20    A.    I am not board certified in
21  cardiology, that's correct.
22    Q.    And you didn't take any
23  specialized training in cardiology, did you?

38

1    A.    Except as an internal
2  medicine, that's correct.
3    Q.    You never practiced medicine
4  as a cardiologist, did you?
5    A.    I ran the cardiac care unit in
6  the U.S. Navy at Portsmouth Naval
7  Hospital -- I'm sorry at Newport Naval
8  Hospital.
9    Q.    When was that?
10    A.    May I see my resume? 1977 to
11  1979.
12    Q.    But you haven't done any
13  cardiology since then?
14    A.    I practiced internal medicine,
15  which included cardiology, at Chickasha in
16  Chickasha, Oklahoma, after the Navy.
17    Q.    When was that?
18    A.    1979 to 1980.
19    Q.    Since then have you done any
20  work in cardiology?
21    A.    No, sir.
22    Q.    Do you currently have hospital
23  privileges to admit patients? You list here

39

1  some hospitals.
2    A.    Not to admit patients.
3    Q.    Yes, sir. And you'd have to
4  have that to practice cardiology, wouldn't
5  you?
6    A.    I may not be clear. I'm not
7  practicing cardiology, I'm a forensic
8  pathologist.
9    Q.    And you haven't practiced
10  cardiology since about 1980 or so; is that
11  right? Or when you were practicing internal
12  medicine?
13    A.    Yes, sir, that's right.
14    Q.    How long has it been since
15  you've admitted a patient to a hospital?
16    A.    It would be about that time,
17  yes, sir.
18    Q.    And that's a part of treating
19  folks with heart problems is admitting them
20  to the hospital when they have significant
21  problems that they need hospitalization,
22  isn't it?
23    A.    Yes. As a treating physician,

40

1  that is correct.
2    Q.    You said that you last
3  admitted somebody to a hospital around 1980.
4  Was that when you were in Oklahoma?
5    A.    Yes.
6    Q.    Would I then be correct in my
7  understanding that you've never had
8  privilege to admit a patient to a hospital
9  in Alabama?
10    A.    That is correct.
11    Q.    What did you -- What was the
12  reason for your leaving Oklahoma?
13    A.    Oklahoma is when I resumed my
14  pathology training.
15    Q.    Yes, sir. And never looked
16  back? You've been doing pathology from then
17  on?
18    A.    Yes.
19    Q.    When did you first get to
20  Alabama?
21    A.    1986. Yes.
22    Q.    You're not a member of the
23  Medical Association of the State of Alabama,

10  (Pages 37 to 40)

# FREEDOM COURT REPORTING

41

1  are you?
2      A.   No, sir.
3      Q.   Is there a reason?
4      A.   The premium, the fees to join,
5  don't match the benefits for me.
6      Q.   Aren't most of the doctors in
7  Alabama a member of the medical association,
8  practicing physicians?
9      A.   I don't know the answer if
10  most are or not.
11      Q.   Being a doctor, being a member
12  of the medical association is sort of like a
13  lawyer being a member of the bar like a
14  association, isn't it?  Don't --
15      A.   Being a member of the bar?
16      Q.   Yes, sir.
17      A.   No.  Having a medical license
18  and being able to practice medicine would be
19  similar to being a member of the bar as I
20  understand it.
21      Q.   Tell me -- I was talking about
22  the bar association.  You list here three
23  professional organizations of which you are

42

1  a member, but none of those are Alabama
2  associations.
3      A.   That's right.  The specialty
4  of forensic pathology is a relatively small
5  specialty, and the organizations that deal
6  with and benefit those specialists through
7  training are national associations.
8      Q.   Your practice would come
9  within the scope of some of the medical
10  societies and organizations here in Alabama
11  though, wouldn't it?
12      A.   I'm -- Can you give me an
13  example?
14      Q.   No.  I'm asking you.  There's
15  no association in the state of Alabama that
16  would cover your specialty?
17      A.   A forensic pathologist is able
18  to effectively practice forensic pathology
19  without belonging to any state medical
20  associations.
21      Q.   Well, help me with this:  Tell
22  me your definition of forensic pathology,
23  please, sir.

43

1      A.   A forensic pathologist is a
2  pathologist who is trained and board
3  certified in either anatomic and clinical or
4  anatomic followed by formal training in an
5  accredited training program in forensic
6  pathology, followed by the successful
7  completion of a certification process and
8  examination.
9      Q.   What sort of examination?
10      A.   What sort of an examination?
11      Q.   Yes, sir.
12      A.   It's an examination set up by
13  the American Board of Medical Examiners.
14      Q.   I understand.  But in what
15  specialty?
16      A.   Forensic pathology.
17      Q.   Forensic pathology.
18      A.   Yes, sir.  I misspoke, it's
19  not the American Board of Medical Examiners.
20      Q.   Tell me, please, sir, how many
21  forensic pathologists are there in Alabama?
22      A.   In Alabama?
23      Q.   Yes, sir.

44

1      A.   Maybe board certified forensic
2  pathologists, there may be ten.  And, again,
3  that's an estimate.  I don't have an exact
4  number.
5      Q.   You're not an approved health
6  care provider by Blue Cross/Blue Shield of
7  Alabama, are you?
8      A.   No.  There's no reason for us
9  to even ask for those kinds of funding.
10  That deals with living patients.
11      Q.   Well, doesn't -- Blue
12  Cross/Blue Shield has, what, eighty-five
13  percent of the health care insurance in the
14  state, something in that range, is that your
15  understanding?
16      A.   I don't have any understanding
17  of that.
18      Q.   Your understanding is it's by
19  far the largest health insurer in the state,
20  don't you?
21      A.   I'm not even sure of that.  I
22  know it's prominent.
23      Q.   Doesn't health insurance pay

11  (Pages 41 to 44)

## FREEDOM COURT REPORTING

45

1  for autopsies, for example?
2      A.    No.
3      Q.    Never?
4      A.    Not in my experiences, it has
5  never paid.
6      Q.    All right. When was the last
7  time you did an autopsy?
8      A.    Monday of this week.
9      Q.    How many do you do in a year?
10     A.    About twenty. Might be closer
11 to fifteen. I don't have that number here.
12     Q.    For whom do you do those
13 autopsies?
14     A.    I do them for hospitals in
15 Dothan and for persons who ask to have
16 autopsies performed.
17     Q.    Do you do those for attorneys?
18     A.    Rarely. And asking if I'm
19 contacted directly by a law firm to do an
20 autopsy?
21     Q.    Directly or indirectly.
22     A.    Rarely that will happen. The
23 last one I turned down.

46

1      Q.    Got it. Where do you perform
2  these autopsies? You told me about a
3  hospital in Dothan. Do you go to funeral
4  homes and such?
5      A.    I do occasionally, yes.
6      Q.    Is that generally where those
7  are performed or hospitals or where?
8      A.    The hospital autopsies are
9  performed in a hospital.
10     Q.    Yes, sir. Where do you
11 perform yours generally?
12     A.    In the hospital when it's for
13 a hospital case. And in a funeral home when
14 it's not a hospital case.
15     Q.    I'm curious about something.
16 Your report is different on paper. You
17 don't use any professional letterhead at
18 all?
19     A.    No, sir. I'm not a
20 professional in your sense of the word. I
21 offer opinions, and I don't have a
22 letterhead.
23     Q.    Got it.

47

1      A.    Is that what you mean I don't
2  have a letterhead?
3      Q.    Yes, sir.
4      A.    I don't have a letterhead.
5      Q.    You told me your office is at
6  home?
7      A.    Yes, sir.
8      Q.    Do you have any other offices?
9      A.    No, sir.
10     Q.    Have you've had any other
11 offers besides your home in the last ten
12 years?
13     A.    Yes, sir.
14     Q.    Tell me where.
15     A.    Once with the Department of
16 Forensic Sciences.
17     Q.    Anywhere else?
18     A.    And once when I was with
19 Beasley.
20     Q.    When were you with Beasley?
21     A.    May I see my resume?
22     Q.    Yes, sir.
23     A.    2001 to 2005.

48

1      Q.    What -- Were you employed by
2  the Beasley firm there?
3      A.    I was, yes.
4      Q.    In what capacity?
5      A.    I was director of graphics for
6  Beasley.
7      Q.    Do you still do that kind of
8  work for the Beasley firm?
9      A.    No.
10     Q.    Why not?
11     A.    It was time for me to move on
12 and to start doing my own individual case
13 work.
14     Q.    I see. Do you consider
15 yourself as practicing medicine now?
16     A.    Of course.
17     Q.    You're not part of any medical
18 group?
19     A.    I'm a member of the National
20 Association of Medical Examiners and the
21 American Academy of Forensic Sciences.
22     Q.    I didn't state my question.
23 You are not a member of any professional

12  (Pages 45 to 48)

# FREEDOM COURT REPORTING

49

1  group that practices together or has an
2  office together?
3      A.    No, sir.
4      Q.    From what source do you gain
5  your referrals and so forth?  Is that from
6  hospitals, for example, calling you in on a
7  special occasion?
8      A.    Are you talking about the
9  hospital autopsies?
10     Q.    Or --
11     A.    When a person dies in a
12  hospital, and an autopsy is requested by the
13  physician or the family, I do the case.
14     Q.    What else do you do besides
15  fifteen or twenty autopsies a year?  I'm
16  trying to understand what your work is now.
17     A.    I do autopsies.
18     Q.    Yes, sir.
19     A.    I do case consultations, and I
20  do clinical medicine.
21     Q.    All right.  Tell me about your
22  clinical medicine practice.
23     A.    I work at Gunter Air Force

50

1  Base doing admission physicals.
2      Q.    Is that for new inductees into
3  the armed forces?
4      A.    Yes.
5      Q.    How many days a week do you
6  work at Gunter?
7      A.    It depends upon the
8  scheduling.  It averages about one to two
9  days a week.
10     Q.    Did you ever know Mr. Woodley
11  before his accident?
12     A.    No.
13     Q.    Know anything about him?
14     A.    No.
15     Q.    Any mutual friends or
16  acquaintances, any contact like that at all?
17     A.    No.
18     Q.    What else do you do?  You told
19  me you go to Gunter and do physicals and
20  autopsies.  What else do you do now?
21     A.    What else do I do?
22     Q.    Yes, sir.
23     A.    Case consultations.

51

1      Q.    Who do you do case
2  consultations with?
3      A.    You want the category of case
4  consultations or what?
5      Q.    Do you do those with lawyers,
6  with physicians?  I'm trying to understand
7  who you work with.  I'm trying to understand
8  what kind of work you're doing now.
9      A.    Most of those are contacts
10  from lawyers, the vast majority are defense
11  attorneys.
12     Q.    How many of those do you do in
13  a year, for example?
14     A.    When you say I do, how many
15  times am I contacted or how many times do I
16  complete a case?
17     Q.    How many consultations do you
18  perform in a year?
19     A.    Complete consultations?
20     Q.    However you would express it.
21  I'm just trying to understand what you do,
22  sir.
23     A.    I probably have maybe four

52

1  contacts a month.  Many of those never --
2  just so you will understand, when a person
3  contacts me, generally an attorney, okay, I
4  will say that I will review a case and then
5  tell them whether I can help them or not.
6  And by help them, whether my opinion is --
7  will help assist them in their case.  If my
8  opinion doesn't assist them in their case,
9  then that's the end of the consult.  And a
10  significant number of those end up that way.
11     Q.    Yes, sir.  How many of those
12  are civil versus criminal?  Can you break it
13  down by percentages or fractions?
14     A.    Most are criminal.  Most are
15  criminal defense.
16     Q.    Does your resume, Exhibit 39,
17  list all of your employments since medical
18  school?
19     A.    Since medical school?
20     Q.    Yes, sir.
21     A.    No.
22     Q.    What else have you -- What
23  other employments have you had since medical

13  (Pages 49 to 52)

# FREEDOM COURT REPORTING

53

1  school?
2      A.    Okay. Since medical school.
3  Yes, since medical school, I believe it
4  does, yes. There should not be any gaps in
5  here.
6              (Whereupon, Defendant's
7              Exhibit No. 30 was marked
8              for identification.)
9      Q.    I'm showing you what I'm going
10  to mark as Exhibit 30 —. Did I mark 29?
11            Let me show you what I'm going
12  to mark as Exhibit 30. Do you remember
13  speaking at some sort of an expert witness
14  conference, SEAK, or S-E-A-K?
15      A.    Yes, I remember this.
16      Q.    What was that about, please,
17  sir?
18      A.    Part of the graphics that I
19  had done while I was working with
20  Mr. Beasley and his group were used in a —
21  one of the cases that they had tried, and
22  this group which is called — the initials
23  are S-E-A-K, and I've forgotten exactly what

54

1  it means, saw that I did graphics for
2  Beasley, Allen, and they asked if I would
3  speak to their conference on how to use
4  graphics in trial.
5      Q.    Yes, sir.
6      A.    So I gave them this talk, and
7  I don't even see it on here to be quite
8  honest with you. I'm sure it's in here
9  somewhere.
10      Q.    I think it's on the third
11  page. That lists you as the director of
12  graphics at the Beasley, Allen firm?
13      A.    That's right.
14      Q.    Tell me, please, sir, what did
15  you do as director of graphics? What was
16  your job description?
17      A.    We started out as just myself.
18  And at that time, the use of computer
19  graphics in the court room to clarify the
20  issues was coming to the fore, so that the
21  jurors would have a better understanding of
22  what amounts to fairly complex cases that
23  come to court. And so I began to do that in

55

1  this firm. And then eventually it was
2  myself, and I had two assistants. And we
3  were doing — generating the graphics for
4  case-specific graphics, and then providing
5  the technical support for the presentation
6  of these graphics in depositions and in
7  trials.
8      Q.    Were you salaried in that
9  position?
10      A.    Yes.
11      Q.    Do you remember what that
12  salary was?
13      A.    I think it started out at a
14  hundred and twenty thousand.
15      Q.    And apparently it went up?
16      A.    It did. And I don't remember
17  where it ended, but I think it was a hundred
18  and fifty, something like that.
19      Q.    Hundred and fifty thousand
20  dollars a year?
21      A.    Yes, sir.
22      Q.    Was that exclusive employment
23  or were you doing some other work as well?

56

1  Did you continue being a pathologist at that
2  time?
3      A.    The only thing that was in
4  addition to this, is I had a contract with
5  the Alabama Department of Forensic Sciences
6  to assist them in some of their cases.
7            Let's see. Hold on. Maybe
8  that wasn't during the same time. Let me
9  make sure. Yes. There was a time when I
10  had — I was — had a contract with the
11  Alabama Department of Forensic Sciences to
12  assist them in some of their evaluations,
13  their case consultations.
14      Q.    I assume you submitted your
15  personal information for the write-up for
16  SEAK to prepare this? Did you submit the
17  information about yourself and your own
18  history?
19      A.    Did I write this, is that the
20  question?
21      Q.    Either write this, or produce
22  the information from which it was prepared.
23      A.    Yes.

14  (Pages 53 to 56)

**FREEDOM COURT REPORTING**

57

1    Your question about my
2 employment on this resume, I believe that
3 there is a gap.
4    Q.    Tell me what it is, please,
5 sir.
6    A.    There is a gap from about
7 April of 2001 to about October of 2001. And
8 during that time I was director of graphics
9 for the Alabama District Attorney's
10 Association.
11    Q.    What did you do for them? The
12 same kind of work that you were describing
13 for them that you did for the Beasley firm?
14    A.    Yes. That's where I started
15 doing the computer graphics.
16    Q.    When you started doing the
17 computer graphics, I assume you were
18 employed by the Alabama District Attorney's
19 Association?
20    A.    Yes.
21    Q.    And then you were employed at
22 the Beasley firm —
23    A.    Following that, yes, sir.

58

1    Q.    — following that.
2    That restricted your practice
3 of forensic pathology, obviously, didn't it?
4    A.    To the extent that I wasn't
5 doing daily cases, yes. I continued, as I
6 say, to be a consultant to the Department of
7 Forensic Sciences during part of that time.
8    Q.    Please, sir, looking back at
9 Exhibit 30, this SEAK, I don't — was there
10 some color brochure that was submitted?
11 This is just what I could find on the web.
12 Was there some glossy brochure that was
13 submitted to persons who might be candidates
14 to attend this program, or do you remember?
15    A.    I'm sure there was a handout
16 at the conference, but I don't remember
17 about it.
18    Q.    Your personal write-up there,
19 the paragraph or so about you, lists your
20 experience particularly with graphics and so
21 forth.
22    A.    Yes, sir.
23    Q.    It doesn't really — It refers

59

1 to you as an M.D., but it does not refer to
2 your medical qualifications or experience,
3 does it?
4    You were really at this
5 conference or seminar, you were speaking
6 about computer graphics as opposed to
7 medicine; is that right?
8    A.    That's right.
9    Q.    There's a last sentence down
10 there that says, Dr. Lauridson has written
11 and lectured extensively on the use of
12 computer graphics in the court room. Do you
13 see that?
14    A.    Yes.
15    Q.    But when we look at your CV,
16 and your publications, I don't see any of
17 your publications on computer graphics.
18    A.    This writing and lecturing, it
19 was all local.
20    Q.    Yes, sir.
21    A.    In relationship to the Alabama
22 Department — Alabama District Attorney's
23 Association and within Beasley, Allen.

60

1 There was not — I don't think I've ever
2 done a — Are you asking about peer reviewed
3 articles in computer graphics, the answer is
4 no, there is none. I'm assuming that was
5 your question.
6    Q.    Well, sir, reports that you
7 have written extensively on the use of
8 computer graphics —
9    A.    Uh-huh.
10    Q.    — and you brought in the
11 subject of peer review, those publications
12 on use of computer graphics in the court
13 room would have been presented to persons
14 who go to court, like lawyers and judges —
15    A.    Yes. That's exactly right.
16    Q.    — and folks who do what you
17 do and go in the court room. Others who
18 testify as experts would have access to
19 those publications, wouldn't they?
20    A.    Yes.
21    Q.    What sort of — How were those
22 matters published?
23    A.    In handouts to lectures and

15 (Pages 57 to 60)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

61

1  that sort of thing. I don't have a list of
2  all of those. But I spent a lot of time
3  lecturing to district attorneys, to
4  prosecutors in these realms and to their
5  assistants.
6      Q.    And apparently you've held
7  yourself out as having qualifications. For
8  gosh sakes, you worked in the area of
9  graphics, preparing graphics for the
10  district attorneys, for the Beasley firm,
11  and preparing matters to be presented in
12  court to juries, just like the jury that
13  will try this case?
14     A.    I think the answer to your
15  question is what were my qualifications. I
16  think my qualifications were judged by my
17  work product --
18     Q.    Yes, sir.
19     A.    -- and the folks who hired me
20  to do those things.
21     Q.    And you considered yourself
22  qualified in the area or you wouldn't have
23  held yourself out as somebody to speak on

62

1  this subject to other experts, would you?
2      A.    I'm not sure what you mean by
3  held myself out. Is there a certification
4  in court computer graphics, the answer is
5  no. My background is in engineering, as you
6  know from having read my resume, which gave
7  me a firm foundation in the sciences needed
8  to do accurate computer graphics.
9      Q.    Yes, sir. And you considered
10  yourself having expertise in computer
11  graphics and the presentation of those
12  graphics to juries and courts, didn't you?
13     A.    Yes. It was accepted in
14  courts and used.
15     Q.    And that's what you did for a
16  living at that time?
17     A.    Yes. That's right.
18     Q.    And, in fact, this program was
19  to be presented to people who, like
20  yourself, would offer expert witness
21  testimony; is that right?
22     A.    That's correct.
23     Q.    Why are none of these computer

63

1  graphics writings listed in either your
2  report, Exhibit 28, or on your CV, which is
3  Exhibit 39?
4      A.    Let's see, Exhibit 28, which
5  is my report --
6      Q.    You didn't list any of your
7  publications there.
8      A.    I didn't list any publications
9  there because it was included in my resume.
10     Q.    Yes, sir. But we didn't get
11  your resume until today.
12            But just begging that
13  question, your resume, Exhibit 39, does not
14  list any of these extensive writings on the
15  use of computer graphics in the court room,
16  does it?
17     A.    No. And this resume isn't
18  meant to include everything that I have
19  written in the past. It's a resume having
20  to do with my qualifications as a
21  pathologist.
22     Q.    Yes, sir. But there's not a
23  limitation, I don't believe, in the Rule

64

1  that's Exhibit 27. It just says that all
2  publications.
3      A.    Okay.
4      Q.    And all of your publications
5  aren't listed, are they?
6      A.    I don't have a listing of all
7  my publications.
8      Q.    Do you have some of them?
9      A.    Of the handouts from --
10     Q.    Yes, sir.
11     A.    No. I don't save those.
12     Q.    Do you have any of them?
13     A.    Probably not.
14     Q.    Please, sir, were you paid or
15  were your expenses paid for appearing on
16  this program?
17     A.    Expenses were paid, yes.
18     Q.    Did you listen to the other
19  speakers at the program?
20     A.    To be quite honest with you, I
21  did not.
22     Q.    Why not?
23     A.    Because it was more appealing

16  (Pages 61 to 64)

**FREEDOM COURT REPORTING**

65

1  to see that part of Massachusetts that I
2  hadn't seen.
3      Q.    All right. Did you listen to
4  any of them?
5      A.    I think I may have listened to
6  the ones right before me or right after me,
7  because it was a session, and I don't
8  remember which ones those were.
9      Q.    Well, did you -- Were you
10 provided with copies of the papers written
11 by the others?
12     A.    I'm sure I was, yes.
13     Q.    Did you review any of them?
14     A.    I don't believe I did. You're
15 asking me questions that I just can't
16 answer. I don't remember.
17     Q.    I think we've established that
18 this program on which you were speaking was
19 designed to attract those who offer expert
20 testimony to learn more about being --
21 providing expert testimony and how to be
22 more effective at their craft; is that
23 right?

66

1      A.    That was the general theme of
2  this conference, that's correct.
3      Q.    And did you consider, before
4  you put yourself out and participated in a
5  program, whether you wanted to be associated
6  with the other speakers and --
7      A.    I'll be honest with you, I
8  didn't realize until I got to this
9  conference what the general theme of the
10 conference was. I went to this conference
11 primarily because as an employee of Beasley,
12 Allen, I had been invited.
13     Q.    Yes, sir. Did anybody else
14 from Beasley, Allen go up there?
15     A.    No. I have not been back to
16 this conference.
17     Q.    Well, have you -- Do you
18 consider that the other speakers were
19 talking about matters that should be of
20 concern and interest to expert witnesses,
21 objectivity, for example, just looking at
22 Dr. Speckart on top of the same page where
23 your name is. Dr. Speckart will explain how

67

1  experts can be successful in enhancing their
2  credibility and creating a favorable
3  disposition among jurors and fact finders.
4  He will review the three-dimensional theory
5  of persuasiveness which includes expertise,
6  objectivity, and communicativeness.
7          Would you consider that to be
8  something of consequence and importance to
9  you as an expert witness?
10     A.    To me?
11     Q.    Yes, sir.
12     A.    No. I don't need a lecture to
13 be objective and credible and truthful.
14     Q.    I see. Objectivity is
15 important and you know that anyway, don't
16 you?
17     A.    Yes, sir.
18     Q.    All right. There were other
19 subjects in here: How far experts can and
20 should go in collaborating with retaining
21 counsel. Is that something of importance to
22 an expert witness?
23     A.    To me?

68

1      Q.    Yes, sir.
2      A.    No. I have my own ethics and
3  my own standards, and I didn't need what
4  this conference was directed to.
5      Q.    For example, Ryan Reed spoke,
6  among other things, about suggestions for
7  what experts should and should not commit to
8  writing. You didn't consider that was
9  something you needed to listen to?
10     A.    No.
11     Q.    A fellow by the name of Bruce
12 Dubinsky talked about: He will also explain
13 personal qualities of the expert and the
14 ability to work as a part of a team.
15         Is that something that you do
16 as an expert witness?
17     A.    To work as a part of a team?
18     Q.    Yes, sir.
19     A.    I'm not sure what the
20 implication is there. I'll tell you how I
21 work as an expert witness.
22     Q.    Yes, sir.
23     A.    Okay. I review evidence that

17  (Pages 65 to 68)

# FREEDOM COURT REPORTING

69

1  is given to me. If I think there is more
2  evidence that I need to see, I ask for it.
3  Then I issue, either orally or written, my
4  opinion of a case. And then whoever is
5  asking for that opinion can decide whether
6  they want to use that opinion or not. And
7  that's how I operate.
8      Q.    Do you consider that you work
9  as a team with the attorneys who retain you
10 to help them present their case and develop
11 the case?
12     A.    I am congenial with the
13 attorneys. If they have difficulties in
14 presenting my opinion in court, I will
15 explain terminology and issues like that.
16 So I guess, that is team work, but I don't
17 know what more I can say beyond that.
18     Q.    All right, sir. The fellow
19 just before you, Edward Ohlbaum, was talking
20 about how to avoid being discredited by
21 one's own report.
22          You're weren't concerned about
23 that?

70

1      A.    No. My wife and I had not
2  been to the Cape, and we spent, with the
3  exception of my lecture and the time that I
4  needed to be in the lecture hall to present
5  it, away from this conference.
6          (Whereupon, Defendant's
7          Exhibit No. 31 was marked
8          for identification.)
9      Q.    I'm going to show you what I'm
10 marking as Exhibit 31. It's the first page
11 and the last page of an article that appears
12 on the Beasley, Allen website in 2007. I've
13 got the whole article if you want to see it.
14          Apparently a paper about
15 technology as a storyteller's tool. And
16 what I'm looking at is just on page nine, it
17 refers to your article Computer Graphics for
18 the Complex Trial.
19     A.    Uh-huh.
20     Q.    Apparently the paper that you
21 presented at that seminar we were just
22 talking about; is that right?
23     A.    I think it's the title of it,

71

1  yes, sir.
2      Q.    Was that the paper that you
3  prepared and presented at that conference?
4      A.    I believe that's what they're
5  referring to. I don't recognize that title,
6  but I believe that's what they're referring
7  to on the website.
8      Q.    Well, all I know is what I
9  found on the web. But it looks like a copy
10 that paper was still around in this office
11 last year. Does that sound correct to you?
12     A.    I haven't been in this office
13 for two or three years, so I can't speak to
14 that.
15     Q.    At any rate, that paper is not
16 included as one of your publications, is it,
17 in the documents you've presented?
18     A.    No, sir. I don't have a copy
19 of this paper.
20     Q.    But that wasn't the question.
21 The question is whether you had listed it as
22 one of your publications -- as one of your
23 writings, and it's not, is it?

72

1      A.    It's not, no, that's right.
2      Q.    You had an e-mail address here
3  at Beasley, Allen when you were working
4  here; is that right?
5      A.    Yes.
6      Q.    Do you still use that address?
7      A.    At Beasley, Allen?
8      Q.    Yes.
9      A.    Oh, no.
10     Q.    Did you have an office at
11 Beasley, Allen?
12     A.    Yes.
13     Q.    And you had an office in this
14 building?
15     A.    It started off in this
16 building and then ended up in the building
17 next door.
18     Q.    But another Beasley, Allen
19 office?
20     A.    Yes. Yes.
21     Q.    Did you -- All right. Have
22 you been involved in other business
23 ventures?

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

73

1    A.    Other business ventures?
2    Q.    Yes, sir. You've told me
3  about your computer graphics work, you've
4  told me about your consultations, you've
5  told me about what you used to do with the
6  state, about doing the -- about what you do
7  with -- at Gunter. Do you -- Have you had
8  any other business ventures in the last ten
9  years or so?
10   A.    No. Not that I can -- I think
11  the answer is no, unless --
12   Q.    What is Nibbana Graphics,
13  L.L.C.?
14   A.    Yeah. Nibbana. You're right.
15          (Whereupon, Defendant's
16           Exhibit No. 33 was marked
17           for identification.)
18   Q.    I'll show you Exhibit 33, a
19  document --
20   A.    It that says it on my resume.
21  Did I not put that on my resume?
22          Just so it doesn't look like
23  I'm trying to hide Nibbana Graphics, it's

74

1  clearly on my resume. And Nibbana Graphics
2  is what I do my computer graphics work on at
3  home. So I guess you're right, that is a
4  business venture.
5    Q.    Is that business still
6  operating?
7    A.    Nibbana Graphics still exists.
8    Q.    You're still operating?
9    A.    It still exists. Now,
10  operating meaning do I still do computer
11  graphics? Occasionally, yes.
12   Q.    Do you use the Nibbana
13  Graphics name?
14   A.    The checks are made out to me.
15   Q.    Yes, sir. As opposed to
16  running through the corporation?
17   A.    As opposed to going to Nibbana
18  Graphics.
19   Q.    Yes, sir.
20   A.    I have a checking account that
21  says Nibbana Graphics, so all of that
22  business stuff stays in Nibbana Graphics.
23   Q.    Yes, sir. Well, Nibbana

75

1  Graphics, according to this record, was
2  formed on February 9th, 2001. I believe you
3  said 2001 was when you went to work for the
4  Beasley firm; is that right?
5    A.    It says 2001, I've got on my
6  resume in 1998. I had Nibbana Graphics
7  before I came to Beasley, Allen.
8    Q.    That's what I found with the
9  Secretary of State.
10   A.    Well, I don't know how to
11  explain that. That may have been when I got
12  a business license. But Nibbana Graphics,
13  itself, was formed in 1998.
14   Q.    I understood you to say that
15  when you were employed at the Beasley firm
16  from, I think, 2001 through 2005, that you
17  worked for them exclusively, with the
18  exception that you explained about some work
19  contracts you had with the district
20  attorney's group?
21   A.    Sure.
22   Q.    This appears to have been
23  operating -- appears to have been formed

76

1  about the time you started at Beasley. I'm
2  just trying to understand.
3    A.    It was formed in 1998 because
4  I wanted to start to do computer graphics.
5    Q.    Right.
6    A.    Okay. And then I went to work
7  for the Alabama District Attorney's
8  Association doing it full time, and then
9  came over here. When I came over here,
10  Nibbana Graphics didn't do any graphics. It
11  didn't do anything. It existed. So if your
12  definition of operation is that it exists,
13  the answer is yes. But it didn't do
14  anything.
15   Q.    It was not operating from 2001
16  forward?
17   A.    What do you mean by operating?
18   Q.    A cash flow in and out, doing
19  work for people, billing folks, that kind of
20  thing.
21   A.    I think I may have had one or
22  two cases -- No. There was one or two cases
23  from an attorney that came through Beasley,

19  (Pages 73 to 76)

## FREEDOM COURT REPORTING

77

1  Allen, and they said would you do it for us
2  privately. And I got permission from them,
3  and that was it. But it was all cases that
4  came through here that I did for them
5  outside, but it was one or two cases. It
6  was next to nothing.
7      Q.   All right, sir. What does the
8  name Nibanna come from? Is there some
9  significance to that name?
10     A.   Nibbana is from an Asian
11 language called Pali, P-A-L-I, it's an
12 extinct language. You may have heard of
13 Sanskrit, Sanskrit is probably its
14 successor. The word Nibbana in Pali is
15 synonymous to the word Dharma -- I'm sorry.
16 There actually isn't a similar word, I'm
17 confusing --
18     Q.   I'm wondering where you got
19 the name.
20     A.   That's where I got it.
21     Q.   It doesn't relate to anything
22 to do with computer graphics obviously?
23     A.   No.

78

1      Q.   Do you assist the Beasley,
2  Allen firm in evaluation of personal injury
3  and death cases?
4      A.   Beg your pardon?
5      Q.   Do you assist the Beasley,
6  Allen firm in evaluation of personal injury
7  and death cases?
8      A.   Now?
9      Q.   Have you ever?
10     A.   I did not act as an expert to
11 Beasley, Allen while I was here as the
12 director of computer graphics.
13     Q.   Did you before, do you now,
14 have you ever assisted the Beasley, Allen
15 firm in evaluation of personal injury
16 and death cases?
17     A.   I have received occasional
18 cases. Mike's is a case that has gone to
19 fruition, so to speak. For example, in the
20 last six months, Julie Beasley has asked me
21 to look at two cases to see if they had any
22 credibility, are these cases worth pursuing.
23 And in both of those, I have told Julie, no,

79

1  and those cases stopped at that point.
2      Q.   So you do assist the firm in
3  evaluating personal injury and death cases?
4      A.   Probably four or five times a
5  year, yeah.
6      Q.   And you still do that?
7      A.   If they ask me, yes.
8      Q.   I'm showing you what I've --
9  Does working at the Beasley firm give you
10 opportunities to do work you couldn't do
11 somewhere else?
12     A.   Yes. That was the reason to
13 come here.
14     Q.   What kind of work are you
15 talking about?
16     A.   I had technical resources here
17 that I could not have gotten working for
18 other agencies, particularly for the state.
19         (Whereupon, Defendant's
20          Exhibit No. 34 was marked
21          for identification.)
22     Q.   I'll show you what I've marked
23 as Exhibit 34, that's the first and

80

1  fifty-third pages of the Jere Beasley
2  report, dated April 2003. I've printed a
3  copy of the whole page if you want to see
4  it. And looking on page fifty-three --
5      A.   Yes.
6      Q.   -- refers to your assisting in
7  the making of essential medical decisions
8  and evaluations in our product liability
9  mass torts and personal injury and death
10 cases. Is that an accurate statement?
11     A.   I'm sorry, where is it?
12     Q.   He assists in the making of
13 essential medical decisions and evaluations
14 in our product liability, mass torts, and
15 personal injury and death cases. Is that an
16 accurate statement of some of the work that
17 you do here?
18     A.   This refers to the sort of
19 work that I just referred to you with --
20 that I mentioned with Julie's cases. And
21 that is when a case was beginning, often --
22 I don't want to say often, occasionally one
23 of the attorneys would say, take a look at

20  (Pages 77 to 80)

# FREEDOM COURT REPORTING

81

1 this and see what the substance of this case
2 is.
3    Q.    Yes, sir.
4    A.    And I would offer my opinion.
5 It would never be taken to court, obviously,
6 because I was not a medical expert for
7 Beasley.
8    Q.    But you assisted in making the
9 essential evaluations and medical decisions
10 in those cases?
11    A.    Did I?
12    Q.    Yes.
13    A.    Yes. I think that's a true
14 statement.
15    Q.    And is it also a true
16 statement that you were a member of the
17 litigation team? I've marked that.
18    A.    Yes, it says that. And I
19 guess by that, Mr. Beasley means that I was
20 providing graphic support and technical
21 support in the court room and then offering
22 these preliminary medical decisions as to
23 whether a case had substance or not. So in

82

1 that sense I would agree, I was a member of
2 the team.
3              (Whereupon, Defendant's
4              Exhibit No. 35 was marked
5              for identification.)
6    Q.    I will show you also a couple
7 of pages of the Jere Beasley report, dated
8 May 2004.
9    A.    Okay.
10    Q.    The front page and page
11 twenty-eight. I have printed the total
12 document if you'd like to see it.
13         You were still working for
14 them then. Do you remember helping them
15 make a decision about putting defibrillators
16 in their offices?
17    A.    Yes. That was -- Mr. Beasley
18 came to me and he said, do you think it's a
19 good idea for a firm our size and with our
20 patient population to provide additional
21 safety for our employees and visitors by
22 having automatic external defibrillators
23 installed. And after reviewing the

83

1 situation, we decided in fact that that was.
2 And Mr. Beasley was ahead of his time in
3 that. And I'm proud of that decision. I'm
4 proud of his decision to put automatic
5 external defibrillators in this office.
6    Q.    How many folks are employed at
7 the Beasley, Allen firm or were at the time
8 you were employed with them?
9    A.    I think it was about a hundred
10 and eighty to two hundred. But -- hundred
11 and fifty to two hundred. And if you have
12 more accurate information, I just simply
13 don't know.
14    Q.    I'm just asking the question,
15 and I don't know.
16         Would you defer to the
17 cardiologist who is actually treating Rufus
18 Woodley concerning his cardiology matters,
19 his heart, his cardiology matters that were
20 occurring and developing during the time
21 that that cardiologist was actually treating
22 Rufus Woodley? Would you consider that such
23 a cardiologist would know more about his

84

1 situation than you, for example?
2    A.    I'm not sure I understand the
3 question. A cardiologist referring to as
4 Dr. Williams?
5    Q.    Whoever. Would you defer to a
6 cardiologist who is actually treating Rufus
7 Woodley hands on, seeing him, putting a
8 stethoscope on his chest, looking at an EKG
9 if he needs one, running lab tests that he
10 orders and doing what he considers
11 appropriate based on what he's physically
12 observing and watching develop in front of
13 him? Would you defer to a cardiologist in
14 that situation as having more knowledge
15 about Mr. Woodley's circumstances than you
16 can perform -- than you can develop now?
17    A.    The cardiologist expertise and
18 my expertise are different areas.
19    Q.    Yes, sir.
20    A.    I would certainly defer to the
21 cardiologist in establishing what
22 medications Mr. Woodley should have and how
23 he should be evaluated. But in establishing

21  (Pages 81 to 84)

# FREEDOM COURT REPORTING

85

1    a sequence of events that eventually led to
2    Mr. Woodley's death, and that is the realm
3    of the forensic pathologist who, on a daily
4    basis, looks at complex factors often
5    involving accidents or other misfortunes and
6    resulting in death. So the answer is, yes,
7    I defer to the cardiologist in his area of
8    expertise.
9         Q.    But you don't consider his
10   area of expertise to form an opinion about
11   the cause of death?
12        A.    Well, he can form an opinion.
13   I won't say anything about that. But I can
14   tell you that the forensic pathologist forms
15   those opinions far more often and on an
16   almost daily basis and is trained to form
17   opinions.
18        Q.    And you don't consider a
19   cardiologist is trained to form those
20   opinions about his or her own patients?
21        A.    Not when it involves a complex
22   series of events. I'm not talking about
23   evaluating or managing a heart attack or

86

1    managing coronary artery disease. But we're
2    going beyond that in this case.
3         Q.    So you would consider your
4    expertise superior to determine the cause of
5    Rufus Woodley's death to that of a
6    cardiologist who is actually treating him at
7    the time he expired, for example?
8         A.    I'd prefer not to use the term
9    superior. But my area of expertise is more
10   specialized than his in this particular
11   question.
12        Q.    Would you consider the
13   cardiologist qualified to form an opinion
14   about the cause of death?
15        A.    The immediate cause of death,
16   yes, I don't have any problem with that.
17        Q.    Do you have available to you
18   any information that was not available to
19   Rufus Woodley's treating cardiologist at the
20   time of his death?
21        A.    I strongly suspect that the
22   cardiologist, at the time of his death, did
23   not have available to them all of the

87

1    medical records that Dr. Williams had that I
2    have reviewed and the other medical records
3    of Mr. Woodley's health care prior to his
4    cervical spine fracture.
5         Q.    Do you know that?
6         A.    No, I don't know that for
7    certain. But I know that it would be most
8    unusual for them to have the complete
9    medical record that I have and have been
10   able to review.
11        Q.    Who is Sylvio Papapietro?
12        A.    Who is he?
13        Q.    Yes, sir.
14        A.    My understanding is, he is the
15   cardiologist who did the catheterization at
16   the time of the acute myo- -- the fatal but
17   acute myocardial infarction.
18        Q.    Have you reviewed his
19   deposition?
20        A.    I have, yes.
21        Q.    You didn't list that or didn't
22   refer to it as part of your file.
23        A.    Let me see here. It is right

88

1    here (indicating). You may not have seen
2    it, but it's right here (indicating).
3         Q.    You went down the list for me
4    and you -- I'm sorry. I said that -- I
5    misspoke. Please forgive me.
6              You did say that you had the
7    deposition?
8         A.    It's right here. Would you
9    like to see it?
10        Q.    You told me. I misspoke.
11   When you looked -- I went back to my notes,
12   and that's what I wrote down, you did have
13   that.
14             Did you consider his testimony
15   in forming your own opinion?
16        A.    No. I had formed my opinion
17   before his testimony.
18        Q.    I see. Why would you not
19   consider Dr. Papapietro's testimony?
20        A.    His deposition testimony?
21        Q.    Yes, sir.
22        A.    Because the facts as
23   documented in the medical records were clear

22  (Pages 85 to 88)

# FREEDOM COURT REPORTING

89

1  enough.
2      Q.    In fact, your report, Exhibit
3  28, is dated about a month before
4  Dr. Papapietro's deposition, isn't it?
5      A.    That may be. I'm not sure
6  what his deposition date was.
7      Q.    I believe his deposition date
8  was November --
9      A.    7th.
10     Q.    -- 7th, 2007.
11     A.    Uh-huh.
12     Q.    And your report, I believe
13  it's Exhibit 28, is dated October 17th.
14     A.    Yes.
15     Q.    So you, as you stated just a
16  minute ago, formed your own opinion before
17  Dr. Papapietro's opinion was available to
18  us; is that right?
19     A.    That's correct.
20     Q.    And even though your report
21  was not delivered until December 18th, about
22  a month after his deposition, you never went
23  back to consider Dr. Papapietro's testimony?

90

1      A.    No.
2      Q.    Why would you not have even
3  considered his testimony?
4      A.    Because the medical records
5  are very clear as to what happened.
6      Q.    I see.
7      A.    And he doesn't deny what's
8  documented in the medical records as being
9  factual.
10     Q.    Tell me what medical records
11  you refer to.
12         MR. CROW: Can we take about a
13  five-minute break?
14     A.    We have medical records from
15  UAB Hospital from Dr. Williams, Dr. Wybenga.
16     Q.    This is just a list of the
17  records that you told me about earlier?
18     A.    Yes. And the records from
19  Dekalb Emergency Room, Hospital.
20     Q.    What are the portions of those
21  records that are significant to you? Can
22  you tell me the parts of those records that
23  tell you that Dr. Papapietro is not correct

91

1  in his opinion?
2      A.    Can I tell you?
3      Q.    Can you identify the pages?
4      A.    And I'm sorry, I need to know
5  what his opinion was as to the causation
6  relationship between the cervical spine
7  fracture and the fatal myocardial
8  infarction. As I read his deposition, he
9  didn't offer an opinion to that causation.
10         Did I misread his deposition?
11         (Whereupon, Defendant's
12         Exhibit No. 36 was marked
13         for identification.)
14  Depo
15     Q.    You have read it, as I
16  understand what you just told us. And I'll
17  mark as Exhibit 36, just a copy of page
18  twenty-four of the deposition of
19  Dr. Papapietro.
20     A.    Are we going to go through
21  this page by page?
22     Q.    I hope not.
23         MR. WOOD: This would be a

92

1  good time for a break?
2         (Recess taken.)
3      Q.    (BY MR. WOOD): Have you had
4  the occasion now during this break to take a
5  look at Exhibit 36?
6      A.    Yes.
7      Q.    I understand Dr. Papapietro
8  said that he just can't tell whether the
9  spinal cord injury contributed or caused the
10  heart attack. Is that what you understand?
11     A.    That is what he said on page
12  twenty-four, yes, sir.
13     Q.    And is that what you
14  understand to be the gist of his testimony
15  through his entire deposition as far as
16  causation?
17     A.    No. That's not how I
18  understand his deposition.
19     Q.    Tell me how you understand it.
20     A.    On page ninety-one he talks
21  about stresses that a person is undergoing
22  as possibly precipitating a heart attack.
23     Q.    Yes, sir. And then on page

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

93

1  ninety-one onto ninety-two, a question was
2  posed to this doctor as to whether this
3  heart attack was a natural progression of
4  the coronary artery disease, and he
5  specifically says: No, not necessarily.
6  Many patients live with blockages for years
7  and years and never have a heart attack.
8       That, taken together with his
9  admission that stresses can produce heart
10 attacks, and his admission that many
11 patients can live with blockages for years
12 and years and never have a heart attack is
13 an implication that there be in his opinion,
14 causation between the cervical spine
15 fracture and the fatal heart attack and in
16 fact, corresponds almost exactly with my
17 interpretation of this case.
18      Q.   Which is what?
19      A.   Which is that Mr. Woodley was
20 a man with severe coronary disease. And
21 Dr. Williams had partially treated him in
22 2003 with a stent and then a redo of the
23 stent with angioplasty. At that point,

94

1  Mr. Woodley then began to be treated
2  medically rather than with surgery. And
3  interestingly over those succeeding years,
4  he really stabilized so that his coronary
5  disease was no longer an important issue as
6  far as needing surgical therapy. And, in
7  fact, he had two stress tests, one in 2004,
8  and one in 2006 that were remarkable for a
9  man who had a severe coronary disease as he
10 had. And, in fact, the one in 2006, he got
11 a heart rate up to about a hundred and
12 thirty beats per minute, which is, for a man
13 his age, remarkable, indicating that his
14 heart was receiving enough blood to the
15 myocardium in the face of exercise and that
16 his coronary disease was now stable and, in
17 fact, corresponds exactly to what
18 Dr. Papapietro said on page ninety-two, that
19 many patients can live with blockages for
20 years and years and years and never have a
21 heart attack.
22      That's even confirmed with a
23 visit to Dr. Fallahi just a few days before

95

1  this accident in which it was documented
2  that Mr. Woodley was able to have extreme
3  amounts of exercise for his age: He was
4  walking several times a week, he was playing
5  golf, he was mowing his grass. And so here
6  was a man who had severe disease but was
7  stable. Then he has this accident, has a
8  cervical spine injury which sets up the
9  usual complications with cervical spine
10 injury, and that is problems with
11 maintaining stable blood pressures, problems
12 with fluid balance. And, in fact, if one
13 reads the medical record closely, there is a
14 specific admonition to maintain the mean
15 arterial pressure above eighty-five. And
16 the importance of that, obviously, is to
17 keep enough blood flowing through the
18 coronary arteries to prevent the heart
19 attack. It's well documented in a couple of
20 places that the mean arterial pressure fell
21 below that, down to sixty, and the day
22 before his heart attack, it was documented
23 to be down at about sixty. Those are the

96

1  stresses, the physiologic stresses, that led
2  to a deterioration of his coronary artery
3  disease and the fatal heart attack, not to
4  mention the psychological stresses of pain
5  and the emotional stresses that also have
6  deleterious effects on the heart.
7       Q.   You do not understand
8  Dr. Papapietro as saying that this man's
9  death could have been a natural progression
10 of his coronary artery disease?
11      A.   Dr. Papapietro, in my opinion,
12 refused to offer an opinion as to whether he
13 thought the spinal injury caused the heart
14 attack or not.
15      Q.   Yes, sir. His testimony will
16 speak for itself. But you don't understand
17 him to say that it could be or it could not
18 be a natural progression of his coronary
19 artery disease; is that right?
20      A.   I'm not sure that I understand
21 your question.
22      Q.   I want to understand your
23 interpretation of Dr. Papapietro's

24  (Pages 93 to 96)

## FREEDOM COURT REPORTING

97

1  deposition. And what I understand you to
2  say is that you do not acknowledge that
3  Dr. Papapietro said it either could be or
4  could not be a progression of his coronary
5  artery disease.
6      A.    As I read the whole context of
7  his deposition, I don't see him offering an
8  opinion either way.
9      Q.    He said he couldn't tell.
10     A.    Yes.
11     Q.    But you can?
12     A.    Yes. I think the facts speak
13  for themselves.
14     Q.    You live here in Montgomery?
15     A.    Yes.
16     Q.    So there's no reason you can't
17  be available when this case -- as a live
18  witness when this case will be tried?
19     A.    When will it be tried?
20     Q.    I don't think we have a trial
21  date yet.
22         MR. CROW: We do. June.
23     Q.    So you will be available in

98

1  June?
2      A.    I can be available in June,
3  yes, sir.
4      Q.    All right.
5         MR. WOOD: Thank you, Mike.
6         MR. CROW: I will say this, I
7  think on the Rule 16 order we have, he has
8  set a trial date in June, don't hold me to
9  it, but at least the week of June 24th. But
10 he did put a footnote on the bottom of that
11 and that says that the trial calendar is
12 full -- his trial docket is full and the
13 case may get passed to his next docket, if I
14 recall it. And I've got that order on my
15 desk. After June, I assume August, maybe
16 September.
17     Q.    Sir, you understand Rufus
18 Woodley's right cardiac artery was one
19 hundred percent occluded?
20     A.    At the time he had the
21 myocardial infarction, yes.
22     Q.    What caused that artery to be
23 completely blocked?

99

1      A.    Without an autopsy, one can't
2  be very specific. It might have been purely
3  a thrombus or it might have been a plaque
4  rupture with associated development of a
5  thrombus.
6      Q.    Could have been a blood clot
7  from his leg or could have been any number
8  of things?
9      A.    A clot from his leg into a
10 coronary artery?
11     Q.    Yes, sir.
12     A.    Oh, no.
13     Q.    You don't think so?
14     A.    No. Blood clots from the leg
15 go to the right side of the heart. The
16 coronary arteries arise from the left side
17 of the heart. Unless he has a foramen ovale
18 that's open, that would be most unusual.
19     Q.    Wasn't his right artery the
20 one that was occluded?
21     A.    Yes.
22     Q.    That's what I thought.
23     A.    You understand that the

100

1  coronary arteries arise from the aorta?
2      Q.    Yes. I'm not going to try to
3  be a doctor, my job is to be a lawyer.
4         But he could have had a blood
5  clot that could have come from any number of
6  places to occlude that artery, couldn't he?
7      A.    You're talking about an
8  embolus to the coronary artery?
9      Q.    Yes, sir.
10     A.    There are very few places in
11 the heart that would give rise to an embolus
12 into a coronary artery, certainly not the
13 legs.
14     Q.    I misunderstood -- I'm not
15 articulating my question to you incorrectly.
16 He could have had any number of causes for
17 that artery to occlude, couldn't he?
18        It could have been any number
19 of causes for the blockage of that
20 cardiac -- that right cardiac artery?
21     A.    If you're including an embolus
22 to the coronary artery in that
23 classification, I would like you to propose

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

101

1    the site of the origin of the thrombus. I
2    couldn't imagine where it's coming from.
3        Q.    I'm just asking you, sir, are
4    there any number of causes --
5        A.    Thrombus?
6        Q.    -- that could -- Aren't there
7    any number of things that could have caused
8    that right artery to block?
9        A.    Thrombus, ruptured plaque are
10   by far and away the -- And you could have a
11   constriction.
12       Q.    Yes, sir.
13       A.    Coronary artery spasm. But
14   it's very unusual to have spasm in a man who
15   has a stent in place and has a calcified
16   artery.
17       Q.    Was a stent in the proper
18   place?
19       A.    I don't know that.
20       Q.    Was there not some difficulty
21   in getting the stent in the proper place?
22       A.    Yes. But I don't know if it
23   was in the proper place or not. There was

102

1    difficulty with the stent, but I'm not here
2    to offer an opinion as to whether the stent
3    was effective or not.
4        Q.    Yes, sir. Tell me, please,
5    sir, have you read Dr. Arciniegas' report?
6        A.    Yes, I have.
7        Q.    Do you agree with his report
8    or disagree with it?
9        A.    Do I agree with his report --
10   Let me just make sure that I've -- When you
11   say do I agree with this report, are you
12   talking about his conclusion or the facts as
13   documented?
14       Q.    Is there any part of his
15   report that you disagree with?
16       A.    The general.
17           (Whereupon, Defendant's
18           Exhibit No. 37 was marked
19           for identification.)
20       Q.    For the Record, I'm making a
21   copy of Dr. Arciniegas as Exhibit Number 37.
22   I think you're looking at it on your
23   computer?

103

1        A.    I am, yes.
2          I would disagree with it in
3    the following context in that I don't think
4    enough importance was given to the cervical
5    spine fracture as the precipitating event in
6    this myocardial infarction, and I do not
7    believe that this was a natural progression
8    of Mr. Woodley's coronary artery disease.
9        Q.    Why not?
10       A.    Because I think that Mr. --
11   that Dr. Papapietro's conclusion that there
12   are people with severe coronary artery
13   disease that go for years and years and
14   years without having myocardial infarction
15   fits perfectly Mr. Woodley's situation, and
16   that's well documented in Dr. Williams
17   records and Dr. Fallahi's records that
18   Mr. Woodley was able to successfully
19   complete exercise stress test, in fact,
20   beyond what one would normally expect as far
21   as his target heart rate and was also very
22   active playing golf, mowing the lawn,
23   walking, et cetera.

104

1          I think Mr. Woodley falls into
2    that category that Dr. Papapietro very
3    clearly delineated that he was a person with
4    stable coronary disease, that he could go
5    for years and years without myocardial
6    infarction, who had a very traumatic
7    accident which interrupted that stability.
8        Q.    So you do not accept then even
9    the possibility that this was a natural or a
10   progression of Mr. Woodley's coronary artery
11   disease?
12       A.    Beyond reasonable medical
13   certainty, it is my opinion that the
14   cervical spine fracture caused this
15   progression. And I think that there is good
16   strong evidence for that.
17       Q.    And you've explained all that
18   for me on the Record today?
19       A.    I've answered -- I believe
20   I've answered your questions that you've
21   asked today.
22       Q.    Have you explained to me all
23   the reasons that you believe to a

26 (Pages 101 to 104)

## FREEDOM COURT REPORTING

105

1   reasonable — beyond a reasonable medical
2   certainty, that the spinal fracture caused
3   the heart attack?
4       A.    I believe that if I were —
5   had the opportunity to review what I've said
6   today that I've covered the major points.
7   There may be some points that I haven't
8   covered, but only with reviewing the depo
9   would I be able to answer that question.
10      Q.    You can't think of anything
11  now?
12      A.    Not within the limitations
13  that I just said in the previous answer.
14      Q.    You understand that the right
15  coronary artery was one hundred percent
16  occluded as reported in the catheterization
17  summary?
18      A.    Yes.  At the time of the fatal
19  event, that's correct.
20      Q.    Do you have any opinion as to
21  what caused that hundred percent occlusion?
22      A.    Without an autopsy, one cannot
23  be certain.  It was thrombus or ruptured

106

1   atherosclerotic plaque with overlying
2   thrombus, possibly, but not likely, coronary
3   spasm with associated thrombus.
4       Q.    That's really — It was the
5   blockage of that artery that actually caused
6   the man's death?
7       A.    Yes.
8       MR. WOOD:  I think that's all.
9       MR. CROW:  I have nothing.
10  (The deposition was concluded at 3:15 p.m.,
11  February 27th, 2008.)
12
13
14
15
16
17
18
19
20
21
22
23

107

1           REPORTER'S CERTIFICATE
2   STATE OF ALABAMA,
3   ELMORE COUNTY,
4       I, Sara Mahler, Certified Court
5   Reporter and Commissioner for the State of
6   Alabama at Large, do hereby certify that the
7   above and foregoing proceeding was taken
8   down by me by stenographic means, and that
9   the content herein was produced in
10  transcript form by computer aid under my
11  supervision, and that the foregoing
12  represents, to the best of my ability, a
13  true and correct transcript of the
14  proceedings occurring on said date and at
15  said time.
16      I further certify that I am neither
17  of kin nor of counsel to the parties to the
18  action; nor in any manner interested in the
19  result of said case.
20
21
22
                    _____
                        Sara Mahler, CCR
23                      ACCR #420

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

LILIAN WOODLEY, as the          *
Administratrix of the Estate of   *
RUFUS WOODLEY,                   *
                                 *
    Plaintiffs,                *
                                 *
vs.                              *
                                 *          2:07-CV-74-ID
                                 *
PFG-LESTER BROADLINE, INC.,      *
and KENNETH O. LESTER           *
COMPANY, INC., et al.,           *
                                 *
    Defendants.                *

## NOTICE TO TAKE DEPOSITION UPON ORAL EXAMINATION

TO:   Michael J. Crow
       Beasley, Allen, Crow
       Methvin, Portis & Miles, PC
       Post Office Box 4160
       Montgomery, AL 36103-4160

Please take notice that the defendants in the above styled cause will take the deposition of

**Dr. James Lauridson,** upon oral examination, on **February 27, 2008, beginning at 1:00 p.m.,**

**at the offices of Beasley, Allen, Crow Methvin, Portis & Miles, P.C.** under the Federal Rules

of Civil Procedure, for the purpose of discovery or for use as evidence in the action, or for both

purposes, before a court reporter, a notary public, or before some other office authorized by law

to administer oaths. The oral examination will continue until completed.

## REQUEST FOR DOCUMENTS

The deponent is requested to bring to the deposition the original and all copies of each of

the following items:



DEFENDANT'S
EXHIBIT

26

1.     The witness' entire file and all documents available to the witness or viewed by the witness at any time concerning the decedent Rufus Woodley.

2.     The report from the witness as an expert required F.R.C.P. 26.

3.     All data or other information considered by the witness in forming any opinion.

4.     Any exhibits to be used as a summary or support for the witness' opinions.

5.     A resume or CV stating the witness' qualifications including a list of all publications authored by the witness within the preceding ten years.

6.     All records of compensation to be paid to the witness for study and testimony.

7.     A list of all other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

WILLIAM C. WOOD
NORMAN, WOOD, KENDRICK & TURNER
Financial Center, Suite 1600
505 Twentieth Street North
Birmingham, AL 35203
Telephone:   (205) 328-6643
Facsimile:    (205) 251-5479
Email: wood@nwkt.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing pleading by fax transmission and by placing a copy of same in the U.S. mail, postage prepaid and properly addressed to all known counsel on this the 26th day of February, 2008, as follows:

Michael J. Crow
Beasley, Allen, Crow
  Methvin, Portis & Miles, PC
Post Office Box 4160
Montgomery, AL 36103-4160

BY _____

another party's disclosures or because another party has not made its disclosures.

**(2) *Disclosure of Expert Testimony.***

**(A)** In addition to the disclosures required by paragraph (1), a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.

**(B)** Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

**(C)** These disclosures shall be made at the times and in the sequence directed by the court. In the absence of other directions from the court or stipulation by the parties, the disclosures shall be made at least 90 days before the trial date or the date the case is to be ready for trial or, if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under paragraph (2)(B), within 30 days after the disclosure made by the other party. The parties shall supplement these disclosures when required under subdivision (e)(1).

**(3) *Pretrial Disclosures.*** In addition to the disclosures required in the preceding paragraphs, a party shall provide to other parties the following information regarding

11


DEFENDANT'S EXHIBIT

27

# Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.

| | | | | |
|---|---|---|---|---|
| JERE LOCKE BEASLEY | DANA G. TAUNTON | *Attorneys at Law* | JOHN E. TOMLINSON | ALSO ADMITTED IN ARIZONA |
| J. GREG ALLEN | J. MARK ENGLEHART ʳʳ | 238 COMMERCE STREET | NAVAN WARD, JR. ᵇᵇ | ALSO ADMITTED IN ARKANSAS |
| EL J. CROW | CLINTON C. CARTER ᵃᵇ ᵇᵇ ᵇᵇ ᵇᵇ ᵇᵇ ᶜᵇ | POST OFFICE BOX 4160 | WESLEY CHADWICK COOK | ALSO ADMITTED IN FLORIDA |
| .S J. METHVIN | BENJAMIN E. BAKER, JR. ᵃᵃ ᵇᵇ ᵇᵇ ᵇᵇ ᵇᵇ | MONTGOMERY, ALABAMA | WILLIAM R. ROBERTSON, V | ALSO ADMITTED IN GEORGIA |
| J. COLE PORTIS | DAVID R. BYRNE, III | 36103-4160 | H. CLAY BARNETT, III ᵇᵇ | ALSO ADMITTED IN KENTUCKY |
| W. DANIEL MILES, III | TED G. MEADOWS ᵇᵇ ᵇᵇ ᵇᵇ ᵇᵇ | (334) 269-2343 | | ALSO ADMITTED IN LOUISIANA |
| R. GRAHAM ESDALE, JR. | FRANK WOODSON | | | ALSO ADMITTED IN MINNESOTA |
| JULIA ANNE BEASLEY | KENDALL C. DUNSON ᵇᵇ | TOLL FREE | OF COUNSEL: | ALSO ADMITTED IN MISSISSIPPI |
| RHON E. JONES | SCARLETTE M. TULEY | (800) 898-2034 | ALYCE S. ROBERTSON | ALSO ADMITTED IN MISSOURI |
| LABARRON N. BOONE | ROMAN ASHLEY SHAUL ᵃᵇ ᵇᵇ ᵇᵇ ᵇᵇ ʷᵗ | | RUSSELL T. ABNEY ᵖᶠˡᵃˢᵃ⁷³ | ALSO ADMITTED IN NEW YORK |
| ANDY D. BIRCHFIELD, JR. | W. ROGER SMITH, III ᵃᵇ ᵇᵇ ᵇᵇ ᵇᵇ ʷᵗ | TELECOPIER | | ALSO ADMITTED IN OHIO |
| RICHARD D. MORRISON ᵇᵇ | P. LEIGH O'DELL | (334) 954-7555 | | ALSO ADMITTED IN OKLAHOMA |
| C. GIBSON VANCE | D. MICHAEL ANDREWS | | | ALSO ADMITTED IN PENNSYLVANIA |
| J. P. SAWYER ᵇᵇ ᵇᵇ | BENJAMIN L. LOCKLAR | BEASLEYALLEN.COM | | ALSO ADMITTED IN SOUTH CAROLINA |
| C. LANCE GOULD | LARRY A. GOLSTON, JR. ᵇᵇ ᵇᵇ | | | ALSO ADMITTED IN TENNESSEE |
| JOSEPH H. AUGHTMAN | MELISSA A. PRICKETT | | | ALSO ADMITTED IN TEXAS |
| | | | | ALSO ADMITTED IN WASHINGTON, D.C. |
| | | | | ALSO ADMITTED IN WEST VIRGINIA |
| | | | | NOT LICENSED IN ALABAMA |

JAMES W. TRAEGER
1953-1987

RONALD AUSTIN CANTY
1963-2004

December 18, 2007

Mr. William C. Wood, Jr.
Norman, Wood, Kendrick and Turner
Financial Center, Suite 1600
505 Twentieth Street North
Birmingham, Alabama 35203

    RE:   **Woodley, Lillian v. Kenneth Lester Company, Inc.**

Dear Bill:

    Enclosed, you will find a copy of Plaintiff's Expert Disclosure and his Rule 26(b) information.

    If you need anything further, please do not hesitate to let me know.

        My best regards,

        BEASLEY, ALLEN, CROW,
          METHVIN, PORTIS & MILES, P.C.

        *Mike Crow/ anc*

        MICHAEL J. CROW

MJC/anc

Enclosure


DEFENDANT'S
EXHIBIT
28

DEC 1 9 2007

In matter of the death of Robert R. Woodley, following a motor vehicle accident and cervical spine injury on August 18, 2006, I have reviewed the emergency medical records from Dekalb Regional Medical Center, medical records of hospitalization at the University of Alabama at Birmingham, the medical records of Dr. John Williams, and the medical records of Dr. Martin Wybenga.

Mr. Woodley's coronary artery disease was treated by Dr. Williams. Mr. Woodley initially presented with angina, which was established to be due to coronary artery disease of the right coronary artery. A stent was placed in the right coronary artery on July 29, 2003 and because of continuing symptoms. Coronary angiography was again conducted on August 19, 2003. At that time, Mr. Woodley was found to have calcifications of his right coronary artery as well as calcification of the left anterior descending diagonal branch that prevented further placement of intraluminal stents. It was felt at that time that Mr. Woodley was a candidate for bypass surgery.

However, over the next three years. Mr. Woodley's cardiac condition stabilized with the exception of occasional mild chest pain. He did not require bypass surgery. On July 11, 2006 on a visit to Dr. Williams, Mr. Woodley was free of symptoms and considered to be doing well. His blood pressures were stable. An electrocardiogram, conducted by Dr.Wybenga on March 6, 2006 was normal except for insignificant sinus arrhythmia.

On August 18, 2006 Mr. Woodley was involved in a motor vehicle accident resulting in severe paralytic cervical spine injury. He underwent surgical repair of the injury, but had very little recovery of neurologic function. His postoperative course was complicated by shifts in blood pressure and fluid imbalance, complications common following spinal cord injury. At one point his documented blood pressure got as low as 93/40. After transfer to Spain Rehabilitation Center he continued to have labile blood pressures as low as systolic in the 90s and the diastolic in the 40s.

On August 31, 2006. He suffered a cardiac arrest, and after resuscitation remained in cardiogenic shock. He was noted to have probable fluid overload as well as electrolyte disturbances at that time. Cardiac catheterization after the arrest revealed a 50 to 60% occlusion of the left main coronary artery, 50% occlusion that portion of the left anterior descending coronary artery, a 30% occlusion of the diagonal coronary artery and calcification and occlusion of the proximal portions of the right coronary artery. He expired September 1, 2006.

In summary, Mr. Woodley had known severe coronary disease for several years, but prior to the automobile accident had been well managed and was clinically stable and active. However, following the severe cervical spinal cord injury, and due to the associated cardiovascular complications and stress. He suffered progressive cardiac deterioration leading to cardiac arrest and eventual death.

*James R. Lauridson*

James R. Lauridson, MD
October 17, 2007

I do not have a written record of prior court testimonies and depositions. I have testified over 200 times in criminal and civil court proceedings. A partial summary of recent testimony includes criminal cases: State versus Jones, Arkansas, 2007; US versus Seale, Mississippi, 2007; State versus McLemore, Alabama, 2007; civil cases: Upton, versus RPS, Alabama, 2006.

My professional fee for case review is $300/hour

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

LILLIAN WOODLEY as the         *
administratrix of the Estate of     *
RUFUS WOODLEY,             *
                            *
      Plaintiffs,               *
                            *    CIV. ACT. NO.: 2:07cv74-ID
v.                            *
                            *
PFG-LESTER BROADLINE, INC.;    *
KENNETH O. LESTER COMPANY,    *
INC.,                        *
                            *
      Defendants.           *
                            *

## PLAINTIFF'S SUPPLEMENTAL EXPERT DISCLOSURE

Plaintiff, Lillian Woodley, pursuant to the Court's Order dated March 13, 2007 hereby discloses the identity of the following persons who may be used at the trial of this matter:

      1.      James Lauridson.

                                        /s/Michael J. Crow
                                        MICHAEL J. CROW (CRO039)
                                        Attorney for Plaintiffs

OF COUNSEL:

BEASLEY, ALLEN, CROW,
  METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
Montgomery, AL 36103-4160
(334) 269-2343

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon all counsel of record listed below via e-file, on this the 18th day of December, 2007.

/s/Michael J. Crow
OF COUNSEL

Matthew W. Robinett
William C. Wood
Norman, Wood, Kendrick and Turner
Financial Center, Suite 1600
505 Twentieth Street North
Birmingham, Alabama 35203

►**Complete Schedule**
*SEAK's Thirteenth Annual*
**National Expert Witness Conference**
*The program for experts of all disciplines and levels of experience*

Four Points by Sheraton Hyannis Resort, Hyannis, Massachusetts
**June 24 and 25, 2004**                                        Schedule

*Conference Leaders:*                                          Hotel and Travel
                                                               Information

        ***Steven Babitsky, Esq. & James J. Mangraviti, Jr., Esq.***    Registration Info

                                                               Registration Form

Expert Witness Directory                                       PDF of Brochure


SEAK, Inc. is pleased to present its Thirteenth Annual National Expert Witness Conference. Experts from all disciplines and with all levels of experience will benefit from multi-disciplinary advanced techniques. Nationally recognized attorneys, experts, judges, and educators will discuss all aspects of expert witness testimony, ethics, and trial techniques. Conference participants will be presented with practical suggestions for succeeding as expert witnesses. This advanced two-day program will include lectures, trial demonstrations, lively question and answer periods, intensive breakout sessions led by a highly qualified faculty, and roundtable discussions where participation by attendees is encouraged.

Conference registrants will have an opportunity to improve their skills while networking and meeting other professionals in a stimulating and collegial atmosphere. We are proud to present four preconferences this year including two new preconferences. We are also pleased to provide continental breakfast each day, an hors d'oeuvre reception on June 24 and a conference luncheon on June 25. Our faculty this year includes four distinguished judges. Our expanded program will permit participants to obtain even more information than in past years.

        *Here is what past attendees have to say about the program:*

"*Excellent! Excellent! Excellent!*"

"*The presenters were excellent.*"

"*This is my fourth year of attendance. I keep coming as long as I go away with new gems of knowledge or technique.*"

"*Informative, attention holding, practical! Exceeded my expectations in terms of what I would be able to take back with me!*"

"*User friendly.*"

"*Very professionally done.*"

"*By far the best value of all training I've attended.*"



*"Good job well done, excellent conference."*

*"All speakers were outstanding and should be invited back."*

*"Thanks for the great opportunity to enhance my skills."*

*"Right on point."*

*"All speakers were good."*

*"All speakers were superb. I would not hesitate to recommend the seminar to others and already have!"*

*"Very well done, great faculty."*

*"Excellent presentations, information, handouts, and interaction."*

*"High quality exceeded expectations."*

*"Well done, on time, excellent speakers and good topics."*

*"All speakers and presentations were very good."*

*"Impressed with the intellectual atmosphere, the thought-provoking questions of the attendees and the insight brought by judges, lawyers and trial consultants."*

*"Excellent, clear speakers, very good breakout sessions."*

*"Very professional, well organized."*

*"Your program was a pot of gold."*

## Schedule

Thursday, June 24th, 2004
Friday, June 25, 2004

## Thursday, June 24th, 2004

7:30-8:30        Registration (Subject to space availability)

8:30-9:30        **A View From The Bench**
                 By The Honorable Melvin Wright

Judge Wright will discuss the type of experts and expert testimony that does and does not impress a judge and jury. He will review the biggest and most common mistakes experts make. Judge Wright will offer practical suggestions for experts to improve their testimony and their effectiveness. The Honorable Melvin R. Wright is an Associate Judge of the Superior Court of the District of Columbia. He received his BA from Federal City College (University of the District of Columbia) and his JD from Georgetown University Law Center. Judge Wright was appointed to the Superior Court bench in April 1998 by President Bill Clinton. He has served in Juvenile and Criminal Division assignments. From January 2001 to December 2002 Judge Wright was the Presiding Judge of the Superior Court Drug Intervention Program (Drug Court), and continued his involvement in family court cases where drug addicted parents and their children were the issues. While he presided over Drug Court, Judge Wright chaired the Drug Court Committee for the DC Superior Court, which was made up of representatives from the United States Attorney's Office, Public Defender Service, Pretrial Services Agency, DC Department of Corrections, Criminal Defense Bar, and other treatment and community organizations. Judge Wright is currently assigned to a Civil Trial calendar where he hears jury and non-jury trials and renders oral and/or written decisions. **Questions and Answers**

9:30-10:30       **Persuasiveness of Expert Witnesses: How to Excel**
                 By George R. Speckart, PhD

Dr. Speckart will explain how experts can be successful in enhancing their credibility and creating a favorable disposition among jurors and fact finders. He will review the three dimensional theory of persuasiveness which includes expertise, objectivity, and communicativeness. Dr. Speckart will discuss the impact of expert's compensation and offer practical suggestions on how experts can enhance their persuasiveness. George R. Speckart, PhD is a senior litigation analyst for Courtroom Science, Inc., in Irving, Texas. Dr. Speckart received his BA, MA, and PhD in Psychology from UCLA. He has written and lectured extensively on persuasiveness of experts, jurors, and communication. Dr. Speckart has personally directed over four hundred research programs designed to assist litigators in achieving favorable verdict outcomes and minimizing damages exposure to corporate clients. He is a member of the American Society of Trial Consultants' Jury Selection Standards Committee. He has given presentations for the Defense Research Institute, the American Corporate Counsel Association, the International Association for Defense Counsel, the Association of Southern California Defense Counsel and numerous State Bar conventions throughout the nation. **Questions and Answers**

| 10:30-11:30 | **Discrediting the Truthful Expert Witness: How to Best Prepare for the Onslaught** |

By Professor Edward D. Ohlbaum

Professor Ohlbaum will explain how testifying experts are now being cross-examined with the use of the reports of non-testifying experts and what the testifying experts can and should do. He will discuss and demonstrate trick questions, impeachment, and cross-examination techniques and explain how the expert can best prepare for them. Professor Ohlbaum will discuss the materials all experts should have before they prepare their reports and how to avoid being discredited by one's own report. Edward D. Ohlbaum is a Professor of Law and Director of Trial Advocacy and Clinical Legal Education at Temple Law School in Philadelphia, Pennsylvania. Professor Ohlbaum received his BA from Wesleyan University and his JD from Temple University School of Law. He has tried over 75 jury trials and teaches as well as consults nationally on evidence, litigation strategy, advocacy, and ethics. Professor Ohlbaum is the former co-chair of the ABA Trial Evidence Sub-committee on Experts and has written and lectured extensively on evidence, advocacy, litigation, and expert witnesses. **Questions and Answers**

| 11:30-12:00 | **Roundtable:** Including Conference Attendees |
| 12:00-1:30 | **Lunch** (On Your Own) |
| 1:30-2:30 | **Breakout Sessions:** Choose One |

**Effective Use of Computer Graphics By Experts: Cost-Effective Techniques That Work**
By James R. Lauridson, MD

Dr. Lauridson will explain the advantages and disadvantages of experts using computer graphics in the courtroom with an emphasis on selecting the most effective and economical methods of presentation. He will discuss computers - backups of hardware and software, the processing and enhancement in the trial setting of digital images, and the use and advantages of graphic still images. He will discuss and demonstrate a few Power Point tricks. Dr. Lauridson will take a look at animations from the eyes of a juror, and ways to save money-using 2 dimensional versus 3 dimensional animation and 3 dimensional models without animation. The presentation will be visually stimulating, informal, and interactive. James R. Lauridson, MD is the Director of Graphics at the Montgomery, Alabama personal injury law firm of Beasley, Allen, Crow, Methvin, Portis & Miles. He received his BS in Electrical Engineering at the University of Colorado, Boulder, and his MD from the University of Colorado School of Medicine in Denver. Dr. Lauridson is the former Director of Graphics, Office of Prosecution Services at the Alabama District Attorney's Association and is a former member of the Scientific Working Group on Imaging Technology for the Federal Bureau of Investigation. Dr. Lauridson has written and lectured extensively on the use of computer graphics in the courtroom. **Questions and Answers**

OR

**Dealing Effectively With Retaining and Opposing Counsel: Avoiding Abuse**
By James A. Williams, PhD

Dr. Williams will review how to professionally and effectively relate to both retaining and opposing counsel while avoiding adverse consequences. He will discuss what the expert should seek to accomplish in the conference with retaining counsel and how to build an excellent rapport and working relationship with counsel. Dr. Williams will explain how to best deal with opposing counsel's tactics, traps, and trick questions. Dr. Williams will demonstrate how and what to do when attacked by opposing counsel. James A. Williams, PhD, is an international consultant for law enforcement practices, policy, and procedures, and principal of Williams and Associates in Cherry Hill, New Jersey. Dr. Williams holds a Doctorate Degree in Criminal Justice with specialized studies in the Pharmacology of Drug Abuse and Criminology. His undergraduate degree is in Sociology. He is also a graduate of the National Training Institute in Washington, DC where he completed courses on organizational security, internal security, law, conspiracy, advanced investigative techniques, organized crime, white-collar crime, and financial investigations. He taught Criminal Justice studies as an adjunct professor at Rowan University, Glassboro, New Jersey, and has written and published numerous

papers on police management and security. As a Federal Agent on deep undercover assignment, Dr. Williams penetrated the infrastructure of the national organized crime movement of "Black Incorporated." The United States Department of Justice (USDOJ) Organized Crime Strike Force investigation, code named Operation OXALIC, resulted in the arrests of targeted top level drug kingpins in eight states, Italy, and Jamaica. Dr. Williams is a highly experienced expert witness. **Questions and Answers**

**2:30-3:30**        **Breakout Sessions: Choose One**

**Ethics and the Expert Witness: What Every Expert Needs to Know to Stay Out of Trouble**
By Professor Edward D. Ohlbaum

Professor Ohlbaum will explain the actions and inactions of experts which can subject them to sanctions, civil suits, professional discipline, damaged reputations, loss of referrals, and prosecution for perjury. He will discuss the ethical standards of professional groups, sins of omissions and commissions, when and what to put in writing, disclaimers versus destruction of reports and other documents, the differences between testifying and consulting experts and how far experts can and should go in collaborating with retaining counsel. Professor Ohlbaum will offer practical advice and suggestions to assist experts in maintaining their reputations, integrity, and credibility. Questions and Answers

OR

**The Litigation Fee Agreement: An In-Depth Analysis**
By Rodney G. Richmond, RPh, MS, CGP, FASCP

Mr. Richmond will review the elements of a successful, bulletproof fee agreement for consultants and experts. He will discuss all of its terms including services performed, fee schedule, payment terms, project approval, terminations, injuries, indemnification, confidentiality, and deposition and courtroom testimony/appearances and expenses. Mr. Richmond will explain the rationale for the terms and how they work in a real world setting. Rodney G. Richmond, RPh, MS, CGP, FASCP, is a registered pharmacist and forensic consultant with The Mackenzie Group, a clinical and forensic pharmaceutical consulting company in Morgantown, West Virginia. He received his BS from West Virginia University and his MS from the University of North Carolina at Chapel Hill. Mr. Richmond is a clinical instructor in the Department of Clinical Pharmacy at West Virginia University, and a member of the American Society of Pharmacy Law. **Questions and Answers**

**3:30-4:30**        Breakout Sessions: Choose One

**Correspondence Between Expert Witnesses and Counsel: Traps, Minefields, and Other Potential Disasters**
By Ryan C. Reed, Esquire

Attorney Reed will explain the limited protection of "work product" concepts and the likely outcome of discovery requests for correspondence between expert witnesses and counsel. He will discuss highlighting, drafts, notes, correspondence, preliminary conclusions, and reports of experts. Attorney Reed will review the use of oral versus written reports and how experts increase their vulnerability to cross-examination by accepting excessive "help" from counsel when drafting their reports. Attorney Reed will offer practical suggestions for what experts should and should not commit to writing. Ryan C. Reed, Esquire is a trial attorney with the Bowling Green, Kentucky law firm of English, Lucas, Priest & Owsley. Attorney Reed received his BA in Economics from Western Kentucky University and his JD from the University of Kentucky College of Law. He is engaged in a broad range of litigation matters, including municipal defense, business and commercial litigation, and workers' compensation. Attorney Reed is the author of *Corresponding With Testifying Experts* and is a member of the Defense Research Institute. Questions and Answers

OR

**Making the Complex Understandable: What Works for Expert Witnesses**
By Daniel E. Krane, PhD

Dr. Krane will discuss how to translate and explain complex scientific concepts, principles, and results in a fashion that can be readily understood by a judge, fact finder, and jury. He will demonstrate how an effective technical expert witness can make juries and judges feel comfortable with the understanding of complex evidentiary material. Dr. Krane will demonstrate by use of examples how all experts can work with retaining counsel to offer coherent, understandable expert testimony even in the most complex and difficult cases. Dan E. Krane is an associate professor of Biological Sciences at Wright State University in Dayton, Ohio, where he routinely teaches introductory biology classes that contain hundreds of students taking their first college-level science course. He is also the lead author of a widely used introductory text on bioinformatics - an intersection of the disciplines of molecular biology and computer science. Dr. Krane's litigation experience includes expert witness and consultation regarding topics pertaining to DNA profiling before many Federal and state courts over the past 12 years including several with high-profile defendants such as O.J. Simpson. Questions and Answers

**4:30-5:30**        **Breakout Sessions: Choose One**

**Trial Demonstration: Direct and Cross-Examination of the Expert Witness**
By Ellsworth T. Rundlett, III, Esquire, David A. Dodge, CSP, and James J. Mangraviti, Jr., Esquire

A mock trial demonstration will be presented by Attorneys Ellsworth T. Rundlett III and James J. Mangraviti, Jr., and David A. Dodge, CSP. The stipulated facts are as follows: The plaintiff, Ms.Haley, went into a Wal Mart store in Farmington, Maine. She located a "creeper" device and reached up with both hands from a stack. She

was then struck when a number of creepers allegedly fell from the shelf striking her back and right elbow. Counsel for the Plaintiff: Ellsworth T. Rundlett, III, Esquire, is a partner in the Portland, Maine law firm of Childs, Rundlett, Fifield, Shumway & Altshuler. Attorney Rundlett received his BA from Bowdoin College and his JD from the University of Maine School of Law. He is a trial attorney and civil trial specialist certified by the National Board of Trial Advocacy. Counsel for the Defense: James J. Mangraviti, Jr., Esquire, is a former trial lawyer with experience in defense and plaintiff personal injury law and insurance law. He currently serves as Vice President and General Counsel of SEAK, Inc. Mr. Mangraviti received his BA degree in mathematics *summa cum laude* from Boston College and his JD degree *cum laude* from Boston College Law School. Expert Witness: David A. Dodge, CSP, is a safety consultant performing accident analysis in the area of safety, worker/machinery accidents and products liability in Standish, Maine. Mr. Dodge received his BS from Maine Maritime Academy and is a registered professional engineer and certified safety specialist. **Questions and Answers**

OR

### Direct Examination and Experts: How Experts Can Excel
By Kevin J. Conway, Esquire

Attorney Conway will explain how the expert can, through direct examination, provide a basic primer translating scientific jargon into plain English. He will discuss preparation and interaction with retained counsel and the use of demonstrative evidence to explain and teach the unfamiliar to the jury. Attorney Conway will show how the expert's opinion can be driven home in a forceful and believable way under direct examination. Attorney Conway will demonstrate how the expert, working with counsel, can soften the blows of anticipated cross-examination. Kevin J. Conway is a partner and the founding, Illinois personal injury law firm of Cooney & Conway. He received his JD from the Loyola University School of Law in 1976 and his BA in 1973 from Loyola University of Chicago. Attorney Conway has achieved million-dollar-plus settlement and/or verdicts in all areas of personal injury law, including aviation, construction, mass torts, and asbestos. Kevin was a member of the Board of Managers of the Illinois Trial Lawyers Association from 1988-1997 and has been a member of the Executive Committee since 1995. As an active member of the Chicago Bar Association, Mr. Conway also chaired the CBA Tort Litigation Committee and co-chaired the Young Lawyers Section of the Trial Technique Committee. He is a Fellow in the American College of Trial Lawyers and is listed in Who's Who in American Law. In 1998, Kevin Conway was nominated as a finalist for Trial Lawyer of the Year by Trial Lawyers for Public Justice in Washington, DC. He will become President of the Illinois Trial Lawyers Association in 2004.**Questions and Answers**

5:30-6:30          **RECEPTION**


## Friday, June 25, 2004

| | |
|---|---|
| 7:30-8:30 | **Late Registration (subject to space availability)** |
| 8:30-9:30 | **A View From The Bench**<br>By The Honorable Allan van Gestel |

Judge van Gestel will explain the factors that go into presenting persuasive expert testimony to a judge and jury. He will discuss how experts lose credibility and believability when they testify. Judge van Gestel will offer practical suggestions on how experts can maintain their integrity while still offering persuasive and convincing expert testimony. The Honorable Allan van Gestel is an Associate Justice of the Massachusetts Superior Court. He obtained his BA from Colby College and his LLB from Boston University School of Law where he was a member of the Law Review. Judge van Gestel was a former partner at Goodwin, Procter & Hoar and is a Fellow of the American College of Trial Lawyers. He is a member of the Standing Advisory Committee for the Massachusetts Rules of Civil Procedure and is currently the Presiding Justice of the Superior Court Business Litigation Session. **Questions and Answers**

9:30-10:30       **Marketing and Building a Forensic/Expert Witness Practice: Cost-Effective Techniques That Work**
By Bruce G. Dubinsky, MST, CPA, CVA, CFE

In order to market, you must effectively network. In order to build a practice, you must have referrals. Mr. Dubinsky will discuss how these two essential factors are key to a successful practice. He will review tracking of results, speaking, writing, reputation, and building word of mouth. He will explain various activities to aid in targeting the appropriate audience while maintaining a reasonable marketing budget and demonstrate how certain cases can help your firm's reputation and exposure. Mr. Dubinsky will offer practical suggestions all experts can use to "get your name out there." Bruce G. Dubinsky is a partner and the Director of Forensic Accounting and Dispute Analysis Services for the public accounting firm of Klausner Dubinsky + Associates, PC, in Bethesda, Maryland. He received his BS from the University of Maryland and his MS from Georgetown University. Mr.Dubinsky has provided support in fraud cases, investment Ponzi scheme cases, bankruptcy cases, tax fraud cases, malpractice cases, commercial damage cases, marital dissolution cases, and personal injury cases. He has been qualified as an expert in cases involving criminal and civil fraud, business valuations, commercial damages, and other financial and tax matters in both federal courts and numerous state level courts. In 2001, Mr. Dubinsky was awarded the Fraud Examiner of the Year Award by the Washington Association of Certified Fraud Examiners. He headed the forensic investigation on campaign finance fraud for the United States Department of Justice through appointment by the US District Court for the Southern District of New York during the International Brotherhood of Teamsters (IBT) Rerun Election during 1998 and again in 2001. He furnished the forensic audit for the Washington Teachers Union fraud investigation in early 2003. Mr. Dubinsky has numerous published articles on investigating and working with fraud cases and has acquired a formidable reputation as an experienced trial witness. **Questions and Answers**

**10:30-11:30**     **How Lawyers Cross-Examine, Impeach, and Destroy Expert Witnesses**
By Marcus Z. Shar, Esquire

Attorney Shar will explain and demonstrate numerous techniques attorneys use to destroy the effectiveness and credibility of expert witnesses. Attorney Shar will discuss inconsistent statements, motivation, truthfulness, learned treatises, and other techniques that experts need to understand and be prepared for. He will offer practical suggestions on how experts can defend themselves against each of these techniques, and in some instances, turn the tables on opposing counsel. Marcus Z. Shar is a partner in the Baltimore, Maryland law firm of Shar, Rosen & Warshaw, LLC, which represents plaintiffs in medical malpractice cases throughout the United States. He is listed in *Woodward and White's, The Best Lawyers in America*; is a Fellow in the prestigious American College of Trial Lawyers; and was one of the first two lawyers in the country to be named a Diplomat of The National College of Advocacy. Mr. Shar is an adjunct faculty member at the University of Maryland School of Law and an associate clinical professor at the University of Maryland School of Medicine. The author of numerous articles on trial techniques and three treatises, Mr. Shar lectures to lawyers, judges, experts, and lay groups around the country. **Questions and Answers**

**11:30-12:00**     **Roundtable: Including Conference Attendees**

**12:00-1:00**     **Conference Luncheon-Provided**

**1:00-2:00**     **Breakout Sessions:**

**How Attorneys Prepare to Depose Experts: What Experts Can Expect and How To Prepare For It**
By Michael F. Imprevento, Esquire

Attorney Imprevento will discuss how attorneys prepare to build a record using gaps in the expert's qualifications, foundation methodology, or reasoning. He will explain how good trial attorneys prepare for the expert's deposition as if they were preparing their own expert. Attorney Imprevento will review thirteen non-Daubert issues attorneys use during an expert's depositions including the classic 5 "Silver Bullets" of John Romano. Attorney Imprevento will offer practical suggestions on how experts can prepare for their deposition. Michael F. Imprevento, Esquire, is a partner and trial lawyer with the personal injury Norfolk, Virginia law firm of Breit, Drescher & Imprevento. He received his BA from Fordham University and his JD from Hofstra University. Mr. Imprevento is a former Special Assistant United States Attorney and served as a Lieutenant in the U.S. Navy Judge Advocate Generals Corps. Attorney Imprevento is Vice-Chair, Products Liability Section of the Virginia Trial Lawyers Association and has written and lectured extensively about products liability and litigation. **Questions and Answers**
OR

**Maintaining Your Integrity and Credibility in the Face of the Adversarial System**
By Vince A. Gallagher, CHCM, CSHM

Mr. Gallagher will discuss the many ways that an expert's integrity is likely to be challenged by lawyers on both sides of the case. He will share his experiences in dealing with unethical lawyers of all kinds. Mr. Gallagher will offer practical, realistic suggestions on how experts can best serve clients while still maintaining their integrity and credibility.

Vincent A. Gallagher, CHCM, CSHM, is the President of Safety Research, Inc., in Audubon, New Jersey. Mr. Gallagher has worked in the field of worker safety for thirty years. Mr. Gallagher has a master's degree in occupational safety and health from New York University. He has consulted for major corporations, unions, and for various United Nations agencies in seven countries. Mr. Gallagher has taught in several universities. He has investigated over five hundred serious or fatal industrial accidents. Mr. Gallagher has testified as an expert witness in court over one hundred times and in depositions more than five hundred times.

**2:00-3:00**     **Breakout Sessions:**

**Acting as a Non-Disclosed Expert: Moving the Goal Posts**
By Crispin Hales, PhD, CEng

In many cases, a seemingly insignificant or overlooked piece of evidence holds the key to what happened. Unless the investigation of such situations is carried out in a meticulous way, based on the application of extensive practical experience, it is likely that erroneous conclusions will be drawn as to the root cause of the problem. Often a theory of what happened is put forward by one party or another early in the discovery phase of a case and it becomes the basis for mainstream deposition questions, testing programs, expert analysis and the development of alternative theories. It is at this stage when the non-disclosed expert has the opportunity to bring all the evidence together and view it from a totally different perspective. If this reveals an entirely different theory, overwhelmingly supported by the evidence, then suddenly the goalposts have been moved and settlement of the case may follow very rapidly, without the need for endless further dispute or trial. Dr. Hales will present several examples to demonstrate where this approach has led to early settlement of otherwise hotly disputed cases, with practical suggestions on the type of evidence to look for and how to help re-orientate the thinking of clients already focused on the theories put forward by other parties. Crispin Hales, PhD, CEng, is a principal mechanical engineer at Triodyne, Inc. in Northbrook, Illinois. He received his BE in mechanical engineering from Canterbury University, his MTech from Loughborough University and his PhD from Cambridge University. Dr. Hales is a Fellow of the American Society of Mechanical Engineers and works in forensic engineering, failure analysis, engineering design, and mechanical systems. Dr. Hales has written and lectured extensively and has broad experience in acting as a consulting and testifying expert in the field of mechanical engineering. **Questions and Answers**
OR

**How Attorneys Really Select Experts: The Impact of Expertise, Experience, Reputation, Writing, Speaking, Marketing, Expert Witness Services, and Other Criteria**
By Anthony R. Zelle, Esquire

Attorney Zelle will discuss how experienced trial attorneys identify, select and prepare expert witnesses for trial. He will explain what attorneys are really looking for and the weight counsel gives to expertise, experience, reputation, writing, speaking, and marketing of expert witnesses. He will offer practical suggestions on how experts can best position themselves for selection by trial counsel and will also discuss the process through which expert witnesses and counsel work together in the interests of advancing their clients' claims. Anthony R. Zelle, Esquire, is a trial attorney specializing in complex litigation in the Boston law firm of Robinson & Cole. He received his JD from Boston College Law School and a BA from the University of Minnesota. He represents plaintiffs and defendants in commercial and insurance related litigation. Attorney Zelle has extensive experience handling fraud claims, and in 2002, he was awarded one of the top three jury verdicts in Massachusetts in an action against a real estate escrow agent and a national brokerage firm. In his representation of clients in the insurance industry, he handles coverage and bad faith cases. He also represents insurers in subrogation cases. He has tried cases across the country and has appeared in the appellate courts of Massachusetts, Rhode Island, New York, New Jersey, Pennsylvania, West Virginia, and Ohio and in the First, Second, and Third Circuit Courts of Appeal. Attorney Zelle is a member of the Defense Research Institute and chairs the Insurance Committee's Extra-Contractual/Bad Faith Claims Committee. He is a frequent speaker at DRI programs and has also served on the faculty of the Loss Executive Association's National Forum for Property Loss Professionals. **Questions and Answers**

**3:00-4:00**     **Breakout Sessions: Choose one**

**Establishing Defensible Opinions**
By Jeffrey D. Zwirn, CPP, CFPS, CFE, DABFET, CHS-III

Mr. Zwirn will discuss effective methods for establishing defensible opinions when retained by plaintiffs or defendants. Mr. Zwirn will explain the proper steps to take in establishing defensible opinions and will demonstrate these steps with examples. Mr. Zwirn will provide practical advice to assist the expert attendee in establishing their own defensible opinions for deposition and trial testimony. Jeffrey D. Zwirn, CPP, CFPS, CFE, DABFET, CHS-III, is a security and alarm expert and President of IDS Research and Development, Inc., in Teaneck, New Jersey. Mr. Zwirn has developed, designed, serviced, installed, and monitored thousands of access control, fire alarm, and security systems for commercial, industrial, and residential clients. Mr. Zwirn has served as an instructor for the NYPD Police Training Academy, International Security Conference, ASIS, museum library, and cultural property protection committee and many other associations and organizations. Mr. Zwirn has developed training curriculum and written alarm and security test examinations for the New York City Police Department and the Joint Terrorist Task Force. Mr. Zwirn is also a member of UL and NFPA technical committees. Mr. Zwirn has been involved in hundreds of cases over the last 23 years including the Revelle murder case. **Questions and Answers**

OR

**How to Stand Up Under Cross-Examination and a Daubert Hearing**
By Melvin L. Tucker

Mr. Tucker will discuss the preparation of expert witnesses for cross-examination and Daubert hearings. He will examine and demonstrate some of the commonly employed tactics and strategies used by attorneys in cross-examination to impeach or damage the credibility and testimony of the expert witness during cross-examination. Mr. Tucker will provide practical suggestions on how to survive and thrive during cross-examination and during Daubert hearings. Melvin L. Tucker is a criminal justice and security consultant. He is a former Special Agent with the Federal Bureau of Investigation and a Chief of Police in four cities. He received his BA from the University of South Florida and his MPA from Appalachian State University. Chief Tucker has written and lectured extensively on law enforcement and security issues. He served as a regular instructor for the Florida Center for Advanced Law Enforcement Studies and the Florida Criminal Justice Institute. Chief Tucker has testified extensively in both state and federal court on criminal justice and security issues.

**Questions and Answers**

**4:00-5:00**     **Breakout Sessions: Choose one**

**Preparing to Testify: Deposition and Trial**
By Bruce G. Dubinsky, MST, CPA, CVA, CFE

Mr. Dubinsky will review credentials and standards required for the court to accept a witness as an expert as well as training requirements. He will also explain personal qualities of the expert and the ability to work as part of a team. Mr. Dubinsky will explain his roles in testifying in depositions and trials and the preparation involved in order to meet the challenges of each step of the litigation process, from pretrial proceedings and depositions to trial exhibits and expert testimony. He will demonstrate how to gather evidence and most crucially, determine what is relevant and needed to support an expert opinion. Mr. Dubinsky will offer practical, time-tested advice on how to play it smart, be effective, and obtain success in the courtroom.

OR

**Communication In the Courtroom: How Experts Can Excel**
By Marcus Z. Shar, Esquire

Attorney Shar will explain and demonstrate the expert's use of demonstrative evidence, verbal and nonverbal techniques, and preparation with counsel to effectively communicate at deposition and at trial. Attorney Shar will offer practical advice on how to win over the fact finder or jury and dramatically improve the expert's effectiveness and persuasiveness while testifying. **Questions and Answers**

---

## SEAK in Hyannis -- June 2004
## Thirteenth Annual Conference-Main Page

Registration     Testifying Advanced Trick and     Expert Report     Expert     Registration

| Info | Skills Workshop | Difficult Questions Workshop | Writing Workshop | Witness Practice Management Workshop | Form |
|------|------|------|------|------|------|
| Expert Witness Directory | | | | | Additional Hotels |

Contact SEAK

| Customer Service | Orders | Fax | Email |
|------|------|------|------|
| 508.548.7023 | 508.457.1111 | 508.540.8304 | seakinc@aol.com |

Mail/Orders:  PO Box 729, Falmouth, MA 02541
Courier:      316 Gifford St., Falmouth, MA 02540

technical questions or suggestions regarding the website: seakinckb@aol.com

# Technology as a StoryTeller's Tool

**Dana G. Taunton**
&
**Leslie C. Ellis**
**Beasley, Allen, Methvin, Portis & Miles, P.C.**
**218 Commerce Street**
**Montgomery, Alabama 36104**

## I.     Introduction – The Art of Persuasion

No doubt, great trial lawyers are remembered most fondly by their closing arguments.   The closing argument is the trial lawyer's single opportunity for pure oratory in the trial process.  By the time trial counsel rises to deliver his closing arguments, there is no longer an issue of a "burden of proof."   Instead, the concern is now focused on the "burden of persuasion."   However, it is a rare case that can be salvaged through even the most eloquent of closing arguments if the foundation or building blocks of persuasion have not been firmly established throughout the preceding stages of trial.

> At best the closing argument confirms jurors' general impressions and conclusions to which they are already predisposed by the evidence.  It provides a logic within which facts can be organized and reasoned and rationales that jurors can rely on to support their opinions and defend them during deliberations.  Ideally, it is the goal of every trial lawyer to fashion a closing argument that turns skeptics into committed advocates.  But, in the final resolve, it will be the facts of the case and not the fashion of counsel which will be of paramount persuasion.

William L. Mock, <u>Closing Argument:  A Checklist for the Experienced Trial Lawyer</u>, Trial Advocacy College:  Essentials of Civil Litigation, October 1996.



DEFENDANT'S
EXHIBIT

3/

Taunton- 1

Copyright © 2007 Beasley Allen, et al.  All rights reserved.

References:

1.    "Courtroom Technology: Tools for Persuasion."  Frank Herrera
      Jr. and Sonia M. Rodriguez – published in TRIAL, May,
      1999.

2.    "The Use of Technology and Presentation Graphics in Closing
      Argument" Ed Walsh, Walsh, Knippen, Knight & Diamond
      – Wheaton, Illinois – Website: www.wkkd.law.com.

3.    "Computer Graphics for the Complex Trial."   James R.
      Lauridson, M.D. - Beasley, Allen, Crow, Methvin, Portis &
      Miles, P.C. – presented at the 13th Annual National Expert
      Witness Conference, Hyannis, Cape Cod, MA – June 24-
      25, 2004.

4.    "Closing Statements" – Mastering Trial Skills – Jere L. Beasley
      October 31, 2003.

5.    "Using Litigation Technology Successfully" – Visual Evidence
      Center – Website: www.visevidence.com.

Taunton- 9

Copyright © 2007 Beasley Allen, et al. All rights reserved.



## Corporate Details

**INITIATE NEW BROWSE**

| | | |
|---|---|---|
| Company<br>Legal Name: | Nibbana Graphics, L.L.C. | DLL 674-317 |
| County Filed: | Montgomery County | |
| Formed Date.: | 02-09-2001 | |
| Report Date.: | * Not On Data Base | |
| Reg Agent...: | LAURIDSON, JAMES R<br>528 SEMINOLE PLACE<br>MONTGOMERY, AL  36117 | |
| Prin Address: | MONTGOMERY, AL | |
| Offc Of Rec.: | * Not On Data Base | |
| Capital Amt.: | * Not On Data Base | |
| Nat Of Bus..: | PREPARE ILLUSTRATIVE GRAPHICS FOR LEGAL/EDUCATIONAL PURPOSES | |
| Members.....: | LAURIDSON, JAMES R | |

**PREVIOUS PAGE**

ISDWebServices

Statements/Policies | info.alabama.gov | alabama.gov | Contact Us     Phone: (334) 242-7200



# THE JERE BEASLEY REPORT

Beasley, Allen, Crow, Methvin, Portis, & Miles, P.C., Attorneys at Law

APRIL 2003

## IN THIS ISSUE

I.    Capitol Observations . . . . . . . . . . . 1
II.   The National Scene . . . . . . . 7
III.  Nursing Home Update . . . . . . . . 16
IV.   Legislative Happenings . . . . . . . . 19
V.    Court Watch . . . . . . . . . . . . . . . 19
VI.   Congressional Update . . . . . . . 20
VII.  Product Liability . . . . . . . . . 20
VIII. Premises Liability Update . . . . . . 27
IX.   Workplace Hazards . . . . . . . . . 27
X.    Transportation . . . . . . . . . . . . 28
XI.   Corporate Happenings . . . . . . . . 29
XII.  Arbitration Update . . . . . . . . . . . 32
XIII. Mass Torts Update . . . . . . . . . 33
XIV.  Business Litigation . . . . . . . . . . 38
XV.   Healthcare Issues . . . . . . . . . . . 40
XVI.  Tobacco Update . . . . . . . . . . . . 43
XVII. Environmental Concerns . . . . . . . 43
XVIII. Monsanto Update . . . . . . . . . . . 45
XIX.  Insurance and Finance Update . . . 46
XX.   Predatory Lending Update . . . . . . 47
XXI.  Consumer Corner . . . . . . . . . . . 48
XXII. Recalls Update . . . . . . . . . . . . . 49
XXIII. Firm Activities . . . . . . . . . . . . . . 52
XXIV. Closing Remarks . . . . . . . . . . . . 54

## I. CAPITOL OBSERVATIONS

### Nursing Homes Mislead People

As expected, the nursing home industry has come with a package of tort reform bills. However, the four-bill package is even worse than we anticipated. If passed, these bills would, among other things, put a cap of $250,000 on both non-economic damages for an injury and a cap of $250,000 on all wrongful death cases. These bills will do nothing to improve case and protect residents or address any problems nursing homes may have in getting insurance. What they will do is further harm those residents already suffering the greatest damage from a nursing home's abuse or neglect, and provide a windfall to the worst homes, especially repeat offenders, at the expense of good homes that try to offer good care. Clearly, the nursing home industry is intentionally misleading people in our state about their financial condition and the reason for any increases in insurance rates. What most Alabama citizens don't know is that the owners of nursing homes in our state have a monopoly under current Alabama law because the number of nursing home beds is set and can get no higher. That means no new or better facilities can be built. The Certificate of Need process that governs new facilities is locked up and must be changed

While the nursing home owners are crying wolf, even the worst of the existing nursing homes could sell out for a tremendous profit at any time if they wanted to. Under the Certificate of Need law, which makes nursing homes a state-protected monopoly, there is no incentive for the owners to operate the homes efficiently or to provide quality care and treatment of residents.

Instead of spending millions of dollars for high-priced lobbyists and paying for a multi-million dollar television advertising campaign trying to pass their lawsuit immunity bills, the owners of the nursing homes should use that money to improve conditions in their facilities and properly staff them. What the state really needs to do, however, is to open things up and bring some real competition into the marketplace. If that can be accomplished, it would guarantee that the conditions in nursing homes in Alabama would be improved greatly.

We have seen firsthand how bad many of the nursing homes are in Alabama. Our investigations have revealed some unbelievable and sometimes shocking incidents of abuse, neglect, and bad treatment of persons who reside in the facilities. For example, I don't believe that people in our state expect to find fire ants eating their loved ones. Neither do they expect maggots, which thrive in filth, to be found in the feeding tubes and bodies of their relatives. I am also convinced that finding a wheelchair-bound lady locked in a nursing home meat freezer overnight is something



DEFENDANT'S EXHIBIT
34

real busy competing in cutting-horse competitions. She made the finals last month (placing 4th out of 108 entrants) in a prestigious event held in Jackson, Mississippi. Julie is part owner of Double B Ranch, which is located south of Montgomery, Alabama. She is responsible for a good number of horses and does all of the "hard" work required of a ranch hand. This highly successful lawyer attends Fresh Anointing International Church in Montgomery. One of the highest compliments that "trial lawyers" can receive is that they truly care about their clients. I can attest for the fact that Julie Beasley, who just happens to be my oldest daughter, cares about all of her clients and wants them to be completely satisfied when their cases are over.

## Dr. Jim Lauridson Heads Up Our Graphic Design Department

The complexity of our cases, especially death and serious bodily injury claims, has increased drastically over the years. As a result, we must use the latest technology to present these cases properly to judges and juries. With the hiring of Dr. James Lauridson to serve as our Director of Graphics, we have recognized this trend, and arguably the need, to add digital graphics to our case preparations in order to reduce the risk that jurors might not fully understand the essential points of a case. The Multimedia Graphics Section is devoted exclusively to preparing various types of images to serve as crucial illustrations during trials and mediations. We believe this has greatly increased our firm's ability to represent our clients in litigation.

Dr. Lauridson, a licensed medical doctor, was a member of the team that drafted the Child Team Review Law in Alabama. Subsequently, he

served on the State of Alabama Child Death Review Team and was the first Chairman of the Montgomery County Child Death Review Team. In the mid-1990's, Dr. Lauridson began to apply the new technology of computer graphics to illustrate the types of child abuse to healthcare providers, the police, and juries. At that time he became associated with the National Center on Shaken Baby Syndrome, and under the Center's sponsorship produced a collection of these graphics that have been used by prosecutors and educators nationally and internationally.

Dr. Lauridson served as Deputy Chief Medical Examiner with the Alabama Department of Forensic Sciences until 2001. He joined our firm that year, and with our encouragement and support, Dr. Lauridson has continued to be active in child abuse consultation and education. In the past year, he has presented his work to the San Diego Child Abuse Conference, the Alabama Chapter of the American Academy of Pediatrics, and the Georgia Council on Child Abuse. We believe his work has been beneficial and is most important.

"The use of visual computer generated graphics is a wonderful tool in the often difficult area of children who are abused and neglected," observed Dr. Lauridson. "I am very fortunate to have the opportunity to apply these tools in the area of child abuse. Being at Beasley Allen gives me opportunities to do this work that I would not have had elsewhere." In addition to Dr. Lauridson's work described above, he assists in the making of essential medical decisions and evaluations in our product liability, mass torts, and personal injury and death cases. Having a medical doctor on staff has proved to be extremely important and highly beneficial to our clients. This experienced doctor has acquired a great

number of additional skills that few other medical doctors possess. We are fortunate to have Dr. Jim Lauridson, a dedicated and compassionate man, as a member of our litigation team.

## Bruce Huggins Heads Up The Firm's Investigative Division

Bruce Huggins, as Chief Investigator, heads up the firm's Investigative Division. Bruce, who grew up in rural Autauga County, obtained a Criminal Justice Degree from AUM in 1977. He was employed as an Investigator with the Montgomery County Sheriff's Office from 1977 through 1988. Bruce received the Montgomery Officer of the Year award in 1983 and was the first member of the Sheriff's Office to ever attend the prestigious FBI National Academy in Quantico, Virginia. Bruce is married to his high school sweetheart, Cindy McKinnon Huggins, who is a registered nurse. They have two children (Amanda, age 21, a student at TSUM School of Nursing, and Brett, age 18, a senior at LAMP High School.) Bruce came to work as the only investigator for what was then Beasley, Wilson, Allen and Mendelsohn on April 1st, 1988. The firm had a total of 13 people at that time and was located in an old wood frame house on Hull Street. Since that time, the firm has evolved to one with 42 lawyers and 210 support staff on board.

Our Investigative Division has proven to be a tremendous asset to the Personal Injury Section and other Sections by investigating potential cases, aiding attorneys in properly evaluating these cases, offering expert analysis and advice, and assisting in the actual preparations for trial. The Investigative Division employs seven full-time investigators, who are professionally trained law enforcement officers, each having

MAY 2004

# THE JERE BEASLEY REPORT

Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., Attorneys at Law

## A NATIONAL LAW FIRM LOCATED IN MONTGOMERY, ALABAMA

*Helping those who need it most for over twenty-five years*

www.BeasleyAllen.com

DEFENDANT'S
EXHIBIT

35

I see nothing unrealistic or ambitious about the deadlines. In fact, these measures should have been put in place years ago to insure that automobile manufacturers put safe cars on the highways.

### ALCOHOL AND DRIVING DON'T MIX

The mother of a 19-year-old killed in a traffic accident has filed a civil lawsuit against Coors Brewing Co., claiming that the company promotes underage drinking. The mother, a Reno, Nevada, resident, contends Coors has failed in its duty to protect the country's youth from drinking. Her son was killed in 2002 after he drank Coors at a party and later drove his girlfriend's car into a light pole at 90 mph. The lawsuit, which seeks unspecified damages, accused Coors of "glorifying a culture of youth, sex and glamour while hiding the dangers of alcohol abuse and addiction." Golden, Colorado-based Coors issued a statement saying that although the company could not comment on pending litigation, the company "doesn't want underage consumers - period." It is difficult for me to believe that the beer companies don't market this product to young people. It is clear that much of their marketing efforts are directed at younger people. In fact, some advertising appears to be designed to appeal to teenagers. Underage drinking and drunk driving is a problem in this country and it may take more lawsuits against those who market the products in order to help stamp out the problem to the extent possible. There is one thing for certain, and that is alcohol and driving – at any age – don't mix!

### U.S. JETS MUST NOW HAVE DEFIBRILLATORS ON BOARD

Every large jet in the U.S. fleet must now have a defibrillator on board. This may result in making an airliner one of the safest places to have a cardiac arrest. A Federal Aviation Administration rule, four years in the making, has taken effect as of April 12th, requiring an automated external defibrillator and more advanced medical kits on all big jets. But, commuter planes are exempt

from the requirement. A defibrillator is an easy-to-use device that delivers a lifesaving shock when the heart develops a deadly short-circuit known as ventricular fibrillation. When the heart is quivering in this electrical chaos, a shock must be delivered within six minutes to save the person's life. The devices are becoming common in public places, largely because of lessons learned in the air. We are putting a defibrillator in each of the 4 buildings occupied by employees of our firm. Having Dr. Jim Lauridson, a medical doctor, on staff helped us make this decision. We are currently providing training for all employees.

# XVI. ARBITRATION UPDATE

### SOME COURTS DEAL WITH THE EVILS OF ARBITRATION

A federal district court in Georgia has refused to change its order in a payday lending case that was good for consumers. In that case, the court struck down an arbitration clause in a payday lending contract on mostly procedural unconscionability grounds. The court found, among other things, that the class of people who are so desperate as to go to payday lenders are in a particularly vulnerable contract position. The court upheld its original ruling by denying a motion to reconsider. The court's order included some good language about the history of payday lenders, and how "arbitration is just another means for high-cost lenders to circumvent state laws."

The payday loan industry is a multi-billion dollar enterprise nationwide. People who have to do business with this industry usually have few, if any, alternatives. However, that fact doesn't justify the payday lenders taking advantage of their customers. It is government's responsibility, both at the federal and state levels, to protect those persons who deal with payday lenders. If I had the authority to do so, I would close down the payday loan operators

or at the very least require them to charge reasonable interest rates.

### ARBITRATION STILL A CONSUMER NIGHTMARE

Even though courts on occasion – such as the federal court mentioned above in Georgia – will strike down an arbitration agreement, those decisions are still too few and far between. In my opinion, the courts in our state and elsewhere have an obligation to protect consumers from the evils of pre-dispute arbitration of a mandatory and binding nature. However, the obligations of both the U.S. Congress and state legislature bodies are much stronger. No legal scholar can justify the transformation of the Federal Arbitration Act, from what it was intended by Congress to be, into a device used by large corporations to "stick it to consumers." Clearly, based on the history of the FAA, it was never intended by Congress to apply to consumer transactions.

Unfortunately, legislative action has also been slow in coming. Consumers have no chance to get justice from mandatory, binding arbitration that comes about from an agreement they were forced to sign before any dispute ever arose. Politicians who take campaign funding from proponents of arbitration have not seen fit to take on their donors. I think it is time for that to change! Congress should amend the FAA to take all consumer transactions and personal injury and death cases out of the Act. State legislatures should pass local legislation to curb the use of pre-dispute arbitration to the extent possible.

# XVII. NURSING HOME UPDATE

### SETTLEMENT BY KINDRED HEALTHCARE

Kindred Healthcare, a national healthcare services company operating hospitals and nursing homes across the country, recently agreed to settle claims resulting from a four-year investigation

1    A.    But your question, I understood, was the heart

2          attack caused or the result of the spinal cord

3          injury?

4    Q.    Well, did the spinal cord injury contribute in

5          any way to his heart -- the heart attack --

6    A.    I don't know.

7    Q.    -- and the other causes or -- that are listed

8          on the death certificate?

9    A.    I don't know.  I don't have any way of proving

10         or disproving that the spinal cord injury

11         contributed.  It might have contributed.

12   Q.    It could have, but you just don't know?

13   A.    I don't know.  It might have contributed.  It

14         might not have contributed.

15   Q.    All right.

16                   MR. CROW:  I believe that's all the

17                   questions I've got, Doctor.

18                        Mr. Wood might have some

19                   questions for you.

20                   CROSS-EXAMINATION

21   BY MR. WOOD:

22   Q.    Doctor, I'm going to show you what I have

23         marked as some records concerning this

DEFENDANT'S
EXHIBIT

36



Alabama
Cardiovascular
Group, P.C.

Alvaro A. Aldana, M.D., F.A.C.C.
Joaquin G. Arciniegas, M.D., F.A.C.C.
Vikram J. Arora, M.D., F.A.C.C.
Jack W. Brand, Jr., M.D., F.A.C.C.
Hasan Güven, M.D., F.A.C.C.
Randall G. Hess, D.O., F.A.C.C.
Byron D. Jones, M.D., F.A.C.C.
William A.H. MacLean, M.D., F.A.C.C.
Edward F. Mahan, III, M.D., F.A.C.C.
Raymond W. Workman, M.D., F.A.C.C.

January 30, 2008

Law Firm of Norman, Wood, Kendrick and Turner



DEFENDANT'S
EXHIBIT

37

RE: ROBERT R. WOODLEY

I have reviewed of all the records that were available to me in the matter of Mr. Robert R. Woodley.

This unfortunate gentleman sustained a motor vehicle accident on August 18, 2006, with initial stabilization at Ft. Payne Hospital. Then he was transferred to the UAB Hospital and underwent surgical intervention for management of his post-traumatic cervical spine injury and paralysis. On August 31 (that is 13 days after his motor vehicle accident), he suffered an extensive inferior myocardial infarction and went into shock requiring balloon counter pulsation, interventional revascularization of the right coronary artery, and stenting by Dr. Papapietro. This occurred in the setting of longstanding coronary artery disease documented by cardiac catheterization in 2003 at which time he underwent placement of drug-eluting stent (Cypher) by Dr. Williams in Montgomery. The results were less than ideal because of the tortuosity and calcification of the right coronary artery. His coronary artery disease as is usually the case was not limited to the right coronary artery. There was indication of lesions and calcification of the left coronary arterial tree (LAD) although not of critical nature. A few days later from the original procedure a second catheterization was performed at that time because of angina. Consideration for coronary artery bypass grafting was entertained. However, the patient appeared to have stabilized medically and this operation was never carried out. In December of the same year, he was still having some angina pectoris responsive to nitroglycerin as documented in a clinic visit on 12/23/03. Prior to 2006, he was on medical therapy. A note of 07/11/06 indicated that he was not having angina pectoris. It indicated that he was not taking his cholesterol medicines. After his motor vehicle accident, he underwent surgery at UAB on August 19. He had a fracture dislocation at C6-C7 level with residual paralysis. Postoperative course at that time was associated with not infrequent problems of hyponatremia and blood pressure shifts, both of which are not unusual after the type of injury he sustained. In review of the records from UAB, I did not see where he was treated postoperatively with aspirin and Plavix and beta blockers, I guess for obvious reasons, due to the nature of the surgery and changes in his clinical condition. He received low-dose Lovenox, an anticoagulant. His myocardial infarction goes along with

Administrative Offices: St. Vincent's Hospital, 2700 Tenth Ave., So. (POB II), Suite 305, Birmingham, AL 35205 (205) 939-0139 Fax (205) 939-4997
Medical Center East, 48 Medical Park East Dr., Suite 453, Birmingham, AL 35235 (205) 838-3895 Fax (205) 838-3014
UAB Medical West, 985 Ninth Ave. SW, Suite X01, Bessemer, AL 35022 (205) 481-7557 Fax (205) 481-7560
UAB Medical West, 985 Ninth Ave. SW, Suite 403, Bessemer, AL 35022 (205) 481-8470 Fax (205) 481-8473

Letter re Robert Woodley
January 30, 2008
Page 2

long-term coronary artery disease with progression evidenced by the development of left main
coronary disease as reported in Cardiac Catheterization Report of the day of his myocardial
infarction (which was not reported in the earlier caths). Traumatic events have been considered
as possible triggers for the acute myocardial infarction but certainly in a patient who has a
longstanding history of coronary artery disease, requiring right coronary artery stenting, the well-
known natural progression of coronary artery disease is not surprising. Certainly the 15 days
elapsed from his initial trauma make it less likely a precipitating event. His myocardial infarction
was very well managed by Dr. Papapietro and his associates. The amount of damage produced
by the infarction was insurmountable which is not infrequently the case.

For your information, I have never been an expert witness in any trial or legal proceedings. I do
not provide opinions in legal matters on a regular basis. For your review, I am enclosing a copy
of my CV.

My hourly fee is $300.00.

Sincerely yours,

Joaquin G. Arciniegas, M.D.
Fellow ACC
Fellow AHA

JGA/cr

# CURRICULUM VITAE
# JOAQUIN G. ARCINIEGAS, M.D.

**DATE OF BIRTH:** July 19, 1948

**PLACE OF BIRTH:** Ibaque, Colombia, South America

**EDUCATION:**

UNDERGRADUATE
Liceo De Cervantes
Bogota, Colombia
Bachelor Degree, November 1965

MEDICAL SCHOOL
National University of Colombia,
        School of Medicine
Bogota, Colombia
M.D., January 1973

**HOSPITAL TRAINING:**

INTERNSHIP
Hospital San Juan de Dios
Bogota, Colombia
1972 to 1973

Henry Ford Hospital
Detroit, Michigan
July 1975 to June 1976

RESIDENCY
Henry Ford Hospital
Detroit, Michigan
July 1976 to June 1978

CHIEF RESIDENT – MEDICINE
Henry Ford Hospital
Detroit, Michigan
July 1977 to June 1978

FELLOWSHIP
University of Alabama at Birmingham
Birmingham, Alabama
July 1978 to June 1980

APPOINTMENTS:

ATTENDING PHYSICIAN
Hospital San Rafael
Espinal, Colombia
January 1973 to January 1974

INSTRUCTOR
Department of Anatomy and Physiology
National University of Colombia
School of Medicine
January 1974 to June 1975

INSTRUCTOR
Department of Medicine
Division of Cardiology
University of Alabama at Birmingham
July 1980 to September 1981

ASSISTANT PROFESSOR
Department of Medicine
Division of Cardiology
University of Alabama at Birmingham
October 1981 to January 1983

CURRENT POSITIONS:

PRESIDENT
Alabama Cardiovascular Group, P.C.
(Private Practice)
Birmingham, Alabama
February 1, 2003 – Present

STAFF CARDIOLOGIST
Carraway Methodist Medical Center and
Norwood Clinic
Birmingham, Alabama
January 1983 to 1/31/2003

VICE PRESIDENT
Norwood Clinic, Largest Multi-
Specialty Clinic, Alabama
Birmingham, Alabama
September, 1997 to February 2003

CHAIRMAN
Department of Cardiology
Norwood Clinic
Birmingham, Alabama
January 1998 to 2002

CHAIRMAN
Department of Cardiology
Carraway Methodist Medical Center
Birmingham, Alabama
January 1998 to 2002

DIRECTOR
Electrophysiology Laboratory
Carraway Methodist Medical Center
Birmingham, Alabama
January 1984 to 2001

CLINICAL ASSISTANT PROFESSOR
Department of Medicine
Division of Cardiology
University of Alabama at Birmingham

JOAQUIN G. ARCINIEGAS, MD
**PAGE 4**

**CERTIFICATION:**

Educational Council for Foreign Medical Graduates (ECFMG)
1972

Federation Licensing Examination (FLEX)
1977

American Board of Internal Medicine
1978

American Board of Internal Medicine
Subspecialty of Cardiovascular Diseases
1981

American Board of Internal Medicine
Subspecialty in Interventional Cardiology
March, 2000

Examination of Special Competency in Cardiac Pacing and Cardioversion Defibrillation for the physician
7/24/06 – 2016
Certificate #:

**LICENSURE:**

Michigan, 1977
Alabama, 1978

JOAQUIN G. ARCINIEGAS, MD
PAGE 5

SOCIETY MEMBERSHIPS:

Fellow, American College of Cardiology
Fellow, American College of Chest Physicians
Fellow, Council of Clinical Cardiology, American Heart Association
Member, American College of Physicians
Member, American Medical Association
Member, Birmingham Cardiovascular Society
Member, Birmingham Society of Internists
Member, American Federation for Clinical Research
Member, Medical Association of the State of Alabama
Member, Jefferson County Medical Society
Member, North American Society for Cardiac Pacing and Electrophysiology
Honorary Member, Colombian Society of Cardiology
Member, New York Academy of Science
Member, American Society of Echocardiography
Member, The Society for Cardiac Angiography and Interventions

INVITED PROFESSOR:

Cardiology Grand Rounds
Medical College of Virginia
1981

Research Seminar
University of Texas, San Antonio
1982

AWARDS:

Daniel Vega Award, Best Medical Student
National University of Colombia
School of Medicine
1972

Honor Degree, Best Medical Student
National University of Colombia
School of Medicine
1972

Carlos Esguerra Award, Best Intern
Colombian National Academy of Medicine
1972 to 1973

JOAQUIN G. ARCINIEGAS, MD
PAGE 6

INVITED INTERNATIONAL LECTURER:

Colombian Society of Cardiology
Course in Cardiac Arrhythmias
1982

Medellin Society of Cardiology
December 1982

Colombian Cardiovascular Center
Santa Maria Clinic
Medellin, Colombia
December 1982

BIBLIOGRAPHY:

1. ARCINIEGAS JG, Rubens M, Soto B: Axial cineangiography in the diagnosis of univentricular hearts. Proceedings of Latin America Congress of Cardiology. Brazil, 1978.

2. ARCINIEGAS JG, Papapietro SE, Soto B: Cinangiography in the diagnosis of aortic dissection. Circulation 60:II-263, 1978.

3. Soto B, Ceballos R, ARCINIEGAS JG: Anatomia angiografica de la valvula mitral. Revista Espanola de Cardiologia 33:307, 1980.

4. Mantle JA, ARCINIEGAS JG, Little WC, Coghlan HC, Russell RO Jr, Rackley CE: Coronary artery spasm. (W. Raffenbuel, editor) Proceedings of the International Symposium on Unstable Angina Pectoris. Hanover, Germany, Theime-Stratton, Inc, New York, 1980.

5. Klein H, ARCINIEGAS JG, Frank G, Karp RB, Kouchoukos NT, James TN, Waldo AL: Identification of the electrophysiologic milieu associated with ventricular arrhythmias in patients with abnormally contracting myocardium. Proceedings of VIII European Congress of Cardiology. June 1980, page 73.

6. ARCINIEGAS JG, Klein H, Karp RB, Kouchoukos NT, James TN, Kirklin JW, Waldo AL: Surgical treatment of life-threatening ventricular tachyarrhythmias. Circulation 62:III-42, 1980.

7. Waldo AL, Plumb VJ, ARCINIEGAS JG, James TN: Overdrive pacing of AV bypass pathway type PAT - A model for demonstrating and understanding reentrant rhythms. Circulation 62:II-47, 1980.

8. ARCINIEGAS JG, Papapietro SE, Soto B: Cineangiography in the diagnosis of aortic dissection. American Journal of Cardiology 47:890, 1981.

9. Little WC, ARCINIEGAS JG, Mantle JA: A safe, rapid method of transfemoral retrograde left ventricular catheterization in valvular aortic stenosis. Catheterization and Cardiovascular Diagnosis 7:417, 1981.

10. Waldo AL, ARCINIEGAS JG, Klein H: Surgical treatment of life-threatening arrhythmias. The role of intraoperative mapping and consideration of the presently available surgical techniques. Progress in Cardiovascular Diseases 23:247, 1981.

11. Waldo AL, Plumb VJ, ARCINIEGAS JG: Treatment of life-threatening arrhythmias. Alabama Journal of Medical Sciences 18:262, 1981.

**BIBLIOGRAPHY** (con't)

12.    ARCINIEGAS JG, Plumb VJ, Waldo AL:  Characterization of the onset of ectopic atrial tachycardia with AV block. American Journal of Cardiology 47:496, 1981.

13.    ARCINIEGAS JG, Little WC, Coghlan HC, Russell RO Jr, Rackley CE, Mantle JA: Coronary artery spasm:  An isolated phenomenon or one manifestation of a more diffuse vascular hyper-reactivity. American Journal of Cardiology 47:450, 1981.

14.    ARCINIEGAS JG, Coghlan HC, Soto B:  Angiographic approach to the diagnosis of congenital heart disease. American Journal of Radiology 137:673, 1981.

15.    Little WC, Reeves RC, ARCINIEGAS JG, Katholi RE, Rogers EW:  Mechanism of abnormal inerventricular septal motion during delayed left ventricular activation. Circulation 65:1486-1491, 1982.

16.    Henthorn RW, Plumb VJ, ARCINIEGAS JG, Waldo AL:  Entrainment of "ectopic atrial tachycardia": Evidence for re-entry.  Clinical Research 29:811A, 1981.

17.    Zimmern SH, Karp RB, Smith LR, Waldo AL, ARCINIEGAS JG, Plumb VJ:  The effects of lidocaine on electrical impulse conduction time in the human heart.  Clinical Research 29:858, 1981.

18.    Maddox WT, Plumb VJ, ARCINIEGAS JG, Henthorn RW, Zimmern SH, Waldo AL:  Electrophysiologic properties of intravenous quinidine in man. Clinical Research 21:812A, 1981.

19.    ARCINIEGAS JG, Plumb VJ, Karp RB, Zorn GL Jr, Zimmern SH, Henthorn RW, Waldo AL: Endocardial mapping during sinus rhythm in patients with recurrent sustained life-threatening ventricular arrhythmias. Clinical Research 29:853A, 1981.

20.    Waldo AL, ARCINIEGAS JG, Klein H:  Surgical treatment of life-threatening ventricular arrhythmias:  The role of the intraoperative mapping and consideration of the presently available surgical techniques.  In: Sudden Cardiac Death.  Edited by Edmund H. Sonnenblick and Michael Lesch, Grune and Stratton, New York, 1981, pages 269-286.

21.    Henthorn RW, Plumb VJ, ARCINIEGAS JG, Waldo AL:  Entrainment of "ectopic atrial tachycardia": Evidence for re-entry. American Journal of Cardiology 49:920, 1982.

22.    ARCINIEGAS JG, Plumb VJ, Karp RB, Zorn GL Jr, Zimmern SH, Henthorn RW, Waldo AL: Endocardial mapping during sinus rhythm in patients with recurrent sustained life-threatening ventricular arrhythmias. American Journal of Cardiology 49:935, 1982.

23.    Little WC, Reeves RC, ARCINIEGAS JG, Katholi RE, Rogers EW:  Mechanism of abnormal intraventricular septal motion during delayed left ventricular activation. Circulation 65:1486-1491, 1982.

24.    Waldo AL, Plumb VJ, ARCINIEGAS JG, Henthorn RW, Zimmern SH: Verapamil therapy in the treatment of supraventricular arrhythmias following open heart surgery.  Angiology 34:755-763, 1983.

## BIBLIOGRAPHY (con't)

25.     Waldo AL, Plumb VJ, ARCINIEGAS JG, MacLean WAH, Cooper TB, Priest MF, James TN: Transient entrainment and interruption of AV bypass pathway type paroxysmal atrial tachycardia. A model for understanding and identifying reentrant arrhythmias. Circulation 67:73-83, 1983.

26.     Page PL, ARCINIEGAS JG, Plumb VJ, Henthorn RW, Karp RB, Waldo AL: Value of early postoperative epicardial programmed ventricular stimulation studies after surgery for ventricular tachyarrhythmias. Journal of the American College of Cardiology 2:1046-1052, 1983.

27.     Kay GN, Plumb VJ, ARCINIEGAS JG, Henthorn RW, Waldo AL: Torsades de pointes: The long-short initiating sequence and other clinical features:  Observations in 32 patients. Journal of the American College of Cardiology 2:806-817, 1983.

28.     Siler W, Cooper TB, ARCINIEGAS JG, MacLean WAH, Papapietro SE, Hess RG, Stanley AWH Jr, Powell VG, McEachern M, Jolly P, Morrison R, Buckley J:  Controlled image acquisition, segmentation, feature extraction and classification of echocardiographic sector scans.  Computers in Cardiology. IEEE Computer Society, 117-120, 1983.

29.     Papapietro SE, MacLean WAH, Stanley AWH Jr, Cooper TB, Hess RG, Corley N, ARCINIEGAS JG: Nonsurgical revascularization for acute evolving myocardial infarction: Effects on mortality and left ventricular function. Clinical Research 31, No 5:827A, 1983.

30.     Stanley AWH Jr, ARCINIEGAS JG, Cooper TB, Corley N, Hess RG, MacLean WAH, Papapietro SE:  Glucose-insulin-potassium following successful coronary reperfusion improves survival during myocardial infarction. Circulation 70, No 4:II-153, 1984.

31.     Papapietro SE, MacLean WAH, Stanley AWH Jr, Hess RG, Corley N, ARCINIEGAS JG, Cooper TB:  Percutaneous transluminal coronary angioplasty after intracoronary Streptokinase in evolving acute myocardial infarction.  The American Journal of Cardiology 55, No 1, 48-53, 1985.

32.     Papapietro SE, Corley N, MacLean WAH, ARCINIEGAS JG, Hess RG, Siler W, Cooper TB, Stanley AWH Jr.  Coronary artery recanalization with intracoronary thrombolysis and transluminal angioplasty in evolving myocardial infarction:  Effects on mortality and ventricular function. Abstracts, XII Interamerican Congress of Cardiology.

33.     Corley N, Siler W, MacLean WAH, ARCINIEGAS JG, Hess RG, Cooper TB, Stanley AWH Jr, Papapietro SE: Predictors of outcome in patients with acute myocardial infarction undergoing coronary arterial recanalization.  Abstracts, XII Interamerican Congress of Cardiology.

34.     Stanley AWH Jr, Prickett C, Simpson MT, Teague J, ARCINIEGAS JG, Cooper TB, Hess RG, MacLean WAH, Papapietro SE, Downey J: Failure to detect xanthine oxidase activity in reperfused human myocardium. Clinical Research 35, No 1:35A, 1987.

35.     ARCINIEGAS JG, Hassett JA, MacLean WAH, Cooper TB, Papapietro SE, Stanley AWH Jr, Hess RG, Simpson MT: Flecainide in recurrent or persistent supraventricular tachycardia. PACE 10, No 3:109, 1987.

**JOAQUIN G. ARCINIEGAS, MD**
**PAGE 9**

BIBLIOGRAPHY (con't)

36.     Papapietro SE, ARCINIEGAS JG, Cooper TB, Walls D, Carroll P, Simpson MT, Hess RG, Stanley AWH Jr, MacLean WAH: New strategies in the treatment of acute myocardial infarction. In "Avances en Cardiopatia Isquemica" (Advances in Ischemic Heart Disease), editors: Carlos Saenz de la Calzada and P. Zarco Gutierrez, Spain. In press.

37.     Papapietro SE, ARCINIEGAS JG, Cooper TB, Walls D, Carroll P, Simpson MT, Hess RG, Stanley AWH Jr, MacLean WAH: New developments in the treatment of acute myocardial infarction. Part I of III. Alabama Medicine 56, No 7, 18-20, 1987.

38.     Papapietro SE, ARCINIEGAS JG, Cooper TB, Walls D, Carroll P, Simpson MT, Hess RG, Stanley AWH Jr, MacLean WAH: New developments in the treatment of acute myocardial infarction. Part II of III. Alabama Medicine 56, No 8, 16-18, 1987.

39.     Papapietro SE, ARCINIEGAS JG, Cooper TB, Walls D, Carroll P, Simpson MT, Hess RG, Stanley AWH Jr, MacLean WAH: New developments in the treatment of acute myocardial infarction. Part III of III. Alabama Medicine 56, No 9, 20-23, 1987.

40.     Athanasuleas CL, Geer DA, ARCINIEGAS JG, Cooper TB, Hess RG, MacLean WAH, Papapietro SE, Stanley AWH Jr, McEachern M: A reappraisal of surgical intervention for acute myocardial infarction. Journal of Thoracic and Cardiovascular Surgery 93, 405-414, 1987.

41.     Rogers WJ, Bourge RC, Papapietro SE, Wackers FJ, Zaret BC, Forman S, for the TIMI Investigators: Left ventricular function following r-tPA in the NHLBI TIMI-II Pilot Study. Circulation 76, No 4:II-1037, 1987.

42.     MacLean WAH, ARCINIEGAS JG, Corley N, McEachren M, Hess RG, Cooper TB, Hefner LL, Stanley AWH Jr, Papapietro SE: Percutaneous transluminal coronary angioplasty for evolving acute myocardial infarction in 244 patients. Clinical Research 36, No 1:6A, 1988.

43.     Passamani E, Hodges M, Herman M, for the TIMI investigators: The thrombolysis in myocardial infarction (TIMI) Phase II Pilot Study: Tissue Plasminogen Activator followed by percutaneous transluminal coronary angioplasty. Journal of the American College of Cardiology 10, No 5, 51B-64B.

44.     The TIMI Research Group: TIMI IIA Results. Immediate vs delayed catheterization and angioplasty following thrombolytic therapy for acute myocardial infarction. The Journal of the American Medical Association 26, No 18, 2849-2858, 1988.

45.     ARCINIEGAS JG, Papapietro SE, Cooper TB, Hefner LL, Hess RG, MacLean WAH, Simpson MT, Stanley AWH Jr: Current concepts in the pathophysiology and management of acute myocardial infarction. Revista Colombiana de Cardiologia 2, No 5, 327-350, 1988.

46.     Hassett JA, Elrod PA, ARCINIEGAS JG, MacLean WAH, Duncan JL: Non-invasive diagnosis and treatment of atrial flutter utilizing previously implanted dual chamber pacemaker. PACE 11, No 11, Part II, 1662-1666, 1988.

## BIBLIOGRAPHY (con't)

47.    Rogers WJ, Bourge RC, Papapietro SE, Wackers FJ, Zaret BL, Forman S, Dodge HT, Robertson TL, Passamani ER, Braunwald E, for the TIMI investigators: Variables predictive of good functional outcome following thrombolytic therapy in the Thrombolysis in Myocardial Infarction Phase II (TIMI-II) Pilot Study. The American Journal of Cardiology 63, 503-512, 1989.

48.    The TIMI Study Group: Comparison of invasive and conservative strategies after treatment with intravenous tissue plasminogen activator in acute myocardial infarction. Results of the Thrombolysis in Myocardial Infarction (TIMI) Phase II Trial. The New England Journal of Medicine 320, No 10, 618-627, 1989.

49.    The CAST Study Group: Preliminary Report: Effect of Encainide and Flecainide on mortality in a randomized trial of arrhythmia suppression after myocardial infarction. New England Journal of Medicine 321, 406-412, 1989.

50.    Chaitman BR, Thompson B, Wittry MD, Stump D, Hamilton WP, Hillis LD, Dwyer JG, Solomon RE, Knatterud GL, for the TIMI investigators: The use of tissue-type plasminogen activator for acute myocardial infarction in the elderly: Results from Thrombolysis in Myocardial Infarction Plase I, Open Label Studies and the Thrombolysis in Myocardial Infarction Phase II Pilot Study. Journal of the American College of Cardiology 14, 1159-1165, 1989.

51.    Papapietro SE, ARCINIEGAS JG, Simpson MT, Stanley AWH Jr, MacLean WAH: Coronary angioplasty in myocardial infarction: Lessons and uncertainties following the Thrombolysis in Myocardial Infarction Trial (TIMI II). Revista Chilena de Cardiologia 8, No 3, 195-202, 1989.

52.    Papapietro SE, ARCINIEGAS JG, Simpson MT, Stanley AWH Jr, Hess RG, Cooper TB, MacLean WAH, Rogers WJ: Coronary angioplasty in acute myocardial infarction: Lessons and uncertainties from the Thrombolysis in Myocardial Infarction Trial (TIMI II). Part I of II. Alabama Medicine 59, No 8, 32-34, 1990.

53.    Papapietro SE, ARCINIEGAS JG, Simpson MT, Stanley AWH Jr, Hess RG, Cooper TB, MacLean WAH, Rogers WJ: Coronary angioplasty in acute myocardial infarction: Lessons and uncertainties from the Thrombolysis in Myocardial Infarction Trial (TIMI II). Part II of II. Alabama Medicine 59, No 9, 24-26, 1990.

54.    Rogers WJ, Baim DS, Gore JM, Brown BG, Roberts R, Williams DO, Chesebro JH, Babb JD, Sheehan FH, Wackers FJ, Zaret BL, Robertson TL, Passamani ER, Ross R, Knatterud GL, Braunwald E, for the TIMI II-A investigators: Comparison of immediate invasive, delayed invasive and conservative strategies after tissue-type plasminogen activator. Circulation 81, 1457-1476, 1990.

55.    The SOLVD Investigators: Effect of Enalapril on survival in patients with reduced left ventricular ejection fractions and congestive heart failure. The New England Journal of Medicine 325:293-302, 1991.

### BIBLIOGRAPHY (con't)

56.  Rogers WJ, Babb JD, Baim DS, Cheseboro JH, Gore JM, Roberts R, Williams DO, Frederick M, Passamani ER, Braunwald E, for the TIMI II Investigators: Selective versus routine predischarge coronary arteriography after therapy with recombinant tissue-type plasminogen activator, heparin and aspirin for acute myocardial infarction. Journal of the American College of Cardiology 17:1007-1016, 1991.

57.  Epstein AE, Bigger JT, Wyse DG, Romhilt DW, Reynolds-Haertle RA, Hallstrom AP, and the CAST Investigators: Events in the Cardiac Arrhythmia Suppression Trial (CAST): Mortality in the entire population enrolled. Journal of the American College of Cardiology 18:14-19, 1991.

58.  Wyse DG, Hallstrom A, McBride R, Cohen JD, Steinberg JS, Mahmarian J, and the CAST Investigators: Events in the Cardiac Arrhythmia Suppression Trial (CAST): Mortality in patients surviving open label titration but not randomized to double-blind therapy. Journal of the American College of Cardiology 18:20-28, 1991.

59.  Bovill EG, Terrin ML, Stump DC, Berke AD, Frederick M, Collen D, Feit F, Gore JM, Hillis LD, Lambrew CT, Leiboff R, Mann KG, Markis JE, Pratt CM, Sharkey SW, Sopko G, Tracy RP and Chesebro JH for the TIMI Investigators: Hemorrhagic events during therapy with recombinant tissue-type plasminogen activator, heparin and aspirin for acute myocardial infarction. Annals of Internal Medicine Vol 115, No 4:256-265, 1991.

60.  Denes P, Gillis AM, Pawitan Y, Kammerling JM, Wilhelmsen L, Salerno DM and the CAST Investigators: Prevalence, characteristics and significance of ventricular premature complexes and ventricular tachycardia detected by 24-hour continuous electrocardiographic recording in the Cardiac Arrhythmia Suppression Trial. American Journal of Cardiology 68:887-896, 1991.

61.  Maske LE, Paine TD, Bradley EL, Rogers WJ for the Alabama Registry of Myocardial Ischemia Investigators: Management of prolonged ischemic chest pain with or without ST elevation: Practice patterns in tertiary care hospitals. Clinical Research 39, No 4:877A, 1991.

62.  Cox DA, Davis WR, Williams JA, Bradley EL, Rogers WJ for the Alabama Registry of Myocardial Ischemia Investigators: Do patients with prior coronary artery bypass grafting and severe chest pain differ in presentation, management and in-hospital outcome? Clinical Research 39, No 4:800A, 1991.

63.  The Cardiac Arrhythmia Suppression Trial II Investigators: Effect of the antiarrhythmic agent moricizine on survival after myocardial infarction. New England Journal of Medicine 327:227-233, 1992.

64.  The SOLVD Investigators: Effect of Enalapril on mortality and the development of heart failure in symptomatic patients with reduced left ventricular ejection fractions. New England Journal of Medicine 327:685-691, 1992.

65.  The TIMI Investigators: A pilot trial of recombinant desulfatohirudin compared with heparin in conjunction with tissue plasminogen activator and aspirin for acute myocardial infarction (TIMI IV Trial). Journal of the American College of Cardiology 23:993-1003, 1994.

BIBLIOGRAPHY (con't)

66.    Rogers WJ, Dean LS, Moore PB, Wool KJ, Burgard SL, Bradley EL, for the Alabama
       Registry of Myocardial Ischemia Investigators:  Comparison of primary angioplasty versus
       thrombolytic therapy for acute myocardial infarction.  American Journal of Cardiology 74:111-
       118, 1994.

67.    Williams JD, Snow RM, ARCINIEGAS JG:  Myocardial involvement in a patient with human
       Ehrlichiosis.  American Journal of Medicine 98:414-415, 1995.

Dr. Fallahi



MONTGOMERY RHEUMATOLOGY
1421 NARROW LANE PARKWAY
MONTGOMERY  AL  36111-2654

(334) 284-3105
STATEMENT
19-OCT-06

All Producers Selected
Account # 000020847

Mr. Rufus R Woodley
175 Lakebend
Elmore AL  36025

| Date of service | Description | Procedure | Qty | Diag | PROD | TO | PLS | Amount |
|---|---|---|---|---|---|---|---|---|
| History A/R | | | | | | | | |
| 11/21/96 | OFFICE CONSULT LEVEL 3 | 99243 | 1 | 720.0 | SF OF 3 | * | | $200.00 |
| 11/21/96 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | * | | $12.50 |
| 11/21/96 | PRINTS AP | 72170 | 1 | 720.0 | SF OF 3 | * | | $62.00 |
| 11/21/96 | FILED: $274 Y CHAMPUS TRI | | | | SF | | | $0.00 |
| 12/23/96 | PMT: CHAMPUS TRICARE PROG | | | | SF | * | | $0.00 |
| 12/23/96 | RSP: DEDUCTIBLE ( 41.08 ) | | | | SF | | | $0.00 |
| 2/23/96 | PMT: CHAMPUS TRICARE PROG | | | | SF | A | | $0.00 |
| 12/23/96 | RESPONSIBILITY CHANGE ( 23.93 ) | | | | SF | | | $0.00 |
| 12/23/96 | RSP: DEDUCTIBLE ( 7.00 ) | | | | SF | | | $0.00 |
| 12/23/96 | WRT-OFF: MISC. INS/ADJ | | | | SF | * | | $158.92- |
| 12/23/96 | WRT-OFF: MISC. INS/ADJ | | | | SF | * | | $5.50- |
| 12/23/96 | WRT-OFF: MISC. INS/ADJ | | | | SF | * | | $38.07- |
| 01/24/97 | CHECK PAYMENT | | | | SF | | | $41.08- |
| 01/24/97 | CHECK PAYMENT | | | | SF | | | $7.00- |
| 01/24/97 | CHECK PAYMENT | | | | SF | | | $23.93- |
| 03/21/97 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | * | | $75.00 |
| 03/21/97 | ROUTINE VENIPUNCTURE | 36415-90 | 1 | 720.0 | SF OF 3 | * | | $12.50 |
| 03/21/97 | FILED: $87 Y CHAMPUS TRI | | | | SF | | | $0.00 |
| 04/21/97 | PMT: CHAMPUS TRICARE PROG | | | | SF | * | | $25.78- |
| 04/21/97 | PMT: CHAMPUS TRICARE PROG | | | | SF | * | | $5.25- |
| 04/21/97 | COST SHARE ( 1.75 ) | | | | SF | | | $0.00 |
| 04/21/97 | WRT-OFF: MISC. INS/ADJ | | | | SF | A | | $5.50- |
| 04/21/97 | COST SHARE ( 8.59 ) | | | | SF | | | $0.00 |
| 04/21/97 | WRT-OFF: MISC. INS/ADJ | | | | SF | * | | $40.63- |
| 05/19/97 | CHECK PAYMENT | | | | SF | | | $8.59 |
| 05/19/97 | CHECK PAYMENT | | | | SF | | | $1.75 |
| 05/22/97 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | * | | $75.00 |
| 05/22/97 | ROUTINE VENIPUNCTURE | 36415-90 | 1 | 720.0 | SF OF 3 | * | | $12.50 |
| 05/22/97 | FILED: $87 Y CHAMPUS TRI | | | | SF | | | $0.00 |
| 06/28/97 | PMT: CHAMPUS TRICARE PROG | | | | SF | * | | $25.78- |
| 06/28/97 | RESPONSIBILITY CHANGE ( 8.59 ) | | | | SF | | | $0.00 |
| 06/28/97 | PMT: CHAMPUS TRICARE PROG | | | | SF | * | | $5.25- |
| 06/28/97 | RESPONSIBILITY CHANGE ( 1.75 ) | | | | SF | | | $0.00 |
| 06/28/97 | WRT-OFF: MISC. INS/ADJ | | | | SF | * | | $5.50- |
| /28/97 | WRT-OFF: MISC. INS/ADJ | | | | SF | * | | $40.63- |

| Date of service | Description | Procedure | Qty | Diag | PROD ID PTS | | Amount |
|---|---|---|---|---|---|---|---|
| 08/18/97 | CHECK PAYMENT | | | | SF | | $8.59- |
| 08/18/97 | CHECK PAYMENT | | | | SF | | $1.75- |
| 09/22/97 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | * | $75.00 |
| 09/22/97 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | * | $12.50 |
| 09/22/97 | FILED: $87 Y CHAMPUS TRI | | | | SF | | $0.00 |
| 10/13/97 | PMT: CHAMPUS TRICARE PROG | | | | SF | * | $25.78- |
| 10/13/97 | RESPONSIBILITY CHANGE ( | 8.59 ) | | | SF | | $0.00 |
| 10/13/97 | PMT: CHAMPUS TRICARE PROG | | | | SF | * | $5.25- |
| 10/13/97 | RESPONSIBILITY CHANGE ( | 1.75 ) | | | SF | | $0.00 |
| 10/13/97 | WRT-OFF: MISC. INS/ADJ | | | | SF | * | $5.50- |
| 10/13/97 | WRT-OFF: MISC. INS/ADJ | | | | SF | * | $40.63- |
| 11/17/97 | CHECK PAYMENT | | | | SF | | $8.59 |
| 11/17/97 | CHECK PAYMENT | | | | SF | | $1.75- |
| 12/12/97 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | * | $75.00 |
| 12/12/97 | ROUTINE VENIPUNCTURE | 36415-90 | 1 | 720.0 | SF OF 3 | * | $12.50 |
| 12/12/97 | FILED: $87 Y CHAMPUS TRI | | | | SF | | $0.00 |
| 01/14/98 | PMT: CHAMPUS TRICARE PROG | | | | SF | * | $0.00 |
| 01/14/98 | DEDUCTIBLE ( | 34.37 ) | | | SF | | $0.00 |
| 01/14/98 | WRT-OFF: MISC. INS/ADJ | | | | SF | * | $40.63- |
| 01/14/98 | PMT: CHAMPUS TRICARE PROG | | | | SF | * | $0.00 |
| 01/14/98 | DEDUCTIBLE ( | 7.00 ) | | | SF | | $0.00 |
| 01/14/98 | WRT-OFF: MISC. INS/ADJ | | | | SF | * | $5.50- |
| 02/11/98 | EST. PATIENT LEVEL 1 | 99211 | 1 | 710.0 | SF OF 3 | * | $23.00 |
| 02/11/98 | ROUTINE VENIPUNCTURE | 36415 | 1 | 710.0 | SF OF 3 | * | $12.50 |
| 02/11/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $10.03- |
| 02/11/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50- |
| 02/11/98 | FILED: $15 Y MEDICARE PA | | | | SF | | $0.00 |
| 02/11/98 | FILED: $15 Y SENIOR PART | | | | SF | | $0.00 |
| 02/11/98 | ReFILED: $15 Y SENIOR PA | | | | SF | | $0.00 |
| 02/23/98 | CHECK PAYMENT | | | | SF | | $41.37- |
| 03/09/98 | No PMT: MEDICARE PART B | | | | SF | * | $0.00 |
| 03/09/98 | PMT: MEDICARE PART B | | | | SF | * | $3.00- |
| 04/14/98 | EST. PATIENT LEVEL 3 | 99213 | 1 | 306 | SF OF 3 | * | $75.00 |
| 04/14/98 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | * | $24.00 |
| 04/14/98 | HEPATIC FUNCTION PANEL | 80076 | 1 | V58.69 | SF OF 3 | * | $20.00 |
| 04/14/98 | CREATININE | 82565 | 1 | V58.69 | SF OF 3 | * | $15.00 |
| 04/14/98 | ROUTINE VENIPUNCTURE | 36415 | 1 | V58.69 | SF OF 3 | * | $12.50 |
| 04/14/98 | LUMBAR SP & PELVIS ALL VW | 72110 | 1 | 306 | SF OF 3 | * | $110.00 |
| 04/14/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $38.20- |
| 04/14/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $12.73- |
| 04/14/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.19- |
| 04/14/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $7.93- |
| 04/14/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50- |
| 04/14/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $64.87- |
| 04/14/98 | FILED: $114 Y MEDICARE PA | | | | SF | | $0.00 |
| 04/14/98 | FILED: $114 Y SENIOR PART | | | | SF | | $0.00 |
| 04/14/98 | ReFILED: $114 Y SENIOR PA | | | | SF | | $0.00 |
| 04/28/98 | PMT: MEDICARE PART B | | | | SF | * | $29.44- |
| 04/28/98 | PMT: MEDICARE PART B | | | | SF | * | $11.27- |
| 04/28/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $4.26- |
| 04/28/98 | PMT: MEDICARE PART B | | | | SF | * | $6.55- |
| 04/28/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $2.78- |
| 04/28/98 | PMT: MEDICARE PART B | | | | SF | * | $4.29- |
| 04/28/98 | PMT: MEDICARE PART B | | | | SF | * | $3.00- |
| 04/28/98 | PMT: MEDICARE PART B | | | | SF | * | $36.10- |
| 07/21/98 | EST. PATIENT LEVEL 3 | 99213 | 1 | 306 | SF OF 3 | * | $75.00 |
| 07/21/98 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | * | $24.00 |

| Date of service | Description | Procedure | Qty | Diag | PROD TO PHS | | Amount |
|---|---|---|---|---|---|---|---|
| 07/21/98 | URINALYSIS W/OUT MICRO. | 81003 | 1 | V58.69 | SF OF 3 | * | $10.00 |
| 07/21/98 | HEPATIC FUNCTION PANEL | 80076 | 1 | V58.69 | SF OF 3 | * | $20.00 |
| 07/21/98 | CREATININE | 82565 | 1 | V58.69 | SF OF 3 | * | $15.00 |
| 07/21/98 | ROUTINE VENIPUNCTURE | 36415 | 1 | V58.69 | SF OF 3 | * | $12.50 |
| 07/21/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $38.20 |
| 07/21/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | $12.73 |
| 07/21/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $6.90 |
| 07/21/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.19 |
| 07/21/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $7.93 |
| 07/21/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50 |
| 07/21/98 | FILED: $72 Y MEDICARE PA | | | | SF | | $0.00 |
| 07/21/98 | FILED: $72 Y SENIOR PART | | | | SF | | $0.00 |
| 07/21/98 | ReFILED: $74 Y SENIOR PA | | | | SF | | $0.00 |
| 08/10/98 | PMT: MEDICARE PART B | | | | SF | * | $29.44 |
| 08/10/98 | PMT: MEDICARE PART B | | | | SF | * | $11.27 |
| 08/10/98 | PMT: MEDICARE PART B | | | | SF | * | $33.10 |
| 08/10/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $4.26 |
| 08/10/98 | PMT: MEDICARE PART B | | | | SF | * | $6.55 |
| 08/10/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $2.78 |
| 08/10/98 | PMT: MEDICARE PART B | | | | SF | * | $4.29 |
| 08/10/98 | PMT: MEDICARE PART B | | | | SF | * | $3.00 |
| 09/01/98 | PMT: SENIOR PARTNERS | | | | SF | * | $12.97 |
| 09/25/98 | PMT: SENIOR PARTNERS | | | | SF | * | $7.36 |
| 09/25/98 | PMT: SENIOR PARTNERS | | | | SF | * | $9.03 |
| 11/20/98 | EST. PATIENT LEVEL 3 | 99213 | 1 | 715.09 | SF OF 3 | * | $75.00 |
| 11/20/98 | ROUTINE VENIPUNCTURE | 36415 | 1 | 715.09 | SF OF 3 | * | $12.50 |
| 11/20/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $38.20 |
| 11/20/98 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50 |
| 1/20/98 | FILED: $39 Y MEDICARE PA | | | | SF | | $0.00 |
| 1/20/98 | FILED: $39 Y SENIOR PART | | | | SF | | $0.00 |
| 12/07/98 | PMT: MEDICARE PART B | | | | SF | * | $29.44 |
| 12/07/98 | PMT: MEDICARE PART B | | | | SF | * | $3.00 |
| 03/02/99 | PMT: SENIOR PARTNERS | | | | SF | * | $7.36 |
| 03/23/99 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | * | $75.00 |
| 03/23/99 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | * | $12.50 |
| 03/23/99 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $36.19 |
| 03/23/99 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50 |
| 03/23/99 | FILED: $41 Y MEDICARE PA | | | | SF | | $0.00 |
| 03/23/99 | FILED: $41 Y SENIOR PART | | | | SF | | $0.00 |
| 03/23/99 | ReFILED: $41 Y SENIOR PA | | | | SF | | $0.00 |
| 04/10/99 | PMT: SENIOR PARTNERS | | | | SF | * | $7.36 |
| 04/12/99 | PMT: MEDICARE PART B | | | | SF | * | $31.05 |
| 04/12/99 | PMT: MEDICARE PART B | | | | SF | * | $3.00 |
| 10/11/99 | PMT: SENIOR PARTNERS | | | | SF | * | $7.76 |
| 10/12/99 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | * | $75.00 |
| 10/12/99 | FLU SHOT | 90658 | 1 | V04.8 | SF OF 3 | * | $30.00 |
| 10/12/99 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | * | $12.50 |
| 10/12/99 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $36.19 |
| 10/12/99 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $25.84 |
| 10/12/99 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50 |
| 10/12/99 | FILED: $45 Y MEDICARE PA | | | | SF | | $0.00 |
| 10/12/99 | FILED: $45 Y BLUE CROSS/ | | | | SF | | $0.00 |
| 10/26/99 | PMT: MEDICARE PART B | | | | SF | * | $31.05 |
| 10/26/99 | PMT: MEDICARE PART B | | | | SF | * | $4.16 |
| 10/26/99 | PMT: MEDICARE PART B | | | | SF | * | $3.00 |
| 10/28/99 | PMT: BLUE CROSS/PMD/HARD | | | | SF | * | $7.76 |
| 10/28/99 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | $0.00 |

| Date of service | Description | Procedure | Qty | Diag | PROD | ID | PLFS | Amount |
|---|---|---|---|---|---|---|---|---|
| 10/28/99 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | | $0.00 |
| 12/06/99 | PMT: SENIOR PARTNERS | | | | SF | | | $0.00 |
| 04/11/00 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | | * | $75.00 |
| 04/11/00 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | | * | $24.00 |
| 04/11/00 | URINALYSIS W/OUT MICRO. | 81003 | 1 | V58.69 | SF OF 3 | | * | $10.00 |
| 04/11/00 | HEPATIC FUNCTION PANEL | 80076 | 1 | V58.69 | SF OF 3 | | * | $20.00 |
| 04/11/00 | CREATININE | 82565 | 1 | V58.69 | SF OF 3 | | * | $15.00 |
| 04/11/00 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | | * | $12.50 |
| 04/11/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $31.21 - |
| 04/11/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $12.73- |
| 04/11/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $6.90- |
| 04/11/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $9.16- |
| 04/11/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $7.93 - |
| 04/11/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $9.50- |
| 04/11/00 | FILED:  $79 Y MEDICARE PA | | | | SF | | | $0.00 |
| 04/11/00 | FILED:  $79 Y BLUE CROSS/ | | | | SF | | | $0.00 |
| 04/25/00 | PMT: MEDICARE PART B | | | | SF | | * | $35.03 - |
| 04/25/00 | PMT: MEDICARE PART B | | | | SF | | * | $11.27- |
| 04/25/00 | PMT: MEDICARE PART B | | | | SF | | * | $3.10- |
| 04/25/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $3.76- |
| 04/25/00 | PMT: MEDICARE PART B | | | | SF | | * | $7.08 - |
| 04/25/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $2.45- |
| 04/25/00 | PMT: MEDICARE PART B | | | | SF | | * | $4.62- |
| 04/25/00 | PMT: MEDICARE PART B | | | | SF | | * | $3.00- |
| 04/27/00 | PMT: BLUE CROSS/PMD/HARD | | | | SF | | * | $8.76- |
| 08/15/00 | EST. PATIENT LEVEL 3 | 99213 | 1 | 715.09 | SF OF 3 | | * | $75.00 |
| 08/15/00 | SED RATE | 85651 | 1 | 720.0 | SF OF 3 | | * | $16.00 |
| 08/15/00 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | | * | $24.00 |
| 9/15/00 | URINALYSIS W/OUT MICRO. | 81003 | 1 | V58.69 | SF OF 3 | | * | $10.00 |
| 8/15/00 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SF OF 3 | | * | $25.00 |
| 08/15/00 | ROUTINE VENIPUNCTURE | 36415 | 1 | V58.69 | SF OF 3 | | * | $12.50 |
| 08/15/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $31.21- |
| 08/15/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $11.09- |
| 08/15/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $12.73- |
| 08/15/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $6.90- |
| 08/15/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $10.39- |
| 08/15/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $9.50 - |
| 08/15/00 | FILED:  $80 Y MEDICARE PA | | | | SF | | | $0.00 |
| 08/15/00 | FILED:  $80 Y BLUE CROSS/ | | | | SF | | | $0.00 |
| 08/29/00 | PMT: MEDICARE PART B | | | | SF | | * | $35.03- |
| 08/29/00 | PMT: MEDICARE PART B | | | | SF | | * | $4.91 - |
| 08/29/00 | PMT: MEDICARE PART B | | | | SF | | * | $11.27- |
| 08/29/00 | PMT: MEDICARE PART B | | | | SF | | * | $3.10 - |
| 08/29/00 | PMT: MEDICARE PART B | | | | SF | | * | $14.61- |
| 08/29/00 | PMT: MEDICARE PART B | | | | SF | | * | $3.00- |
| 08/31/00 | PMT: BLUE CROSS/PMD/HARD | | | | SF | | * | $8.76- |
| 08/31/00 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | | $0.00 |
| 08/31/00 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | | $0.00 |
| 08/31/00 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | | $0.00 |
| 08/31/00 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | | $0.00 |
| 08/31/00 | No PMT: BLUE CROSS/PMD/HA | | | | SF | | | $0.00 |
| 12/19/00 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | | * | $75.00 |
| 12/19/00 | ROUTINE VENIPUNCTURE | 36415 | 1 | V58.69 | SF OF 3 | | * | $12.50 |
| 12/19/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $31.21- |
| 12/19/00 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | | * | $9.50 - |
| 12/19/00 | FILED:  $46 Y MEDICARE PA | | | | SF | | | $0.00 |
| 12/19/00 | FILED:  $46 Y BLUE CROSS/ | | | | SF | | | $0.00 |

| Date of service | Description | Procedure | Qty | Diag | PROD ID | PTS | Amount |
|---|---|---|---|---|---|---|---|
| 01/08/01 | PMT: MEDICARE PART B | | | | SP | * | $35.03 |
| 01/08/01 | PMT: MEDICARE PART B | | | | SP | * | $3.00 |
| 01/11/01 | PMT: BLUE CROSS/PMD/HARD | | | | SP | * | $8.76 |
| 01/11/01 | No PMT: BLUE CROSS/PMD/HA | | | | SP | | $0.00 |
| 06/25/01 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SP OF 3 | * | $75.00 |
| 06/25/01 | SED RATE | 85651 | 1 | 720.0 | SP OF 3 | * | $16.00 |
| 06/25/01 | CHC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SP OF 3 | * | $24.00 |
| 06/25/01 | URINALYSIS W/OUT MICRO. | 81003 | 1 | V58.69 | SP OF 3 | * | $10.00 |
| 06/25/01 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SP OF 3 | * | $25.00 |
| 06/25/01 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SP OF 3 | * | $12.50 |
| 06/25/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $28.31 |
| 06/25/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $11.09 |
| 06/25/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $12.73 |
| 06/25/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $6.90 |
| 06/25/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $10.39 |
| 06/25/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $9.50 |
| 06/25/01 | FILED:   $83 Y MEDICARE PA | | | | SP | | $0.00 |
| 06/25/01 | FILED:   $83 Y BLUE CROSS/ | | | | SP | | $0.00 |
| 07/10/01 | PMT: MEDICARE PART B | | | | SP | * | $37.35 |
| 07/10/01 | PMT: MEDICARE PART B | | | | SP | * | $4.91 |
| 07/10/01 | PMT: MEDICARE PART B | | | | SP | * | $11.27 |
| 07/10/01 | PMT: MEDICARE PART B | | | | SP | * | $3.10 |
| 07/10/01 | PMT: MEDICARE PART B | | | | SP | * | $14.61 |
| 07/10/01 | PMT: MEDICARE PART B | | | | SP | * | $3.00 |
| 07/12/01 | PMT: BLUE CROSS/PMD/HARD | | | | SP | * | $9.34 |
| 07/12/01 | No PMT: BLUE CROSS/PMD/HA | | | | SP | | $0.00 |
| 07/12/01 | No PMT: BLUE CROSS/PMD/HA | | | | SP | | $0.00 |
| 07/12/01 | No PMT: BLUE CROSS/PMD/HA | | | | SP | | $0.00 |
| 07/12/01 | No PMT: BLUE CROSS/PMD/HA | | | | SP | | $0.00 |
| 07/12/01 | No PMT: BLUE CROSS/PMD/HA | | | | SP | | $0.00 |
| 12/21/01 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SP OF 3 | * | $75.00 |
| 12/21/01 | ROUTINE VENIPUNCTURE | 36415-90 | 1 | 720.0 | SP OF 3 | * | $12.50 |
| 12/21/01 | PRINTS AP | 72170 | 1 | 720.2 | SP OF 3 | * | $62.00 |
| 12/21/01 | LUMBAR SPINE AP&LA | 72100 | 1 | 720.2 | SP OF 3 | * | $85.00 |
| 12/21/01 | OS CALCIS/HEEL | 73650-RT | 1 | 729.5 | SP OF 3 | * | $60.00 |
| 12/21/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $28.31 |
| 12/21/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $9.50 |
| 12/21/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $34.68 |
| 12/21/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $49.83 |
| 12/21/01 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | * | $34.72 |
| 12/21/01 | FILED: $137 Y MEDICARE PA | | | | SP | | $0.00 |
| 12/21/01 | FILED: $137 Y TRICARE REG | | | | SP | | $0.00 |
| 12/21/01 | ReFILED:   $3 Y MEDICARE | | | | SP | | $0.00 |
| 12/21/01 | ReFILED:   $3 Y TRICARE R | | | | SP | | $0.00 |
| 01/08/02 | PMT: MEDICARE PART B | | | | SP | * | $37.35 |
| 01/08/02 | PMT: MEDICARE PART B | | | | SP | * | $21.86 |
| 01/08/02 | PMT: MEDICARE PART B | | | | SP | * | $28.14 |
| 01/08/02 | PMT: MEDICARE PART B | | | | SP | * | $20.22 |
| 01/22/02 | PMT: MEDICARE PART B | | | | SP | | $3.00 |
| 01/22/02 | OB.MEMO: MISC/ADJ | | | | SP | | $3.00 |
| 01/23/02 | PMT: TRICARE REGION 3 & 4 | | | | SP | * | $9.34 |
| 01/23/02 | WRT-OFF: MEDICARE ADJ | | | | SP | * | $3.00 |
| 01/23/02 | PMT: TRICARE REGION 3 & 4 | | | | SP | * | $5.46 |
| 01/23/02 | PMT: TRICARE REGION 3 & 4 | | | | SP | * | $7.03 |
| 01/23/02 | PMT: TRICARE REGION 3 & 4 | | | | SP | * | $5.06 |
| 05/30/02 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SP OF 3 | * | $75.00 |
| 05/30/02 | SED RATE | 85651 | 1 | 720.0 | SP OF 3 | * | $16.00 |

| Date of service | Description | Procedure | Qty | Diag | PROD TO PTS | | Amount |
|---|---|---|---|---|---|---|---|
| 05/30/02 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | * | $24.00 |
| 05/30/02 | URINALYSIS W/OUT MICRO. | 81003 | 1 | V58.69 | SF OF 3 | * | $10.00 |
| 05/30/02 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SF OF 3 | * | $25.00 |
| 05/30/02 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | * | $12.50 |
| 05/30/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $28.67- |
| 05/30/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $11.09- |
| 05/30/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $12.73- |
| 05/30/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $6.90- |
| 05/30/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $10.39- |
| 05/30/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50- |
| 05/30/02 | FILED: $83 Y MEDICARE PA | | | | SF | | $0.00 |
| 05/30/02 | FILED: $83 Y TRICARE REG | | | | SF | | $0.00 |
| 06/17/02 | PMT: MEDICARE PART B | | | | SF | * | $37.06- |
| 06/17/02 | PMT: MEDICARE PART B | | | | SF | * | $4.91- |
| 06/17/02 | PMT: MEDICARE PART B | | | | SF | * | $11.27- |
| 06/17/02 | PMT: MEDICARE PART B | | | | SF | * | $3.10- |
| 06/17/02 | PMT: MEDICARE PART B | | | | SF | * | $14.61- |
| 06/17/02 | PMT: MEDICARE PART B | | | | SF | * | $3.00- |
| 06/20/02 | PMT: TRICARE REGION 3 & 4 | | | | SF | * | $9.27- |
| 11/19/02 | EST. PATIENT LEVEL 3 | 99213 | 1 | 715.09 | SF OF 3 | * | $75.00 |
| 11/19/02 | SED RATE | 85651 | 1 | 720.0 | SF OF 3 | * | $16.00 |
| 11/19/02 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | * | $24.00 |
| 11/19/02 | URINALYSIS WITH MICRO. | 81001 | 1 | V58.69 | SF OF 3 | * | $13.00 |
| 11/19/02 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SF OF 3 | * | $25.00 |
| 11/19/02 | ROUTINE VENIPUNCTURE | 36415 | 1 | 715.09 | SF OF 3 | * | $12.50 |
| 11/19/02 | CERVICAL SPINE APALA | 72040 | 1 | 723.1 | SF OF 3 | * | $66.00 |
| 11/19/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $28.67- |
| 11/19/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $11.09- |
| 11/19/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $12.73- |
| 11/19/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $8.63- |
| 11/19/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $10.39- |
| 11/19/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50- |
| 11/19/02 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $36.57- |
| 11/19/02 | FILED: $113 Y MEDICARE PA | | | | SF | | $0.00 |
| 11/19/02 | FILED: $113 Y TRICARE REG | | | | SF | | $0.00 |
| 12/09/02 | PMT: MEDICARE PART B | | | | SF | * | $37.06- |
| 12/09/02 | PMT: MEDICARE PART B | | | | SF | * | $4.91- |
| 12/09/02 | PMT: MEDICARE PART B | | | | SF | * | $11.27- |
| 12/09/02 | PMT: MEDICARE PART B | | | | SF | * | $4.37- |
| 12/09/02 | PMT: MEDICARE PART B | | | | SF | * | $14.61- |
| 12/09/02 | PMT: MEDICARE PART B | | | | SF | * | $3.00- |
| 12/09/02 | PMT: MEDICARE PART B | | | | SF | * | $23.55- |
| 12/19/02 | PMT: TRICARE REGION 3 & 4 | | | | SF | * | $9.27- |
| 12/19/02 | PMT: TRICARE REGION 3 & 4 | | | | SF | * | $5.88- |

Current A/R

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 03/19/03 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | * | $75.00 |
| 03/19/03 | ROUTINE VENIPUNCTURE | 36415 | 1 | V58.69 | SF OF 3 | * | $12.50 |
| 03/19/03 | PELVIS AP | 72170 | 1 | 306 | SF OF 3 | * | $62.00 |
| 03/19/03 | LUMBAR SPINE APALA | 72100 | 1 | 306 | SF OF 3 | * | $85.00 |
| 03/19/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $30.73- |
| 03/19/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50- |
| 03/19/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $37.96- |
| 03/19/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $53.59- |
| 04/07/03 | PMT: MEDICARE PART B | | | | SF | * | $35.42- |
| 04/07/03 | PMT: MEDICARE PART B | | | | SF | * | $3.00- |

| Date of service | Description | Procedure | Qty | Diag | PROD | TO | PTS | Amount |
|---|---|---|---|---|---|---|---|---|
| 04/07/03 | PMT: MEDICARE PART B | | | | SP | | * | $19.23 |
| 04/07/03 | PMT: MEDICARE PART B | | | | SP | | * | $25.13 |
| 04/24/03 | PMT: TRICARE REGION 3 & 4 | | | | SP | | * | $8.85 |
| 04/24/03 | PMT: TRICARE REGION 3 & 4 | | | | SP | | * | $4.81 |
| 04/24/03 | PMT: TRICARE REGION 3 & 4 | | | | SP | | * | $6.28 |
| 07/28/03 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SP OF 3 | | * | $75.00 |
| 07/28/03 | ROUTINE VENI PUNCTURE | 36415 | 1 | 720.0 | SP OF 3 | | * | $12.50 |
| 07/28/03 | SHOULDER 2 VWS | 73030-RT | 1 | 719.41 | SP OF 3 | | * | $66.00 |
| 07/28/03 | SHOULDER 2 VWS | 73030-LT | 1 | 719.41 | SP OF 3 | | * | $66.00 |
| 07/28/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | | * | $27.92 |
| 07/28/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | | * | $9.50 |
| 07/28/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | | * | $38.17 |
| 08/18/03 | PMT: MEDICARE PART B | | | | SP | | * | $38.17 |
| 08/18/03 | PMT: MEDICARE PART B | | | | SP | | * | $37.66 |
| 08/18/03 | PMT: MEDICARE PART B | | | | SP | | * | $3.00 |
| 08/18/03 | PMT: MEDICARE PART B | | | | SP | | * | $22.26 |
| 10/06/03 | PMT: TRICARE REGION 3 & 4 | | | | SP | | * | $22.27 |
| 10/06/03 | PMT: TRICARE REGION 3 & 4 | | | | SP | | * | $9.42 |
| 10/06/03 | PMT: TRICARE REGION 3 & 4 | | | | SP | | * | $5.57 |
| 12/01/03 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SP OF 3 | | * | $5.56 |
| 12/01/03 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SP OF 3 | | * | $75.00 |
| 12/01/03 | URINALYSIS W/OUT MICRO. | 81003 | 1 | V58.69 | SP OF 3 | | * | $24.00 |
| 12/01/03 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SP OF 3 | | * | $10.00 |
| 12/01/03 | ROUTINE VENI PUNCTURE | 36415 | 1 | 720.0 | SP OF 3 | | * | $25.00 |
| 12/01/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | | * | $12.50 |
| 12/01/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | | * | $27.92 |
| 12/01/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | | * | $13.14 |
| 12/01/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | | * | $6.86 |
| /01/03 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | | * | $10.23 |
| 12/01/03 | FILED: $78 Y MEDICARE PA | | | | SP | | | $9.50 |
| 12/01/03 | FILED: $78 Y TRICARE REG | | | | SP | | | $0.00 |
| 12/17/03 | PMT: MEDICARE PART B | | | | SP | | | $0.00 |
| 12/17/03 | PMT: MEDICARE PART B | | | | SP | | * | $37.66 |
| 12/17/03 | PMT: MEDICARE PART B | | | | SP | | * | $10.86 |
| 12/17/03 | PMT: MEDICARE PART B | | | | SP | | * | $3.14 |
| 12/17/03 | PMT: MEDICARE PART B | | | | SP | | * | $14.77 |
| 01/07/04 | PMT: TRICARE REGION 3 & 4 | | | | SP | | * | $3.00 |
| 04/06/04 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SP OF 3 | | * | $9.42 |
| 04/06/04 | SED RATE | 85651 | 1 | 720.0 | SP OF 3 | | * | $75.00 |
| 04/06/04 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SP OF 3 | | * | $16.00 |
| 04/06/04 | URINALYSIS WITH MICRO. | 81001 | 1 | V58.69 | SP OF 3 | | * | $24.00 |
| 04/06/04 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SP OF 3 | | * | $13.00 |
| 04/06/04 | ROUTINE VENI PUNCTURE | 36415 | 1 | 720.0 | SP OF 3 | | * | $25.00 |
| 04/06/04 | FILED: $165 Y MEDICARE PA | | | | SP | | * | $12.50 |
| 04/06/04 | FILED: $165 Y TRICARE REG | | | | SP | | | $0.00 |
| 04/21/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | | | $0.00 |
| 04/21/04 | PMT: MEDICARE PART B | | | | SP | | * | $26.08 |
| 04/21/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | | * | $39.14 |
| 04/21/04 | PMT: MEDICARE PART B | | | | SP | | * | $11.04 |
| 04/21/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | | * | $4.96 |
| 04/21/04 | PMT: MEDICARE PART B | | | | SP | | * | $13.14 |
| 04/21/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | | * | $10.86 |
| 04/21/04 | PMT: MEDICARE PART B | | | | SP | | * | $8.57 |
| 04/21/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | | * | $4.43 |
| 04/21/04 | PMT: MEDICARE PART B | | | | SP | | * | $10.23 |
| 04/21/04 | PMT: MEDICARE PART B | | | | SP | | * | $14.77 |
| /21/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SP | | * | $9.50 |

| Date of service | Description | Procedure | Qty | Diag | PROD ID PLS | | Amount |
|---|---|---|---|---|---|---|---|
| 4/21/04 | PMT: MEDICARE PART B | | | | SF | * | $3.00 |
| 05/06/04 | PMT: TRICARE REGION 3 & 4 | | | | SF | * | $9.78 |
| 08/10/04 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | * | $75.00 |
| 08/10/04 | SED RATE | 85651 | 1 | 720.0 | SF OF 3 | * | $16.00 |
| 08/10/04 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | * | $24.00 |
| 08/10/04 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SF OF 3 | * | $25.00 |
| 08/10/04 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | * | $12.50 |
| 08/10/04 | FILED: $152 Y MEDICARE PA | | | | SF | | $0.00 |
| 08/10/04 | FILED: $152 Y TRICARE REG | | | | SF | | $0.00 |
| 08/16/04 | THYTEST | 86580 | 1 | 720.0 | SF OF 3 | * | $15.00 |
| 08/16/04 | FILED:   $15 Y MEDICARE PA | | | | SF | | $0.00 |
| 08/16/04 | FILED:   $15 Y TRICARE REG | | | | SF | | $0.00 |
| 08/17/04 | PMT: MEDICARE PART B | | | | SF | * | $39.14 |
| 08/17/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $11.04 |
| 08/17/04 | PMT: MEDICARE PART B | | | | SF | * | $4.96 |
| 08/17/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $13.14 |
| 08/17/04 | PMT: MEDICARE PART B | | | | SF | * | $10.86 |
| 08/17/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $10.23 |
| 08/17/04 | PMT: MEDICARE PART B | | | | SF | * | $14.77 |
| 08/17/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50 |
| 08/17/04 | PMT: MEDICARE PART B | | | | SF | * | $3.00 |
| 08/23/04 | PMT: MEDICARE PART B | | | | SF | * | $26.08 |
| 09/28/04 | PMT: TRICARE FOR DIFF | | | | SF | * | $7.22 |
| 09/28/04 | PMT: TRICARE FOR DIFF | | | | SF | * | $9.78 |
| 09/28/04 | WRT-OFF: MEDICARE ADJ | | | | SF | * | $1.81 |
| 09/28/04 | | | | | SF | * | $5.97 |
| 11/02/04 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | * | $75.00 |
| 11/02/04 | SED RATE | 85651 | 1 | 720.0 | SF OF 3 | * | $16.00 |
| /02/04 | C-REACTIVE PROTEIN | 86140 | 1 | 720.0 | SF OF 3 | * | $10.00 |
| 11/02/04 | RHEUMATOID LATEX | 86430 | 1 | 720.0 | SF OF 3 | * | $24.00 |
| 11/02/04 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | * | $24.00 |
| 11/02/04 | URINALYSIS WITH MICRO. | 81001 | 1 | V58.69 | SF OF 3 | * | $13.00 |
| 11/02/04 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SF OF 3 | * | $25.00 |
| 11/02/04 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | * | $12.50 |
| 11/02/04 | FILED: $199 Y MEDICARE PA | | | | SF | | $0.00 |
| 11/02/04 | FILED: $199 Y TRICARE FOR | | | | SF | | $0.00 |
| 11/16/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $26.08 |
| 11/16/04 | PMT: MEDICARE PART B | | | | SF | * | $39.14 |
| 11/16/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $11.04 |
| 11/16/04 | PMT: MEDICARE PART B | | | | SF | * | $4.96 |
| 11/16/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $2.77 |
| 11/16/04 | PMT: MEDICARE PART B | | | | SF | * | $7.23 |
| 11/16/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $16.07 |
| 11/16/04 | PMT: MEDICARE PART B | | | | SF | * | $7.93 |
| 11/16/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $13.14 |
| 11/16/04 | PMT: MEDICARE PART B | | | | SF | * | $10.86 |
| 11/16/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $8.57 |
| 11/16/04 | PMT: MEDICARE PART B | | | | SF | * | $4.43 |
| 11/16/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $10.23 |
| 11/16/04 | PMT: MEDICARE PART B | | | | SF | * | $14.77 |
| 11/16/04 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50 |
| 11/16/04 | PMT: MEDICARE PART B | | | | SF | * | $3.00 |
| 12/06/04 | PMT: TRICARE FOR DIFF | | | | SF | * | $9.78 |
| 03/08/05 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | * | $75.00 |
| 03/08/05 | SED RATE | 85651 | 1 | 720.0 | SF OF 3 | * | $16.00 |
| 03/08/05 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | * | $24.00 |
| /08/05 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SF OF 3 | * | $25.00 |

| Date of service | Description | Procedure | Qty | Diag | MOD TO PRS | Amount |
|---|---|---|---|---|---|---|
| 3/08/05 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | * | $12.50 |
| 03/08/05 | FILED: $152 Y MEDICARE PA | | | | SF | | $0.00 |
| 03/08/05 | FILED: $152 Y TRICARE FOR | | | | SF | | $0.00 |
| 03/28/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $26.32- |
| 03/28/05 | PMT: MEDICARE PART B | | | | SF | * | $38.94- |
| 03/28/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $11.04- |
| 03/28/05 | PMT: MEDICARE PART B | | | | SF | * | $4.96- |
| 03/28/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $13.14 |
| 03/28/05 | PMT: MEDICARE PART B | | | | SF | * | $10.86- |
| 03/28/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $10.23 |
| 03/28/05 | PMT: MEDICARE PART B | | | | SF | * | $14.77- |
| 03/28/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50- |
| 03/28/05 | PMT: MEDICARE PART B | | | | SF | * | $3.00- |
| 04/08/05 | PMT: TRICARE FOR LIFE | | | | SF | * | $9.74- |
| 07/12/05 | EST. PATIENT LEVEL 3 | 99213 | 1 | 720.0 | SF OF 3 | * | $75.00 |
| 07/12/05 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | * | $24.00 |
| 07/12/05 | URINALYSIS WITH MICRO. | 81001 | 1 | V58.69 | SF OF 3 | * | $13.00 |
| 07/12/05 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SF OF 3 | * | $25.00 |
| 07/12/05 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | * | $12.50 |
| 07/12/05 | FILED: $149 Y MEDICARE PA | | | | SF | | $0.00 |
| 07/27/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $26.32- |
| 07/27/05 | PMT: MEDICARE PART B | | | | SF | * | $38.94- |
| 07/27/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $13.14- |
| 07/27/05 | PMT: MEDICARE PART B | | | | SF | * | $10.86- |
| 07/27/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $8.57- |
| 07/27/05 | PMT: MEDICARE PART B | | | | SF | * | $4.43- |
| 07/27/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $10.23 |
| 07/27/05 | PMT: MEDICARE PART B | | | | SF | * | $14.77- |
| 7/27/05 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50- |
| 07/27/05 | PMT: MEDICARE PART B | | | | SF | * | $3.00- |
| 08/02/05 | PMT: TRICARE FOR LIFE | | | | SF | * | $9.74- |
| 08/02/05 | PMT: TRICARE FOR LIFE | | | | SF | * | $0.00 |
| 08/02/05 | PMT: TRICARE FOR LIFE | | | | SF | * | $0.00 |
| 08/02/05 | PMT: TRICARE FOR LIFE | | | | SF | * | $0.00 |
| 08/02/05 | PMT: TRICARE FOR LIFE | | | | SF | * | $0.00 |
| 01/31/06 | EST. PATIENT LEVEL 4 | 99214 | 1 | 720.0 | SF OF 3 | * | $88.00 |
| 01/31/06 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | * | $12.50 |
| 01/31/06 | FILED: $100 Y MEDICARE PA | | | | SF | | $0.00 |
| 01/31/06 | FILED: $100 Y TRICARE FOR | | | | SF | | $0.00 |
| 02/15/06 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $11.86- |
| 02/15/06 | PMT: MEDICARE PART B | | | | SF | * | $60.91- |
| 02/15/06 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $9.50- |
| 02/15/06 | PMT: MEDICARE PART B | | | | SF | * | $3.00- |
| 03/16/06 | PMT: TRICARE FOR LIFE | | | | SF | * | $15.23 |
| 03/16/06 | PMT: TRICARE FOR LIFE | | | | SF | * | $0.00 |
| 08/15/06 | EST. PATIENT LEVEL 4 | 99214 | 1 | 720.0 | SF OF 3 | * | $88.00 |
| 08/15/06 | CBC W/DIFF. PLT. CT. | 85025 | 1 | V58.69 | SF OF 3 | * | $24.00 |
| 08/15/06 | URINALYSIS WITH MICRO. | 81001 | 1 | V58.69 | SF OF 3 | * | $13.00 |
| 08/15/06 | COMPREHENSIVE METABOLIC | 80053 | 1 | V58.69 | SF OF 3 | * | $25.00 |
| 08/15/06 | ROUTINE VENIPUNCTURE | 36415 | 1 | 720.0 | SF OF 3 | * | $12.50 |
| 08/30/06 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $11.86- |
| 08/30/06 | PMT: MEDICARE PART B | | | | SF | * | $60.91- |
| 08/30/06 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $13.14- |
| 08/30/06 | PMT: MEDICARE PART B | | | | SF | * | $10.86- |
| 08/30/06 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $8.57- |
| 08/30/06 | PMT: MEDICARE PART B | | | | SF | * | $4.43- |
| 30/06 | WRT-OFF: M'CARE FEE ADJ. | | | | SF | * | $10.23- |

| Date of service | Description | Procedure | Qty | Diag | PROD | LO | PLS | Amount |
|---|---|---|---|---|---|---|---|---|
| 08/30/06 | PMT: MEDICARE PART B | | | | | SP | * | $74.77 |
| 08/30/06 | WRT-OFF: M'CARE FEE ADJ. | | | | | SP | * | $9.50- |
| 08/30/06 | PMT: MEDICARE PART B | | | | | SP | * | $3.00- |

Note:    PLS means "Place of service"

BALANCE:        $15.23
Amount suspended:  (    $15.23 )

Total patient payments in 1997:    $103.03-
  "        "        "     in 1998:      $41.37-

Location   (LO): OF - MONTGOMERY RHEU/OFFICE
Provider (PROD):   SP  -  FAILAND M.D., SOHRAB

DATE: 8/15/06

CHIEF COMPLAINT

AM STIFF _____ SLEEP

WELL BEING R W S

ACT OF DAILY    DRESS
_____ G    HELP
           INDE

MED TOX    RASH    MUL
     YES
     NO
OTHER _____

MUSCLES    NF    NE    D
R   S/A    /    /    /

L   S/A    /    /    /

ULN DEV    R_____
HBN    R_____    L____

X RAY _____
HEENT _____ LUM
OTHER _____

ƁUTT    DOOR

HA    EDEM

INT HAND
    /

    /

LEX   B   T   K   A
      R
      L

L ─┼─┼─┼

N F/E R___/___ L___/___
E F/R R___/___ L___/___
K F/E R___/___ L___/___
S I/A R___/___ L___/___
HPF/I/E R    /    /
        L    /    /

---

has bony hypertrophy of the knees with crepitus on flexion and extension. His mobility is fine.

His social activity is great. He is playing golf and cutting grass. He walks 2 miles 3 days a week.

**ASSESSMENT/PLAN:**
(1) Ankylosing spondylitis – under very good control.
(2) Monitoring the side effects of medications.

I checked CBC, liver panel and creatinine.

(3) Osteoarthritis – appropriate for age.

I will see him back in 6 months for re-evaluation.

Sohrab Fallahi/ef

End

ATE: _____ CHIEF COMPLAINT _____
M STIFF _____ SLEEP _____ WELL BEING B W S
CT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
N         HELP
          INDE
ED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
    YES
    NO
THER _____

USCLES   NF   NE   D   B   T   W   WF   HF   HAB   HAD   KF   KE   APF   ADF   GTOE   INT HAND
  S/A   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /

  S/A   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /

N DEV   R _____ L _____ SN R _____ L _____ BOU R _____ L
N   R _____ L _____ BOUC N R _____ L _____ GRIP R _____ _____ REFLEX B T K A
                                                                          R
                                                                          L
RAY _____
ENT _____ LUNG   CLEAR   HEART _____ ABD _____ SKIN
HER _____

I/E PIPR |   |   |   | L |   |   | MCPR |   |   |   | L |   |   |
         WT  20      T 97/6 P - 145 P SS
                                    /6/

—WOODLEY, RUFUS R.
—8/15/06

—This patient is here toady for follow-up of
—his ankylosing spondylitis and osteoarthritis.
—He is self-administering Enbrel.   He is
_extremely happy.   He does not have any SAE
 with respect to the medications.   He denies
—URI, UTI, cough, congestion or PIR.   In short,
—he does not have any SAE.

_IPMH:   Unremarkable for medical or surgical
 intervention.

—FHx:   Non-contributory.

_PE:   His peripheral joint exam shows DJD
—manifesting with Heberdens and Bouchards.   He

DATE: 1 31 06    CHIEF COMPLAINT

AM STIFF _____ SLEEP _____ WELL BEING  B  W  S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR
    3    HELP
         INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
    YES
    NO
OTHER

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| L  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV    R _____ L _____  SN R _____ L _____  BOU R _____ L _____
HBN    R _____ L _____  BOUC N R _____ L _____  GRIP R _____ L _____  REFLEX  B  T  K  A
                                                                                        R
                                                                                        L
RAY
EENT _____ LUNG _____ HEART _____ ABD _____ SKIN

F/E PIPR |   |   |   |   | L |   |   | MCPR |   |   |   |   | L |   |   |

had A.E. for tooth prolic

WOODLEY, RUFUS R.
1/31/06

This patient is here today for follow-up of his ankylosing spondylitis for which he is now taking Enbrel, 15 mg subcu, as a monotherapy. He is doing excellently. He is very happy. He says he used to have a lot of back problems when he was not taking any medicine until he got this medicine on board. Since then at times he is aware of some discomfort in his back but he doesn't have any pain that wakes him up and he is resting well. The quality of life has improved considerably.

IPMH since the last visit with me is remarkable for dental work for which he had to take antibiotics for a while.

F/E R
F/R R
WA R
F/I/E R
    L

DATE: 1/31/06   CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR

II ;   HELP
        INDE
MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
   YES
   NO
OTHER _____

| MUSCLES | NF | NE | D |
|---|---|---|---|
| R   S/A | / | / | / |
| L   S/A | / | / | / |

ULN DEV   R_____
HBN   R_____ L_____

X RAY _____
HEENT _____ L
OTHER _____

INT HAND
   /
_____
   /
_____
_L_____
:FLEX  B  T  K  A
        R
        L

W F/E R___/___ L___/___
E F/R R___/___ L___/___
K F/E R___/___ L___/___
S I/A R___/___ L___/___
HPF/I/E R   /   /
        L   /   /

Otherwise he did not have any URI, UTI, cough, congestion or PIR. In short, he did not have any SAE in regard to his Enbrel.

PE: He has very good range of motion of every single small, medium and large size joint of the upper and lower extremities on both sides of the body. Chest, heart and abdominal exams are unremarkable.

SH: Remarkable for him working around the house. Although he is not employed, he does do some tax preparation work.

ASSESSMENT/PLAN:
(1) Ankylosing spondylitis - under good control with improvement of the quality of

life and improvement of the mobility of the spine.
(2) Osteoarthritis - appropriate for age.
(3) Monitoring the side effects of medicine.

I checked CBC, liver panel and creatinine.

I will see him back in 6 months for re-evaluation.

                    Sohrab Fallahi/ef

2 of 2 end/KR

MRA-12A

DATE: 7/12/05          CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR
I/ G        HELP
            INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
     YES
     NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---------|----|----|---|---|---|---|----|----|----|----|----|----|----|----|------|----------|
| R  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| L  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV    R_____ L_____ SN R_____ L_____ BOU R_____ L_____
HBN  R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
                                                                                                R
                                                                                                L

X RAY _____

HEENT _____ LUNG _____ HEART NSR _____ ABD _____ SKIN _____

OTHER _____

F/E PIPR |   |   |   | L |   |   | MCPR |   |   | L |   |
WT) 193    T 97    P 64    B/P) 134/61

Went to kirkland Clinic
for kidney problem, the
(Doctor (kirkland Clinic) did
Not find anything (concerning at
at least that's down

WOODLEY, RUFUS R.
7/12/05

This patient is here today for follow-up of
his ankylosing spondylitis for which he is now
taking monotherapy with Enbrel once weekly.
He is not taking any NSAIDs.

IPMH since the last visit is remarkable for
him being found to have elevation of his
creatinine.  For that reason he was sent to
Birmingham and he saw a nephrologist in
Kirklin Clinic.  By then his creatinine had
come down.  He attributes that problem to the
heavy work that he did with painting and with
physical activity that went on for 3 weeks or
so.  Now they have told him that his kidney is

W F/E R ___/___ L ___/___
E F/R R ___/___ L ___/___
K F/E R ___/___ L ___/___
S I/A R ___/___ L ___/___
HPF/I/E R ___/___
         L ___/___

DATE:_____

AM STIFF _____ SLEEP ___

ACT OF DAILY    DRESS    E

LI  3    HELP
         INDE

MED TOX    RASH    MULCER
    YES
    NO

OTHER _____

MUSCLES    NF    NE    D    B
R    S/A    /    /    /

    S/A    /    /    /

LN DEV    R_____
BN    R_____    L_____

RAY_____
EENT_____    L
THER_____

C' coming back to normal. He assured me that he
was not taking any kind of NSAID.

With careful inquiry he denies any URI, UTI,
cough, congestion or PIR. In short, he did
not have any SAE in regard to his Enbrel. He
thinks that the Enbrel really helped his back
and now he feels better than he did before.

PE:        Peripheral    joint    exam    shows
osteoarthritis manifesting with Heberdens and
Bouchards and bony hypertrophy of the knees,
but his mobility is fine. The cardiopulmonary
exam is unremarkable.

ASSESSMENT/PLAN:
(1) Ankylosing spondylitis - stable at the
present time.

I advised him to continue taking the Enbrel on
a weekly basis.

(2) History of renal failure.

I will check his creatinine and liver
function.

I will see him back in 6 months for re-
evaluation.

Sohrab Fallahi/ef

DOOR

EDEM

T HAND
    /

    /

EX  B  T  K  A
    R
    L

E R__/__ L_
R R__/__ L__,_
E R__/__ L__/_
A R__/__ L__/_
E R    /    /
    L    /    /

DATE: 3/8/05    CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
I   G   HELP
INDE

MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
YES
NO
OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| L   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV   R_____ L_____ SN R_____ L_____ BOU R_____ L_____
HBN   R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
                                                                                          R
                                                                                          L

X RAY _____
HEENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____
OTHER _____

F/E PIPR |__|__|__|__|L|4|/|__|__|MCPR|__|__|__|__|L|__|__|__|
Wt 196   BP 141/64   P 66   T 975

F/E R__/__ L__/__
F/R R__/__ L__/__
F/E R__/__ L__/__
I/A R__/__ L__/__
PF/I/E R  /   /
        L  /   /

WOODLEY, RUFUS R.
3/8/05

This patient is here today for follow-up of
his ankylosing spondylitis for which he is
taking the combination of Enbrel and
Azulfidine twice daily. He is doing very well
in respect to the symptoms. He has
practically no morning stiffness or night
pain. Since he decreased the Azulfidine to
two tablets daily he has not gotten any worse.

ROS: There are no stigmata of inflammatory
process now.

PE: His mobility is fine. His peripheral
joint exam shows DJD manifesting with

DATE: 3-8-05   CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING  B  W  S

ACT OF DAILY   DRESS   BATHE                                    DOOR

L[ ]G   HELP
         INDE                Heberdens   and   Bouchards.   Back   exam   is
MED TOX   RASH   MULCER   AL  unremarkable.                     EDEM
       YES
       NO                    ASSESSMENT/PLAN:
OTHER _____            Ankylosing   spondylitis  -  under   excellent
MUSCLES   NF   NE   D   B   T   control with Enbrel and Azulfidine.    AND
R   S/A   /   /   /   /   /                                     /
                             I advised him to stop taking the Azulfidine.
L   S/A   /   /   /   /   /   We are hoping the Enbrel alone will take care
                             of the problem.   I will do the blood test  /
                             today.   I will see him back in 4 months for
ULN DEV   R_____ L_____    re-evaluation.                     ─────
HBN   R_____ L_____ BOU
                                      Sohrab Fallahi/ef          B  T  K  A
                                                                 R
                                                                 L

K RAY_____                                          ─
HEENT_____LUNG_____                                      _____
OTHER_____                                           _____
                                                                ┼─┼─┼
              F/E PIPR| ·  ·  ·  ·  ·  ·  ·  ·  ·  · ·· · ·  · ─



V F/E R__/__ L__/__
E F/R R__/__ L__/__
 F/E R__/__ L__/__
 I/A R__/__ L__/__
IPF/I/E R  /  /
       L  /  /

DATE: 11/2/04    CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING  B W S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR
LI ;    HELP
        INDE

| MED TOX | RASH | MULCER | ALOPECIA | COUGH | SOB | NAUSEA | DIAR | ABD PAIN | HA | EDEM |
|---|---|---|---|---|---|---|---|---|---|---|
| YES | | | | | | | | | | |
| NO | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| OTHER | | | | | | | | | | |

MUSCLES    NF   NE   D   B   T   W   WF   HF   HAB   HAD   KF   KE   APF   ADF   GTOE   INT HAND
R  S/A    /   /   /   /   /   /   /   /    /    /    /   /   /    /    /          /
L  S/A    /   /   /   /   /   /   /   /    /    /    /   /   /    /    /          /

ULN DEV   R _____ L _____   SN R _____ L _____   BOU R _____ L _____
HBN   R _____ L _____   BOUC N R _____ L _____   GRIP R _____ L _____   REFLEX   B  T  K  A
                                                                                R
                                                                                L

X RAY _____
HEENT _____    LUNG _____    HEART _____    ABD _____    SKIN _____
OTHER _____

F/E PIPR |  |  |  |  | L |  |  |  | MCPR |  |  |  | L |  |

Int 193   BP 114/66   P80   T 96.3

WOODLEY, RUFUS R.
11/2/04

This patient is here today for follow-up of his ankylosing spondylitis for which he is now taking a biological agent, i.e. Enbrel, and he is still on 2 grams of sulfasalazine. To both of these he has a very good response. Since he has started the Enbrel he has improved considerably as far as the quality of life goes. He has much less morning stiffness and practically none. He has no night pain whatsoever. He has degenerative arthritis of the peripheral joints.

ROS: He does not have any SAE like cough, congestion, bronchitis or sinusitis.

DATE:_____CHIEF COMPLAINT _____

AM STIFF _____ SLEEP __
ACT OF DAILY    DRESS                                                    Γ    DOOR
N          HELP
            INDE
MED TOX    RASH    MULCEF      PE:    His    peripheral    joint    exam    shows      EDEM
    YES                        degenerative    arthritis    manifesting    with
    NO                         Heberdens and Bouchards.  His mobility is fine
OTHER _____              without assistive device.  Chest, heart and
                              abdominal exams are unremarkable.
MUSCLES    NF    NE    D    B                                                   HAND
    S/A    /    /    /    /    ASSESSMENT/PLAN:                                  /
                              (1) Ankylosing spondylitis - under very good
    S/A    /    /    /    /    control.                                         /

LN DEV    R_____  I      He is doing so well on biological agents that
BN    R_____  L_____     I    think    it    would    be    prudent    for    his      B  T  K  A
                              sulfasalazine to be decreased gradually.    To     R
                              that end I advised him to take only 1 gram        L
                              daily.
RAY_____
EENT_____LUNG_      (2)    Monitoring    the    side    effects    of
THER_____          sulfasalazine.
                                                                               L  ─┼──┼──┼─
                      F/E

                              ── I checked CBC, liver panel and creatinine.

                              ── I will see him back in 3-4 months for re-
                                 evaluation.
                                                 Sohrab Fallahi/ef


                                      2 0 2
                                     End FR

F/E R__/__  L__/__
F/R R__/__  L__/__
F/E R__/__  L__/__
A R__/__  L__/__
F/I/E R    /    /
      L    /    /

DATE: 8-10-04   CHIEF COMPLAINT _____ pain

AM STIFF _____ SLEEP _____ WELL BEING  B  W  S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
L   3   HELP
           INDE

MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
YES
NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT | HAND |
|---------|----|----|----|---|---|---|----|----|-----|-----|----|----|-----|-----|------|-----|------|
| R   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | | / |
| L   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | | / |

ULN DEV   R_____ L_____   SN R_____ L_____ BOU R_____ L_____
HBN   R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____   REFLEX  B  T  K  A
                                                                                                      R
                                                                                                      L

X RAY _____
HEENT _____ LUNG_____ HEART_____ ABD_____ SKIN_____
OTHER _____

F/E PIPR |  |  |  |  |  | L |  |  |  | MCPR |  |  | L |  |  |

WT 196    BP 130/64   P 62   Temp 96.6

PMH  5-04, urine test showed
kidney problem, by D W/berg,
who sent me to Dr. Krissamai
Kirkland Clinic, nephrologist
she did not have enough
evidence, but stay away from
Mainster/dady, she say
I want to go to Pa Clinic
had U/s of kidneys. had 24
hour protein

WOODLEY, RUFUS R.
8/10/

**DATE:** 8/10/04

AM STIFF _____ SL

ACT OF DAILY DRES
L G HELP
INDE

MED TOX RASH M
YES
NO
OTHER _____
MUSCLES NF NE I
R S/A / / /

L S/A / / /

ULN DEV R_____
HBN R_____ L__

X RAY _____
HEENT _____ LU
OTHER _____

BUTT DOOR

HA EDEM

INT HAND
/

/

L_____
FLEX B T K A
R

L

This patient is here today for follow-up of his ankylosing spondylitis for which he is taking Azulfidine, four daily. He was taking different kinds of NSAIDs.

IPMH since the last visit is remarkable for him being off the NSAID because of the "kidney problem," he says. Apparently he describes that Dr. Wybenga found some abnormality in the kidney and sent him to a nephrologist in Birmingham Kirklin Clinic. It was a month later before he was evaluated by that nephrologist and her evaluation showed that whatever problem he had was resolved. Nevertheless, he was advised by the nephrologist, he says, that he should not take any NSAIDs.

Since he has stayed away from NSAIDs his pain has gotten a whole lot worse. He is now having so much pain that he is seeking some advice from a pain clinic. I explained to him that his problem with ankylosing spondylitis is nothing the pain clinic can help with. He remembers that he was advised about Enbrel and is going to find out from his insurance whether or not they provide that. After that we have to prepare him with a TB test. He understands the dos and don'ts with Enbrel. I still discussed this with him in depth and the potential risks of that, including increased risk of infectious process, were explained. I gave him a prescription to take to his insurance company to see if they provide this or not. In case he gets the medicine he is to bring it here and we will teach him how to get it. Also, we will check a PPD skin test at that time. In the meanwhile he is to continue Azulfidine but stay away from NSAIDs.

In order to monitor the potential risks of Azulfidine, I checked CBC, liver panel and creatinine. I tentatively plan to see him back in one month for re-evaluation.

Sohrab Fallahi/ef

Cc: Dr. Wybenga

W F/E R___/ L__/
E F/R R___/ L__/
K F/E R___/ L__/
S I/A R___/ L__/
HPF/I/E R / /
L / /

DATE: 04-06-04   CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S _____

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR

LIV__ S   HELP
         INDE

MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
   YES
   NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| L   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV   R_____ L_____ SN R_____ L_____ BOU R_____ L_____
HBN   R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
                                                                                    R
                                                                                    L

X RAY _____
HEENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____
OTHER _____

F/E PIPR | | | | | | L | | | | MCPR | | | | | L | | |

Wt 198   BP 147/59   P 74   T 96?

off Vioxx → swelled

WOODLEY, RUFUS R.
4/6/04

This patient is here today for follow-up of
his ankylosing spondylitis for which he is now
taking Bextra. He used to be taking Vioxx
with good results. However, that made him
swell up. Dr. Wybenga appropriately took him
off of that. He called us and we gave him
samples of Bextra and he is taking 10 mg
daily. Up until yesterday he thought the
Bextra was not helping but today he is
somewhat better. He has taken it for only 4
days and he would like to give it a little
more time.

FHx: No change.

DATE:_____  SH: No.. contributory.

AM STIFF _____ SLE

ACT OF DAILY    DRESS   ROS:  I carefully inquired to see if he might          BUTT   DOOR
I"'NG    HELP                have any AE to his existing medications and
         INDE                the answer seems to be negative.

MED TOX   RASH   MU      PE:        Peripheral   joint   exam   shows   OA     HA   EDEM
    YES                  manifesting with Heberdens and Bouchards.  He
    NO                   does not have any inflammatory process.  He
OTHER _____         has  OA  manifesting  with  Heberdens  and
MUSCLES  NF  NE  D       Bouchards.  His back exam is unremarkable.  He       INT HAND
R   S/A   /   /   /      continues  to  have  difficulty  with  his  back          /
                         with prolonged morning stiffness.
L   S/A   /   /   /                                                                 /
                        ASSESSMENT/PLAN:
ULN DEV    R_____     (1)  Ankylosing  spondylitis  -  stable  with         __L_____
HBN  R_____ L___     partial remission - on Azulfidine and Bextra.        EFLEX  B  T  K  A
                        (2) Osteoarthritis - on Bextra.                              R
                                                                                     L
X RAY_____
HEENT_____        (3) Monitoring the side effects of Azulfidine
OTHER_____        and NSAIDs.

                         I checked CBC, liver panel and creatinine.

                         He  is  now  seriously  considering  taking  the
                         Enbrel.    He  is  going  to  check  with  his
                         insurance company.  If they give the okay he
                         is to get back with us and we will prepare him
                         logistically by checking his chest x-ray and
                         doing a PPD skin test, I discussed with him
                         and elaborated on that.

                         At this time I have given him samples of Mobic
                         to take one daily only if he thought the
                         Bextra was not helping.   Otherwise he should
                         continue  taking  the  Bextra.   (I , clearly

F/E R___/___ L___/___
F/R R___/___ L___/___
F/E R___/___ L___/___    explained that he should not mix the Bextra
I/A R___/___ L___/___    and Mobic.)
PF/I/E R    /    /
      L    /    /        I  will  see  him  back  in  4  months  for  re-
                         evaluation.
                                                  Sohrab Fallahi/ef

DATE: 12-01-03    CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING R.W.S.

ACT OF DAILY   DRE

LI  ;    HELP
         INDE

MED TOX   RASH
    YES
    NO
OTHER _____

MUSCLES   NF   NE
R   S/A   /    /

_   S/A   /    /

_____

ULN DEV    R_____
HBN    R_____L_

X RAY_____
HEENT_____
OTHER_____

BUTT    DOOR

WOODLEY, RUFUS R.
12/1/03

This patient is here today for follow-up of his AS for which he is taking Azulfidine now. He takes Vioxx.

IPMH since the last visit is unremarkable. He has read extensively about Enbrel and would like very much to take that.

ROS: I inquired to see if he might have any AE to his existing medications and the answer seems to be negative.

He did not have any nausea or vomiting. In July he underwent cardiac cath and stint placement by Dr. Williams.

¹ HA   EDEM

'E   INT HAND
        /

        /

__ L_____
REFLEX  B  T  K  A
        R
        L

W2oy  B/P  11/18/165 P 56    T97.5

had a flu shot

Cardiac Cath done Jly ly

Dr Williams

PE: His peripheral joints show only degenerative arthritis but not inflammatory process.

As far as his AS is concerned, he still has some stiffness of his back.

The cardiopulmonary exam is unremarkable.

ASSESSMENT/PLAN:
(1) AS - in partial remission with Azulfidine.
(2) Monitoring the side effects of Azulfidine.

I checked CBC, liver panel and creatinine.

I extensively discussion with him about the fact that the AS would be very responsive to

V F/E R___/___ L___/___
E F/R R___/___ L___/___
E F/E R___/___ L___/___
S I/A R___/___ L___/_.
NPF/I/E R   /   /
        L   /   /

DATE:_____

AM STIFF _____ SLEE

ACT OF DAILY    DRESS

IM  ;    HELP

INDE

MED TOX    RASH    MUL

YES

NO

OTHER _____

MUSCLES    NF    NE    D

R    S/A    /    /    /

S/A    /    /    /

ULN DEV    R_____

IBN    R_____ L____

RAY_____

EENT_____LUI

OTHER_____

MUSCLES  NF  NE  D

/ F/E R___/___ L___/___

F/R R___/___ L___/___

F/E R___/___ L___/___

I/A R___/___ L___/___

PF/I/E R    /    /

L    /    /

TNF in general, Enbrel in particular, and advised him to consider that. He is worried about the price of the medicine and doesn't know if his insurance would let him have it or not. I also discussed with him about the alternative, considering methotrexate, and to that end I gave him information to read about methotrexate and brought to his attention that it was a cancer chemotherapy medicine with negative impact on the bone marrow and liver. I provided him with literature to read.

(3) Need for flu shot.

He assures me that it has been furnished already for this year.

F/E PIPR |  |  |  |  |L—|  |  |  |MCPR|  |  |  |L—|  |  |

I will see him back in 4 months for re-evaluation. However, if the Enbrel is furnished he will have to have a PPD skin test, I explained, and also we need to teach him how to receive this medicine. I gave him a prescription for this. He is going to check with his insurance company.

Sohrab Fallahi/ef

BUTT    DOOR

HA    EDEM

INT HAND

/

/

L_____

LEX  B  T  K  A

R

L

DATE: 7/28/03    CHIEF COMPLAINT

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR
LIV  ,    HELP
          INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
    YES
    NO
OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV    R_____ L_____    SN R_____ L_____    BOU R_____ L_____
HBN    R_____ L_____    BOUC N R_____ L_____    GRIP R_____ L_____    REFLEX  B T K A
                                                                                                R
                                                                                                L

X RAY_____
HEENT_____ LUNG_____ HEART_____ ABD_____ SKIN_____
OTHER_____

F/E PIPR | | | | | L | | | | MCPR | | | | L | | |
UT 195-        BP 140/65-        Temp 97'

WOODLEY, RUFUS
7/28/03

This patient is here today for follow-up of
his ankylosing spondylitis for which he is now
taking the Sulfasalazine, 4 a day.  He is on
Vioxx.  He has a lot of shoulder pain.  The
pain in the shoulder is consistent on a daily
basis and keeps him very uncomfortable.  He is
worried about the possibility of a heart
problem and that is why he has seen Dr. John
Williams who is going to do a cardiac cath
tomorrow, he says.

ROS:  I inquired to see if he might have any
AE to his existing medications and the answer
seems to be negative.  He has a lot of morning

R__/  L__/
R__/  L__/
R__/  L__/
R__/  L__/
R  /  /
L  /  /

DATE: _____ CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR
LIVING        HELP
              INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
    YES
    NO

OTHER _____

| MUSCLES | NF | NE | D | B |
|---|---|---|---|---|
| R    S/A | / | / | / | / |
| _    S/A | / | / | / | / |

ULN DEV    R_____ I

HBN    R_____ L_____

RAY_____
EENT_____ LUNG_
OTHER_____

F/E

HAND
/

/

B T K A
R
L

stiffness and still has pain in the shoulders and neck.

PE:  His neck and back motion is limited.

ASSESSMENT/PLAN:
(1) Ankylosing spondylitis.
(2) Osteoarthritis.
(3) Monitoring the side effects of medications.

I checked CBC, liver panel and creatinine.

I discussed with him the option of using Enbrel. We discussed the pros and cons and the potential risks vs benefits. He said he was not that bad and did not want to try that. However, for educational purpose he was given

information to take home and read. I increased the Azulfidine to 6 a day now. He is to continue Vioxx.

I checked a blood test today and x-rayed his shoulder because he is hurting so much. I will see him back in 4 months for re-evaluation, sooner if needed.

X-RAY READING: Internal and external rotation of the left shoulder shows OA of the AC junction.

Internal and external rotation of the right shoulder shows OA of the AC junction. The head of the humerus itself is round and smooth.

Sohrab Fallahi/ef

End of report

DATE: 3.19.03    CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR

IN    HELP
        INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
    YES
    NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---------|----|----|---|---|---|---|----|----|----|-----|----|----|-----|-----|------|----------|
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

LN DEV    R_____ L_____    SN R_____ L_____    BOU R_____ L_____

BN    R_____ L_____    BOUC N R_____ L_____    GRIP R_____ L_____    REFLEX B T K A
                                                                                              R
                                                                                              L

RAY _____

EENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____

THER _____

F/E PIPR |—|—|—|L|—|—|—|MCPR|—|—|—|L—|—|—|
    197    6.2    13./16



WOODLEY, RUFUS R.
3/19/03

This patient is here today for follow-up of
his ankylosing spondylitis for which he is
supposed to be taking 4 Azulfidine daily and
Vioxx once daily. It turned out that he was
taking only 3 Azulfidine. He says he is tired
of taking so much medicine. His back,
however, has started to hurt him more
recently, he says.

IPMH since the last visit is unremarkable for
medical or surgical intervention.

FHx:  Non-contributory.

SH:  Unchanged.

He takes several other medications for other
purposes.

ROS:  I inquired and he has nothing to suggest
that he might have a problem with taking the
medications.

F/E R __/__ L __/__
F/R R __/__ L __/__
F/E R __/__ L __/__
I/A R __/__ L __/__
PF/I/E R __/__ __/__
        L __/__ __/__

15 of 27 assign.

DATE:_____

AM STIFF _____ SLEEP ___

ACT OF DAILY    DRESS    BA
LIVING    HELP
          INDE
MED TOX    RASH    MULCER
    YES
    NO
OTHER _____

MUSCLES    NF    NE    D    B
    S/A    /    /    /    /    /

    S/A    /    /    /    /

LN DEV    R_____ L
BN    R_____ L_____

X-RAY_____

EENT_____LUNG_
OTHER_____

F/E

F/E R___/___ L___/___
F/E R___/___ L___/___
F/E R___/___ L___/___
I/A R___/___ L___/___
PF/I/E R___/___/___
        L___/___/___

DOOR

EDEM _

AND

/

B  T  K  A
R
L

I____

FU:  Peripheral joint exam is unremarkable.
His mobility is fine without assistive device.

ASSESSMENT/PLAN:
(1)  Lumbalgia - mostly due to ankylosing
spondylitis.

This is in flare with him decreasing the
number of Azulfidine.  For that reason I
suggested he increase the Azulfidine to 4
daily or consider taking methotrexate.  We
explained and elaborated on this.  He decided
to increase the Azulfidine to 4.  He does not
want to take the methotrexate.  He is afraid
of the side effects.

(2)  Osteoarthritis - diffuse and reasonable
responsive to Vioxx.
(3)  Monitoring the side effects of
medications.

I checked CBC, liver panel and creatinine.

I will x-ray his back today.  I will see him
back in 4 months for re-evaluation, sooner if
needed.

X-RAY READING:  AP and lateral view of the
lumbosacral spine shows normal looking
pedicles.  In the upper lumbar area he is
developing classic bamboo spine.

Lateral view shows anterior fusion of the
upper lumbar area with some osteoarthritic
change in the lower part.

AP of the pelvis shows complete fusion of both
sacroiliac joints indicative of bilateral
sacroiliitis.  Hip joints are fairly well
preserved.  There is x-ray evidence of OA of
the hips.

Sohrab Fallahi/ef

DATE: 11-19-02  CHIEF COMPLAINT

AM STIFF _Better_  SLEEP _Normal_  WELL BEING B W S

ACT OF DAILY  DRESS  BATHE  DRIVE  HWORK  CHAIR  CANE  WALKER  BUTT  DOOR
LIVING  HELP
          INDE

MED TOX  RASH  MULCER  ALOPECIA  COUGH  SOB  NAUSEA  DIAR  ABD PAIN  HA  EDEM
    YES
    NO
OTHER

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---------|----|----|----|----|----|----|----|----|-----|-----|----|----|-----|-----|------|----------|
| R  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| L  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | |

ULN DEV  R_____ L_____  SN R_____ L_____  BOU R_____ L_____

IBN  R_____ L_____  BOUC N R_____ L_____  GRIP R _Good_ L _Good_  REFLEX B T K A
                                                                              R
                                                                              L

RAY
EENT_____ LUNG_____ HEART_____ ABD_____ SKIN_____
OTHER

F/E PIPR |  |  |  |  | L |  |  |  | MCPR |  |  |  | L |  |  |

Temp 96.1   Weight 196 lbs   Pulse 61   BP 158/78

— WOODLEY, RUFUS R.
— 11/19/02

— This patient is here today for follow-up of
— his ankylosing spondylitis for which he is
— taking Azulfidine, 4 tablets a day. Since he
— finished his study with Celebrex he is on
— Vioxx, 25 mg daily. To that he has a good
— tolerance.

— IPMH since the last visit is unremarkable.

— FHx: Non-contributory.

— SH: Remarkable for the fact that he is
— retired but he can do anything he wants
— including playing golf and all kinds of social
— activities.

— ROS: I inquired to see if he might have any
— AE to his existing medications. The answer
— seems to be negative, as the details have been
— hand marked on the ROS sheet by myself.

— PE: The findings for the small, medium and
— large size joints of the upper and lower
— extremities on both sides of the body have
— been summarized in the chart in my handwritten
— note.

F/E R 90 80 90 80
F/R R 110 110 110 110
F/E R 110 110 110 110
I/A R 110 110 110 78
PF/I/E R  /  /
      L  /  /

Cont'd

DATE:_____  CHIEF  OMPLAINT _____
AM STIFF _____ SLEEP _____ WELL BEING  B  W  S
ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
'   'G   HELP
         INDE
MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
      YES
      NO                                    cont'd  11-19-02                          AND
OTHER _____
MUSCLES   NF   NE   D   B     ASSESSMENT/PLAN:
R   S/A    /    /    /    /    (1) Ankylosing spondylitis – stable.

L   S/A    /    /    /    /    He is considering stopping his medicine,
                              Azulfidine, for a while to find out if he gets
ULN DEV   R_____ L_     worse or not.  I discussed with him the pros   B T K A
HBN   R_____ L_____    and cons of this idea.                          R
                                                                             L
                              (2) Osteoarthritis.

X RAY_____    He is taking Vioxx with good tolerance, which
HEENT_____LUNG___     we will continue for the time being.
OTHER_____
                  F/E F        (3)  Monitoring  the   side   effects   of
                              medications.



                              I checked a CBC, liver panel and creatinine.

                              I will see him back in 4 months for re-
                              evaluation, sooner if needed.

                              X-RAY READING:  AP and lateral view of the
                              neck shows severe OA of the apophyseal
                              junction and subaxial area manifesting with
                              degenerative disk disease and osteophyte
                              formation.  C1/C2 relationship is okay.
                                                  Sohrab Fallahi/ef

W F/E R__/__ L__/__
E F/R R__/__ L_____
K F/E R__/__ L__/__
S I/A R____ L__/__
HPF/I/E R   /   /
        L   /   /

MRA-1

DATE: 5-30-02   CHIEF COMPLAINT

AM STIFF _____ SLEEP _____ WELL BEING  B  W  S

| ACT OF DAILY LIVING | DRESS | BATHE | DRIVE | HWORK | CHAIR | CANE | WALKER | BUTT | DOOR |
|---|---|---|---|---|---|---|---|---|---|
| HELP | | | | | | | | | |
| INDE | | | | | | | | | |

| MED TOX | RASH | MULCER | ALOPECIA | COUGH | SOB | NAUSEA | DIAR | ABD PAIN | HA | EDEM |
|---|---|---|---|---|---|---|---|---|---|---|
| YES | | | | | | | | | | |
| NO | | | | | | | | | | |

OTHER

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT | HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | | / |
| L   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | | | |

ULN DEV   R _____ L _____   SN R _____ L _____   BOU R _____ L _____

HBN   R _____ L _____   BOUC N R _____ L _____   GRIP R _____ L _____   REFLEX  B  T  K  A

R

L

X RAY _____

HEENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____

OTHER _____

F/E PIPR | | | | | | L | | | | MCPR | | | | L | | |

Wt 191   Temp 96.8   BP 146/70

WOODLEY, RUFUS R.
5/30/02

This patient is here today for follow-up of his ankylosing spondylitis, which is responding very nicely to Vioxx and Azulfidine; however, he has heard about the negative publicity against Vioxx in the news media and he would like to change the medicine. Since he heard this negative publicity he thinks he might have some headache. I inquired and he did not have any stomach problems or rash. He denies any edema.

PE:  He has a very good range of motion of all the small, medium and large size joints of the upper and lower extremities. Mobility is fine. He has OA manifesting with Heberdens and Bouchards and bony overgrowth of the knees. Chest, heart and abdominal exams are unremarkable.

ASSESSMENT/PLAN:
(1) OA - diffuse and stable - responsive to Vioxx.
(2) Ankylosing spondylitis - responsive to Azulfidine and Vioxx.

9/0 Abd   9/0 Abd

F/E R 70,60,70,60
F/R R L/60/90
F/E R L/10°/170
I/A R 170/170 L/170/170
PF/I/E R / /
L / /

DATE:_____CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR

L'''G    HELP
         INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
    YES
    NO

OTHER _____

| MUSCLES | NF | NE | D | B |
|---------|----|----|----|----|
| R   S/A | / | / | / | / |
| L   S/A | / | / | / | / |

ULN DEV    R_____

HBN    R_____    L_____

X RAY _____
HEENT _____LUNG_
OTHER _____

He wants to change the Vioxx and we offered for him to participate in a study for Celebrex vs Naprosyn on ankylosing spondylitis. He is going to consider that. If he gets on that study, fine, otherwise, we will put him on Celebrex or Bextra, we discussed in depth.

(3) Monitoring the side effects of medications.

I checked a CBC, liver panel and creatinine.

I will see him back in 4 months for re-evaluation, sooner if needed.

F/L.......,                          Sohrab Fallahi/ef

W F/E R___/___ L___/___
E F/R R___/___ L___/___
X F/E R___/___ L___/___
S I/A R___/___ L___/___
HPF/I/E R    /    /
       L    /    /

DATE: 12·21·01   CHIEF COMPLAINT

AM STIFF _____ SLEEP

ACT OF DAILY   DRE
LIVING    HELP
          INDE
MED TOX   RASH
    YES
    NO
OTHER _____
MUSCLES   NF  NE
R   S/A   /   /

    S/A   /   /

ULN DEV   R_____
MBN   R_____  L_

 RAY_____
EENT_____
OTHER_____

BUTT   DOOR

HA   EDEM

WOODLEY, RUFUS R.
12/21/01

This patient is here today complaining of low
back pain and stiffness.  He has ankylosing
spondylitis.  He also complains of right heel
numbness and some soreness.  The numbness is
more than the soreness, he says.  This is off
and on and sometimes mostly when he stands up.

This gentleman has ankylosing spondylitis and
takes Azulfidine, 1000 mg b.i.d.  He is on
Vioxx.  So far he is OK and can get by, but he
is not definitely sure if the combination has
helped him or not.  On the other hand, he is
quick to say he doesn't know how he would be
if he didn't take it and he wants to continue
it.

E   INT HAND
        /

        /

  L_____

REFLEX  B  T  K  A
        R
        L

F/E PIPR|  |  |  |  ⌐L  |  |  |  |MCPR|  |  |  |  |L  |  |  |  |

207 lbs  96.5  138/62

had a flu shot.

IPMH  since  the  last  visit  with  me  is
unremarkable  for  medical  or  surgical
intervention.

FHx/SH: Non-contributory and unchanged.

ROS:  I inquired to find out if he has any
problem with the medicine and the answer seems
to be negative.  He denies bladder or bowel
dysfunction.

PE:  His mobility is without assistive device.
Peripheral joint exam shows a very good range
of  motion  without  inflammatory  process.
Chest,  heart  and  abdominal  exams  are
unrevealing.

F/E R___/___ L___/___
F/F R___/___ L___/___
F/E R___/___ L___/___
I/A R___/___ L___/___
PF/I/E R   /   /
    L   /   /

ACT OF DAILY    DRI
LIVING    HELP
          INDE
MED TOX   RASH
     YES
     NO
OTHER _____
MUSCLES   NF   NE
     S/A   /   /

     S/A   /   /

LN DEV   R_____
BN   R_____ L_

RAY_____
EENT_____
THER_____

BUTT    DOOR

I  HA   EDEM

E  INT HAND
        /

        /

__L_____
REFLEX  B  T  K  A
        R
        L

The ankle joint is fine. There is no atrophy in the heel area and no cellulitis.

ASSESSMENT/PLAN:
(1) Lumbalgia due to ankylosing spondylitis.
(2) Heel pain and numbness due to spinal stenosis. (He had an MRI of the back in 1998 showing this problem.)

This is due to his ankylosing spondylitis.

(3) Osteoarthritis - appropriate for age.
(4) Monitoring the side effects of medicine.

I checked a CBC, liver panel and creatinine.

I discussed my views with him. Since he is not a surgical candidate and can easily cope

F/E R__/__ L__/__
F/R R__/__ L__/__
F/E R__/__ L__/__
/A R__/__ L__/__
F/I/E R   /   /
      L   /   /

with the heel numbness, we are not going to change the medicine right now or do any surgical procedure. I tentatively plan to see him back in 4 months for re-evaluation.

X-RAY READING: AP of the pelvis shows normal cartilage of the hip joints. SI joints seem to be fused bilaterally. This is typical for ankylosing spondylitis. Sacral bone is intact.

In the thoracolumbar area on the AP view the patient has typical bamboo spine. Lateral view shows anterior fusion of the thoracolumbar spine, again typical for ankylosing spondylitis.

The right heel x-ray shows no spur and no lytic or blastic lesion.

                              Sohrab Fallahi/ef

DATE: 6.25.01    CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING  B  W  S

ACT OF DAILY    DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR

LIV.    HELP
        INDE
MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
        YES
        NO
OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
|     S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV   R____ L____   SN R____ L____   BOU R____ L____
IBN   R____ L____   BOUC N R____ L____   GRIP R____ L____   REFLEX  B  T  K  A
                                                                      R
                                                                      L

RAY _____
EENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____
OTHER _____

F/E PIPR |  |  |  |  | L |  |  |  | MCPR |  |  |  | L |  |  |

Wt 201    Temp 92.2    BP 130/60

David Newman
& D w/bengor. 3-01

WOODLEY, RUFUS
6/25/01

This patient is here today.  He is doing very
well.  He has ankylosing spondylitis for which
he is taking Azulfidine.   For OA he takes
Vioxx.  He has a very good tolerance to both
of those.

IPMH since the last visit with me is
unremarkable.

ROS: I inquired and he does not have any side
effects.  He is very active playing golf four
times a week and piddles around the house.

PE: He has a very good range of motion of all
the small, medium and large size joints of the

cont'd ↓

DATE:_____  CHIE  OMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR

'  'NG    HELP
         INDE
MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
         YES
         NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---------|----|----|----|----|----|----|----|----|-----|-----|----|----|-----|-----|------|----------|
| R  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| L  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV   R_____  L_____  SN R_____  L_____  BOU R_____  L_____

HBN  R_____  L_____  BOUC N R_____  L_____  GRIP R_____  L_____  REFLEX  B  T  K  A

R
L .

X RAY_____

HEENT_____LUNG___

OTHER_____

F/E PI

upper and lower extremities on both sides of
the body. He has some soreness in the lower
part of the back. Chest, heart and abdominal
exams are unremarkable.

ASSESSMENT/PLAN:
(1) Lumbalgia - mostly due to ankylosing
spondylitis that is stable at the present
time.
(2) Monitoring the side effects of
medications.

I checked a CBC, liver panel and creatinine.

(3) Osteoarthritis - responsive to Vioxx.

I will see him back in six months for re-
evaluation, sooner if needed. SOHRAB FALLAHI/ef

Cont'd 10-25-01

W F/E R___/___ L___/___
E F/R R___/___ L___/___
K F/E R___/___ L___/___
S I/A R___/___ L___/___
HPF/I/E R   /   /
        L   /   /

DATE: 12-19-00 _____ CHIE OMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING  B  W  S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR

I  'G   HELP
        INDE

MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
    YES
    NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---------|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
| R   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| L   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV   R_____ L_____ SN R_____ L_____ BOU R_____ L_____
HBN   R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX  B  T  K  A
                                                                                              R
                                                                                              L

X RAY _____
HEENT_____ LUNG_____ HEART_____ ABD_____ SKIN_____
OTHER _____

F/E PIPR |  |  |  |  |  | L |  |  |  | MCPR |  |  |  | L |  |  |

W 198 , T. 97   BP. 118/60

Had a flu shot 2 wks ago

WOODLEY, RUFUS R.
12/19/00

This patient is here today.  He does not have
any particular complaint.  He has ankylosing
spondylitis and OA.  He takes Azulfidine and
Vioxx and is very pleased.

IPMH  since  the  last  visit  with  me  is
unremarkable  for  medical  or  surgical
intervention.

FHx/SH:  Non-contributory.

ROS:  There is nothing to suggest inflammatory
process.

PE:  He has a very normal chest without rale,
rhonchi or wheeze.  Heart sounds are normal
without gallop, murmur or rub.  The abdomen is
soft and benign.

Joint  exam  shows  evidence  of  degenerative
arthritis  manifesting  with  Heberden  and
Bouchard  nodes  but  there  is  no  inflammatory
process.

W F/E R __/__ L __/__
F/R R __/__ L __/__
F/E R __/__ L __/__
I/A R __/__ L __/__
PF/I/E R  /  /  L  /  /

DATE:_____  CHIEF COMPLAINT
AM STIFF _____ SLEEP _____ WELL BEING B W S
ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
L  G   HELP
      INDE
MED TOX  RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
      YES
      NO
OTHER_____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---------|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
| R  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| L  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV   R_____   L_____   SN R_____   L_____   BOU R_____   L_____
HBN   R_____   L_____   BOUC N R_____   L_____   GRIP R_____   L_____   REFLEX B T K A
                                                                                                R
                                                                                                L

cont'd 12-19-00

X RAY_____
HEENT_____LUNG___
OTHER_____

F/E F

ASSESSMENT/PLAN:
(1) Ankylosing spondylitis - stable and
responsive to current medications.
(2) Osteoarthritis - on Vioxx.
(3) Monitoring the side effects of
medications.

I checked a CBC, liver panel and creatinine.

I will see him back in four months for re-
evaluation.
                              Sohrab Fallahi/ef

W F/E R___/___ L___/___
E F/R R___/___ L___/___
K F/E R___/___ L___/___
S I/A R___/___ L___/___
HPF/I/E R   /   /
       L   /   /

MRA-12A

ATE: 8-15-00    CHIEF COMPLAINT _____

M STIFF _____ SLEEP _____ WELL BEING  B  W  S

CT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR

V'    HELP
      INDE

ED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
        YES
        NO

THER _____

USCLES    NF    NE    D    B    T    W    WF    HF    HAB    HAD    KF    KE    APF    ADF    GTOE    INT HAND
    S/A    /    /    /    /    /    /    /    /    /    /    /    /    /    /    /    /

    S/A    /    /    /    /    /    /    /    /    /    /    /    /    /    /    /    /

LN DEV    R _____    L _____    SN R _____    L _____    BOU R _____    L _____    REFLEX  B  T  K  A
BN    R _____    L _____    BOUC N R _____    L _____    GRIP R _____    L _____    R
                                                                                      L

RAY _____
EENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____
THER _____

F/E PIP R |  |  |  |  |  | L |  |  | MCP R |  |  |  | L |  |  |

8-15-00  WT 200  BP 12/64  Temp 973

WOODLEY, RUFUS R.
8/15/00

This patient is here today. He is happy as long as he
takes his Vioxx and Azulfidine. That has been
controlling his ankylosing spondylitis. He has no
inflammatory process.

IPMH since the last visit with me is unremarkable for
medical or surgical intervention.

FHx/SH:  Non-contributory.

ROS:  Specific inquiries were directed towards the
potential side effects of medications on different
organ systems. He does not seem to have any problem.

PE:  His peripheral joint exam shows OA but not
inflammatory process. His mobility is fine without
assistive device.

ASSESSMENT/PLAN:
(1) Osteoarthritis - diffuse.
(2) Ankylosing spondylitis - stable.
(3) Monitoring the side effects of medications.

I checked a CBC, liver panel and creatinine.

I will see him back in four months for re-evaluation.
                                    Sohrab Fallahi/ef

/ F/E R ___/___  L ___/___
  F/R R ___/___  L ___/___
  F/E R ___/___  L ___/___
  1/A R ___/___  L ___/___
PF/I/E R ___/___
        L ___/___

E N D

DATE: 4/11/00   CHIEF COMPLAINT

AM STIFF _____ SLEEP _____ WELL BEING B W S

IMPACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
LIVING   HELP
   INDE

MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
   YES
   NO
OTHER

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | | / |

ULN DEV   R _____ L _____   SN R _____ L _____   BOU R _____ L _____

IBN   R _____ L _____   BOUC N R _____ L _____   GRIP R _____ L _____   REFLEX  B  T  K  A
   R
   L

X RAY _____

   EENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____

OTHER _____

F/E PIPR |—|—|—|—| L |—|—|—| MCPR |—|—|—|—| L |—|—|—|

W = 202   T = 96²   BP 123/63   P = 73

- WOODLEY, RUFUS
- 4/11/00

- This patient is here today. He does not have any
- particular complaint. He has AS and takes Azulfidine
- and Vioxx, 12.5 mg daily.

- FHx:   Non-contributory.

- SH:   Remarkable for the fact that he plays golf three
- days a week. He can keep up with that.

- ROS:   Specific inquiries were directed towards the
- potential side effects of medications on different
- organ systems as the details have been handmarked on
- the ROS sheet by myself. He does not seem to have any
- problems.

- PE:   The findings for the small, medium and large size
- joints of the upper and lower extremities on both sides
- of the body have been summarized in the chart in my
- handwritten note.   His mobility is fine without
- assistive device. The chest, heart and abdominal exams
- are unremarkable.

- ASSESSMENT/PLAN:
- (1) OA - diffuse.
- (2) Ankylosing spondylitis - stable on Azulfidine and
      Vioxx.

- I increased the dose of Vioxx to 25 mg because he still
- has some residual pain which is a combination of his OA
- and AS.

cont'd

DATE:_____ CHIEF COMPLAINT _____

M STIFF _____ SLEEP _____ WELL BEING B W S

CT OF DAILY  DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR

VIN      HELP
         INDE

ED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
   YES
   NO

THER _____

USCLES   NF   NE   D   B   T   W   WF   HF   HAB   HAD   KF   KE   APF   ADF   GTOE   INT HAND
   S/A   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /

   S/A   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /

LN DEV  R_____ L_____ SN R_____ L_____ BOU R_____ L_____
BN   R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
                                                                                        R
                                                                                        L

RAY_____
EENT_____ LUNG   especially with combination of NSAIDs and
THER_____        Azulfidine.

For that I checked a CBC, liver panel and creatinine.

I will see him back in four months for re-evaluation.
                                    Sohrab Fallahi/ef

                                    2nd of 2 part

F/E R__/__ L__/__
F/R R__/__ L__/__
F/E R__/__ L__/__
I/A R__/__ L__/__
F/I/E R   /   /
     L   /   /

DATE: 10/12/99   CHIEF  COMPLAINT

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR

_____   HELP
            INDE

MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
   YES
   NO
OTHER

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT | HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | | / |

LN DEV   R _____ L _____ SN R _____ L _____ BOU R _____ L _____

BN  R _____ L _____ BOUC N R _____ L _____ GRIP R _____ L _____ REFLEX B T K A
                                                                                          R
                                                                                          L

RAY _____

EENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____

THER _____

F/E PIPR | | | | | L | | | | MCPR | | | | | L | | | |

10-12-99 wt 198 BP 110/68 Temp 92.6

WOODLEY, RUFUS R.
10/12/99

This patient is here today.  He is doing fairly well as
long  as he takes the  Voltaren and Cytotec to which he
has  a  good  tolerance.  He takes Azulfidine.   He has
been off of it for the past week or two only because he
ran  out  of  the  medicine.  He  wants to  try  Cox II
inhibitors but  he knows  that Maxwell doesn't carry
that.   He is hoping  that Cox  II inhibitors will take
the  place of the Voltaren and Cytotec combined so that
he doesn't have to take so much medicine, he says.

IPMH  since the last  visit with me is unremarkable for
medical or surgical intervention.

FHx/SH:  Non-contributory.

ROS:  Specific  questions  were  directed  towards  the
potential  side effects of  Voltaren, especially on the
GI tract.  He does  not  have any  problems with his
medications.

PE:   The peripheral joint exam shows a very good range
of  motion of  all the  small, medium and  large sized
joints of the upper and lower extremities on both sides
of  the body.   His mobility  is fine without assistive
device.  Back motion is fine.

ASSESSMENT:
(1) Ankylosing spondylitis – stable at the present time
     with NSAID alone.

We  will  continue  that.   I  gave  him  a  month of

DATE: 10-12-04    CHIEF COMPLAINT

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR
LIVING    HELP
         INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
    YES
    NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

LN DEV    R_____ L_____ SN R_____ L_____ BOU R_____ L_____
BN    R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
                                                                                        R

RAY

EENT _____ L

THER _____

This would take the place of Voltaren and Cytotec combined. I explained this to him.

(2) Monitoring the side effects of Azulfidine and Voltaren.

We will check a CBC, liver panel and creatinine.

We will check his blood sugar on his request because he wants to know what his blood sugar is and he has a "strange feeling" and wants to see that his blood sugar is not high. He denies polydipsia or polyuria.

(3) Need for flu shot.

This was provided on his request after an explanation about the potential risks including possibility of flu-like symptoms and remote possibility of a CNS problem. (I elaborated on this.)

I will see him back in four months for re-evaluation. I explained that if for some reason he could not get the Vioxx he should go back and take Voltaren and Cytotec together.

Sohrab Fallahi/ef

2nd of 2 parts

F/E R__/__ L__/__
F/R R__/__ L__/__
F/E R__/__ L__/__
I/A R__/__ L__/__
F/I/E R__/__ L__/__



DATE: 3/23/99   CHIEF COMPLAINT _____

AM STIFF _____   SLEEP _____   WELL BEING B W S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
LIVING   HELP
        INDE

MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
     YES
     NO
OTHER

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV   R _____ L _____   SN R _____ L _____   BOU R _____ L _____

HBN   R _____ L _____   BOUC N R (–) L (–)   GRIP R good L good   REFLEX   B  T  K  A
                                                                            R
                                                                            L

X RAY
HEENT _____   LUNG _____   HEART _____   ABD _____   SKIN _____
OTHER

90/60   F/E PIPR | | | | | L | | | | MCPR | | | | L | |

3/23/99 WT 195 BP 100/60 Temp 98.2

WOODLEY, RUFUS R.
3/23/99

This patient is here today. He is having some aches
and pains. He has ankylosing spondylitis and takes
Voltaren, Cytotec and Azulfidine. This combination has
helped him. He has heard about the Celebrex. He
inquired and I explained to him that the base didn't
carry that. He wished to try the Celebrex. I provided
him with a two week supply of 200 mg b.i.d. to try and
see if it helps him better than the Voltaren. I
explained that it would take the place of his Voltaren
and Cytotec combined.

IPMH since the last visit with me is unremarkable for
medical or surgical intervention.

FHx/SH: Non-contributory.

ROS: Specific questions were directed towards the
potential side effects of Voltaren, Cytotec and
Azulfidine. He does not seem to have any problem.

PE: The peripheral joints have a very good range of
motion of all the small, medium and large sized joints
of the upper and lower extremities on both sides of the
body. The cardiopulmonary exam is unremarkable. His
mobility is fine.

ASSESSMENT/PLAN:
(1) Ankylosing spondylitis - stable on current
    treatment.                                          cont'd ↓

I gave him a two week supply of Celebrex. (See above.)

F/E R 80/75 80 75
F/R R 10/00 1/01/00
F/E R 10-180 06/00
I/A R 10-171 10-170
PF/E R / /
L / /

DATE: _____ | CHIEF COMPLAINT: WELL BEING B W S

AM STIFF _____ SLEEP _____

ACT OF DAILY DRESS BATHE DRIVE HWORK CHAIR CANE WALKER BUTT DOOR

L G: HELP INDE

MED TOX RASH MULCER ALOPECIA COUGH SOB NAUSEA DIAR ABD PAIN HA EDEM

YES

NO

OTHER _____ NF NE D B T W WF HF HAB HAD KF KE APF ADF GTOE INT HAND

MUSCLES

R  S/A / / / / / / / / / / / / / /

L  S/A / / / / / / / / / / /

ULN DEV R_____ L_____ SN R_____ L_____ BOU R_____ L_____ REFLEX B T K A

HBN R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ R

L

Cont'd 3-23-99

X RAY _____

HEENT _____ LUNG

OTHER _____

If he was not happy with that he is to fill his Voltaren and Cytotec and continue them as they are now.

F/ (2) Monitoring the side effects of medications, especially Voltaren and Azulfidine.

I checked a CBC, liver panel and creatinine.

I will see him back in 3-4 months for re-evaluation, sooner if needed.

Sohrab Fallahi/ef

2nd of 2 parts

W F/E R___/___ L___/___
E F/R R___/___ L___/___
K F/E R___/___ L___/___
S I/A R___/___ L___/___
HPF/I/E R / / 
L / /

DATE: 11/20/98   CHI   COMPLAINT

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR

LIVING   HELP
         INDE

MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
   YES
   NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| L   S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV R_____ L_____ SN R_____ L_____ BOU R_____ L_____

HBN R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
                                                                              R
                                                                              L

X RAY _____
HEENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____
OTHER _____

F/E PIPR | | | | | | |L| | | | | |MCPR| | | | |L| | |

LH 196↑   BP 110/66   Temp 96.8

WOODLEY, RUFUS R.
11/20/98

This patient is here today. He is having some aches
and pains since he has switched from Voltaren to
Disalcid. He does not believe Disalcid helps him as
well. He wants to switch back to Voltaren, he says. He
gets his medicine from Maxwell and they give him
Cytotec. He has to buy his Voltaren separately. He
has ankylosing spondylitis and degenerative arthritis.
The combination of Voltaren with Azulfidine has helped
him some; however, he still has a considerable amount
of aches and pains.

IPMH since the last visit with me in July is
unremarkable for any medical or surgical intervention.

FHx/SH: Non-contributory.

ROS: Specific questions were directed towards the
potential side effects of Azulfidine and Voltaren on
different organ systems such as skin, mucosa, GI,
lungs, etc. He does not have any problem and seems to
be very tolerant.

PE: His peripheral joints show very good range of
motion of all the small, medium and large sized joints
of the upper and lower extremities on both sides of the
body. His chest is clear without rale, rhonchi or
wheeze. Heart sounds are normal without gallop, murmur
or rub. The abdomen is soft and benign.

Peripheral joints show degenerative arthritis but not
inflammatory synovitis, septic joint or effusion. His

W F/E R ___/___ L ___/___
E F/E R ___/___ L ___/___
K F/E R ___/___ L ___/___
S I/A R ___/___ L ___/___
HPF/I/E R ___ / ___
       L ___ / ___

DATE: 11/20/98 cm _____ CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

CT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR

V⁻⁻    HELP
       INDE

ED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
    YES
    NO

THER _____

USCLES    NF    NE    D    B    T    W    WF    HF    HAB    HAD    KF    KE    APF    ADF    GTOE    INT HAND
    S/A    /    /    /    /    /    /    /    /    /    /    /    /    /    /    /    /

    S/A    /    /    /    /    /    /    /    /    /    /    /    /    /    /    /

LN DEV    R _____    L _____    SN R _____    L _____    BOU R _____    L _____

BN    R _____    L _____    BOUC N R _____    L _____    GRIP R _____    L _____    REFLEX B T K A

neck motion is somewhat decreased. His mobility
generally is acceptable.

RAY _____

EENT _____

THER _____

ASSESSMENT/PLAN:
(1) Ankylosing spondylitis - reasonably stable on
    Azulfidine and NSAIDs.
(2) Monitoring the side effects of those medications.

I checked a CBC, liver panel and creatinine.

(3) OA - stable with combination of those medications.

I asked him if he had his flu shot and he assured me he
had. I switched his medicine to Voltaren and Cytotec.
However, I informed him that there is a product called
Arthrotec and I gave him some samples. If he likes the
results he might consider buying it in this combined
form. I will see him back in four months for
re-evaluation.

                                        Sohrab Fallahi/ef

F/E R __/__ L __/__
F/R R __/__ L __/__
F/E R __/__ L __/__
I/A R __/__ L __/__
PF/I/E R __/__ /__
    L __/__ /__

M STIFF_____ SLEEP _____ WELL BEING B W S

CT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR

IVING   HELP
        INDE

ED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM

·YES

NO

THER

USCLES   NF   NE   D   B   T   W   WF   HF   HAB   HAD   KF   KE   APF   ADF   GTOE   INT HAND

S/A   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /

S/A   /   /   /   /   /   /   /   /   /   /   /   /   /   /   /

N DEV  R_____   L_____   SN R_____   L_____   BOU R_____   L_____

3N& R_____   L_____   BOUC N R_____   L_____   GRIP R_____   L_____   REFLEX B  T  K  A

                                                                                                R

                                                                                                L

RAY

EENT _____ LUNG_____ HEART_____ ABD_____ SKIN_____

THER

F/E PIPR |   |   |   |   | L |   |   |   |   | MCPR |   |   |   |   | L |   |   |

Wei.ht - 191#        BP- 126/62        T- 97²

WOODLEY, RUFUS R.

- 7/21/98

This patient is here today. His back is a whole lot
better. This gentleman has low back pain which is
multifactorial, mostly from degenerative disk disease
with some herniated disk. Since he has been taking
Voltaren it has helped him quite a bit, he says. He is
tolerating it with taking the Cytotec.

ROS: He has no GI problem. The back is better
although the pain is not completely gone. He does not
have radiation of the pain down the leg. He wants to
try a NSAID from Maxwell AFB and has brought a list of
them.

PE: His mobility is fairly good without assistive
device. He has degenerative arthritis. There is no
indication of surgically correctable back problem.

ASSESSMENT:
(1) Lumbalgia - multifactorial, mostly from
    degenerative disk disease and osteoarthritis.
(2) Diffuse osteoarthritis.
(3) Monitoring the side effects of non-steroidal
    medicine, i.e. Voltaren.

For that I checked a CBC, liver panel and urinalysis.

- PLAN: On his request I changed his medicine and gave
him a prescription for Disalcid to take two t.i.d. with
meals with GI precautions. I have cautioned him for
ringing in the ear. He was advised not to mix this

F/E R  /   L  /
F/R R  /   L  /
F/E R  /   L  /
I/A-R  /   L  /
F/I/E R   /   /



DATE:_____ CHIEF    APLAIN

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR

IV    HELP
        INDE
        RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM

MED TOX
        YES
        NO

OTHER _____ KF    KE    APF    ADF    GTOE    INT HAND

MUSCLES    NF    NE    D    B    T    W    WF    HF    HAB    HAD    KF    KE    APF    ADF    GTOE    INT HAND
R    S/A    /    /    /    /    /    /    /    /    /    /    /    /    /    /    /    /

    S/A    /    /    /    /    /    /    /    /    /    /    /    /    /    /    /

ULN DEV    R_____    L_____    SN R_____    L_____    BOU R_____    L_____
HBN    R_____    L_____    BOUC N R_____    L_____    GRIP R_____    L_____    REFLEX    B    T    K    A
                                                                                                                        R
                                                                                                                        L

X RAY_____

HEENT_____    LUNG

OTHER_____
                        F,

cont'd 7-21-98
_____
he can switch back to Voltaren.  Therefore I gave him
two prescriptions with the understanding that he is not
going to mix them.  He is to take Cytotec with either
of those medications.

I will see him back in four months for re-evaluation.
                                        Sohrab Fallahi/ef

W F/E R___/___ L___/___
E F/R R___/___ L___/___
K F/E R___/___ L___/___
S I/A R___/___ L___/___
HPF/I/E R    /    /
        L    /    /

ATE: _____

M STIFF _____ SLEEP _____ WELL BEING B W S

CT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    —WALKER    BUTT    DOOR

VING    HELP
        INDE

| ED TOX | RASH | MULCER | ALOPECIA | COUGH | SOB | NAUSEA | DIAR | ABD PAIN | HA | EDEM |
|--------|------|--------|----------|-------|-----|--------|------|----------|-----|------|
| YES |  |  |  |  |  |  |  |  |  |  |
| NO: |  |  |  |  |  |  |  |  |  |  |
| THER |  |  |  |  |  |  |  |  |  |  |  |

| USCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|--------|----|----|---|---|---|---|----|----|----|-----|----|----|-----|-----|------|----------|
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / |  | / |  | / |

LN DEV   R_____ L_____ SN R_____ L_____ BOU R_____ L_____

BN  R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
R
L

RAY _____

ENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____

THER _____

F/E PIPR |   |   |   |   | L |   |   |   | MCPR |   |   |   |   | L |   |   |

4/14/98  WT 196  BP 11%00  Temp 97.5  pulse 80  R 18

WOODLEY, RUFUS R.
4/14/98

This patient is here today complaining of low back pain, especially in the left SI area. This pain does not have any radiation and he does not have any paresthesia of the leg. He does not have any difficulty with his bowel or bladder movement.

This gentleman has ankylosing spondylitis and at times this acts up and gets very severe. He is taking Azulfidine. Ultram has not helped him much. In the past he tried Indocin but is not sure if it is helping him or not.

ROS: He is tolerating Azulfidine very nicely and does not have any GI upset, rash or any other problem as the details had been handmarked on the ROS sheet by myself.

FHx/SH: Unremarkable. I learned that he cannot tell me if the pain is worse on sitting, lying down or walking. Apparently in any position the pain is there but whenever he stooped over to play golf the pain sometimes catches.

PE: He is a WD, WN, WM, A&O, in NAD. The chest is clear without rale, rhonchi or wheeze. Heart sounds are normal without gallop, murmur or rub. The abdomen is soft and benign.

Joint exam shows fairly good range of motion of all the small, medium and large sized joints of the upper and lower extremities on the left and right sides of the body. Straight leg raising is negative...

F/E R __/__ L __/__
F/E R __/__ L __/__
F/E R __/__ L __/__
/A R __/__ L __/__
F/II E R __/__ L __/__
L __/__

have localized soreness in the SI area. Reflexes are equal and normal. His mobility is fine without assistive device. There is no pulsative mass in the abdomen or bruit.

ASSESSMENT:

(1) Ankylosing spondylitis with severe pain in the left lower back which comes episodically and it "catches" and he cannot walk.

He could have spinal stenosis, I explained and elaborated by showing him on the mannequin. He should have an MRI of his back for that reason.

(2) Monitoring the side effects of Azulfidine which has helped his ankylosing spondylitis.

For that I will check a CBC, liver panel and urinalysis.

PLAN: I put him on Voltaren, 75 mg b.i.d., to take with Cytotec, 100 mcg t.i.d., along with Azulfidine.

I will see him back in three months for re-evaluation or sooner if needed.

AP of the lumbosacral spine shows fusion of the sacroiliac bilaterally. There also is some bamboo spine in the upper part of the lumbar spine and lower part of the thoracic spine; however, in the lateral view the lowest part of the lumbar spine is not fused together.

AP of the pelvis shows normal looking hip joint cartilage, but sacroiliac joint again _____.

Sohrab Fallahi/ef

DATE: 12/12/97   CHIEF COMPLAINT

AM STIFF _____ SLEEP _____ WELL BEING  B  W  S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
LIVING      HELP
            INDE

MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
   YES
   NO
OTHER

MUSCLES   NF   NE   D   B   T   W   WF   HF   HAB   HAD   KF   KE   APF   ADF   GTOE   INT HAND
R  S/A
L  S/A

ULN DEV  R  ⊖  L  ⊖     SN R  ⊖  L  ⊖     BOU R  ⊖  L  ⊖

HBN  R  L     BOUC N R  L     GRIP R  god  L  good   REFLEX  B  T  K  A
                                                              R
                                                              L

X RAY:
HEENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____
OTHER

F/E PIPR |—|—|—|—| |L—|—|—| |MCPR |—|—|—|—| |L—|—|—|
wt. 192 lbs.        BP 122/66              Temp. 96.9

F/E R  /  L  /
F/E R  /  L  /
F/E R  /  L  /
I/A R  /  L  /
PF/E R  /  L  /
   L  /  L  /



WOODLEY, RUFUS R.
12/12/97

This patient is here today with aches and pains,
especially of the hands, particularly the left second
finger. The gentleman has ankylosing spondylitis for
which he is taking Azulfidine, about 1 1/2 grams daily
now. He takes Ultram as well. Generally he is doing
fairly well and does not have any major medical
problems by history since the last visit with me.

SH: He is looking forward to turning 65 and getting
Medicare underway. He is active.

ROS: He has some stiffness in the PIPs and DIPs,
especially in the morning, he describes. He does not
have any swelling of the joints, Raynauds,
photosensitivity, mucositis or serositis. The details
of the ROS have been handmarked on the ROS sheet by
myself.

PE: He is a WD, WN, WM, A&O and in NAD. His general
exam of the chest, heart and abdomen is benign. He has
mild Heberden and Bouchard nodes throughout. He can
make a good grip. His exam of the joints shows full
range of motion of the wrists, elbows, shoulders, hips,
knees and ankles bilaterally.

ASSESS: (1) Ankylosing spondylitis - somewhat better.
In hopes of better control, I advised him to increase
his Azulfidine to six a day, although this might
irritate his stomach. He is taking the Ultram. (2)
Osteoarthritis - continue current medications. I

CHIEF COMPLAINT

TE:
STIFF _____ SLEEP _____ WELL BEING B W S
T OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR
N    HELP
     INDE
 TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
     YES
     NO
HER

| SCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

DEV    R_____    L_____    SN R_____    L_____    BOU R_____    L_____
N  R_____    L_____    BOUC N R_____    L_____    GRIP R_____    L_____    REFLEX  B  T  K  A
                                                                                                    R
                                                                                                    L

AY_____
ENT_____    LUNG_____    HEART_____    ABD_____    SKIN_____
HER_____

F/E PIPR |  |  |  |  | L |  |  |  | MCPR |  |  |  | L |  |  |

-- he is afraid  of because  it runs in  his family.    (3)
-- Monitoring the side effects of Azulfidine.  I checked a
   CBC and liver panel today.

-- PLAN:  I would like for him to check his blood  test in
   a couple of months.  I will see him back in four months
   for re-evaluation.
                                                Sohrab Fallahi/ef

2nd of report

/E R ___/___ L___/___
/R R ___/___ L___/___
/E R ___/___ L___/___
A R ___/___ L___/___
F/I/E R ___/___ L___/___
       L ___/___ /

WOODLEY, RUFUS R.
9/22/97

This patient is here today for follow-up of his anky-losing spondylitis and back pain as a result of that. He is now receiving Azulfidine. He is taking six Ascriptin daily and is still in pain. He is taking Cytotec and his ENT doctor recently put him on Zantac, he says. He wants verification as to whether or not the Cytotec and Zantac are both necessary or not.

Interim past medical history since the last visit with me is quite unremarkable.

SH: Unchanged.

PE: Peripheral joints have no inflammatory arthro-pathy, septic joint or effusion. His mobility is fine without any assistive device.

He has not done any blood tests since the last visit with me. His cardiopulmonary exam is unrevealing.

ASSESS/PLAN: (1) Ankylosing spondylitis - continues to be symptomatic in spite of the combination of several medications. (2) Monitoring the side effects of Azulfidine and six aspirin a day. For this I checked a CBC, liver panel and urinalysis.

I gave him a sample of Ultram to try every six hours on an as-needed basis for relief of pain. I have cautioned him for all the potential risks including the remote possibility of seizures.

I provided him with literature to read and consider methotrexate so that if the combination of these current medications (refer to medicine list that I reviewed with him today) did not work, I will consider giving him MTX. I tentatively plan to see him back in three months for re-evaluation.

Sohrab Fallahi/ef

ATE: 5-22-97   CHIEF COMPLAINT _____

M STIFF _____ SLEEP _____ WELL BEING B W S

CT OF DAILY / DRESS  BATHE  DRIVE  HWORK  CHAIR  CANE  WALKER  BUTT  DOOR

VI... / HELP
       INDE

ED TOX  RASH  MULCER  ALOPECIA  COUGH  SOB  NAUSEA  DIAR  ABD PAIN  HA  EDEM

  YES
  NO

THER _____

USCLES  NF  NE  D  B  T  W  WF  HF  HAB  HAD  KF  KE  APF  ADF  GTOE  INT HAND
  S/A  /   /   /   /  /  /  /   /    /    /    /   /    /    /     /          /

  S/A  /   /   /   /  /  /  /   /    /    /    /   /    /    /     /          /

LN DEV  R_____ L_____ SN R_____ L_____ BOU R_____ L_____
BN  R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
                                                                              R
                                                                              L

RAY _____
EENT _____ LUNG_____ HEART_____ ABD_____ SKIN_____
THER _____

F/E P|PR| | | | |L| | | | |MCP|R| | | | |L| | | |

5-22-97  WT 192  BP 118/74  Temp 96.8  Pulse 88  R 20



WOODLEY, RUFUS
5/22/97

This patient is here today for follow-up of his anky-
losing spondylitis for which he was taking Indocin and
Azulfidine.  (Please refer to my note of 3/21/97.)

Interim past medical history since then is significant
for the fact that he developed a lot of GI symptoms.
Because of that he stopped taking it.  He is not sure
if the problem was coming from Azulfidine alone or was
due to the combination of that and Cytotec and Indocin.

After he left them off for a while he started taking
Cama and is taking four a day.  He is having possibly
some benefit from it, i.e. relieving stiffness and
pain, but he is not sure about the benefit, but he has
good tolerance.

FHx/SOCIAL HISTORY:  Unrevealing.

ROS:  The patient tells me that he would like to get a
second line medication.  (This is for controlling
effect of that on the nature of the disease which
usually does not happen with Indocin or Cama.)  For
this he was given the option for either trying Azulfi-
dine again or taking MTX.  After a full discussion
about these he decided to go ahead and try Azulfidine
again; however, he would like to read about the metho-
trexate as well.

PE:  The peripheral joints are fine.  His mobility is
fine.

DATE:_____ CHIEF MPLAINT_____

AM STIFF_____ SLEEP_____ WELL BEING B W S

ACT OF DAILY   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR

LIVING   HELP

INDE

MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM

   YES

   NO

OTHER

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT | HAND |
|---------|----|----|----|----|----|----|----|----|-----|-----|----|----|-----|-----|------|-----|------|
| R  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | | / |

ULN DEV   R_____ L_____ SN R_____ L_____ BOU R_____ L_____

HBN  R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A

R

L

cont'd 5-22-97

X RAY_____

HEENT_____   LUNG_   ASSESS:   (1) Ankylosing spondylitis.   (2) Monitoring
the side effects of medications, i.e. non-steroidal
OTHER_____   medicine and partly because of Azulfidine.  For this I
F/E checked a CBC and liver panel.

PLAN:  He is going to try the Azulfidine again, 500 mg
t.i.d., to find out if this is going to work.  He will
read about MTX and if Azulfidine eventually did not
work he may consider taking the MTX, he said.  I will
see him back in four months for re-evaluation; how-
ever, every other month he is to stop by and check his
blood test, I advised him.

Sohrab Fallahi/ef

W F/E R___/___ L___/___
E F/R R___/___ L___/___
X F/E R___/___ L___/___
S I/A R___/___ L___/___
HPF/I/E R   /   /
L   /   /

DATE: _____ CHIEF COMPLAINT

AM STIFF _____ SLEEP _____ WELL BEING  B  W  S

ACT OF DAILY   HELP   DRESS   BATHE   DRIVE   HWORK   CHAIR   CANE   WALKER   BUTT   DOOR
LIVING         INDE

MED TOX   RASH   MULCER   ALOPECIA   COUGH   SOB   NAUSEA   DIAR   ABD PAIN   HA   EDEM
     YES
     NO
OTHER

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT HAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| L  S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / |

ULN DEV   R_____ L_____ SN R_____ L_____ BOU R_____ L_____
HBN  R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B  T  K  A
                                                                                    R
                                                                                    L

X RAY _____

HEENT _____ LUNG _____ HEART _____ ABD _____ SKIN _____

OTHER

F/E PIPR |||||L||||MCPR ||||L||

Weight 198      BP 142/80      Temp 97.8

WOODLEY, RUFUS R.
3/21/97

This patient is here today for follow-up of his anky-
losing spondylitis for which he is taking Indocin
t.i.d. He did not remember if he read about anky-
losing spondylitis, he says. However, he did read
about methotrexate and Azulfidine. He has some relief
with taking Indocin although he continues to have a lot
of thoracolumbar area pain and lower back stiffness,
especially in the morning. He never had inflammatory
change of his uveitis.

Pertinent lab data is positive B27, negative ANA and
rheumatoid factor. He has a history of occasional epi-
gastric area discomfort but he does not describe
penetrating pain. He has not passed any blood. He
generally feels fine.

ASSESS/PLAN: (1) Ankylosing spondylitis - continues to
be present with partial remission with taking Indocin.
(2) Monitoring the side effects of Indocin. We will
check a CBC and liver panel.

I discussed with him about the additional benefit he
might get from addition of Azulfidine to his regimen
although all the pros and cons about that were ex-
plained. He is willing to give that a try. I put him
on Azulfidine 100 mg t.i.d. along with Indocin. I
brought it to his attention that in case he had con-
siderable improvement to the extent that he feels
better, he could decrease the Indocin by himself to
twice or once daily. He was cautioned that every other

DATE:_____ CHIEF COMPLAINT _____

AM STIFF _____ SLEEP _____ WELL BEING B W S

ACT OF DAILY    DRESS    BATHE    DRIVE    HWORK    CHAIR    CANE    WALKER    BUTT    DOOR

LIVING    HELP
          INDE

MED TOX    RASH    MULCER    ALOPECIA    COUGH    SOB    NAUSEA    DIAR    ABD PAIN    HA    EDEM
      YES
      NO

OTHER _____

| MUSCLES | NF | NE | D | B | T | W | WF | HF | HAB | HAD | KF | KE | APF | ADF | GTOE | INT | HAND |
|---------|----|----|----|----|----|----|----|----|-----|-----|----|----|-----|-----|------|-----|------|
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | | / |
| S/A | / | / | / | / | / | / | / | / | / | / | / | / | / | / | / | | / |

LN DEV    R_____ L_____ SN R_____ L_____ BOU R_____ L_____

BN    R_____ L_____ BOUC N R_____ L_____ GRIP R_____ L_____ REFLEX B T K A
                                                                                                   R
                                                                                                   L

RAY_____

ENT_____ LUNG_____ HEART_____ ABD_____ SKIN_____

THER_____

F/E PIPR |—|—|—|—|—|L|—|—|—|—| MCPR |—|—|—|—| L|—|—|—|

3-21-97-(cont)

him back in two months for re-evaluation.

Sohrab Fallahi/ef



E R__/__ L__/__
R R__/__ L__/__
E R__/__ L__/__
A R__/__ L__/__
/E R __/ __/
   L   /   /

RUFUS R. WOODLEY
INITIAL HISTORY AND PHYSICAL EXAMINATION:    11/21/96

This new patient is a 63-year-old white gentleman who was kindly
referred from Family Practice Clinic of Maxwell for office consultation.
The patient has the diagnosis of ankylosing spondylitis from the
air force in 1971 by a doctor whose name he has forgotten.    He
used to take Indocin for several years and then he took Coma for
a while.    Indocin was restarted a month ago because he was in
so much pain with stiffness and difficulty with his lower back.
Sometimes the pain gets so severe that he cannot climb down stairs.
He has gone to physical therapy and proper exercises were given.
He feels somewhat improved with that.    He has not taken any other
medicine.    He does have stiffness in the lower part of the back
lasting about two hours or so.    He has some pain in the bed.
The pain does not wake him up.

PAST MEDICAL HISTORY:    Negative for any surgery or major medical
problem.    He does not smoke or drink.    He is semi-retired and
is working as a general contractor and builds houses and on doing
so he has to lift and bend sometimes.

REVIEW OF SYSTEMS:    The details have been indicated in the chart.
Specifically he does not have any history of heart problems or
eye problems.

PHYSICAL EXAM:    He has no skin rash.    He is in good general condition
without any abnormality in the cardiopulmonary exam.    Chest is
clear.    His joints show no inflammatory arthritis, septic joint
or effusion.    He does have decreased motion of the lower part
of the back although chest expansion seems to be reasonably well-
preserved.    He brought an x-ray from his thoracic and lumbosacral
spine which did not have the AP pelvis in it.    I reviewed that.
In the upper spine in the thoracic spine he does have bamboo spine
although in the lower part of the back he does not have bambooing
of the spine.    Because he did not have AP of the pelvis with him
for me to see the sacroiliac joint, I did an AP pelvis today which
shows bilateral fusion of the sacroiliac joint typical for AS.
He does have diffuse osteopenia as well.    Sacral bone and hip
joints are fairly well-preserved.

ASSESSMENT:    (1) Ankylosing spondylitis.
                (2) Low back pain and stiffness due to that.
                (3) Evidence of osteoarthritis.

COUNSELLING/PLAN:    I discussed with him about the meanings of
ankylosing spondylitis and gene related, i.e. HLAB 27.    I advised
him to continue his Indocin.    However, I cautioned him carefully
about GI, liver problem and kidney problem that can happen with
any non-steroidal medicine in general.    I provided him with literature
to read about the side effects.    I put him on Cytotec to try 100
micrograms t.i.d. with meals with an explanation about the reason.
I gave him a brochure to read about methotrexate and Azulfidine
and explained the difference in the way these medications work

RE: Rufus R. Woodley
November 21, 1996
Page Two


vs the way NSAIDs work.  I advised him to continue his proper
regular exercises that have been provided by PT.  I checked a
diagnostic screen and rheumatoid profile today and checked B27
today.  I will see him back in four months for re-evaluation.


                              Sohrab Fallahi, M.D.


SF/ef

# James R. Lauridson, M.D.

528 Seminole Place

Montgomery, Alabama 36117

## Education

**Bachelor of Science** (electrical engineering), *with Special Honors*
University of Colorado Boulder, Colorado , May 1965

**Doctor of Medicine**, *summa cum laude*
University of Colorado School of Medicine Denver, Colorado, May, 1971

**Internal Medicine**
Bethesda Naval Hospital, Bethesda, Maryland, 1974 to 1977
**Pathology**
Stanford University, Stanford, California, 1971 to 1973. Anatomic pathology
Presbyterian Hospital, Denver, Colorado, 1983 to 1985. Anatomic and clinical pathology.
**Forensic Pathology**
Dade County Medical Examiner's Office, Miami, Florida, 1985 to 1986.

**Board Certification**
American Board of Internal Medicine, 1977
American Board of Pathology, Anatomic Pathology, 1985
American Board of Pathology, Forensic Pathology, 1986.

**Medical License**
**Alabama** (12621), 1986 (current)
**Florida** (003 7127), 1985(inactive)

Oklahoma (12080), 1979

Colorado (25450), 1983
New York (173618), 1988

California (23990), 1972

## Medical Practice

**Internal Medicine**
Staff Internist, Naval Hospital, Newport, Rhode Island, 1977-1979
Private Practice, Chickasha, Oklahoma, 1979-1980
Veterans Administration Hospital, Oklahoma City, Oklahoma, 1980-1982
Clinical Instructor in Medicine, University of Oklahoma School of Medicine, 1981-1982
Private Practice, Edmond, Oklahoma, 1982-1983
**Forensic Pathology**
*Associate Medical Examiner*, Dade County Medical Examiner's Office, Miami, Florida, 1985-1986
*Deputy Chief Medical Examiner*, Alabama Department of Forensic Sciences, Montgomery, Alabama, 1986 -2001



DEFENDANT'S EXHIBIT

39

*Consultant to Alabama Department of Forensic Sceinces,* Montgomery, Alabama, 2003 to 2005

*Chief Medical Examiner, Alabama Department of Forensic Sciences*, Montgomery, Alabama, 2005 to 2006

### Hospital Pathology Practice

**Southeast Alabama Medical Center,** Dothan, Alabama, 2007 to present.
**Flowers Hospital,** Dothan, Alabama, 2007 to present.
**Veterans Medical Center,** Montgomery, Alabama, 2007 to present.

## Medical Legal Illustration

*Founder and Member*, Nibbana Graphics, L.L.C., 1998 to present

*Director of Graphics*, Office of Prosecution Services, Alabama District Attorneys Association,  2001

*Director of Graphics*, Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., Montgomery, Alabama, 2001 to 2005

## Military Experience

*Lieutenant Colonel*, Medical Corps, U. S. Army Reserve, 1985-1993
*Lieutenant Commander,* Medical Corps, U.S. Navy, 1973-1979

### OTHER OFFICES:

*Chairperson*, Montgomery County Child Death Review Team, 1999 to 2001
*Member*, State of Alabama Child Death Review Team, 1998 to 2001 and 2003 to present

*Member*, Scientific Working Group on Imaging Technology, Federal Bureau of Investigation
*Member*, Commission on Continuing Education, Forensic Pathology, American Society of Clinical Pathologists, 1993-1994
*Member,* Check Sample Editorial Review Board, American Society of Clinical Pathologists, 1993-present

Invited Reviewer, "The Quarterly Update, reviews of current child abuse medical research," Robert M. Reece, executive editor, North Falmouth, Massachusetts

*Founder,* Nibbana Graphics, L.L.C.

## Professional Organizations

National Association of Medical Examiners
American Academy of Forensic Sciences, elected *Fellow*, 1997
National Association of Photoshop Professionals

## Academic Honorary Societies

Alpha Omega Alpha (medicine)
Et Kappa Nu (electrical engineering)
Tau Beta Pi (enqineering)

## Honors and Awards

Outstanding Employee for 1989, Region III Alabama Department of Forensic Sciences

Paul E. Shoffeitt Distinguished Service Award, 1992, Alabama Department of Forensic Sciences

C. J. Rehling Meritorious Service Certificate, 1993, Alabama Department of Forensic Sciences

C. J. Rehling Meritorious Service Certificate, 1994, Alabama Department of Forensic Sciences

C. J. Rehling Meritorious Service Certificate, 1995, Alabama Department of Forensic Sciences

C. J. Rehling Meritorious Service Certificate, 1998, Alabama Department of Forensic Sciences

C. J. Rehling Meritorious Service Certificate, 2001, Alabama Department of Forensic Sciences

## Publications

*Gilliland, M G. F.; Levin, Alex V. MD; Enzenauer, Robert W.; Smith, Charles; Parsons, M Andrew; Rorke-Adams, Lucy B.; Lauridson, James R.; La Roche, G Robert; Christmann, Linda M. MD; Mian, Marcellina; Jentzen, Jeffrey; Simons, Kenneth B.; Morad, Yair;*

*Alexander, Randell MD; Jenny, Carole MD; Wygnanski-Jaffe, Tamara,* " Guidelines for Postmortem Protocol for Ocular Investigation of Sudden Unexplained Infant Death and Suspected Physical Child Abuse," American Journal of Forensic Medicine & Pathology. 28(4):323-329, December 2007

*Lauridson, J, (panel moderator),* "Postmortem CT and MRI Imaging," Pediatric Abusive Head Trauma, Milton S. Hershey Medical Center, Hershey, Pennsylvania, July 12, 2007

*Lauridson, James R.,* Parrish, R. N,, "Use of Technology in Presenting Evidence," in Abusive Head Trauma in Infants and Children, Frasier, L, et. al., GW Medical Publishing, 2006.

*Lauridson, James,* Levin, A., Reece, R., "Shaken Baby Syndrome, A Visual Overview: Version 3.0, The National Center on Shaken Baby Syndrome, 2006
*Lauridson,* James R., Myers, Lawrence, "Evaluation of Fatal Dog Bites: The View of the Medical Excaminer and Animal Behaviorist---A Case Report," in Animal Law and Dog Behavior, Favre, D. and Borchelt, P.,(ed.), p. 325, Lawyers & Judges Publishing, 1999.

*Lauridson,* J., "Chylothorax and Child Abuse," Forensic Check Sample, FP-96-5, American Society of Clinical Pathologists, 1996
Embry, B., Embry, J., *Lauridson,* J.,"Missed Ectopic Pregnancies: A Report of Three Cases," Alabama Medicine, 63:13-16, March, 1994

*Lauridson,* James R., A Discussion of 'A Computer Program for the Estimation of Time of Death'," Letters to the Editor, J. Forensic Sciences, 39:601, May, 1994

*Lauridson,* James R., Myers, Lawerence, "Evaluation of Fatal Dog Bites: The View of the Medical Examiner and Animal Behaviorist," J. Forensic Sciences, 38:726-731, May, 1993.

*Lauridson,* James R., "Traumatic Occlusion of the Vertebral Artery," The American Society of Clinical Pathologists, Forensic Pathology Check Sample, FP 92-3 (FP-182), 1992.

*Lauridson,* James R., "Fatal Dog Bites," The American Society of Clinical Pathologists, Forensic Pathology Check Sample, FP 91-3, 33:3, 1991.

*Lauridson,* James R., Scheuerman, E. Hunt, "Unique Aspects of a New, Hand-Reloadable Ammunition," J. of Forensic Sciences, 35:987, July, 1990.

*Lauridson,* James R., "Sudden Death and Anomalous Origin of the Coronary Arteries from the Aorta, A case report and review," American Journal of Forensic Pathology and Medicine, 9(3):236, 1988.

*Lauridson,* James R., "Sudden Death and Anomalous Origin of the Coronary Arteries from the Aorta," Forensic Pathology Check Sample FP 89-2, The American Society of Clinical Pathologists, 1989.

*Lauridson*, James R., "The Importance of the Death Scene in SIDS Cases," The Alabama State Police Magazine, 2:29, April, 1989.

*Lauridson,* James R., "Neuroleptic Malignant Syndrome," The American Society of Clinical Pathologists, Forensic Pathology Check Sample FP 87-1, 1987.

*Lauridson,* James R., "Data Transmission Between Computers," Pathologist, April, 1985.

*Lauridson,* J.R., Rainer, W.G., Merrick, T.A., "The Dental Patient with Artificial Heart Valves," J. of Colorado Dental Association, p. 5, March/April, 1984.

Wolf, P.L., Kearns, T., Neuhoff, J., *Lauridson*, J.R., "Identification of CPK Isoenzyme MB in Myocardial Infarction," Laboratory Medicine, 5:48, 1974.

Pomerantz, M., Baumgartner, R., *Lauridson*, J., Eiseman, B., "Transthoracic Electrical Impedance for the Early Detection of PulmonarY Edema," Surgery, 66:260, 1969.

## Presentations to Professional Associations

Computer Graphics in Child Abuse, Sixth North American Conerence on Shaken Baby Syndrome, Park, City, Utah, September, 2006

Lauridson, J., Abusive Head Trauma,  invited speaker Prevent Child Abuse Alabama, Best Practices Conference,  July 23, 2004 Mobile, Alabama, and              August 3, 2004,  Birmingham, Alabama.

Regular seminars on court technology and trial graphics, The Alabama District Attorneys Association

*Lauridson*, J., Alexander, R., "Shaken Baby Syndrome," The Seventeenth National Symposium on Child Sexual Abuse, Huntsville, Alabama, march 15, 2001

*Lauridson*, J., "Graphics in Trial Presentation" Technology Conference Alabama Law Enforcement Technology Association, November, 2000

*Lauridson*, J., "Graphics and the Education of Police and Jurors in the Shaken Baby Syndrome," Third National Conference on Shaken Baby Syndrome, Salt Lake City, Utah, September 25, 2000

*Lauridson*, J., Cooper, S., Holmgren, B., "The Use of Computer Graphics in Physical Child Abuse," American Professional Society on the Abuse of Children, Annual Colloquium, Chicago, Illinois, July 13, 2000

*Lauridson*, J., "Closing Address," Southeastern Conference on Child Abuse, Hilton Head, South Carolina, May 15, 2000

*Lauridson*, J., Santoro, C., "Computer Graphics, Exhibits and Demonstrative Aids," 2000

Eastern Circuit Trial Counsel Conference, Eglin Air Force Base, April 6, 2000

*Lauridson*, J., "Forensic Pathology and Death Investigations," 2000 Eastern Circuit Trial Counsel Conference, Eglin Air Force Base, April 6, 2000

*Lauridson*, J., "Presenting Complex Concepts in Child Abuse to the Court and Lay Audiences," National Symposium on Child Sexual Abuse, Huntsville, Alabama, March 9, 2000

*Lauridson*, J., "The Use of Computer Animation In Homicide, Child Abuse and Violence Against Women Cases," Alabama District Attorneys Association, Winter Meeting, Birmingham, Alabama, January 7, 2000

Fierro, M., *Lauridson*, J., "Problems and Pitfalls in Forensic Pathology," American Society of Cilincal Pathologists, National Meeting, Fall, 1996, San Diego, California

Downs, J., *Lauridson*, J., Wanger, G., Riddick, L., "Sport Related Deaths in the Deep South," American Academy of Forensic Sciences, Nashville, February, 1996.

*Lauridson*, J., "Pitfalls in Forensic Pathology," American Society of Clinical Pathologists Teleconference, March, 1995.

Donoghue, E., *Lauridson*, J., "Problems and Pitfalls in Forensic Pathology," American Society of Clinical Pathologists National Meeting, Fall, 1994, Washington, D.C.

Hyde, D., *Lauridson*, J., "Skull Reconstruction Following Crush Injuries by Bulldozer-Was Murder for Insurance the Motive?" American Academy of Forensic Sciences, Boston, 1993.

*Lauridson*, J., Myers, L.,"Evalutaton of Fatal Dog Bites," American Academy of Forensic Sciences, New Orleans, La., February, 1992.

*Lauridson*, J., Myers, L., "Evaluation of a Fatal Dog Bite: Views of a Medical Examiner and a Behaviorist", Animal Behavior Society Meeting, Wilmington, N.C., June 1991

McChesney, Warren J., *Lauridson*, James R., "Multiple Stab Wound Suicides", American Academy of Forensic Sciences, Anaheim. California, February 1991.

Eldridge, Gary, *Lauridson*, James R., "Researching The Forensic Literature with Your Personal Computer", American Academy of Forensic Sciences, Anaheim, California, February 1991.

*Lauridson*, James R., "Comparison of Methods of Computerized Literature Searching," American Academy of Forensic Sciences, Pathology Section, Cincinnati, 1990.

*Lauridson*, James R., "Unique Aspects of Hand Reloadable Ammunition" American

Academy of Forensic Sciences, Pathology Section, Las Vegas, 1989.

*Lauridson*, James R., "Long-Term Wear Patterns in the Starr-Edwards Mitral Valve", Colorado Society of Clinical Pathology, 1985.

# Exhibit C

Deposition of Silvio Papapietro, M.D.  WOODLEY vs. PFG-LESTER  November 7, 2007

Case 2:07-cv-00074-WHA-TFM  Document 43-4  Filed 04/04/2008  Page 2 of 26

Page 1

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3            NORTHERN DIVISION
4
5   LILLIAN WOODLEY as the
    administratrix of the Estate of
    RUFUS WOODLEY,
6
        Plaintiffs,
7
    vs.              CIVIL ACTION NO.
8                    2:07cv74-ID
9   PFG-LESTER BROADLINE,
    INC.; KENNETH O. LESTER
10  COMPANY, INC.,
11      Defendants.
12
13
        * * * * * * * * * * * *
14
15      VIDEO DEPOSITION OF SILVIO PAPAPIETRO, M.D.,
16  taken pursuant to stipulation and agreement before
17  Julie A. Duncan, Certified Court Reporter and
18  Commissioner for the State of Alabama at Large, at the
19  Offices of Silvio E. Papapietro, M.D., 1808 7th Avenue
20  South, Boshell Diabetes Building, Suite 383,
21  Birmingham, Alabama, on Wednesday, November 7, 2007,
22  commencing at approximately 4:00 p.m.
23      * * * * * * * * * * * *

Page 2

1            APPEARANCES
2   ON BEHALF OF THE PLAINTIFFS:
3   Mr. Michael J. Crow
    BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES
4   Attorneys at Law
    218 Commerce Street
5   Montgomery, Alabama 36104
6   ON BEHALF OF THE DEFENDANTS:
7   Mr. William C. Wood
    Mr. William McKenzie
8   NORMAN, WOOD, KENDRICK AND TURNER
    Attorneys at Law
9   Financial Center, Suite 1600
    505 Twentieth Street North
10  Birmingham, Alabama 35203
11  VIDEOGRAPHER:
12  Mr. John M. Harris
    EXECUTIVE VIDEO PRODUCTIONS
13  Post Office Box 680306
    Prattville, Alabama 36068
14
15
        * * * * * * * * * * * *
16
17      EXAMINATION INDEX
18
    SILVIO PAPAPIETRO, M.D.
19
    DIRECT BY MR. CROW . . . . . . . . . . 6
20  CROSS BY MR. WOOD . . . . . . . . . . 24
    REDIRECT BY MR. CROW . . . . . . . . 92
21
22
23      * * * * * * * * * * * *

Page 3

1           EXHIBIT INDEX
2   DEPOSITION EXHIBIT              MAR
3    1   Alabama Certificate of Death    21
4    2   Medical Record, 1/16/02, John A. Williams,   25
         M.D.
5
6    3   Cardiolite Thallium Stress Test, 7/22/03,   26
         John A. Williams, M.D.; Nuclear Images,
7        Howard L. Brazil, M.D.
8    4   Cardiac Catheterization, 7/29/2003, John A.   30
         Williams, M.D.
9    5   Medical Record, 08/05/2003, John A.   38
         Williams, M.D.
10
     6   Graded Exercise Test, 08/05/2003, Dr. John A.   40
11       Williams, M.D.
12   7   Cardiac Catheterization, Date of Procedure:   42
         8/19/03
13
     8   Medical Record, 08/19/2003, John A.   46
14       Williams, M.D.
15   9   Medical Record, Jackson Hospital & Clinic,   48
         Admit Date: August 19, 2003
16
     10  Medical Record, 08/26/2003, John A.   50
17       Williams, M.D.
18   11  Medical Record, 09/23/2003, John A.   52
         Williams, M.D.
19
     12  Medical Record, 01/27/2004, John A.   54
20       Williams, M.D.
     13  Cardiolite Thallium Stress Test, 06/01/04,   56
21       John A. Williams, M.D.; Nuclear Images,
22       Howard L. Brazil, M.D.
23

Page 4

1           EXHIBIT INDEX
2                    MAR
    DEPOSITION EXHIBITS
3
     14  Cardiolite Thallium Stress Test, 01/10/06,   58
4        John A. Williams, M.D.; Nuclear Images,
         Howard L. Brazil, M.D.
5
     15  Medical Record, 07/11/2006, John A.   60
6        Williams, M.D.
7    16  Medical Record, Final Sample Report,   61
         06/15/05, Bridger Lab - Prattville
8
     17  UAB University Hospital, History, Physical   64
9        Examination and Progress Notes, 8/30/06
10   18  UAB Hospital, Radiology, US Lower Extremity   67
         Veins Bilateral, 8/30/2006
11
     19  UAB University Hospital, History, Physical   69
12       Examination and Progress Notes, 8/31/2006
13   20  UAB University Hospital, History, Physical   74
         Examination and Progress Notes, 8/31/2006
14
     21  UAB University Hospital,   80
15       TICU/BICU/SICU/TBICU Flowsheets, etc.
16   22  Seven-Day Medications Summary   84
17   23  Catheterization Summary, 8/31/2006   85
18   24  UAB University Hospital, History, Physical   88
         Examination and Progress Notes, 9/1/06
19
     25  UAB University Hospital, History, Physical   89
20       Examination and Progress Notes, 9/1/06
21
22      * * * * * * * * * * * * *
23

Page 5

1          STIPULATION
2      It is hereby stipulated and agreed by and
3  between counsel representing the parties that the
4  deposition of SILVIO PAPAPIETRO, M.D. is taken
5  pursuant to the Federal Rules of Civil Procedure and
6  that said deposition may be taken before Julie A.
7  Duncan, Court Reporter and Commissioner for the State
8  of Alabama at Large, without the formality of a
9  commission, that objections to questions other than
10  objections as to the form of the question need not be
11  made at this time but may be reserved for a ruling at
12  such time as the said deposition may be offered in
13  evidence or used for any other purpose by either party
14  provided for by the Statute.
15      It is further stipulated and agreed by and
16  between counsel representing the parties in this case
17  that the filing of said deposition is hereby waived
18  and may be introduced at the trial of this case or
19  used in any other manner by either party hereto
20  provided for by the Statute regardless of the waiving
21  of the filing of the same.
22      It is further stipulated and agreed by and
23  between the parties hereto and the witness that the

Page 6

1  signature of the witness to this deposition is hereby
2  waived.
3
4      * * * * * * * * * * * *
5
6        SILVIO PAPAPIETRO, M.D.
7      The witness, after having first been duly sworn
8  to speak the truth, the whole truth and nothing but
9  the truth testified as follows:
10        DIRECT EXAMINATION
11  BY MR. CROW:
12  Q.  If you will, state your name for us, please.
13  A.  My name is Silvio Papapietro.
14  Q.  And what is your profession, Mr. Papapietro?
15  A.  I'm a cardiologist physician.
16  Q.  Okay.  Where do you practice medicine?
17  A.  At UAB in Birmingham.
18  Q.  How long have you practiced medicine at UAB?
19  A.  Well, I practiced initially here between 1976
20     and 1981, and then I went into private
21     practice in Birmingham and came back to UAB in
22     2004.
23  Q.  And during the time that you were away from

Page 7

1     UAB, from '81 to 2004, you had a private
2     practice in cardiology?
3  A.  Yes.
4  Q.  I assume you're licensed to practice medicine
5     in the state of Alabama?
6  A.  Yes.
7  Q.  Are you licensed in any other states?
8  A.  I have an inactive license in the District of
9     Columbia that I haven't used.
10  Q.  And, if you will, just give us a little bit of
11     your educational background history, where you
12     went to college, medical school, residencies,
13     interns.
14  A.  I am originally from Chile.  I went to the
15     University of Chile Medical School.  I
16     graduated in 1972.  I came to the United
17     States in 1973 and did my internship at the
18     Memorial Hospital in Worcester,
19     Massachusetts.  I did my internal medicine
20     residency at the University of Alabama Service
21     in Montgomery and University of Oklahoma in
22     Oklahoma City.  Then I came for cardiology
23     training at UAB in 1976.  I did two years of

Page 8

1     fellowship, and then I stayed on faculty until
2     1981.
3  Q.  And you've been in the Birmingham area since
4     1976?
5  A.  '76.
6  Q.  And are you board certified in cardiology?
7  A.  Yes.
8  Q.  If you will, just tell us a little bit about
9     what board certification is and how one
10     obtains that.
11  A.  Well, board certification is a -- basically, a
12     test that a physician takes after some years
13     of training in a given speciality.  And it's,
14     I think, a way to certify some degree of
15     competence in the area.
16  Q.  And did I understand you -- did you teach at
17     the medical school here at UAB for a while, or
18     do you still?
19  A.  Yes, I do.  And I did years ago when I was
20     here.
21  Q.  Okay.  We're here today to ask you some
22     questions about a patient that was here at
23     UAB, which I think you did a little treatment

Page 9

1    on.
2    A.  Yes.
3    Q.  A fellow named Rufus Woodley. And I will ask
4        you if you had a chance to see and treat
5        Mr. Woodley back in August of 2006.
6    A.  That's correct.
7    Q.  Okay. Tell me how you got involved with
8        Mr. Woodley initially.
9    A.  Well, I was -- I work in the -- I'm an
10       interventional cardiologist. I do cardiac
11       procedures, arteriograms and interventions.
12       So I was working the -- in the catheterization
13       laboratory. And on August 31st, 2006, you
14       know, I was told that Mr. Woodley was having a
15       severe heart attack, that he was critically
16       ill. And the normal procedure in a situation
17       like that is to do an emergent arteriogram to
18       determine if there's an artery that is
19       closed. Because if that artery can be opened
20       quickly, that's the best treatment for a heart
21       attack. So that's how I became acquainted
22       with Mr. Woodley.
23   Q.  Did you perform some procedures on Mr. Woodley

Page 10

1        back on August the 31st of 2006?
2    A.  Yes.
3    Q.  And tell us what those procedures were.
4    A.  Well, I performed a heart catheterization. We
5        performed coronary arteriograms. We performed
6        a percutaneous coronary intervention. We
7        opened up an artery that was completely
8        blocked. We placed a coronary stent in the
9        artery with the blockage, and we also --
10       because he was very ill with his low heart
11       rate and low blood pressure, we inserted a
12       temporary pacemaker, a temporary pacing
13       electrode. And we inserted an intra-aortic
14       balloon.
15   Q.  Tell us what the purpose of the heart
16       catheterization was.
17   A.  Well, the purpose was to -- we suspected --
18       based on what had happened to him at the
19       electrocardiogram, we suspected that he had a
20       blockage in one of the major arteries. So the
21       purpose of the arteriogram was to confirm
22       there was a blockage, or more than one
23       blockage, and then, if that was the case, to

Page 11

1        try to open up the blockage and restore blood
2        flow.
3    Q.  And were you successful in opening up the
4        blockage?
5    A.  Yes.
6    Q.  You had mentioned that he was critically ill.
7        Do you know what precipitated him being
8        critically ill?
9    A.  Well, I know that -- you know, that he had
10       been in the hospital for some period of time,
11       that he had sustained a motor vehicle
12       accident, that he had had some cervical spine
13       fractures, and that he had had severe neurologic
14       damage from the surgical fractures.
15           And then, you know, the day -- I think it
16       was the day he was actually being
17       discharged -- if I am correct, although, I may
18       not be certain, but I believe they were in the
19       process of making plans to transfer him to a
20       rehabilitation center -- he -- he became
21       acutely ill. And I'm going by the records --
22   Q.  Right.
23   A.  -- of Dr. James Allred, who is a cardiology

Page 12

1        fellow here. You know, Dr. Allred noted that
2        at ten p.m. on that evening, August 31st,
3        he -- the patient became acutely ill,
4        developed respiratory arrest, required
5        intubation, that means, you know, he had to --
6        he had to put a tube in his trachea and
7        support his breathing. His blood pressure
8        dropped. And an EKG, an electrocardiogram,
9        was consistent with an evolving inferior
10       lateral heart attack.
11           So that's, basically, what developed that
12       prompted him to be transferred to the
13       catheterization laboratory a few hours later.
14   Q.  Okay. And was it your understanding that
15       Mr. Woodley had a spinal cord injury?
16   A.  Yes.
17   Q.  Okay. And what kind of complications as far
18       as -- can someone have with a spinal cord
19       injury that may affect their heart or their
20       blood pressure? What kind of signs would you
21       be looking for? What kind of complications
22       would a person have?
23   A.  Well, I -- you know, that's more in the domain

Page 13

1 of the neurosurgeon --
2 Q. Right.
3 A. -- you know. But in general, you know,
4 anybody who -- you know, I guess you're going
5 to have to rephrase the question --
6 Q. Yes.
7 A. -- because --
8 Q. All right. Well, let me ask you this. When
9 somebody has a spinal cord injury, would that
10 affect their blood pressure?
11 A. Yes, it certainly can.
12 Q. All right. And can it affect the fluids of a
13 person's body?
14 A. A spinal cord injury, I -- I think so. But,
15 again, I'm not a -- you know, I'm not a
16 neurosurgeon, so --
17 Q. Right. Right.
18 A. -- those are questions that I think are better
19 answered by a neurosurgeon --
20 Q. Okay.
21 A. -- in terms of what a --
22 Q. Okay.
23 A. -- spinal cord injury can do --

Page 14

1 Q. What about the --
2 A. -- to fluid volume.
3 Q. I noticed in looking at the records there was
4 some concern about Mr. Woodley's mean arterial
5 pressure, or MAP?
6 A. That was when? At the time of the heart
7 attack or --
8 Q. No. Prior -- prior to that time.
9 A. Okay.
10 Q. A couple days prior to that. And there was
11 some notations that they didn't want the mean
12 arterial pressure to drop below a certain
13 number, I think seventy.
14 Can you tell us what the mean arterial
15 pressure is?
16 A. Well, the mean arterial pressure,
17 technically -- technically, is the diastolic
18 blood pressure plus one-third of the pulse
19 pressure. And that's a technical answer.
20 What it actually means is -- it's
21 difficult to put this in lay terms. It is --
22 if the cardiovascular system became
23 stationary, it would be the great inner

Page 15

1 pressure that drives the circulation between
2 the arterial and the venous system. It is --
3 it is basically a number that gives us an idea
4 of what the perfusion pressure of the tissues
5 of the body is.
6 Q. And when you're talking about perfusion,
7 you're talking about the blood flow through
8 the system?
9 A. That's correct.
10 Q. Okay. And when that blood flow gets below a
11 certain number, does it become critical in
12 some -- in patients?
13 A. It may, yes.
14 Q. Okay. And what is, generally, that -- that
15 number?
16 A. Well, it varies from situation to situation,
17 from patient to patient. But, you know, a
18 normal mean blood pressure usually is about --
19 anywhere between seventy, eighty, eighty-five
20 millimeters of mercury. But, again, it varies
21 considerably depending on circumstances.
22 Q. And does it -- when it gets below a certain
23 number, does that cause a problem with the

Page 16

1 blood flow to the major organs of the body?
2 A. Yes, it may.
3 Q. Okay. And when a person like Mr. Woodley, who
4 has had a history of coronary problems -- when
5 his blood -- mean blood arterial pressure gets
6 below a certain number, would that be critical
7 to him?
8 A. Well, it could be certainly.
9 Q. And -- well, I noticed one of the terms in
10 there that Dr. Allred used. It said he had a
11 cardiogenic shock. Can you tell us what
12 cardiogenic shock is?
13 A. Yes. Cardiogenic shock -- shock, in general,
14 means that the cardiovascular system is
15 failing and there's inadequate blood pressure
16 to profuse the tissues. Now, that can be due
17 to different things. An infection can cause
18 shock. Bleeding can cause shock. Cardiogenic
19 shock refers specifically to the fact that the
20 shock is due to the failure of the -- of the
21 heart.
22 Q. I noticed in the records after you performed
23 your catheterization -- Mr. Woodley lived for

(Pages 13 to 16)

Page 17

1    a period of time after that. I think,
2    approximately, twelve or fourteen hours before
3    he passed away. There was some notations in
4    there that he developed hypotension. What --
5    can you tell us what hypotension --
6  A.  Well, he actually developed the hypotension
7    before, I think, when he developed the heart
8    attack. Because when -- when he came to the
9    catheterization laboratory, his blood pressure
10    was approximately sixty-two over thirty-nine.
11    That is very low. And this -- you know, in
12    spite of opening up the artery and putting an
13    intra-aortic balloon, his blood pressure
14    remained low and never really actually
15    normalized.
16  Q.  Sure. Did you -- I know that my office sent
17    you some records. Did you receive any of the
18    records of Mr. Woodley's cardiologist in
19    Montgomery, Dr. Williams?
20  A.  Yes. I have -- I think that this was sent
21    also by your office.
22  Q.  Right.
23  A.  Yes.

Page 18

1  Q.  And I just was going to ask you about -- did
2    you have a chance to review that and see what
3    his kind of condition was prior to August
4    the 18th of 2006?
5        MR. WOOD: What records are those?
6        MR. CROW: Dr. Williams.
7        John Williams.
8        MR. WOOD: Thank you.
9  A.  I looked at this briefly before this
10    deposition.
11  Q.  Right.
12  A.  But not in detail.
13  Q.  Okay. Well, it looks like he had the two
14    visits prior to the car wreck. One would have
15    been on July the 11th, 2006. And one -- and
16    the one prior to that would have been January
17    the 10th of '06.
18  A.  You can -- maybe you can find it for me.
19  Q.  Yes, let me see if I can find those for you.
20  A.  Okay. There's one on July here, July 29.
21  Q.  The one I was looking at -- I don't know if
22    it's -- I thought it was dictated on July the
23    11th.

Page 19

1  A.  Okay.
2  Q.  And it looks like when Mr. Woodley saw
3    Dr. Williams on July the 11th of '06 that he
4    was asymptomatic, didn't have any problems,
5    and he had a regular heartbeat and regular
6    rhythm.
7  A.  Based on Dr. Williams' note, that's the case.
8    Yes.
9  Q.  Right.
10  A.  It says, asymptomatic, regular rate and
11    rhythm.
12  Q.  And then on the record following that I think
13    he shows that he had a stress test done on
14    January the 10th of '06?
15  A.  Yes.
16  Q.  EKG was normal. And they put him on a stress
17    test, for about nine minutes on a treadmill
18    and got his heart rate up to about a hundred
19    and thirty?
20  A.  Yes. It says, nine minutes on the Bruce
21    protocol achieving a heart rate of one hundred
22    and thirty beats per minute. No chest pain or
23    EKG changes. That's correct.

Page 20

1  Q.  Okay. I guess the question is --
2    Dr. Papapietro, is whether or not, in your
3    opinion, the spinal cord injury that
4    Mr. Woodley sustained on August the 18th in
5    this car wreck contributed to his death on
6    September 1 while he was here?
7        MR. WOOD: Objection to form.
8  Q.  And you can answer, if you understand my
9    question.
10  A.  I understand the question. You know, he -- he
11    appears -- he died from a -- from a large
12    heart attack.
13  Q.  Right.
14  A.  And I don't really know, or at least I don't
15    have any evidence one way or the other, if the
16    heart attack was precipitated by the events
17    that preceded the heart attack. I mean, it is
18    certainly possible that, you know, the spinal
19    cord injury, the transient low blood pressure
20    could have precipitated the heart attack; but
21    it's also possible that the heart attack could
22    have developed regardless, or it could have
23    happened even if he had not had a spinal cord

Page 21

1  injury. I mean, it's very difficult to tell.
2  In fact, I don't have any way of knowing one
3  way or the other, you know, if this is the
4  case.
5  Q. Right. Well, he had been -- he had been about
6  three years with any kind of -- without any
7  kind of heart problem prior to this injury,
8  had had a stable heart condition. And then he
9  has this traumatic event where he has the
10  spinal cord injury.
11  MR. WOOD: Object to form.
12  Q. And I guess the question would be whether or
13  not, based on what you know, that that spinal
14  cord injury contributed to his death in any
15  way.
16  A. I don't know that.
17  (Exhibit Number 1 marked for
18  identification.)
19  Q. Let me show you what I'll mark as Exhibit 1,
20  which is the death certificate. And it's
21  signed by an Alison Rome. Is she a doctor
22  here?
23  A. I don't know.

Page 22

1  Q. You don't know?
2  A. I presume she is.
3  Q. Okay. And she lists the cause of death as
4  myocardial infarction.
5  A. Uh-huh (positive response).
6  Q. And that's a heart attack, right?
7  A. That's correct.
8  Q. And then she also lists due to the consequence
9  of hypotension, which is low blood pressure?
10  A. That's correct.
11  MR. WOOD: Can I look at that for a
12  minute?
13  MR. CROW: Sure.
14  Q. And then she also says, as a consequence of
15  cardiogenic shock, which you told us is a
16  condition that can be brought on by other
17  things and a heart attack?
18  A. That's correct.
19  Q. And then she also says, a consequence of renal
20  failure. And then in the next line it says,
21  part B, other significant conditions
22  contributing to the death resulting in the
23  underlying cause given in part one. There's a

Page 23

1  compression wedge fracture of C7 and
2  subluxation of the C6 and 7, HTN.
3  A. Hypertension, I think.
4  Q. Okay. So at least Dr. Rome thinks that in
5  some way that the spinal fracture injury
6  contributed to Mr. Woodley's death --
7  MR. WOOD: Objection to form.
8  Q. -- based on the death certificate?
9  MR. WOOD: Objection to form.
10  Q. You can --
11  MR. WOOD: The document speaks for
12  itself.
13  Q. All right. You can answer, if you
14  understand.
15  A. Yeah. I mean, I'm reading the --
16  Q. Sure.
17  A. -- the report. I mean -- yes, the question --
18  I mean, it depends -- the question is, did he
19  die of a heart attack? The answer is yes. I
20  don't have any --
21  Q. Right.
22  A. Obviously, he died of a large heart attack.
23  Q. Right.

Page 24

1  A. But your question, I understood, was the heart
2  attack caused or the result of the spinal cord
3  injury?
4  Q. Well, did the spinal cord injury contribute in
5  any way to his heart -- the heart attack --
6  A. I don't know.
7  Q. -- and the other causes or -- that are listed
8  on the death certificate?
9  A. I don't know. I don't have any way of proving
10  or disproving that the spinal cord injury
11  contributed. It might have contributed.
12  Q. It could have, but you just don't know?
13  A. I don't know. It might have contributed. It
14  might not have contributed.
15  Q. All right.
16  MR. CROW: I believe that's all the
17  questions I've got, Doctor.
18  Mr. Wood might have some
19  questions for you.
20  CROSS-EXAMINATION
21  BY MR. WOOD:
22  Q. Doctor, I'm going to show you what I have
23  marked as some records concerning this

Page 25

1   patient.
2        MR. WOOD: What is our next exhibit,
3        ma'am, Number 2?
4        COURT REPORTER: 2.
5        MR. CROW: 2.
6        (Exhibit Number 2 marked for
7        identification.)
8   Q.  I'm going to show you what I'm going to mark
9        as Exhibit 2. And I'll identify that to you
10       as a page from Dr. Williams' records. It
11       looks like this man had pain radiating down
12       his arms waking him at night. This was back
13       on January 16th of 2002. The record -- it
14       says there, it sounds anginal at this time.
15            What does that term mean, anginal?
16   A.  Well, anginal or anginal means that -- implies
17       that the pain is coming from the heart, that
18       is heart pain due to inadequate blood flow to
19       the heart.
20   Q.  All right. And that was in 2002; is that
21       right?
22   A.  I'm looking for the date here. Yes,
23       January 16th, 2002 dictated.

Page 26

1        (Exhibit Number 3 marked for
2        identification.)
3   Q.  All right, sir. I'm going to show you what
4        I'm marking as Exhibit 3, which is also from
5        Dr. Williams' records. It looks to be a
6        record dated July 23rd of 2003 indicating
7        Mr. Woodley returned to Dr. Williams' office
8        and had a cardiolite thallium stress test.
9            Tell me, what is a cardiolite thallium
10       stress test, please, sir.
11   A.  It's a nuclear medicine test where the patient
12       is stressed with exercise and then a
13       radioactive material is injected. And this
14       radioactive material -- it distributes in the
15       heart muscle, and the distribution of the
16       material is in relation to the amount of blood
17       flow. So it's a way of evaluating if the
18       blood flow to the patient's heart is adequate
19       or not.
20   Q.  Is that a test that is performed on patients
21       who are indicating possible heart problems?
22   A.  Yeah. It's frequently performed, yes.
23   Q.  I notice up there under assessment it says,

Page 27

1        only minor ST segment changes were noted.
2            Tell me, what is an ST change?
3   A.  An ST -- ST segment is a segment of the
4        electrocardiogram. It's part of what we call
5        the Q-R-S-T --
6   Q.  Yes, sir.
7   A.  -- segment of the electrocardiogram. And
8        it's -- when the ST segments are displaced
9        downwards, usually it's a manifestation of
10       ischemia. So it's a -- it's a parameter that
11       we follow when somebody is being exercised to
12       help determine if the patient has inadequate
13       blood flow.
14            Usually, you know, if somebody has
15       inadequate blood flow to a portion of their
16       heart on a treadmill test, it will lead to a
17       depression or a downward movement of the ST
18       segment.
19            So this -- the greater the degree of
20       ischemia -- in other words, the more -- the
21       greater the inadequate blood flow, the greater
22       the magnitude of the ST segment dropping. So
23       it's an electrocardiographic marker of

Page 28

1        inadequate blood flow.
2   Q.  Is an ST change also a marker of an infarction
3        or a heart attack?
4   A.  It may be. If the degree of ischemia is
5        severe enough, it can lead to myocardial
6        damage, and that's a heart attack.
7   Q.  Looking at that same document, Exhibit 3,
8        conclusion 4 states, thallium images
9        demonstrate some evidence of reversible
10       ischemia. And I believe you used the word
11       ischemia a minute ago. Help me with the
12       definition of ischemia.
13   A.  Well, ischemia is inadequate blood flow to a
14       portion of the heart muscle.
15   Q.  Is that damage, but not necessarily death of
16       tissue?
17   A.  That's correct. I mean, it's a -- it's a
18       transient event. It means that there's
19       inadequate blood flow under stress. And then,
20       you know, it's reversible, meaning that
21       there's no permanent damage.
22   Q.  Looking further down, under the nuclear
23       images, the report shows, stress images show a

Page 29

1  small to moderate inferior wall perfusion
2  deficit, which has some filling in the --
3  filling in on the rest of the picture
4  suggesting on -- on the rest picture, excuse
5  me, suggesting a small amount of ischemia. Is
6  that, again, confirmation, perhaps?
7  A.  Yes. This suggests the same thing.
8  Q.  Yes, sir. And that's the perfusion that you
9  were talking about just a minute ago?
10  A.  That's correct.
11  Q.  Down there under conclusion -- help me
12  understand. The first conclusion is small
13  inferior ischemia. And you've told us about
14  that; is that correct?
15  A.  Yes.
16  Q.  The second one is a small interior infarction.
17  A.  Inferior infarction.
18  Q.  Now, an infarction is actual death of heart
19  tissue; is that --
20  A.  That's correct.
21  Q.  And that would be caused by a heart attack?
22  A.  Yes, it could be.
23  Q.  Generally, is that what causes that?

Page 30

1  A.  Well, this -- this is actually the
2  manifestation of a small heart attack.
3  Q.  All right. So the indication here then is
4  that the man has had a small heart attack
5  already?
6  A.  That's -- this is what the test would
7  suggest.
8  Q.  Thank you, sir.
9         (Exhibit Number 4 marked for
10        identification.)
11  Q.  Let me now ask you -- he was scheduled for a
12  cardiac catheterization on July 29, 2003. And
13  I'm going to show you what has been marked as
14  Exhibit 4. Again, that is from Dr. Williams'
15  records. Would that have been -- would that
16  be something that you might find would be
17  scheduled because of the findings on the
18  stress test that you saw in Exhibit 6 -- in
19  Exhibit 3?
20  A.  Yes.
21  Q.  All right, sir. Please explain to us what
22  cardiac catheterization is, or an
23  arteriogram.

Page 31

1  A.  Well, cardiac catheterization is a procedure
2  by which we introduce a small plastic tube, a
3  little flexible catheter from the arteries or
4  veins usually in the -- in the groin area.
5  And it's advanced to the heart and positioned
6  at the origin of the arteries that supply
7  blood to the heart, so-called coronary
8  arteries. And dye is injected -- a contrast
9  is injected. This is done under x-ray
10  equipment so that we can take pictures of the
11  arteries that supply blood to the heart and
12  also, you know, can measure the pressures
13  inside the heart and take pictures of the
14  various cardiac chambers.
15  Q.  All right, sir. Now, Exhibit 4 appears to
16  be -- a catheterization and an arteriogram,
17  are those terms interchangeable?
18  A.  Yes, pretty much.
19  Q.  Exhibit 4 is a report of that catheterization
20  or arteriogram procedure, July 29, 2003. Help
21  me understand some of what is written to us
22  there. The -- I read there under -- down
23  there under -- the result marked B, left

Page 32

1  anterior descending artery. Among other
2  things it says, irregularities of
3  approximately fifty percent stenosis. Tell
4  me, please, sir, what does that mean?
5  A.  Stenosis is -- means the narrowing --
6  Q.  Yes, sir.
7  A.  -- of the -- of the -- the opening of the
8  blood vessels. So that means that there was a
9  fifty-percent narrowing in the left anterior
10  descending artery. That is the main artery
11  that supplies the front of the heart.
12  Q.  That's one of the three main arteries that
13  supply blood to the heart?
14  A.  That's correct.
15  Q.  And fifty percent of this man's blood flow
16  through that artery was gone?
17  A.  No. No. It doesn't mean that fifty percent
18  of the blood flow is gone. It means that
19  there's a fifty percent reduction in the
20  diameter of the artery. Your flow may still
21  be normal --
22  Q.  Yes, sir.
23  A.  -- with a fifty-percent narrowing.

Page 33

1  Q.  Is that -- that's not a desirable condition
2      though, is it?
3  A.  Of course not.
4  Q.  And what would -- what could that lead to?
5  A.  Well, it could lead to several things. It
6      could be -- lead to nothing, if it stays like
7      that and nothing changes. The patient may
8      lead a normal life with a fifty-percent
9      narrowing. It could gradually become more
10     severe and, you know, lead to an eighty or
11     ninety percent stenosis or narrowing that
12     could actually impair blood flow, or it can
13     abruptly close. Some of these blockages can
14     develop a blood clot, and you can go from
15     fifty percent to a hundred percent abruptly
16     and lead to a heart attack.
17 Q.  All right, sir. Take a look, please, at the
18     second page of Exhibit 4, please, sir.
19     There's a finding there that this man had in
20     his right coronary artery an ulcerated and
21     calcified plaque. Tell me -- tell me, please,
22     sir, what that means.
23 A.  Well, it means -- plaque is, basically, the

Page 34

1      deposit of cholesterol and scar tissue that
2      leads to a narrowing of the artery.
3  Q.  Yes, sir.
4  A.  So he had fifty percent plaque in the other
5      artery. Now, in the right coronary artery,
6      there's the artery that supplies blood to the
7      right side of the heart on the bottom. He
8      describes a plaque that is calcified.
9      Calcified means simply that this calcium --
10     the position in the plaque. It usually means
11     that it's an old plaque that has got some bony
12     formation. An ulceration -- it's sort of an
13     ominous sign in the sense that it means that
14     the plaque had been -- has eroded. And these
15     are plaques that are at high risk for
16     developing a blood clot and closing.
17 Q.  All right. Tell me what that last sentence
18     communicates to you as a doctor, the artery
19     was quite tortuous in mid portion. What does
20     that mean?
21 A.  That means simply that the artery was not a
22     straight artery that had -- you know, it
23     looked like a zigzag or a -- it had many

Page 35

1      curves. That's an important -- for those of
2      us who do intervention, that tells that it may
3      be difficult to perform a procedure. I think
4      that's what he was alluding to.
5  Q.  Thank you, sir.
6          Now, the report also shows some
7      conclusions there. And the first one, it
8      reports coronary artery disease in a single
9      vessel and scattered disease in the left
10     system; is that correct?
11 A.  That's correct.
12 Q.  And then the next sentence says, right
13     coronary artery demonstrated two areas of
14     significant stenosis.
15         Is that what we were talking about just a
16     minute ago?
17 A.  Yes. He's now talking about two areas of
18     narrowing.
19 Q.  Yes, sir. And then in that last part, last
20     conclusion, the second one that he's got
21     there, there was a stent deployment. Tell us
22     what that means, stent.
23 A.  Well, a stent is a -- it's a metal device

Page 36

1      that -- it's -- it's got the shape of a
2      little -- tiny little tube.
3  Q.  Yes, sir.
4  A.  It sort of looks like the spring in a ball --
5      in a ball point pen. And it's usually made
6      out of stainless steel. And it's delivered in
7      the area of the narrowing and expanded to push
8      this plaque away and open up the -- the
9      artery.
10 Q.  Yes, sir. Was -- but, apparently, the way I
11     read the -- and help me understand this note.
12     Apparently, they couldn't get the stent into
13     the place where they really wanted to get it.
14     Is that -- the stent would -- why it's not
15     advanced into the distal to mid portion?
16 A.  Let me read the procedure note on the previous
17     page. It says, the ulcerated plaque in the
18     mid portion of the right coronary was easily
19     identified. Through the guider, a zero point
20     zero one four wire was placed into the distal
21     right over which a Cypher stent, eighteen
22     millimeter, was deployed and dilated.
23     Following the procedure, post dilation was

Page 37

1    obtained and the resulting stenosis was
2    negligible in the mid portion. However,
3    distal to -- distal to that, a less than
4    optimal result was obtained due to
5    calcification and tortuosity of the artery.
6        So I think what he is describing is that
7    due to the fact that the artery was calcified,
8    meaning there was bony, very, very hard --
9    this is literally like feeling a bone -- and
10   that the artery was also tortuous -- it was
11   not straight -- it was technically difficult
12   to position the stent where he wanted to. And
13   it was difficult to expand the stent to have
14   an optimal result.
15       So this was, obviously, a difficult
16   procedure; and he was not totally satisfied
17   with the result.
18  Q.  This is -- this is a surgical procedure, isn't
19   it?
20  A.  Well, it's done by a cardiologist. It's
21   done -- it's not surgical in the sense that
22   there's no cutting going on. It's all done
23   from the groin with a -- through a tiny little

Page 38

1    hole.
2  Q.  Yes, sir. But in the sense -- but it's
3   classified as a surgical procedure, is it not?
4  A.  I guess so. I don't really know. In terms of
5   payment and insurance, I think it's classified
6   as a surgical procedure. We consider it a
7   non-surgical procedure.
8      (Exhibit Number 5 marked for
9      identification.)
10  Q.  All right. I'll show you what I've marked as
11   Exhibit 5. And looking at Exhibit 5, it
12   appears that on August 5th of 2003
13   Mr. Woodley returned to Dr. Williams' office
14   with complaints of chest pain when he was
15   exercising and right arm pain. Do you see
16   that there --
17  A.  Yes.
18  Q.  -- his complaint? Is that likely related to
19   his coronary condition?
20  A.  Yes. Based on his impression, yes.
21  Q.  And reports that he had angioplasty last
22   week. That's the procedure you -- we just
23   talked about?

Page 39

1  A.  That's correct.
2  Q.  And he's in now for follow-up after the
3   less-than-optimal result, which you discussed
4   with us, and then reports he's having some
5   angina since discharge.
6      Tell us, please, sir, what that -- angina
7   means.
8  A.  Well, I think he's -- you know, it's apparent
9   that the patient is still having chest pain
10   probably due to the fact that they could not
11   open up the artery as optimally as they wanted
12   to.
13  Q.  All right, sir. Was he taking -- was he on
14   nitrates? Is that -- and nitrate is
15   nitroglycerin? Is that --
16  A.  Yes. Well, he --
17  Q.  Is that --
18  A.  He says -- I'm sorry.
19  Q.  Excuse me. Go ahead.
20  A.  He says, I gave him ISMO, and I will talk with
21   him on Thursday. ISMO is long-acting
22   nitroglycerin.
23  Q.  And is that a treatment for angina?

Page 40

1  A.  Yes.
2  Q.  And that's pain coming from the heart not
3   getting enough blood, basically?
4  A.  That's correct.
5  Q.  Thank you, sir.
6      (Exhibit Number 6 marked for
7      identification.)
8  Q.  Let me show you what we're marking as
9   Exhibit 6, again, from Dr. Williams' records.
10   It appears that he -- on August the 15th, 2003
11   he had another graded exercise test. Is
12   that -- that's a stress test; is that right?
13  A.  No. It says August 5th, dictated August 5th
14   at the bottom of the page. So this looks like
15   the same date of that previous visit.
16  Q.  I'm sorry. I've got the wrong -- I've got my
17   exhibits mixed up. I've got -- I've got my
18   dates wrong. Let's look at Exhibit 6 while
19   we've got it there.
20      Apparently, he did have a graded exercise
21   test?
22  A.  That's correct. August 5th, 2003.
23  Q.  And under assessment it shows that he began to

Page 41

1     have chest pain with a ST segment depression.
2        Is that what happened to him during the
3     exercise portion of the test?
4   A.  Yes. Based on the report, yes.
5   Q.  And that's the depression of the ST segment of
6     the electrocardiogram you discussed with us
7     earlier?
8   A.  That's correct.
9   Q.  And the conclusion shows that he had a normal
10    control EKG, but he had an abnormal ST segment
11    when he was exercising; is that right?
12  A.  That is correct.
13  Q.  Does this tell us that the man had -- that the
14    patient's cardiovascular functioning became
15    decreased on exercise? Is that what we read
16    into this?
17  A.  Well, what we read is that during exercise
18    he's -- there was evidence from the test that
19    there was not adequate blood supply to a
20    portion of the heart muscle.
21  Q.  And that would occur whether -- just with
22    any -- anything just causing him to exercise,
23    whether it's walking on a treadmill or --

Page 42

1   A.  Well, usually, it depends on the level of
2    exercise, you know.
3   Q.  Yes, sir.
4   A.  If you reach a certain level of exercise and
5    if there's a blockage in an artery that
6    impairs the amount of blood flow, yes, it can
7    be caused on a treadmill. It can be caused by
8    walking up stairs or running. It -- you know,
9    if you reach a certain level of exercise, then
10    the heart is required to pump more blood and
11    use more oxygen, then if there's a fixed
12    narrowing somewhere, the limited amount of
13    blood flow, it can lead to chest pain and ST
14    segment changes.
15       (Exhibit Number 7 marked for
16      identification.)
17  Q.  Let me show you what we'll mark as Exhibit 7.
18    It appears that he had another heart
19    catheterization, arteriogram on August the
20    19th; is that -- is that correct?
21  A.  Yes.
22  Q.  And tell me, please, sir, that's -- that's
23    sort of quick to have two arteriograms close

Page 43

1     together, isn't it?
2   A.  Yes.
3   Q.  Why would you have two arteriograms so close
4     together?
5   A.  Well, there's many reasons why you can have
6     two arteriograms close together. I think that
7     in this case, if I am interpreting
8     Dr. Williams' assessment correctly, you know,
9     the patient had a stent. The result was
10    suboptimal. He was still having symptoms,
11    chest pain, was limited by the symptoms. So
12    it was very reasonable to do another
13    arteriogram to see what was going on.
14    Sometimes lesions can progress rapidly. So I
15    think it was perfectly appropriate to do
16    another arteriogram to try to figure out what
17    was going on.
18  Q.  Let's look at the results, particularly down
19    there -- part B, under the -- on the left
20    anterior descending artery. It says it's free
21    from disease. But then it says, the left
22    diagonal branch was a significant vessel and
23    demonstrated a seventy-five to eighty percent

Page 44

1     stenosis. Just -- do you see that?
2   A.  Yes.
3   Q.  Well, does it look like then that this man's
4    function had decreased from fifty percent
5    to -- or, excuse me, his stenosis has
6    increased from fifty percent to seventy-five
7    percent to eighty percent in a matter of like
8    three weeks?
9   A.  Well, reading the reports, yes. I mean,
10    he -- on July 29th, 2003, he had called the
11    diagonal blockage at fifty percent. And now
12    he calls it seventy-five to eighty percent.
13  Q.  Is that a significant increase in that
14    blockage, particularly in that short period of
15    time?
16  A.  Well, let me just tell you that this -- the
17    assessment of this blockage is visual. Okay.
18    It's not a mathematical -- we don't do a -- do
19    it with a caliper or a ruler. So there is
20    some, what we call, intraobserver
21    variability. Sometimes, you know, you can see
22    somebody look at a blockage and call it
23    fifty. And then you look at the same blockage

**Page 45**

1    a week later and you call it sixty or
2    sometimes even seventy or forty.
3         So with that consideration and the fact
4    that there is some visual variability, because
5    it's not a precise measurement -- if it is in
6    fact a change from fifty to seventy-five or
7    eighty, yes, that would be a significant
8    change in a very short period of time.
9    Q.  All right, sir.  And that's a quick increase
10   in that stenosis; is that correct?
11   A.  Yes.
12   Q.  Looking at the right coronary artery we see,
13   again, the ulcerated eccentric calcerated --
14   eccentric calcified plaque; is that correct?
15   A.  Yes, ulcerated eccentric calcified plaque.
16   Q.  And it says, distal to the Cypher stent.  And
17   you're telling us that the stent didn't --
18   again, that the stent did not get into the
19   main area --
20   A.  That's correct.
21   Q.  -- of concern?
22        And the conclusion -- now, the first
23   conclusion is that he's got two-vessel

**Page 46**

1    coronary artery disease.  Is that correct?
2    A.  Yes.
3    Q.  Okay.
4    A.  See, let me just -- just to illustrate my
5    previous point, in the description of the
6    diagonal blockage, he called it seventy-five
7    to eighty.  But in the conclusions, he calls
8    it sixty-five to seventy.
9    Q.  Yes, sir.
10   A.  So that goes to show that it's -- this is not
11   a mathematical, very precise, you know,
12   measurement.  I mean, it's clear that in the
13   diagonal there was a significant blockage.
14   There was somewhere in the range of sixty-five
15   to eighty percent, depending on which
16   paragraph you read.
17   Q.  Thank you, sir.
18        (Exhibit Number 8 marked for
19        identification.)
20   Q.  Let me show you what's been marked as
21   Exhibit 8, which is -- it looks like a summary
22   after his discharge on August the 20th, 2003.
23   It indicates up there at the top that he's now

**Page 47**

1    known as having coronary artery disease; is
2    that correct?
3    A.  Yes.
4    Q.  And he's been taking nitroglycerin?
5    A.  Uh-huh (positive response).
6    Q.  That's for his --
7    A.  Yes.
8    Q.  That's for his pain.  And then down at the end
9    it says, if he continues to have chest pain,
10   he will probably need coronary artery bypass
11   grafting as his right coronary artery was
12   highly calcified, limited stent deployment,
13   and LAD diagonal branch demonstrates a
14   significant lesion as well.
15        Referring particularly to that, but not
16   limiting you, of course, does this mean that
17   the doctor is expecting he may be having
18   problems in the future in this area of his
19   heart and may need cardiac bypass surgery?
20   A.  Yes.  That's what I think Dr. Williams was
21   concerned about.
22   Q.  Do you know if the patient ever had bypass
23   surgery?

**Page 48**

1    A.  I don't think he did.
2    Q.  You didn't -- you didn't see the -- you didn't
3    see any scars --
4    A.  No.  No.  No.
5    Q.  -- indicating that he had --
6    A.  No, we didn't.
7    Q.  -- that surgery?
8    A.  Unh-unh (negative response).
9        (Exhibit Number 9 marked for
10       identification.)
11   Q.  Let me show you what's marked as Exhibit 9,
12   which I apparently --
13       MR. CROW:  Do you need the
14       highlighted copy?
15   Q.  Did I give you the highlighted copy?
16   A.  Yes.
17   Q.  I didn't mean to -- I didn't mean to give you
18   one that was marked up, Doctor.  I'm sorry.
19       MR. CROW:  Here, put a sticker on
20       that one.
21       MR. WOOD:  Do you have a clean
22       copy?
23       MR. MCKENZIE:  Here is a clean

Page 49

1      copy.
2          MR. WOOD: There you go, Mike.
3      Q. Looking at Exhibit 9, apparently August 19th
4      he went into -- the record is from
5      Jackson Hospital in Montgomery. It records
6      that he is being followed for chronic chest
7      pain. Help us -- help me be sure I'm
8      understanding. Chronic, does that mean
9      long-term or long -- what does chronic mean?
10     A. Chronic means that it's long term, recurrent,
11     that lasts more than a short period of time.
12     Q. Yes, sir. And then it goes on to refer to a
13     high grade stenosis in the -- in proximal
14     right coronary artery. That's the -- that's
15     what we've been talking about; is that
16     correct?
17     A. Yes.
18     Q. And then it reports, Mr. Woodley called our
19     office complaining of chest pain on exertion
20     and right arm pain. He's experiencing -- has
21     been experiencing this angina since discharge?
22     A. That is correct.
23     Q. Does that mean that the patient is calling in

Page 50

1      because of problems associated with his heart
2      pain?
3      A. Yes. Based on the note, it appears that --
4      you know, it's what we mentioned before, that
5      because he had a severe blockage in the right
6      coronary artery and, apparently, also a
7      blockage in the diagonal branch that he
8      continued to have heart pain.
9          (Exhibit Number 10 marked for
10     identification.)
11     Q. Let me show you what we've marked as
12     Exhibit 10. And it appears to be some office
13     notes dictated August 26th, again, this is
14     from Dr. Williams. And he refers to this man
15     having -- having calcification in his right
16     coronary artery. It says he's going to -- is
17     this something that's going to go away or is
18     that --
19     A. No. That never goes away.
20     Q. Is it something that's likely to develop and
21     progress instead?
22     A. It may progress. It may stay the same, but
23     it's not going to go away.

Page 51

1      Q. All right, sir. Take a look on page 3. It
2      says he's going to give him nitroglycerin and
3      Lipitor today. The nitroglycerin, I think
4      you've told us, is for anginal pain?
5      A. Yes.
6      Q. And what is Lipitor for? What is that drug?
7      A. Lipitor is what is called a statin.
8      Q. Yes, sir.
9      A. It's a cholesterol-lowering medicine that also
10     has some antiinflammatory properties. And we
11     use it to lower the cholesterol, reduce
12     inflammation in the arteries; and, hopefully,
13     you know, slow the progression of these
14     blockages.
15     Q. Well, I haven't had mine since this morning.
16     But is that a medication to decrease or help
17     slow the progression of the formation of
18     plaque and the stenosis in the arteries?
19     A. Yes, that's the --
20     Q. And continuing on with this same exhibit. It
21     says, going to see him again on the 23rd if he
22     is still having angina. And then -- and if he
23     is still having angina, then he is going to

Page 52

1      need an operation.
2          Is that, again, a reference to a need for
3      a coronary artery bypass?
4      A. Yes.
5      Q. All right, sir.
6          (Off-the-record discussion.)
7          (Brief interruption in proceedings.)
8          (Exhibit Number 11 marked for
9      identification.)
10     Q. (Mr. Wood continuing) Now, Doctor, I've handed
11     to you what has been marked as Exhibit 11,
12     which appear to be notes from Dr. Williams'
13     office dated September 23rd, 2003. Chief
14     complaint, the first notation there is discuss
15     angina pain and operation. Do you see that?
16     A. Yes.
17     Q. And that's the angina pain and the cardiac
18     bypass we've been discussing; is that correct?
19     A. Yes. He's still talking about the patient is
20     having a little exertional angina.
21     Q. Yes, sir. And then he says, Mr. Woodley is an
22     elderly gentleman who we follow for coronary
23     artery disease. He has a right coronary

Page 53

1    artery that has been difficult to dilate. He
2    still had a little exertional angina, but
3    nothing that interferes with his lifestyle.
4        Help me understand that. We've -- we've
5    read that when he exercises or if he gets to
6    breathing -- apparently gets to breathing
7    heavy doing anything, then he does have
8    angina; is that correct?
9    A.    Yes, he has angina.
10   Q.    But he doesn't have it if he's just sedentary,
11   if he's just sitting in a chair, for --
12   A.    Based on this note, the --
13   Q.    -- for example?
14   A.    -- the pain is usually with activities. Based
15   on the note, it appears that most of the time
16   the patient was comfortable and not unhappy
17   with his lifestyle.
18   Q.    So would we gather from that that he just,
19   apparently, was not exercising, or at least
20   not getting his heart rate up?
21   A.    Or that the angina was not severe enough so
22   that even when he exercised it didn't bother
23   him very much.

Page 54

1    Q.    All right, sir. Is that inconsistent with the
2    prior note that we were looking at about
3    probably needing a coronary bypass?
4    A.    No, it's not inconsistent.
5    Q.    The August 19th note?
6    A.    This is a dynamic situation. It may change
7    sometimes for the better, sometimes for the
8    worse. So I think that Dr. Williams,
9    appropriately so, had, you know, left the
10   option open that if the situation became more
11   severe that surgery was an option.
12   Q.    Why would he -- well, excuse me. I think
13   we've already answered that question.
14            (Exhibit Number 12 marked for
15            identification.)
16   Q.    I'll show you now what we've marked as
17   Exhibit 12, which appears to be Dr. Williams'
18   notes on January 27th, 2004. Dr. Williams,
19   again, notes a little chest pain and then
20   notes the patient is in for follow-up. He is
21   an elderly gentleman who we follow for complex
22   right coronary artery disease that has not
23   been optimally dilated on two occasions.

Page 55

1        Is that your understanding of the
2    situation at --
3    A.    Yes.
4    Q.    -- that time?
5    A.    Uh-huh (positive response).
6    Q.    Then he reports he has pain from time to time,
7    but cannot call it exertional and cannot say
8    that it is relieved by nitroglycerin.
9        If the patient is having pain, anginal
10   pain, that's not relieved by nitroglycerin, is
11   that a symptom that might itself call for
12   surgery, for a bypass?
13   A.    Well, it depends. You know, if it's not
14   relieved by nitroglycerin, it may mean that
15   it's not angina, that it's not heart pain. So
16   in that case, of course, you would not
17   consider surgery. But if it is -- if it is
18   heart pain, and one is sure that it's heart
19   pain, and it's not relieved by nitroglycerin,
20   yes, that would be another consideration,
21   among many, to consider another option that
22   could be surgery.
23   Q.    All right, sir.

Page 56

1            (Exhibit Number 13 marked for
2            identification.)
3    Q.    Let me show you what we've marked as
4    Exhibit 13, which, again, notes in part from
5    Dr. Williams and in part from Dr. Brazil, or
6    Brazil, if I'm pronouncing that correctly.
7        It looks like -- does it look -- appear
8    that the patient had another cardiolite
9    thallium stress test in -- on June the 1st of
10   2004?
11   A.    Yes.
12   Q.    Now, he's had a -- he's had this test before
13   which is showing ischemia, if I recollect; is
14   that right?
15   A.    Yes.
16   Q.    We've got here some clinical reports from
17   Dr. Williams, and we also have the nuclear
18   imaging report. Is it correct that the
19   nuclear images report would be
20   more -- something we would rely upon more than
21   a clinical report?
22   A.    Yes.
23   Q.    The nuclear imaging shows a small to moderate

Page 57

1    fixed inferior deficit, suggestion of
2    infarction. Again, is that an indication that
3    this man -- a suggestion that this man has had
4    a heart attack?
5  A.  Yes.
6  Q.  And some of the tissue in his heart is
7    already -- is already dead at this time?
8  A.  That is correct.
9  Q.  And then -- but on top of that, he has a
10    reversible inferior perfusion deficit
11    consistent with ischemia?
12  A.  That is correct.
13  Q.  And what is this, ejection fraction of
14    sixty-eight percent?
15  A.  That is -- ejection fraction is the percentage
16    of blood that the left ventricle -- the main
17    pumping chamber of the heart pumps with every
18    beat. And so it means that the heart is
19    pumping sixty-eight percent. That's perfectly
20    normal.
21  Q.  It means that it's what, two-thirds of what
22    full capacity would be?
23  A.  Well, it means that the main pumping chamber

Page 58

1    of the heart pumps sixty-eight percent of the
2    blood that gets, you know, to the chamber with
3    every beat.
4  Q.  Doesn't all of this medical history that we
5    have discussed up to this point show us that
6    Mr. Woodley was likely to have another heart
7    attack?
8  A.  Well, it tells us that he had coronary
9    disease, that he had a blockage in the right
10    coronary, in the circumflex. He was having
11    angina. He was having pain due to inadequate
12    blood flow. But it doesn't really tell us
13    much about the future. I mean, it's
14    impossible to predict based on this data if he
15    will have another heart attack or if he will
16    live with this condition for a long -- for a
17    long time without another heart attack.
18    (Exhibit Number 14 marked for
19    identification.)
20  Q.  Let me show you what's marked as Exhibit 14.
21    We're up now to January the 10th of 2006. It
22    looks like the patient has another cardiolite
23    thallium stress test. And, again, we show a

Page 59

1    reversible inferior deficit suggesting
2    ischemia. And we've talked about that --
3  A.  Yes.
4  Q.  -- before?
5    And, again, we show, cannot exclude
6    infarction from that inferior deficit,
7    possibly secondary to an infarct (sic)?
8  A.  Yes.
9  Q.  Is Mr. Woodley more likely to have a heart
10    attack at this point than someone who doesn't
11    have these problems that he's -- for which
12    he's been treated?
13  A.  Yes. I mean, he's -- he's more likely to have
14    a heart attack than somebody who doesn't have
15    any blockage in the coronary arteries. That's
16    for sure.
17  Q.  All right, sir. He has had previous heart
18    problems with his right coronary artery, and
19    that was difficult to dilate; is that correct?
20  A.  That is correct.
21  Q.  And elevated cholesterol would in time tend to
22    occlude or block his coronary arteries?
23  A.  In general, yes.

Page 60

1  Q.  All right, sir. Could that -- could those
2    conditions have contributed in any way to his
3    heart attack on August 31st, 2006?
4  A.  Which condition, the cholesterol?
5  Q.  Everything that you've --
6  A.  Yes.
7  Q.  -- seen here.
8  A.  Yes. Yes. Yes.
9  Q.  (Indicating).
10  A.  Yes.
11  Q.  Yes. Thank you, sir. My hearing --
12  A.  That's fine.
13  Q.  -- is not real good sometimes.
14  A.  That's perfectly fine.
15    (Exhibit Number 15 marked for
16    identification.)
17  Q.  Please, sir, I want to show you now what we'll
18    mark as Exhibit 15, again from Dr. Williams,
19    July of 2006, reports that he is not taking
20    any cholesterol medication.
21    Would there be a reason for this patient,
22    Mr. Woodley, in his condition to have stopped
23    taking his Lipitor, his cholesterol

Page 61

1    medication?
2    A.  Well, there may -- there could be many reasons
3        why he's not taking it. It may be, you know,
4        he's had side effects. He couldn't afford
5        it. I mean, I don't really know why he's not
6        taking it. You know, there's a note before
7        that said he was on Lipitor. I don't really
8        know why he's not taking it. But certainly
9        there are -- sometimes these drugs can cause
10       serious side effects. Some of them are
11       expensive. So I don't really know why he's
12       not taking it, but it would be beneficial for
13       him to take it.
14   Q.  That would be -- if there was a medical reason
15       for him to stop taking it, you would expect
16       that to be noted in Dr. Williams' records,
17       wouldn't you?
18   A.  I would think so, yes.
19           (Exhibit Number 16 marked for
20            identification.)
21   Q.  Let me show you what's been marked as
22       Exhibit 16, which -- help me understand that.
23       Is that a lab report of some type?

Page 62

1    A.  Yes. This is a -- what is called a lipid
2        profile. It's a report of the blood
3        cholesterol; triglycerides; and what is called
4        HDL cholesterol, good cholesterol; and LDL
5        cholesterol, bad cholesterol.
6    Q.  Yes, sir. What is his cholesterol reading
7        there?
8    A.  Well, the total cholesterol is two hundred and
9        twenty-two.
10   Q.  Is that a high reading?
11   A.  That is -- yes, that's mildly to moderately
12       elevated.
13   Q.  Yes, sir. In fact, it's under the column for
14       abnormal on the report, isn't it?
15   A.  That is correct.
16   Q.  And his low density cholesterol reading was
17       what?
18   A.  One sixty-one. That's -- that's very high.
19   Q.  Yes, sir. Would that be a cause for concern?
20   A.  Yes.
21   Q.  Would that -- would these lab records indicate
22       a need for this patient to be on cholesterol
23       medication?

Page 63

1    A.  Yes.
2    Q.  But that's dated -- reported June 15th. And
3        Exhibit 15 says that in July -- I'm sorry,
4        that's June 15th of 2005. I got -- I got my
5        dates wrong.
6    A.  Yes, this one.
7    Q.  So unless we had some indication that his
8        cholesterol had changed, he should be on his
9        cholesterol medication in July of '06,
10       shouldn't he?
11   A.  That is correct.
12   Q.  If Mr. Woodley was not taking his Lipitor,
13       would that -- could that cause his
14       calcification to worsen and increase?
15   A.  Well, there is clearly an added risk to the
16       blockage to get worse, for a heart attack to
17       develop if -- you know, somebody like him with
18       two severe blockages and high cholesterol. So
19       no question that the addition of a cholesterol
20       lowering medication like Lipitor would have
21       been beneficial, or would be beneficial.
22   Q.  Yes, sir. Is it possible and, in fact, likely
23       that not taking his Lipitor would have led up

Page 64

1        to the condition that caused his heart attack
2        in August of 2006?
3    A.  Well, it's -- I think it's more likely that it
4        might have contributed than if he had been
5        not -- he had been taking the medication.
6    Q.  Yes, sir.
7           (Exhibit Number 17 marked for
8            identification.)
9    Q.  I show you what has been marked as
10       Exhibit 17. Apparently, these are some notes
11       by -- help me pronounce this doctor's name.
12       Is it Olesen?
13   A.  I don't know.
14   Q.  I think it's O-L-E-S-E-N. That's the name I
15       found in --
16   A.  O-L --
17   Q.  -- the directory.
18   A.  I guess so. I don't -- I can't --
19   Q.  These are from Mr. Woodley's University
20       Hospital -- hospital records dated
21       August 30th, 2006. And if I'm pronouncing the
22       name -- it looks like -- you see the signature
23       down at the bottom?

Page 65

1  A. Yes.
2  Q. That looks like Dr. Olesen, whatever the
3  doctor's name is.
4  A. Okay.
5  Q. He reports --
6  A. His number -- go by number. He is number 2598
7  at UAB. So doctor two thousand five hundred
8  and ninety-eight. You can find out.
9  Q. I'm more concerned with what the symptoms are
10  than the actual name.
11  A. The doctor's name.
12  Q. But I do want to get it as accurate as we can.
13  A. Okay.
14  Q. It looks like he presented with a number of
15  system -- symptoms at ten-fifteen that
16  morning: shortness of breath, increased
17  respiratory rate, decreased oxygen level,
18  noticeable wet voice.
19  By the way, what is wet voice?
20  A. I have no idea. Now -- let me see. I have
21  never heard that term before. This is
22  current -- his breathing -- respiratory rate
23  thirty, oxygen saturation -- I don't know what

Page 66

1  a wet voice is.
2  Q. All right, sir. Increased lower leg edema,
3  tight legs, and abdomen.
4  Could a heart attack cause these -- cause
5  these symptoms?
6  A. Which symptoms specifically?
7  Q. Well, any of them, the ones that we're talking
8  about.
9  A. Well, I don't know what wet voice is. I'm
10  assuming that --
11  Q. Then let's leave that one out.
12  A. Yes. Significant scrotal edema, slightly
13  worse than two days ago. Well, very
14  unlikely. Because edema means swelling.
15  Q. Yes, sir.
16  A. That usually takes days or weeks to develop.
17  So an acute heart attack is not likely to
18  develop -- to cause edema of the scrotum. It
19  can cause swelling of the lungs due to heart
20  failure. And it may be what he's saying about
21  the wet voice was that he thought that the
22  patient was quote, unquote, wet. That is a
23  loose term to mean that there's fluid in the

Page 67

1  lungs. But, no, the scrotal edema, I don't
2  think that could be caused by an acute heart
3  attack.
4  Q. But the shortness of breath --
5  A. Yes.
6  Q. -- the increased respiratory rate --
7  A. Yes.
8  Q. -- the decreased oxygen level?
9  A. Yes. Yes. All of that is very possible.
10  Q. And that's consistent with a heart attack
11  developing at that point?
12  A. That is correct.
13  (Exhibit Number 18 marked for
14  identification.)
15  Q. Let me show you, please, sir, what we'll mark
16  as Exhibit 18, which, again, that is from the
17  University Hospital records, same day, August
18  the -- August the 30th. No evidence of deep
19  venous thrombosis in either lower extremity.
20  Tell us what that -- what that means.
21  Well, I think the doctor who saw him was
22  concerned because the patient was short of
23  breath, his respiratory rate was high. So he

Page 68

1  was concerned about the possibility of a blood
2  clot to the lungs.
3  Q. A pulmonary embolus?
4  A. A pulmonary embolus. And he recommended a
5  Doppler of the lower extremities. That's an
6  ultrasound of the legs.
7  Q. Yes, sir.
8  A. That was done, and, basically, showed that
9  there was some swelling of the legs, but they
10  did not see any evidence of blood clots in the
11  veins of the legs.
12  Q. So what we see there then is a ruling out of a
13  pulmonary embolus at that time?
14  A. No. You're seeing -- it's a ruling out of
15  clots in the legs. Now, that's -- the
16  inference is that that's the most common cause
17  of blood clots in the lungs. So that if there
18  are no blood clots in the legs, the likelihood
19  is that there are no blood clots in the
20  lungs. But this is not ruling out blood clots
21  in the legs -- this is ruling out blood clots
22  in the legs, not in the lungs.
23  Q. All right. If a doctor had -- could have

17 (Pages 65 to 68)

**Page 69**

1     done -- could have done a -- could have looked
2     in his lungs to see if there was an embolus
3     there, if they felt it was warranted, I guess,
4     couldn't they?
5   A.  Well, yeah, you can do a -- what is called a
6     pulmonary angiogram or a CT angiogram that
7     would -- would be other options to look at
8     that. But in a very ill patient, those tests
9     are not done, you know, unless there's a real
10    indication for it.
11  Q.  All right, sir.
12  A.  So I don't think that the degree of suspicion
13    was great enough to justify doing that, so
14    they just went with the ultrasound of the
15    legs.
16      He also thought -- you know, he said,
17    possible need for diuretics if doppler
18    negative. So I think the doctors were also
19    concerned that the patient was probably
20    developing some heart failure. And I'm just
21    assuming that's what they meant because of the
22    consideration of using diuretics.
23       (Exhibit Number 19 marked for

**Page 70**

1      identification.)
2   Q.  I will show you what's been marked as
3     Exhibit 19. It appears to be notes, again,
4     on -- this time on August 31st. And they
5     were -- and there -- is he documenting the
6     investigation of the possibility of a
7     pulmonary embolus?
8   A.  Well, I have to read the note.
9   Q.  I'm sorry. Go ahead.
10  A.  Have to re-evaluate -- I -- there's some words
11    that I cannot read. But, apparently, have to
12    re-evaluate patient with shortness of breath,
13    tachypnea, that means rapid respiratory rate.
14  Q.  Yes, sir.
15  A.  With history of arteriosclerotic heart
16    disease, I believe, ASHD. Patient continues
17    with tachypnea but presently off oxygen,
18    still -- something about gasps when speaking,
19    but able to get through a sentence.
20    Given -- I don't -- I cannot read that -- in
21    the seven dash fourteen days post-injury. We
22    see symptoms suggestive of PTE. So PTE is
23    pulmonary thromboembolism. So the doctor is

**Page 71**

1     thinking about the possibility of a blood clot
2     to the lungs, in parentheses, tachypnea,
3     decreased oxygen saturation on August 30.
4     Rule out possibility with CT angiogram.
5      So they were thinking about the
6     possibility of doing an angiogram of the chest
7     to further investigate a blood clot.
8     Dr. George aware. Something ordered. Lower
9     extremity ultrasound was negative, but would
10    also check iliac. Additional sources of clot
11    can be pelvic veins which cannot be easily
12    viewed, so meaning that there were no clots in
13    the legs, but, you know, he's considering the
14    possibility of blood clots in the pelvis that
15    could have traveled to the lungs. Four bowel
16    movements in the last twenty-four hours.
17      And then it goes to the exam, present
18    temperature, maximal 98; blood pressure,
19    135/80; respiration is 28; oxygen saturation
20    is unable to locate; pulse, 108.
21      Do you want me to read everything here?
22  Q.  Whatever -- I don't want to -- I do not want
23    to limit you.

**Page 72**

1   A.  Well, just tell me what the question is, and
2     I'll see if I can --
3   Q.  Well, a spiral CT would have shown a pulmonary
4     embolus if it existed, wouldn't it?
5   A.  Well, it would show most of them, but you can
6     miss it. You know, if it's a small pulmonary
7     embolus in the periphery of the lungs, it can
8     be missed by a spiral CT. So, in general, it
9     would detect most of them, but not all of
10    them. But a large blood clot, yes.
11  Q.  All right, sir. There never was a diagnosis
12    of a pulmonary embolus and no embolism was
13    ever found, was it?
14  A.  That is correct.
15  Q.  Thank you, sir. Particularly -- I'm not
16    trying to restrict you. It's harder for me to
17    read it than it is you, I assure you.
18  A.  Yes.
19  Q.  But I'll refer you to the second page of
20    Exhibit 19. Apparently, he was considering
21    also a -- that the primary team might wish to
22    consider a cardiac echo?
23  A.  Yes.

Page 73

1  Q. And even have a consult from a cardiologist?
2  A. Well, I think it says, asked son to obtain
3     cardiologist's phone number.
4  Q. Ah.
5  A. So that any prior information can be checked.
6  Q. Okay. That would, apparently, indicate that
7     Mr. Woodley's son was present and was -- there
8     was some discussion that he had been seen by a
9     cardiologist previously, apparently,
10    Dr. Williams?
11 A. I would assume so.
12 Q. Do you know whether that cardiac echo was ever
13    done?
14 A. In fact, they wrote the number there,
15    Dr. John Williams (334) 264-9191.
16 Q. Right.
17 A. Patient -- let's see, at that -- I don't know
18    if they ordered the echo or not. I cannot
19    tell from -- from this note.
20 Q. It shows -- it shows there further that he --
21    he has a question about -- a question whether
22    there was any demonstrated pulmonary edema?
23 A. Well, it says, I agree with fluid

Page 74

1  restriction. Creatine is one, meaning that
2  kidney function was adequate. So he could
3  likely tolerate lasix from that standpoint.
4  Q. Right.
5  A. But he was concerned about the blood pressure.
6  Q. There never was any pulmonary edema diagnosed
7     or found, was there?
8  A. From what I can tell by reading these notes
9     now, I think they -- they were concerned about
10    the possibility of pulmonary edema, but I
11    don't see any objective evidence from any of
12    the tests they did that they documented that.
13 Q. Thank you, sir.
14    (Exhibit Number 20 marked for
15    identification.)
16 Q. Let me show you what's been marked as
17    Exhibit 20, again from the University records.
18 A. Now, there's another page missing. This is
19    half of it.
20 Q. I'm sorry?
21 A. This is -- this is my note, so I can recognize
22    there's another page missing on that.
23 Q. Well -- all right. That's going to take me --

Page 75

1  A. That's fine. I've got it here.
2  Q. No. No. I've got it. Is this page 2?
3  A. Yes, that's page 2. And I -- I failed to sign
4     this note, so ...
5  Q. Well, that -- that was a question I had on
6     that one. Both -- both of these pages are --
7  A. Are mine.
8  Q. -- your notes?
9  A. This is my note.
10 Q. And together they are one document?
11 A. Yes. And I apologize. I mean, I guess I --
12 Q. No. No. I --
13 A. In the midst of this -- what was going on, I
14    never signed this note, but that's me.
15 Q. I suspected that was the case --
16 A. Yeah.
17 Q. -- but I didn't -- but -- so now you've got a
18    complete document with the two pages --
19 A. Yes.
20 Q. -- together?
21 A. Yes.
22 Q. Okay. This is, apparently, the first time
23    that you've seen the patient; is that right?

Page 76

1  A. Yes. Yes.
2  Q. You note there on the first page probable --
3     assessment -- your assessment, probable
4     S-T-E-M-I?
5  A. Well, I said critically ill, cardiogenic
6     shock, probably STEMI, that means ST elevation
7     myocardial infarction.
8  Q. Yes, sir.
9  A. We call it STEMI, S-T-E-M-I.
10 Q. What I understand, that ST elevation
11    myocardial infarction means that the man is
12    having a heart attack, or has had it?
13 A. Well, it means, usually, that it's a major
14    heart attack and that the artery responsible
15    for the heart attack is totally occluded. And
16    that leads to elevation of the ST segments on
17    the EKG.
18 Q. And that ST elevation, that's going back to
19    that ST segment --
20 A. Yes.
21 Q. -- of the EKG that we talked about earlier?
22    Is --
23 A. That is correct.

Page 77

1 Q. -- that correct?
2      Thank you, sir. You note, I believe,
3     that the coronary artery -- were you noting an
4     occlusion of the coronary arteries in this --
5     in this note?
6 A. Well, yes. Now, this is a preliminary note --
7 Q. Yes, sir.
8 A. -- by the way. There's a final typed in the
9     chart.
10 Q. Yes, sir.
11 A. But it's basically the same thing. But I
12     noted that the main artery that supplied blood
13     to the heart had a fifty to sixty percent
14     narrowing.
15 Q. Yes, sir.
16 A. Then the left anterior descending, that is the
17     main artery to the front of the heart, had a
18     fifty percent narrowing. The first diagonal
19     had a thirty percent narrowing. And then the
20     circumflex artery that supplies blood to the
21     left side of the heart had what I call
22     irregularities. And then the right coronary
23     artery that supplied blood to the heart -- to

Page 78

1     the bottom of the heart was large, was
2     calcified, and had a complete occlusion, was
3     totally closed, in the proximal segment.
4 Q. Now, you've got a note there that follows
5     that, something about a -- probably fever
6     embolism?
7 A. No. PCI.
8 Q. All right. I'm looking --
9 A. P -- where are you talking about?
10 Q. I'm looking at the second page.
11 A. Oh. Oh. Oh. Yes. Yes. Yes. Well, it
12     says -- what we did was we -- PCI means
13     percutaneous coronary intervention --
14 Q. Yes, sir.
15 A. -- of the right coronary artery. So that
16     means that we -- we put a wire through the
17     blockage and put a balloon and opened up the
18     artery and put a stent. And those are the
19     dimensions of the stent. Three millimeters by
20     twenty-three millimeters. So we restored
21     blood flow. And there was flow now going
22     distally. The artery was very calcified. And
23     there was a residual thirty to fifty percent

Page 79

1     narrowing.
2     And then there was a distal branch very
3     downstream that was occluded, that I thought
4     it was most likely due to the blood clot that
5     closed the artery proximally. Sometimes these
6     clots migrate distally --
7 Q. Yes, sir.
8 A. -- so that it can close small side branches.
9     Is that -- is that clear?
10 Q. Yes, sir. But as far as fever, there never
11     was any diagnosis --
12 A. There was no fever. I did not say fever.
13 Q. Well, I --
14 A. Probably from embolus.
15 Q. Ah.
16 A. I'm sorry about my writing, F-R-O-M, I said,
17     occluded right PLS, that means occluded right
18     posterior lateral segment, probably from
19     embolus.
20 Q. Okay. No embolus was ever diagnosed, was it,
21     or seen?
22 A. No. No. We're talking about -- this is --
23     we're talking about the coronary arteries

Page 80

1     now.
2 Q. Yes.
3 A. When this artery is clogged, you end up with
4     large blood clots in the artery. Sometimes as
5     the arteries open up with the balloon, you
6     know, some of the fragments of blood clots
7     that were occluding the artery migrate
8     distally and can transiently close little
9     arteries. So this is not a pulmonary
10     embolus. We're talking about an embolus in a
11     small branch of the coronary artery that is
12     probably the result of the blood clot that
13     closed the right coronary artery and caused
14     the heart attack.
15     (Exhibit Number 21 marked for
16     identification.)
17 Q. Doctor, I've marked as Exhibit 21 a voluminous
18     exhibit. These are nursing notes from the
19     hospital. I do not mean to belabor all of
20     this, but there are some notations in there.
21     And I'll walk you through them, where I found
22     them.
23 A. Okay.

Page 81

1   Q.  When this patient, Mr. Woodley, was in the
2       hospital, in fact, was he getting treatment to
3       keep him from getting or developing a blood
4       clot that might cause a problem like this,
5       such as thromboembolic devices, TED, SCD, the
6       pneumatic hoses and so forth, to prevent him
7       from forming a clot?
8           I put sticky notes on my copy. And
9       I'll -- and I've highlighted them. And I'll
10      show those to you. I've tried not to give you
11      a marked-up exhibit.
12  A.  Well, see, I have not reviewed these records.
13      And I didn't take care of him before the heart
14      attack --
15  Q.  Yes, sir.
16  A.  -- so I don't really know.
17          MR. WOOD: Mike, do you have any
18              objection to my showing the
19              doctor the ones that I've
20              marked?
21          MR. CROW: No.
22  Q.  I'm going, then, Doctor, to hand you my copy
23      of Exhibit 21, which is marked up. And it's

Page 82

1       got yellow sticky notes there on the side, and
2       I've highlighted those sections. The question
3       really is whether this man was getting
4       treatment through the course of his
5       hospitalization that would -- that would be
6       designed to keep him from having an embolism
7       or a clot form.
8   A.  Okay. One mark here says TEDs and S-C-D-S to
9       B-L-E.
10  Q.  Tell us what that -- what --
11  A.  I don't know.
12  Q.  Is TEDS -- is that a thromboembolic device?
13  A.  I don't know.
14  Q.  The hose --
15  A.  I don't know what they mean by this.
16  Q.  How about -- all right.
17  A.  I don't know what S-C -- I'm not familiar with
18      these acronyms. S-C-D-s to B-L-E. B -- L-E
19      is lower extremity. So it may be, but I can't
20      answer you straight.
21  Q.  You found another one.
22  A.  TEDS -- yes, here they are. Yeah. You're
23      right. TEDS, they've got a drawing on the

Page 83

1       next page.
2   Q.  Yes, sir.
3   A.  Yes. I think that that's what -- that's what
4       it means.
5   Q.  Those notes go for a period of days, and
6       there's --
7   A.  Yes.
8   Q.  -- several notations there --
9   A.  Yes.
10  Q.  -- that have the yellow sticky notes on them?
11  A.  Yes. TEDS. This is pretty much routine in
12      the intensive care unit to do this.
13  Q.  You would expect that --
14  A.  Yes.
15  Q.  -- wouldn't you?
16  A.  Yes.
17  Q.  The purpose of my question is just to --
18  A.  Bilateral TED, you know --
19  Q.  -- clarify that this was occurring.
20  A.  Yes. I mean, I agree with the marks and
21      what -- yes.
22  Q.  We'll leave that exhibit with its -- with its
23      markup.

Page 84

1           MR. WOOD: And I've got a yellow
2               highlighter, and we can mark our
3               copies, Mike, if we want to
4               after the deposition. But I'm
5               going to leave that marked-up
6               one as the exhibit.
7           MR. CROW: That will be fine.
8           (Exhibit Number 22 marked for
9               identification.)
10  Q.  I'll show you, Doctor, what has been marked as
11      Exhibit 22 to your deposition. Was the -- was
12      Mr. Woodley getting a Heparin-like drug, a
13      blood thinner?
14  A.  Yes.
15  Q.  Is that that -- pronounce that for me, please,
16      sir.
17  A.  Enoxaparin, E-N-O-X-A-P-A-R-I-N.
18  Q.  Yes, sir. And what is -- what's the purpose
19      of that medication?
20  A.  That's -- it's a blood thinner to -- it's used
21      to thin the blood.
22  Q.  So he was getting treatment all of the way
23      through the course of his hospitalization --

Page 85

1    hospital treatment to keep him from forming a
2    blood clot?
3    A.  I think so.
4    Q.  You did a cardiac catheterization on this
5        patient, I believe; is that right?
6    A.  Yes.
7            (Exhibit Number 23 marked for
8             identification.)
9    Q.  Let me show you what I've marked as
10       Exhibit 23.  Do you recognize that as a report
11       of that procedure?
12   A.  Yes.
13   Q.  When you did that procedure, you found the
14       right coronary artery a hundred percent
15       blocked; is that correct?
16   A.  Yes.
17   Q.  And that's the same -- that's the artery
18       that's been the primary cause of concern going
19       back to 2003 --
20   A.  That is correct.
21   Q.  -- that we've been talking about here for a
22       while?
23           Please, sir, were you -- you were able to

Page 86

1    open that to some degree; is that correct?
2    A.  Yes.
3    Q.  To what extent was that artery opened?
4    A.  Well, we opened it -- you know, it went from a
5        hundred percent blockage to a ten percent
6        narrowing at the end.  So we opened it quite
7        well, widely -- widely opened.
8    Q.  You substantially reduced the stenosis?
9    A.  Well, I mean, it was completely -- it didn't
10       have stenosis.  It was totally closed.  There
11       was no blood flowing, so we restored the blood
12       flow and put a stent there.
13   Q.  That's right.  After the operation, you had --
14   A.  Yes.  Yes.
15   Q.  -- restored that?
16   A.  Yes.
17   Q.  And you were able to -- and you did get a
18       stent in this time; is that right?
19   A.  Yes.  Yes.
20   Q.  Where did your stent -- where was your stent
21       placed, in that same right coronary artery,
22       the same one that's been the problem?
23   A.  Yes.

Page 87

1    Q.  Were you able to get your stent into the place
2        where the man -- where they were trying to get
3        the stent earlier?
4    A.  Well, you know, I -- unless I could look at
5        the angiograms from Dr. Williams, I cannot
6        tell you precisely that it's the same site.
7        But the artery, based on my description, was
8        closed in the proximal part, at the beginning
9        of the artery.  And we had no difficulty in
10       crossing it with a wire and putting a stent.
11       And after the procedure, there was very little
12       blockage left.
13           So, you know, I would say there's a very
14       large distal vessel after the stent.  We
15       diffused thirty to fifty percent narrowing
16       more distally.  So there was no significant
17       blockage left after we put the stent.
18           But to answer your question, I don't know
19       if it was exactly the -- we put the stent
20       where the artery was blocked.
21   Q.  Yes, sir.
22   A.  And after we opened it up and restored blood
23       flow, there was a very mild blockage left,

Page 88

1        more distally.
2            (Exhibit Number 24 marked for
3             identification.)
4    Q.  Please, sir, let me show you what we've marked
5        as Exhibit 24.  I believe those are
6        Dr. Allred's notes.
7    A.  Yes.
8    Q.  These are his handwritten notes.  And I'll
9        show you the section that I'm referring to --
10   A.  Okay.
11   Q.  -- if you want me to.  But I believe --
12   A.  Okay.
13   Q.  -- that he also recorded that the angioplasty
14       revealed a one-hundred-percent occlusion?
15   A.  Yes.
16   Q.  Which he says was -- was the -- was the
17       culprit -- was culprit lesion?
18   A.  That is correct.
19   Q.  And that's the same -- that's your assessment
20       as well?
21   A.  Yes.
22   Q.  What happened to the first stent?  You never
23       saw it or found it?

Page 89

1    A.  Well, it's there.
2    Q.  But it's not mentioned on any of these?
3    A.  Well, we may not have been able to see it.
4    Q.  I see.
5    A.  Sometimes the stents are -- you know, it's
6        very thin metal. So sometimes, you know, if
7        the patient is heavyset, if there's fluid in
8        the lung, it just -- you know, it's
9        incorporated in the wall of the artery. And
10       often we see them. Sometimes we cannot see
11       them at all. It's -- it's there.
12   Q.  But you expect the stent was still -- still in
13       place?
14   A.  Oh, it is there. It doesn't go anywhere.
15       It's embedded in the wall of the artery.
16           (Exhibit Number 25 marked for
17           identification.)
18   Q.  Let me show you what's been marked as
19       Exhibit 25. And, again, this is from
20       Dr. Allred's notes. And the question I have
21       for you has to do really with the last line.
22       Does this record that the family declined an
23       autopsy?

Page 90

1    A.  They declined autopsy, yes.
2    Q.  Without an autopsy, we don't have a way to
3        really know what caused this man's heart
4        attack, do we?
5    A.  Well, the heart attack was caused by the right
6        coronary artery closing with a blood clot.
7        You don't need an autopsy for this. I mean,
8        that was part of -- the angiogram showed that.
9    Q.  I see. And the closing of the right coronary
10       artery is something that you -- that you
11       can't -- that's not unexpected for
12       Mr. Woodley's history, is it?
13   A.  Well, he was at high risk for developing a
14       blood clot. Now --
15   Q.  Before he ever got to this hospital or --
16   A.  Yes.
17   Q.  -- before that --
18   A.  The one thing that -- you know, is that
19       he -- well, it's impossible for me to tell you
20       what the precipitating factor is.
21   Q.  Yes, sir.
22   A.  You know, I mean, what caused him that day at
23       a certain time to develop a blood clot in an

Page 91

1        artery that otherwise had been open for
2        years. Was it the stress of the illness that
3        he had or was it a random act? I don't know
4        that. We don't have any evidence. We know
5        that in general stress can lead to -- you
6        know, can precipitate a heart attack if there
7        is the underlying situation. If there are
8        blockages there, heart attacks are more common
9        or precipitated more often by a stressful
10       situation, be it an earthquake, be it the
11       death of a loved -- of a loved one. There's
12       no question about that.
13           The specifics about this patient is, do I
14       have any evidence one way or the other that,
15       you know, a specific event caused that artery
16       to close that day, I have no way to tell you
17       one way or the other. I know that when we
18       went there the artery was closed. And,
19       obviously, it's been open for years.
20   Q.  Yes, sir.
21   A.  And he lived with that. That day, the artery
22       closed and he had a heart attack.
23   Q.  Would the heart attack that Mr. Woodley

Page 92

1        sustained, the fatal heart attack, be a
2        natural progression of the coronary artery
3        disease and the cardiac history?
4    A.  Not necessarily. Many patients live with
5        blockages for years and years and years and
6        never have a heart attack.
7    Q.  Yes, sir.
8    A.  So this is not a natural progression. It's
9        just a random event.
10   Q.  I see. But it could be a natural progression,
11       could it not?
12   A.  Yes, it could be.
13   Q.  Thank you, sir.
14           MR. CROW: Are you done?
15           MR. WOOD: Yes.
16           (Off-the-record discussion.)
17           MR. CROW: I've got just a couple of
18           follow-ups, Doctor.
19           THE WITNESS: Yes.
20           REDIRECT EXAMINATION
21   BY MR. CROW:
22   Q.  So what I hear you saying here is that a
23       gentleman like Mr. Woodley who had a coronary

Page 93

1       disease that's put under stress -- assuming he
2       had a spinal cord injury, that would -- that
3       would put a stress on his body, wouldn't it?
4               MR. WOOD: Object to leading.
5   A.  Yes.
6   Q.  Okay. And from what I heard you testify
7       earlier, someone in his condition put under
8       stress could cause him to have a heart
9       attack?
10              MR. WOOD: Object.
11  A.  Yes, it could increase the risk of a heart
12      attack.
13  Q.  Okay. I kind of want to go back to some of
14      these earlier records, specifically, 13 and
15      14. Because it looks like in Dr. Williams'
16      records that Mr. Woodley had some angina back
17      in '03 when he -- and he had the
18      catheterization and the stent put in. And
19      then it looks like in '04 -- in fact, on
20      this -- in fact, on Exhibit Number 12, which
21      is Mr. Woodley's office visit to --
22  A.  Dr. Williams.
23  Q.  -- Dr. Williams, and Dr. Williams is -- and

Page 94

1       this was when he's complaining that he -- he
2       has had some pain from time to time but cannot
3       call it exertional and cannot say that it's
4       relieved by nitroglycerin. That's in the --
5       in the history. And then on his impression,
6       Dr. Williams writes, I seriously doubt he is
7       having angina. He's gotten a little nervous,
8       so we've had to decide about doing another
9       test that we talked about earlier, that
10      Exhibit 13 and Exhibit 14. Is that the test
11      we're talking about?
12  A.  Yes, sir.
13  Q.  Okay. So in January of '04, he's -- the
14      doctor doesn't think he's having any angina?
15              MR. WOOD: Object to leading.
16  A.  Yes. I think he's beginning to doubt --
17      actually, he says, I doubt seriously he's
18      having angina.
19  Q.  Right. And then he has on -- June of '04 he
20      has an EKG, which is normal. In fact, he
21      gets -- under the stress test, Mr. Woodley
22      gets his heart rate up to a hundred and
23      thirty?

Page 95

1   A.  Yes.
2   Q.  And Dr. Williams documents he's not having any
3       chest pain with his heart rate at a hundred
4       and thirty?
5   A.  That is correct.
6   Q.  And these stress tests is where they put him
7       on a treadmill and they make him walk until
8       they get his heart rate up to that level?
9   A.  That is correct.
10  Q.  And, normally, what would be the heart rate
11      of --
12  A.  Well, we usually go for what is called the
13      maximal heart rate predicted for the patient.
14  Q.  Right.
15  A.  That would be two-twenty minus the patient's
16      age. That's the target, you know, predicted
17      heart rate. So he was seventy-three. The
18      target would be two twenty minus
19      seventy-three.
20  Q.  Okay.
21  A.  But this is a pretty good heart rate for a
22      seventy-three-year-old gentleman --
23  Q.  Right.

Page 96

1   A.  -- to achieve on a treadmill test.
2   Q.  Right. So he has that in '04, and he's not
3       having any angina. And then he comes back
4       with Dr. Williams and has another -- in
5       Exhibit Number 14, he has another stress test
6       in '06. And he's not exhibiting any angina at
7       that time, is he?
8   A.  Yes. He's -- on the treadmill test he says he
9       did not have any chest pain or ECG -- or EKG
10      changes.
11  Q.  And he got his heart rate up to a hundred and
12      thirty beats per minute, which was adequate
13      for that test?
14  A.  That is correct.
15  Q.  Okay. And so the only recorded angina that
16      Mr. Woodley had in Dr. Williams' records would
17      be -- would have been back in '03, 2003. And
18      then he went 2004 with no recorded angina,
19      2005 with no recorded angina, and in 2006 we
20      don't have any record of him having any kind
21      of angina or heart pain?
22  A.  Well, the report -- yes, according to the
23      treadmill test he -- yes. In June of 2004 and

Page 97

1    January of 2006, the patient did not have any
2    angina on the treadmill test --
3    Q.  Right.
4    A.  -- up to a heart rate of a hundred and thirty
5    beats per minute.
6    Q.  Right.  Right.  Okay.  And that was -- the
7    purpose of that treadmill test is to put his
8    heart under some stress to see if he can
9    produce some angina?
10   A.  That is correct.
11             MR. CROW:  I think that's all I
12       have, Doctor.
13             Thank you.
14       MR. WOOD:  Thank you, Doctor.
15       THE WITNESS:  Okay.  Thank you very
16       much.
17
18       (The deposition concluded at
19       approximately 5:55 p.m.)
20
21       * * * * * * * * * * * *
22       FURTHER DEPONENT SAITH NOT
23       * * * * * * * * * * * *

Page 98

1             REPORTER'S CERTIFICATE
2    STATE OF ALABAMA:
3    BUTLER COUNTY:
4        I, Julie A. Duncan, Court Reporter and
5    Commissioner for the State of Alabama at Large, do
6    hereby certify that I reported the deposition of:
7        SILVIO PAPAPIETRO, M.D.
8    who was first duly sworn by me to speak the truth,
9    the whole truth and nothing but the truth, in the
10   matter of:
11       LILLIAN WOODLEY as the
12       administratrix of the Estate of
13       RUFUS WOODLEY,
14       Plaintiffs,
15       vs.
16       PFG-LESTER BROADLINE,
17       INC.; KENNETH O. LESTER
18       COMPANY, INC.,
19       Defendants.
20       In the United States District Court
21       for the Middle District of Alabama
22       Northern Division,
23       2:07cv74-ID,

Page 99

1    on Wednesday, November 7, 2007.
2        The foregoing 98 computer-printed pages
3    contain a true and correct transcript of the
4    examination of said witness by counsel for the parties
5    set out herein.  The reading and signing of same is
6    hereby waived.
7        I further certify that I am neither of kin
8    nor of counsel to the parties to said cause nor in any
9    manner interested in the results thereof.
10       This 30th day of November, 2007.
11
12
13
         _____
         Julie A. Duncan, ACCR#: 256
14       Expiration Date:  9/30/2008
         Certified Court Reporter and
15       Commissioner for the State
         of Alabama at Large
16
17
18
19
20
21
22
23