**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **LILLIAN WOODLEY as the** | * | |
| **administratrix of the Estate of** | * | |
| **RUFUS WOODLEY,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **CIVIL ACTION NO.: 2:07cv74-ID** |
| **v.** | * | |
| | * | |
| **PFG-LESTER BROADLINE, INC.;** | * | |
| **KENNETH O. LESTER COMPANY,** | * | |
| **INC.,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE THE**
**TESTIMONY OF PLAINTIFFS' EXPERT JAMES R. LAURIDSON, M.D.**
_____

COMES NOW the Plaintiff and files her Response in Opposition to Defendants' Motion to Exclude the Expert Testimony of Dr. James Lauridson. Plaintiff submits that this Memorandum and its exhibits[1] demonstrate that Dr. Lauridson is qualified to testify as an expert witness and that the opinions expressed by Dr. Lauridson satisfy the requirements of the Federal Rules of Evidence 702, Daubert and its progeny in that his opinions are both relevant and reliable.

**I.    Statement of Facts.**

The facts relied upon by the Plaintiff are located in Plaintiff's Opposition to Defendants' Motion for Summary Judgment filed simultaneously herewith.

---

[1] All citations to the record contained herein are attached as Exhibits to "Plaintiff's Evidentiary Submissions in Opposition to Defendants' Motions for Summary Judgment and Motion to Exclude," filed simultaneously herewith.

**II.    Gatekeeping Principles under <u>Daubert</u> and Rule 702.**

Under Rule 702 of the Federal Rules of Evidence and <u>Daubert</u>, the trial court plays a "gatekeeping role" to ensure that all scientific testimony or evidence admitted is not only relevant, but also reliable.  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*See also* <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).  Thus, expert testimony under Rule 702 is admissible if three basic requirements are satisfied.  First, the expert must be qualified.  Second, the testimony must be relevant. And finally, the testimony/opinion must be reliable.

Case law after <u>Daubert</u> demonstrates that the rejection of expert testimony is the exception rather than the rule.  As the Fifth Circuit noted, <u>Daubert</u> did not work "a sea change over federal evidence law . . . . the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." <u>United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi</u>, 80 F.3d 1074, 1078 (5th Cir. 1996).  "Rather, as <u>Daubert</u> makes clear, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. Thus, while exercising its role as a gatekeeper, a trial court must take care not to transform a <u>Daubert</u> hearing into a trial on the merits.'" <u>Pipitone v. Biomatrix, Inc.</u>, 288 F.3d 239, 250 (5th Cir. 2002).

The "gatekeeping" role of the trial court, therefore, concerns only whether the expert testimony is admissible, not how persuasive the evidence may be to the fact finder. *See* <u>Cavallo v. Star Enterprise</u>, 100 F.3d 1150, 1157-58 (4th Cir. 1996); <u>Heller v. Shaw Indus., Inc.</u>, 167 F.3d 146, 152 (3rd Cir. 1999)("[E]xpert opinion . . . need not be so persuasive as to meet a party's burden of proof or even necessarily its burden of production."). Scientific and/or technical evidence is reliable if it is based on an assertion that is grounded in methods of science—again, the focus is on principles and methodology, not conclusions. <u>Daubert</u>, 509 U.S. at 595-96. The Supreme Court further has recognized that there is a range in which experts might reasonably differ on issues of science, and that such conflicting evidence should be ***admitted***, not excluded, to aid the jury in deciding those issues. *See* <u>Kuhmo Tire Co. v. Carmichael</u>, 526 U.S. 137, 153, 119 S. Ct. 1167 (1999); *accord,* <u>Globetti v. Sandoz Pharm. Corp.</u>, 111 F. Supp.2d 1174, 1177 (N.D. Ala. 2000)(stating that it is the role of the fact finder, not the judge, to decided whether an expert's opinion is correct or worthy of credence.).

### III.    Dr. Lauridson's Opinions and Methodology are Reliable and Generally Accepted In The Scientific and Medical Communities.

