IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

| | |
|---|---|
| LILLIAN WOODLEY as the administratrix of the Estate of RUFUS WOODLEY, | * * * * |
| Plaintiffs, | * |
| v. | * CIV. ACT. NO.: 2:07cv74-ID * |
| PFG-LESTER BROADLINE, INC.; KENNETH O. LESTER COMPANY, INC., | * * * * |
| Defendants. | * * |

### PLAINTIFF'S MEMORANDUM BRIEF IN OPPOSITION TO DEFENDANT PFG-LESTER BROADLINE, INC.'S MOTION FOR SUMMARY JUDGMENT

#### INTRODUCTION

This case is a noncontact wreck between Plaintiff's automobile and the Defendant's 18-wheeler truck, which occurred on August 18, 2006. As a result of the wreck, Rufus Woodley died.

#### FACTS

In 1987 Pocahontas Foods merged with Caro Foods and Kenneth O. Lester Company and took its current name Performance Food Group. (PFG) (Exhibit 11)

On August 18, 2006, Julius Abonyo was operating an 18-wheeler tractor trailer. The trailer had a Performance Food Group logo and insignia on this side. (Exhibit 12) For facts about how the accident occurred, see p.2 of Plaintiff's Opposition to Defendant's Motion for Summary Judgment. (The accident).

In January 2006, Julius Abonyo, the driver for Defendant PFG was driving Route 289 and drove Route 289 from at least January 2006 up until the date of the incident on August 18, 2006.  (Exhibit 13, Dispatch Information, January 2006 through July 2006, January Bates No.'s 515-530, February Bates No.'s 455-499, March Bates No.'s 498-487, April Bates No.'s 462-480, May Bates No.'s 471-453, June Bates No.'s 452-437, July Bates No.'s 436-426)

Route 289 required Mr. Abonyo on every Friday to drive from the PFG's distribution center in Lebanon, Tennessee to East Ridge, Tennessee (to make a delivery to Cracker Barrel).  Mr. Abonyo would then leave East Ridge, Tennessee and drive to Gadsden, Alabama (make a delivery to Logan's Roadhouse Restaurant) and from there drive to Fort Payne, Alabama, (make a delivery to Ruby Tuesday's).  After making the delivery in Fort Payne, he would return to Lebanon, Tennessee or go to Chattanooga, Tennessee and pick up a back haul.  (Abonyo depo pg. 225, lines 17-23; pg. 226, lines 1,2; depo pg. 236, lines 9-14; p. 102, lines 11-15)

Mr. Abonyo testified that he had been falsifying his log books ever since he had been driving Route 289.  Mr. Abonyo testified that he was required to submit his logs to management every Tuesday of each week.  However, he was delinquent almost every week and did not submit his logs until Wednesday of each week.  Mr. Abonyo testified that he would copy the previous weeks logs instead of keeping a daily log of his time and activities as required by Federal Motor Carrier Safety Regulations §395.8.  (Abonyo depo pg. 64, lines 8-23; depo pg. 256; lines 19-23; depo pg. 257, lines 1-9; depo pg. 261, lines 1-18)

2

F.M.C.S.R. §395.8(a)(1) regulation requires the drivers to record their duty status each time they change a duty status 395.8(f)(1), make entries that are current while on duty 395.8(f)(7); drivers are required to certify the entries are correct, and the motor carrier is to retain these documents for at least six months 395.8(k).  Based upon the records and evidence, a reasonable jury could infer that Defendant PFG consciously failed to audit Mr. Abonyo's logs and documents to determine the seriousness of his problem or PFG did audit Mr. Abonyo's logs and documents and consciously failed to question his practices and terminate him for violating company policies.  (Exhibit 14, Driver's Manual, pg. 3, no. 4, Bates No. 210, Exhibit 29)

Mr. Abonyo's logs for August 18, 2006, show he arrived in Gadsden, Alabama (Logan's Roadhouse) at 7:00 a.m.  He then assisted unloading cargo between 7:00 a.m. and 8:00 a.m.  Mr. Abonyo's logs then show that he drove his truck from 8:00 a.m. to 9:00 a.m.  His logs then show that he spent the next eight hours in the sleeper of his cab.  When in reality, from 9:30 a.m. until 1:00 p.m. he was in Collinsville, Alabama on the shoulder of I-59 northbound or in Gadsden unloading at Ruby Tuesday's restaurant and having his right tire repaired.  (See Exhibit 6, Abonyo's deposition testimony and Exhibit 15 & 18)

## Negligence and Wantonness

PFG-Lester Broadline, Inc. takes the position that it does not employ, train or control Julius Abonyo, the driver of the truck, which forced Mr. Woodley off I-59 on August 18, 2006.