The Defendants argue that Dr. Lauridson's opinions are not reliable (1) because Dr. Lauridson allegedly does not know what caused the occlusion of Mr. Woodley's artery that led to his heart attack and (2) because Dr. Lauridson did not perform an autopsy. As a result, the Defendants assert that Dr. Lauridson's opinions are nothing more than mere speculation. In reality, the Defendants' attacks are not on Dr. Lauridson's methodologies, but on his conclusions. The methodology Dr. Lauridson used in forming his opinions in this case (which is the sole focus of a <u>Daubert</u> challenge)

are well accepted and well established in the field of forensic pathology. (Exhibit 1, Lauridson Aff. at 4-5.) It is a methodology that Dr. Lauridson has been using throughout his 35-year career as a forensic pathology. (Exhibit 1, Id. at 4.) It is the same methodology that is outlined in many of the established forensic pathology textbooks. [2] The methodology he applied is standard practice in the medical and scientific community. (Exhibit 1, Id. at 4-5.) This well-accepted and recognized standard methodology is what Dr. Lauridson applied in analyzing the cause of Mr. Woodley's death. (Exhibit 1, Id.)

In forming his opinions in this case, Dr. Lauridson read and reviewed all of Mr. Woodley's medical records associated with his spinal cord injury and his heart conditions. (Exhibit 1, Id. at 3-4.) Then using his education, experience, and training as a forensic pathologist and applying the established scientific methodology used to analyze a death, Dr. Lauridson determined that the <u>mechanism</u> of Woodley's death was the occlusion of the artery, but the <u>cause</u> of his death was the spinal cord injury. (Exhibit 1, Id. at 11.) Dr. Lauridson explains the difference between mechanism and cause of death:

> Specifically, the forensic pathologist is trained to recognize mechanisms of death and to differentiate the **mechanism of death** from the **cause of death**. The **cause of death**, sometimes called proximate cause, is the event that initiates a sequence of events terminating in the death of an individual. The final event that results in the death of the individual is called the **mechanism of death**. This methodology is standard practice in forensic pathology, and the clear delineation of **cause of death** from **mechanism of death** is critical in medical legal cases.
>
> To assist in understanding the distinction between cause of death and mechanism of death, I offer the following example: If a person suffers

---

[2] In his affidavit, Dr. Lauridson cites to the many established forensic pathology textbooks that demonstrate that his methodology in this case is not only the well-accepted practice, but is also the standard practice in forensic pathology. (Lauridson Aff. at 4-5.)

debilitating, but non-fatal brain injury, and then dies of complicating pneumonia several weeks later in the hospital, the mechanism of death is pneumonia.   That is, the immediate process that caused the person's death was the pneumonia.   However, the process leading to the fatal pneumonia was initiated by the brain injury.   Therefore, the **cause** of death was brain injury and the **mechanism** of death was pneumonia.  If the brain injury was from a gunshot to the head inflicted by someone else, the case is considered a homicide.  It would be a serious medical error to consider the cause of death as pneumonia and ignore the actual cause of death, i.e., the brain injury from gunshot wound.  The legal process would be subverted by not recognizing the role of the brain injury as the cause of death.

I have used this same recognized methodology in analyzing the cause of death of Mr. Robert Woodley.   This scientific methodology results in reliable and scientifically valid results.

(Exhibit 1, Id. at 5-6.)

The Defendants are critical of Dr. Lauridson's methodology because they argue that "Dr. Lauridson cannot be certain as to what caused the blockage of the artery and Woodley's death."  (Motion to Exclude at p. 7.)  This is absolutely wrong.  Dr. Lauridson does know what caused the occlusion.  "It was thrombus or ruptured atherosclerotic plaque with overlying thrombus, [or] possibly, but not likely, coronary spasm with associated thrombus."  (Exhibit 2, Lauridson's depo., p. 105, ln. 20 – p. 106, ln. 3; see also p. 98, ln. 22 – p. 99, ln. 5; p. 101, ln. 6-16.)  In fact, Dr. Lauridson's opinions are consistent with Dr. Papapietro, the cardiologist in this case, who stated that the heart attack was caused by the right coronary artery "closing with a blood clot."  (Exhibit 5, Papapietro depo., p. 90, ln. 2-8.)  What the Defendants fail to realize is that the thrombus or blood clot that caused the occlusion was caused by the spinal fracture resulting from the automobile accident.