This argument is contrary to Mr. Abonyo's testimony and the documents produced to the Plaintiff in discovery. The following evidence shows that PFG retained control over the driver of the truck, Julius Abonyo and it is as follows:

1. The trailer that was attached to the truck on the date of the incident had a PFG logo. (See Exhibit 12)

2. Julius Abonyo testified that he worked for PFG. (Exhibit 6, J. Abonyo deposition pg. 163, line14-16)

3. Julius Abonyo testified that he wore a shirt with a PFG logo on it while driving. (Exhibit 6, J. Abonyo deposition pg. 163, lines 6-11, and Exhibit 14, Bates No. 211)

4. Julius Abonyo received a Driver's Manual when he started driving a truck for the defendant, which has "PFG/Performance Food Group" on the coversheet. (Exhibit 14) (Exhibit 6, Abonyo's depo pg. 165, lines 4-12)

5. On the second page of the Driver's Manual, Bates No. 206, states "I agree to return this Driver's Manual when I leave my employment of PFG". (Exhibit 14)

6. Julius Abonyo testified that he is part of the transportation team, Driver's Manual, Bates No. 209, and his Manager is Jim Hunter and his Training Safety Manager is Phil Woodard. (Exhibit 14) (Exhibit 6, J. Abonyo deposition pg. 161, lines 3-10, pg. 62, lines13-23, pg. 63, lines 1-5)

7. Driver's Manual, pg. 3, Bates No. 210, states PFG reserves the right to set employees rules and regulations. (Exhibit 14)

8. Driver's Manual, Bates No. 211, "All PFG drivers must wear PFG uniforms or PFG identification badges." (Exhibit 14)  (Exhibit 6, Abonyo's depo pg. 174, lines 7-15)

9. Driver's Manual, pg. 5, Bates No. 212, Driver Qualifications number 7, "successfully complete PFG's driver's training". (Exhibit 14)

10. Driver's Manual pg. 12, Delivery Procedures. (Bates 218) (Exhibit 14)

11. Driver's Manual pg. 15, PFG pays driver's a non-taxable per diem to help with food expenses since your job requires travel. (Exhibit 14)

12. Driver's Manual pg. 17, Driver's Manual, Bates 223, "with good health and well-being, our associates are very important to PFG. The following information is intended to help you, the PFG driver, to perform your duties in the safety possible way." (Exhibit 14)

13. Driver's Manual pg. 24, Driver's Manual, Bates 230, Section F providing information 1c) give the following to anyone requesting it: "the PFG training and Safety Manager's name and phone number". (Exhibit 14)

The 48 page PFG Driver's Manual sets forth policies and procedures for its drivers to follow.

Mr. Abonyo's personnel file, which was produced by the Defendant's contained the following:

14. Evaluations (2001-2006) of the truck driver, Bates No.117-147, PFG form signed off by James Hunter, Transportation Manager for PFG. (Exhibit 16)

15.    An authorization/release of information from prior employees to PFG, Bates No. 182. (Exhibit 17)

16.    Job application agreement and certification, Bates No. 189. (Exhibit 18)

17.    PFG Employment Application, Bates 192. (Exhibit 19)

18.    PFG-change of address, Bates No. 193. (Exhibit 20)

19.    PFG certifies that Julius Abonyo completed the defensive driving course, Bates No. 196. (Exhibit 21)

20.    January 2000, Julius Abonyo attended a Crossroad Driving School, which was paid for by PFG, Bates 156 and 180. (Exhibit 25)

The following documents were in Mr. Abonyo's driver's qualification file, which was produced during discovery:

21.    Driver's receipt of the Federal Motor Carrier Safety Regulations on a PFG form, Bates 35.  (Exhibit 22)

22.    A request for checking the driving record on a PFG form, Bates 45. (Exhibit 23)

23.    A certification of a road test on a PFG form, Bates 49.  (Exhibit 24)

Based upon the deposition testimony of Mr. Abonyo and the documents provided by the Defendant's, a reasonable jury could find Mr. Abonyo was employed by PFG.