There are three possible causes of the occlusion of the coronary artery of Mr. Woodley.  They are a clot (thrombus), clot on a ruptured plaque and coronary artery spasm associated with a plaque.  It is possible that all

5

three of these causes played a role in the occlusion.  <u>It is also more probable than not that all of these, i.e., the thrombus, clot on a ruptured plaque and coronary artery spasm, were caused by the complications of the spine fracture documented above</u>.  To state the medical chain of causation simply:  the accident caused the cervical spine fracture which caused either a thrombus, a clot on a ruptured plaque, a coronary artery spasm, or all of these, which caused the occlusion of Mr. Woodley's artery, which caused his death.  Mr. Woodley would not have died from this heart attack but for the accident that resulted in his cervical spine fracture.

(Exhibit 1, Lauridson Aff. at 9-10.)  In Dr. Lauridson's expert report, his deposition and now in his affidavit, he details how the spinal cord injury received in the accident caused significant complications in Mr. Woodley's health such as hypotension, hypertension, bradycardia, and pulmonary edema.  (Exhibit 1, Id. at 7-9; Exhibit 26, Lauridson Expert Report at 1; Exhibit 2, Lauridson depo. at p. 24, ln. 8 – p. 25, ln. 1; p. 93, ln. 19 – p. 96, ln. 6; p. 103, ln. 10 – p. 104, ln. 16.)  Dr. Lauridson then explains how these complications from the spinal cord injury led to the occlusion of the coronary artery ultimately resulting in the heart attack.  (Id.)  Not only did physical complications accompany the cervical spine fracture, but also "acute emotional stress" too.  (Exhibit 1, Lauridson Aff. at 9.)  "The adverse effects of acute emotional stress on persons with heart disease and specifically with coronary artery disease is well recognized . . . [and] contributed to the deterioration of [Mr. Woodley's] previously stable coronary artery disease."  (Exhibit 1, Id. at 9-10.)  Dr. Lauridson cites published medical literature establishing the causal relationship between spinal cord injuries and resulting heart attacks.  (Exhibit 1,Id.)  In further support of his opinions, Dr. Lauridson cites medical literature that recognizes that elderly persons over 65 years of age who suffer cervical spine injury have a higher mortality rate than younger persons and the common mechanism of death in these cases is a heart attack.  (I Exhibit 1, d. at 10.)  Even Dr.

Papapietro recognized that the stress associated with a spinal cord injury would increase the risk of a heart attack. (Exhibit 5, Papapietro depo. at 92, ln. 22-93, ln. 12.)

Here, the evidence is overwhelming that Dr. Lauridson's methodology is the standard and accepted methodology used in determining cause of death in the medical profession. Dr. Lauridson based his opinions on the medical records of Mr. Woodley and his own background, experience, and training in the medical profession. His opinions are supported by the published literature in the medical profession. Simply put, Dr. Lauridson's methodologies and opinions are reliable, relevant, and meet and exceed the requirements of <u>Daubert</u> and its progeny.