In <u>Jenkins v. Gadsden Times Pub'g Corp.</u>, 521 So. 2d 957 (Ala. 1988), the issue presented was whether Connie Chambers was an employee or independent contractor.  Justice Maddox, Alabama Supreme Court, set forth 15

6

facts that showed GTPC retained sufficient control over Mrs. Chambers to present a jury issue on respondent superior. Just as in the case the Plaintiff has submitted overwhelming evidence that a jury could find Mr. Abonyo worked for PFG.

## **Wantonness**

A claim of wantonness implies greater cupibility on the part of the Defendant than a claim of simple negligence. The Alabama Supreme Court defined wantonness as:

> The conscious doing of an act or omission or some duty under knowledge of existing conditions and conscious that from doing of such act or omission or such duty, an injury will likely or probably result. Before a party can be said to be guilty of wanton conduct, it must be shown that with reckless indifference to the consequences, he either consciously or intentionally did some wrongful act or consciously omitted some known duty, which produced the injury.

Shuler v. Nelson Weaver Cos., 120 So.2d. 908, 909 (Ala. 1960).

One may be guilty of wanton misconduct without actual intent to injure anyone. Burns v. Moore, 494 So.2d. 4, 5 (Ala. 1986) (citing Birmingham Rail, Light & Power Co. v. Murphy, 56 So. 817 (Ala. 1911).

> The concept is, of course, universal that to constitute wantonness, it is not essential that the Defendant should have entertained a specific design or intent to injure the Plaintiff. A willful or intentional act may not necessarily be involved in wantonness. It may consist of an inadvertent failure to act by a person with knowledge that somebody is probably imperiled and the act or failure to act is reckless disregard of the consequences.

McNickle v. Strippling, 67 So.2d. 832, 835 (Ala. 1953).

The use of the word "intentionally" as part of the definition of wantonness speaks to the nature of the act from which a wanton misconduct arises. It is not required that the act be done with an intent to injure. Lynn Strickland Sales and Service, Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 742 (1987); See Roe v. Lewis, 416 So.2d. 750 (Ala. 1982); See also Joseph v. Staggs, 519 So.2d. 952 (Ala. 1988). "In wantonness, the party doing the act or failing to act is conscious of his conduct, and without having the intent to injure, his conscious, from his knowledge of existing circumstances and conditions, that his conduct will likely or probably result in injury." Rosen v. Lawson, 202 So.2d. 716, 720 (Ala. 1967). In sum, a willful intent to injure is "not involved in wantonness." General Motors Corp. v. Bell, 714 So.2d. 268, 285 (1996).

In all cases, what constitutes wanton conduct depends on the facts presented. Central Ala. Elec. Coop. v. Tapley, 546 So.2d. 371 (Ala. 1989). Brown v. Turner, 497 So.2d. 1119 (Ala.1986). Wantonness is a question of fact for the jury. Cash v. Caldwell, 603 So.2d. 1001, 1003 (Ala. 1992). Wantonness should be submitted to the jury unless there is a total lack of evidence in which a jury could reasonably infer wantonness.

Wantonness differs from negligence according to the mental state of the actor. Wantonness, unlike negligence, requires both knowledge and consciousness that an act or omission will likely result in injury to another. Thompson v. White, 274 Ala. 413, 149 So. 2d. 797, 804 (1963). Wantonness differs from intentional injury and that intentional injury requires both knowledge

8

of the danger and a design or purpose to inflict injury.  <u>Central of Georgia Railway v. Corbitt</u>, 218 Ala. 410, 118 So. 2d 755, 756 (1928).  To constitute wantonness, the design or purpose may be absent, and the injury inadvertent.  If the act is done in reckless disregard of its probably consequences.  <u>English v. Jacobs</u>, 82 So. 2d. 542, 545 (1955).

The Plaintiff has presented more than substantial evidence that Defendant PFG failed within eight months to audit Mr. Abonyo's logs and documents.  If management had, it would have discovered Mr. Abonyo was falsifying his driver's logs since he was drivign Route 289.  Based upon PFG's own company policy, Mr. Abonyo should have been terminated.  (Exhibit 14, pg. 3, Driver's Manual No. 4, Bates No. 210)  (Exhibit 6, Abonyo depo pgs. 260-265)

## **Negligent Entrustment**

Mr. Abonyo's driving record reflects that he had the following list of violations and testified to the same:

1)   February 1, 1998, speeding 55mph in a 30mph zone in Wilson County, Tennessee.