The Defendants also argue that Dr. Lauridson's methodology is "flawed" because Dr. Lauridson did not perform an autopsy in the case. This argument is completely lacking in merit. An autopsy is not an absolute necessity in determining the cause of death. In this case, the medical evidence is in agreement that an autopsy was not needed. Defendants have offered no evidence to demonstrate otherwise. Dr. Lauridson stated in his deposition that an autopsy was only a "bit of information that may or may not actually even contribute to establishing cause and manner of death." (Exhibit 2, Lauridson depo. at p. 32, ln. 13-16.) "When documentation is definitive with a test showing a clear mechanism of death, then the forensic pathologist can determine cause of death with reasonable medical certainty without the need of an autopsy." (Lauridson Aff. at 6.) Dr. Papapietro even agreed that an autopsy was not necessary in this case. "[T]he heart attack was caused by the right coronary artery closing with a blood clot. You don't need an autopsy for this." (Exhibit 5, Papapietro at p. 90, ln. 5-8.) Clearly, Defendants' assertion that Dr. Lauridson's methodology is somehow flawed by

the lack of an autopsy is not supported by any medical literature or even the medical testimony in this case.

The Defendants next argue that Dr. Lauridson's proposed testimony does not assist the trier of fact because "Lauridson merely provides testimony that follows the Plaintiffs' argument, not the science."  Defendants contend that:

> Lauridson states that the motor vehicle accident and cervical spine fracture led to the cardiac event which caused the [sic] Woodley's death. However, it is just as likely that as Lauridson testified the 100% calcification of the artery, a plaque rupture with associated development of a thrombus, or a coronary spasm, that [sic] caused the event; Lauridson does not know.

(Brief in Support of Motion to Exclude at 13) (citations omitted).  This quote demonstrates the Defendants' clear misunderstanding of the medical causation in this case.  The "calcification of the artery, a plaque rupture with associated development with a thrombus, or a coronary spasm" are not separate and distinct causes of the heart attack.  Instead, as explained by Dr. Lauridson, they are all part of the same chain of causation.  The "plaque rupture," "thrombus" or "coronary spasm" that caused the occlusion was caused by the spinal cord injury.

> To state the medical chain of causation simply:  the accident caused the cervical spine fracture which caused either a thrombus, a clot on a ruptured plague, a coronary artery spasm, or all of these, which caused the occlusion of Mr. Woodley's artery, which caused his death.  Mr. Woodley would not have died from this heart attack but for the accident that resulted in his cervical spine fracture.

(Exhibit 1, Lauridson Aff. at 10.)  Simply put, the mechanism of death in this case was the occlusion of Mr. Woodley's coronary artery.  The cause of death was the cervical spine fracture Mr. Woodley suffered in the automobile accident.  Mr. Woodley would not have died from this heart attack but for the accident that resulted in cervical spine

8

fracture. The need for Dr. Lauridson's testimony in this case is abundantly evident from the very confusion the Defendants have mistakenly or intentionally created in making their lack of causation argument to this Court. The medical literature and medical testimony support Dr. Lauridson's opinions. Defendants have offered nothing to the contrary.

**IV.    Dr. James Lauridson is Well-Qualified to Offer Opinions as to the Cause of Death.**

The Defendants challenge Dr. Lauridson's qualifications to offer opinions regarding the cause of Mr. Woodley's death. The gist of their argument is that because Dr. Lauridson is not a board-certified cardiologist, he is not qualified to offer opinions on the cause of Mr. Woodley's heart attack. Yet, the Defendants offer very little reasoning and no case law to support their contentions that a well-qualified board-certified forensic pathologist, trained and specialized in determining causes of death and mechanisms of death, cannot offer opinions as the cause of death in this case.

Further, the Defendants offer no support as to why only a cardiologist can offer an opinion in this case. Ironically, the only testimony from a cardiologist in this case is that of Dr. Papapietro. When Dr. Papapietro was asked questions regarding the effects a spinal cord injury has on an individual's heart or blood pressure, he would not answer the questions indicating that "that's more in the domain of the neurosurgeon." (Exhibit 5, Papapietro at p. 12, ln. 17 – p. 13, ln. 5.) Dr. Papapietro indicated that any questions related to spinal cord injuries effect on an individual's heart were questions better suited for another medical profession, not a cardiologist. (Exhibit 5, Papapietro at p. 13, ln. 8-19.) Thus, even before discussing the qualifications of Dr. Lauridson and the clear applicability of forensic pathology in determining cause of death, the Defendants'

argument that only a cardiologist is qualified to offer opinions in this case is defeated by Dr. Papapietro's own admissions that he, as a cardiologist, is not qualified to testify about the medical chain of causation in this case, i.e., the effects of a spinal cord injury on the heart.