2)   December 1999, speeding, Lebanon, Tennessee.

3)   December 21, 2000, speeding in a commercial vehicle 70mph in a 55mph in Hamilton, Tennessee.

4)   November 27, 2001, improper passing in Wilson County, Tennessee.

5)   October 31, 2004, speeding 72mph in a 55mph in Trousdale, Tennessee.

9

  6)  October 2005, speeding, Hartsfield, Tennessee.

  7)  April 16, 2006, speeding 68mph in a 55mph, Glasgow, Kentucky.

Based upon the Driver's Manual, (Exhibit 14, pg. 43, Bates No. 245 and Exhibit 6, Abonyos depo pgs. 199-216), Mr. Abonyo should have been disqualified as a driver because of two violations of 15mph over the posted speed and an improper lane change.

For Defendant PFG to be liable for negligent entrustment, the following elements must be proved:

  1.  Proof that Julius Abonyo was incompetent and/or reckless. The evidence would show that Mr. Abonyo ran Mr. and Mrs. Woodley off the road and his prior driving history is evidence of his incompetence and/or recklessness.

  2.  proof that he or PFG had or should have known that Mr. Abonyo was an incompetent or reckless.

PFG had actual knowledge of Mr. Abonyo's moving violations, which were in his driver's qualification file, which was produced to the Plaintiff. Further, §391.25(a) Federal Motor Carrier Safety Regulations (Exhibit 30) requires the motor carrier, once every twelve months to make an inquiry into the driving record of each driver and employees, for the preceding twelve months, to the appropriate agency of every state in which the driver held a CDL during that time. If PFG had checked with the State of Tennessee and requested the driving records for Mr. Abonyo, they would have known of his driving history and he should not have been driving pursuant to their Driver's Manual. (Exhibit 14) (page 43, Bates No. 245). Because of the serious traffic violations in which Mr.

Abonyo had two or more speeding tickets over 15mph the posted speed limit and an improper lane change.

    3.    Proof that PFG entrusted the truck to Mr. Abonyo. Mr. Abonyo testified in his deposition that he was employed by PFG (Abonyo depo pg. 163, line 14-16)

    4.    PFG's entrustment created an appreciable risk of harm to the Plaintiff and a relational duty to PFG.

Pursuant to its own Driver's Manual, page 245, Abonyo should have not been driving the truck on August 18, 2006, 1) because of his falsifications of his log book; and 2) because of his past driving records. (See Exhibit 14, Bates No. 210, 245)

    5.    Proof that the harm's Mr. Woodley was caused by the negligence of PFG.

Ex parte McCollough, 747 So. 2d 887 (Ala. 1999).

## Negligent Supervision and Retention

There is substantial evidence that PFG didn't supervised, but retained Mr. Abonyo, the driver of the truck. PFG is required to make annual checks pursuant to FMSRC §391.25(a) of his driving record on an annual basis. Further, PFG should have had audited Mr. Abonyo's driver's logs and accompany documents between January 2006 and August 2006 and should have discovered the log discrepancies or at the very least, PFG would be negligent for not auditing Mr. Abonyo's logs and documents during that time period to discover the discrepancies. (Abonyo depo pgs. 260-265)

**CONCLUSION**

Plaintiff Woodley has submitted substantial evidence in opposition to Defendant PFG's claims and Defendant is not entitled to summary judgment on any claims against Plaintiff.

                                         /s/ Michael J. Crow
                                         MICHAEL J. CROW (CRO039)
                                         Attorney for Plaintiffs

OF COUNSEL:

BEASLEY, ALLEN, CROW,
 METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
Montgomery, AL 36103-4160
(334) 269-2343

**CERTIFICATE OF SERVICE**

I hereby certify that I have electronically filed the original of the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to those attorneys registered and I have placed a copy of the foregoing to the attorneys not set up for email notification in the United States Mail, first class, postage prepaid on this the __ day of May, 2008.

                                         /s/ Michael J. Crow
                                         OF COUNSEL

Matthew W. Robinett
William C. Wood
Norman, Wood, Kendrick and Turner
Financial Center, Suite 1600
505 Twentieth Street North
Birmingham, Alabama 35203

Stanley A. Cash
Huie, Fernambucq & Stewart, LLP
2801 Highway 280 South, Suite 200
Birmingham, Alabama 35223-2484