Indeed, the very limitations of a cardiologist that Dr. Papapietro discussed is the very reason why a board-certified forensic pathologist is the most qualified expert to testify about the cause of death. There is a distinction in the medical profession between the mechanism of death and the cause of death. "The analysis of death and the differentiation of cause of death and mechanism of death is part of the established scientific methodology of the forensic pathologist. The strict differentiation of cause of death and mechanism of death falls directly and exclusively within the practice and expertise of the forensic pathologist." (Exhibit 1, Lauridson Aff. at 4.) The cardiologist expertise and the forensic pathologist expertise are simply different areas. A cardiologist expertise involves the treatment of living patients through evaluating and managing a heart attack or a coronary artery disease. (Exhibit 2, Lauridson depo. at p. 85, ln. 21 – p. 86, ln. 2.) As Dr. Lauridson explained:

> I would certainly defer to the cardiologist in establishing what medications Mr. Woodley should and how he should be evaluated. But in establishing a sequence of events that eventually led to Mr. Woodley's death, and that is the realm of the forensic pathologist who, on a daily basis, looks at complex factors often involving accidents or other misfortunes and resulting in death.

(Exhibit 2, Lauridson depo. at 84, ln. 20 – p. 85, ln. 6.) The field of forensic pathology deals with all types of death from a multitude of causes. A large portion of these is related to the heart and coronary artery disease. (Exhibit 1, Lauridson Aff. at 6.) "The training of the forensic pathologist and the daily practice of forensic pathology involves

the evaluation of the cardiovascular system.  This is a diagnostic methodology that is separate from the practice of cardiology, which involves treating living patients.  The practice of forensic pathology involves analyzing deaths." (Exhibit 1, Lauridson Aff. at 6.)

> Specifically, the forensic pathologist is trained to recognize mechanisms of death and to differentiate the mechanism of death from the cause of death.  The cause of death, sometimes called proximate cause, is the event that initiates the sequence of events terminating in the death of an individual.  The final event that results in the death of the individual is called the mechanism of death.  This methodology is standard practice in forensic pathology, and the clear delineation of cause of death from mechanism of death is critical in medical legal cases.

(Exhibit 1, Id. at 5.)

Given these facts, it is overwhelmingly evident that Dr. Lauridson is well-qualified to offer opinions as to the mechanism and cause of death of Mr. Woodley.   Dr. Lauridson is a board-certified forensic pathologist with over 35 years of experience in his field.  Dr. Lauridson summarizes his qualifications as follows:

> I am a board certified forensic pathologist and medical physician licensed to practice medicine in the State of Alabama.  I graduated from the University of Colorado School of Medicine *summa cum laude* in 1971.  Between 1971 and 1973, I received residency training in anatomic pathology at Stanford University.  Thereafter, between 1974 and 1977, I completed residency training in internal medicine in the United States Navy.  I continued my training in anatomic and clinical pathology at Presbyterian Hospital in Denver, Colorado between 1983 and 1985.  I completed my training in forensic pathology at the Dade County Medical Examiner's Office in Miami, Florida in 1985 to 1986.  In addition to forensic pathology, I am also board certified in internal medicine and anatomic pathology.  My practice experience has included internal medicine in the Navy (cardiology clinic and intensive care unit) and the practice of internal medicine in Oklahoma.   I worked as a physician at the Veterans Administration Hospital in Oklahoma City, Oklahoma and was a clinical instructor in medicine at the University of Oklahoma School of Medicine.
>
> In 1985, I became the Associate Medical Examiner at the Dade County Medical Examiner's Office.  In 1986, I became the Deputy Chief Medical

Examiner for the Alabama Department of Forensic Sciences. I retired from the State of Alabama in 2001 but later continued to work as a Consultant for the Department. In 2005, I was appointed as the Chief Medical Examiner for the Alabama Department of Forensic Sciences. In those positions, I supervised the work of other medical examiners, technicians, investigators and support personnel. As the Chief Medical Examiner, I supervised approximately 25 employees. I have conducted over 4,000 autopsies during my career as a Forensic Pathologist. While at the Alabama Department of Forensic Sciences, I received awards for meritorious and distinguished service on 7 different occasions.

I am a member and Fellow of the American Academy of Forensic Sciences and a member of the National Association of Medical Examiners. I have served on the Scientific Working Group on Imaging Technology for the Federal Bureau of Investigation. I have served on the Commission on Continuing Education-Forensic Pathology and the Check Sample Editorial Review Board for the American Association of Clinical Pathologists. I am an invited peer reviewer for "The Quarterly Update, reviews of current child abuse medical research." I have nearly 20 published articles, and numerous lectures and talks on a wide range of topics in forensic pathology.

(Exhibit 1, Lauridson Aff. at 1-3; see also, Exhibit 27, Dr. Lauridson's C.V.) During his career, Dr. Lauridson has determined the mechanism and cause of death in approximately 4,000 cases. (Exhibit 1, Id. at 4.) In addition, he has overseen several other thousand cases where mechanism and cause of death were determined. (Exhibit 1, Id.) To this day, he is routinely called upon by hospitals to conduct medical records reviews and/or autopsies to establish cause of death. (Exhibit 1, Id. at 3.) Dr. Lauridson has testified in over 250 criminal and civil cases and has never been excluded by any court of law. (Exhibit 1, Id. at 4.) In sum, Dr. Lauridson is a well-qualified forensic pathologic who clearly has the expertise to testify as to the mechanism and cause of death of Mr. Woodley.[3]

---

[3] In their motion and at Dr. Lauridson's deposition, the Defendants spent the majority of their time attacking Dr. Lauridson for the three to four years he worked for Beasley, Allen overseeing the Graphics Department. They ignored his 35 years as a forensic pathologist, a field he continues to practice in today.

## V.    Conclusion and Prayer.

Under Rule 702 of the Federal Rules of Evidence and <u>Daubert</u> and its progeny, Plaintiffs have met their burden of showing that Dr. James Lauridson is qualified and capable of rendering opinions concerning the cause of death of Rufus Robert Woodley. Plaintiffs have shown that under <u>Daubert</u> and Rule 702, Dr. Lauridson's testimony is relevant, reliable and admissible.  His opinions will aid the jury in understanding the evidence and in determining important issues in this case.  Thus, the Court should deny the Defendants' Motion to Exclude Dr. Lauridson.  However, should this Court be inclined to grant the Defendants' motion, or any portion thereof, the Plaintiffs respectfully request a hearing pursuant to Rule 104 of the Federal Rules of Evidence.


<u>/s/ Michael J. Crow</u>
MICHAEL J. CROW (CRO039)
Attorney for Plaintiffs


OF COUNSEL:

BEASLEY, ALLEN, CROW,
  METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
Montgomery, AL 36103-4160
(334) 269-2343

---

Dr. Lauridson's work with Beasley, Allen is completely irrelevant to the issue of whether Dr. Lauridson is qualified to testify about the cause of Mr. Woodley's death.

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the original of the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to those attorneys registered and I have placed a copy of the foregoing to the attorneys not set up for email notification in the United States Mail, first class, postage prepaid on this the _____ day of _____, 2008.


/s/ Michael J. Crow_____
OF COUNSEL


Matthew W. Robinett
William C. Wood
Norman, Wood, Kendrick and Turner
Financial Center, Suite 1600
505 Twentieth Street North
Birmingham, Alabama 35203


Stanley A. Cash
Huie, Fernambucq & Stewart, LLP
2801 Highway 280 South, Suite 200
Birmingham, Alabama 35223-2484